**Ross C. Goodman, Esq., Nevada State Bar No. 7722**
**GOODMAN LAW GROUP**
520 South Fourth Street
Las Vegas, Nevada 89101
(702) 383-5088
(702) 385-5088 (Facsimile)

**David M. Buckner, Esq., Florida State Bar No. 60550**
**Brett von Borke, Esq., Florida State Bar No. 44802**
**KOZYAK TROPIN & THROCKMORTON, PA**
2525 Ponce de Leon, 9th Floor
Miami, Florida 33134
(305) 372-1800
(305) 372-3508 (Facsimile)

**ATTORNEYS FOR PLAINTIFF**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| GERALD HESTER, on behalf of himself )<br>and all others similarly situated, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>VISION AIRLINES, INC., )<br>)<br>Defendant. )<br>_____ ) | Case No. _____<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY DEMAND** |

In the years after the devastating attacks of September 11, the United States government sought contractors to provide logistical support to enhance its overtaxed supply lines to Iraq and Afghanistan. The government knew the work was extremely dangerous. One such mission involved establishing an air bridge, flying large, slow commercial aircraft into war zones in Baghdad and Kabul to deliver supplies for United States diplomatic posts and other related

294790

activities. Accordingly, to compensate the civilian pilots and air crews completing these critical missions for the additional dangers they faced, the United States government contracts establishing these operations mandated that contractors pass through to their personnel payments in addition to their normal pay. These payments are known as hazard pay, and they are ubiquitous in the war zones in which the United States is engaged.

Vision Airlines, Inc. ("Vision"), is a government subcontractor, operating the air bridge to Kabul and Baghdad from May 1, 2005 to the present time. Its pilots and flight crews have risked their lives on a daily basis, and were supposed to receive the hazard pay funded and mandated by the United States government. However, despite its legal and moral obligations, Vision chose to keep this money for itself. Accordingly, Plaintiff Gerald Hester ("Plaintiff"), on behalf of himself and all others similarly situated, sues Vision, and alleges as follows on personal knowledge as to all matters relating to himself, and on information and belief based upon the investigation of his counsel as to all other matters:

## PARTIES

1.      Plaintiff Gerald Hester resides in Colleyville, Texas and is a retired Captain in the United States Navy where he served on active and reserve duty for a total of 24 years. After receiving an honorable discharge, Mr. Hester was employed as a captain at AirCal, a commercial airline that was purchased by American Airlines in October 1987. Mr. Hester worked for more than twenty-two years at American Airlines and AirCal. He retired in September 2000 upon reaching the mandatory retirement age Congress imposes on commercial airline pilots. After retiring, Mr. Hester worked as an independent contract pilot and flew to various destinations in Europe, the United States and Asia. On September 24, 2006, Vision hired Mr. Hester as a pilot to fly its Boeing 737s, and later its Boeing 767s, to and from the airports in Baghdad, Iraq and

294790                                                                                          2

Kabul, Afghanistan.

2.     Vision is a specialty charter airline located in North Las Vegas, Nevada. Vision is incorporated and has its principal place of business in Nevada. All personnel decisions, including those decisions related to hiring, termination, and employee compensation, are made at Vision's headquarters in North Las Vegas. Vision operates commercial and charter flights to various destinations throughout the southwest region of the United States. In addition, Vision operates as a subcontractor for the United States government and provides air charter services, transporting personnel and cargo, to Baghdad, Iraq and Kabul, Afghanistan.

## JURISDICTION

3.     This Court has subject matter jurisdiction because the amount in controversy exceeds $75,000 and diversity exists between the Plaintiff and the Defendant. 28 U.S.C.A. § 1332(a)(1).

4.     This Court also has subject matter jurisdiction because the amount in controversy exceeds $5 million and diversity exists between the Plaintiff and the Defendant. 28 U.S.C.A. § 1332(d)(2).

5.     This Court has personal jurisdiction over the Defendant, and venue is proper in the District of Nevada, because: a) Vision is incorporated in the District of Nevada; b) Vision's principal place of business is in the District of Nevada; and c) Vision's wrongful conduct occurred in the District of Nevada. *See* 28 U.S.C.A. § 1391(a).     Moreover, the acts and omissions alleged herein occurred, in whole or in part, within Nevada.

## FACTS

6.     Vision asked its employees to risk their lives and fly into two of the world's most dangerous locations in order to support the efforts of the United States government. Vision's

294790                                                           3

employees answered the call, and in return, the United States government provided Vision hazard pay for those employees who risked their lives as crew members on those flights. Despite receiving more than $21 million in hazard pay intended for its employees, Vision has failed to pay its employees the hazard pay to which they are entitled. Instead, Vision has wrongfully retained that hazard pay for its own benefit.

## The Role Of Private Contractors In Support Of The United States Government's Efforts In Iraq And Afghanistan

7. After September 11, the United States government implemented a global strategy designed to eradicate terrorist organizations that threatened the security of the United States and its allies. The United States government contracted with numerous private contractors to work in combat zones, such as Iraq and Afghanistan, to implement its global strategy. Private contractors were hired to provide support for the United States embassies, armed-forces and other government agencies operating in those countries.

8. While more than 4,186 U.S. soldiers have died in the wars in Iraq and Afghanistan and more than 35,856 have been wounded, significant numbers of U.S. government contractors have also died or been severely injured. In February 2008, Reuters reported that more than 1,000 government contractors have died in Iraq and Afghanistan since the wars began and more than 13,000 have been severely wounded or injured.

9. To support its efforts in Iraq and Afghanistan, the United States government established an air bridge that relies primarily on charter airlines to transport supplies and personnel to these countries. Accordingly, the United States government contracts directly with various contractors to provide air transport services to Iraq and Afghanistan. In limited instances, the government contractor provides the air transport services, but more often these

294790                                    4

services are subcontracted to various charter airlines.

10. Flying aircraft to and from the airports in Baghdad and Kabul is extremely dangerous. Aircraft typically arrive or depart these airports under the cover of darkness to avoid light arms fire, rocket propelled grenades and missile attacks. In fact, all flights arriving and departing from the airports in Baghdad and Kabul must be authorized by either the United States or British military operational command centers located in those cities.

11. To reduce the likelihood of rocket and missile attacks, aircraft arriving and departing Baghdad International Airport must observe blackout procedures which require all exterior and interior aircraft lighting (except for cockpit instruments) to be turned off. In addition, aircraft arriving and departing Baghdad must utilize a dangerous corkscrew procedure, which requires the airplane to fly in a spiral directly above the airport in order to stay within the areas most heavily fortified by the United States military. This procedure requires a high degree of skill and judgment and significantly increases the risk of death and serious injury for the crews on these flights.

12. Despite flying under the cover of darkness and extensive security precautions, numerous aircraft have been targeted and shot down flying to and from the airports in Baghdad and Kabul. For example, on November 22, 2003, an A-300 cargo plane made an emergency landing after take-off from Baghdad International Airport, because its engine exploded after it was struck by a surface to air missile. Similarly, on February 1, 2005, a C-130 cargo plane crashed after take-off from Baghdad International Airport when it sustained light arms fire, killing one of the crew members onboard.

## Hazard Pay

13. Congress, pursuant to 5 C.F.R. 550.901 *et seq.*, requires the United States

294790

5

government to pay government employees hazard pay, in addition to their regular salary, when they work under hazardous conditions or in combat zones. Hazard pay is to compensate the employee for the additional risk the employee incurs in performing his or her job under hazardous conditions.

14. Similarly, the United States government provides members of the United States Armed Services with imminent danger pay. Pursuant to 37 U.S.C § 310, members of the Armed Services receive imminent danger pay when they operate "in a foreign area in which [the service member] was subject to the threat of physical harm or imminent danger on the basis of civil insurrection, civil war, terrorism, or wartime conditions."

15. In support of a bill to raise hazard pay for military personnel in Iraq and Afghanistan, Congressman McNerney stated, "[t]he multiple consecutive deployments that our troops face in Iraq and Afghanistan often include traumatic experiences such as sectarian violence and serious personal injuries that call for difficult rehabilitation. Raising pay for soldiers who encounter such injuries, [including] hazardous duty pay . . . is simply the right thing to do."

16. The United States government recognizes that employees of government contractors in Iraq and Afghanistan confront some of the same dangerous conditions encountered by government employees and members of the Armed Services. Accordingly, the United States government has extended the practice of paying hazard and imminent danger pay to the employees of government contractors that work in Iraq and Afghanistan. Specifically, the United States government pays the contractor hazard pay, which the United States government requires the contractor to pay to its employees based on a predetermined formula.

17. Moreover, the danger of working in Iraq and Afghanistan has made it difficult for

6

government contractors to recruit employees to work in those countries. Due to the United States government's reliance on contractors, the shortage of individuals willing to work in those countries threatens the government's ability to successfully implement its global defense strategy. To help contractors recruit individuals willing to work in the war zones, the United States government has increased the amount of hazard pay for contractor employees.

18. Because the United States government contracts with numerous contractors for the support it requires in Iraq and Afghanistan, it has developed a standardized model for the way it compensates contractors. Specifically, the United States government provides the contractor with funds for the following: (1) the contracted services; and (2) hazard pay for the contractor's employees that work in Iraq and Afghanistan.

19. The first category, payment for the contracted services, is the amount the government pays the contractor for the services the contractor is to provide under the contract. The second category, hazard pay, is compensation the United States government provides contractors for the benefit of the contractors' employees who operate in combat zones.

20. Prior to the creation of separate categories for payment purposes, government contractors were required to pay hazard pay out of the money they received for performing the contracted services. Accordingly, private contractors favored the creation of a separate category for hazard pay, because it prevented profit erosion by no longer requiring the contractors to pay their employees the hazard pay out of the compensation the contractors received for performing the contract.

21. The United States government utilizes various hazard pay formulas, depending on the type of services the contract requires, to determine the total amount of hazard pay an employee should receive. Those formulas, however, are typically uniform for all contractors that

294790                                                              7

provide the same type of service.

22.     Hazard pay compensation is incorporated into a pass-through provision contained in the contract between the government and the contractor. Accordingly, if the contractor subcontracts with another company to perform the contracted services, the pass-through provision requires that the contractor "pass through" the hazard pay that it collects from the United States government to the subcontractor, *i.e.*, the contractor pays the subcontractor the hazard pay, which the subcontractor is required to pass through to the employees that work in the combat zones, without taking a cut of those funds.

23.     Further, to ensure that the employees receive the hazard pay, the United States government requires contractors and their subcontractors to execute affidavits, under oath, certifying that the hazard pay was paid to those employees that performed the work in the combat zones.

24.     The United States government's air bridge to and from Iraq and Afghanistan involves numerous charter airlines. The risks the crews encounter flying into those countries is substantial, but similar. Accordingly, the United States government has standardized the amount of hazard pay that crew members on the flights to Baghdad and Kabul receive for every take-off and landing. Specifically, every captain, first officer and international relief officer receives $2,500 each, for every take-off and landing at the airports in Baghdad and Kabul, making a total of $5,000 in hazard pay per round-trip. In addition, every other crew member, including flight attendants and mechanics, receive $1,500 each, for every take-off and landing at those airports, making a total of $3,000 in hazard pay per round-trip.

The United States Government Contracts To Provide Air Transport Services To Afghanistan

25.     The United States government in 2004 contracted with Capital Aviation to

294790                                          8

provide air transport services to fly personnel and cargo twice weekly on a Boeing 737 to the airports located in Baghdad and Kabul. The contract provided funds to Capital Aviation in the following manner: (1) payment for air transport services to Baghdad and Kabul twice weekly; and (2) hazard pay for the crew members on the flights to and from Baghdad and Kabul.

26.     Specifically, the contract between the United States government and Capital Aviation provided that every pilot, first officer and international relief officer would receive $2,500 each for every take-off and landing at the Baghdad and Kabul airports, making a total of $5,0000 in hazard pay per round-trip. In addition, every other crew member on those flights, including flight attendants and mechanics, were to receive $1,500 each, for every take-off and landing at those airports, making a total of $3,000 in hazard pay per round-trip.

27.     In contracting with Capital Aviation for air transport services, the United States government incorporated the hazard pay into a pass-through provision of the contract. Because the employee hazard pay was incorporated into a pass-through provision, it required Capital Aviation to pay the hazard pay it received from the United States government to any subcontractor, who was required to pass those funds through to the air crews completing the work.

28.     Capital Aviation subcontracted with Vision to provide the air transport services it agreed to provide to the United States government.

29.     Pursuant to the terms of the contract between Capital Aviation and Vision, Capital Aviation agreed to pay Vision for providing air transport services twice weekly to and from the airports in Baghdad and Kabul.

30.     In addition, Capital Aviation provided Vision the hazard pay that the United States government gave Capital Aviation for the benefit of Vision's employees, which Vision

294790                                                                                    9

was required to distribute to those crew members on the flights to Baghdad and Kabul. Vision agreed to pay every captain, first officer and international relief officer $2,500 each, and every additional crew member $1,500 each, for every take-off and landing they made at the airports in Baghdad and Kabul.

31.     In May 2005, Vision began providing air transport services, moving personnel and cargo twice weekly to and from Kabul International Airport. Vision based its Kabul operation in Frankfurt, Germany, and maintained its Boeing 737, which it used to transport personnel and cargo to and from Kabul, at Frankfurt International Airport.

32.     Vision developed a standard schedule for flying to Kabul International Airport. Vision hired a handling company at Frankfurt International Airport to load any cargo the United States government required transported to Kabul onto Vision's Boeing 737 on the day of each flight's departure.

33.     In addition to transporting cargo, Vision flew diplomatic and other personnel to and from Kabul.

34.     From May 2005 through August 2005, Capital Aviation provided hazard pay to Vision, which Vision was required to pay to its employees who worked as crew members on the flights to Kabul International Airport. The average flight crew consisted of a captain, first officer, international relief officer and four flight attendants. For each take-off and landing in Kabul, Capital Aviation provided Vision $2,500 for every captain, first officer and international relief officer and $1,500 for every other crew member, which funds were originally provided to Capital Aviation by the United States government.

35.     Accordingly, the United States government provided Capital Aviation with a minimum of $27,000 in hazard pay per flight for the benefit of, and to be paid to, Vision's

294790                                                                                                   10

employees. In addition, there were many instances where a mechanic or extra crew member was required to accompany a flight to Kabul, which allowed Vision to collect additional hazard pay from Capital Aviation, which Capital Aviation, in turn, collected from the United States government.

36. Accordingly, Capital Aviation provided Vision with a minimum of $54,000 per week in hazard pay meant for Vision's employees. During the eighteen week span from May to August 2005, the United States government indirectly provided more than $972,000 in hazard pay to Vision for the benefit of Vision's employees who worked as crew members on the flights to Kabul.

37. From May 2005 through August 2005, certain Vision employees who served as crew members on the flights to Kabul received, in addition to their wages, hazard pay from Vision. In some instances, Vision actually paid its captains, first officers and international relief officers $2,500 in hazard pay for every take-off and landing at Kabul International Airport, as it was required to do. Vision, however, never paid any of its flight attendants or other crew members on the flights to Kabul any of the hazard pay it collected on their behalf from Capital Aviation.

38. In August 2005, Vision decided that it could capture a financial windfall if it simply retained all of the hazard pay it collected from Capital Aviation for its own benefit. In order to accomplish this, Vision immediately stopped its sporadic payments of hazard pay to those employees who were receiving it. Moreover, Vision fired all of the crew members that knew about, or had previously received, hazard pay for flying to Kabul, and replaced them with employees who did not know they were entitled to receive hazard pay. This process was complete by September 2005.

294790                                                                                        11

39. Since September 2005, Vision has intentionally failed to pay any of the more than $21 million it has collected in hazard pay to any of its employees, and instead, has wrongfully retained that money for its own benefit.

The United States Government Contracts To Provide Air Transport Services To Iraq

40. In October 2005, Vision began flying to Baghdad International Airport twice weekly. It based its Baghdad operation in Frankfurt and utilized another Boeing 737 to fly to Baghdad, pursuant to a subcontract with Capital Aviation. Vision hired additional crew members and used its employees from its Kabul operation to serve as crew members on the flights to Baghdad. Accordingly, by October 2005, the Frankfurt operation sent flights twice weekly to both Kabul and Baghdad.

41. Vision developed a standard schedule for flying to Baghdad. Vision hired a handling company at Frankfurt International Airport to load any cargo the United States government required transported to Baghdad on Vision's Boeing 737 prior to each flight's departure.

42. In addition to transporting cargo, Vision flew diplomatic and other personnel to and from Baghdad.

43. Vision flew twice weekly to Baghdad, and twice weekly to Kabul, from Frankfurt, until the fall of 2006. During this time period, Capital Aviation provided Vision with a minimum of $104,000 per week in hazard pay, which the United States government provided Capital Aviation for the benefit of Vision's employees who risked their lives as crew members on the flights to and from Baghdad and Kabul. During the time period from October 2005 through the fall of 2006, the United States government indirectly provided Vision with a minimum of $5,408,000 in hazard pay for its employees. Vision, however, wrongfully retained

294790                                                                                  12

this money and never paid any of it to its employees.

44.     Vision moved its flight operation from Frankfurt to Bucharest, Romania in the fall of 2006. Vision maintained the same flight schedule, operating flights twice weekly to Baghdad, and twice weekly to Kabul, from the Banesa International Airport.

45.     Vision hired a freight handling company at Banesa International Airport to load any cargo the United States government required transported to Baghdad or Kabul onto Vision's Boeing 737 prior to each flight's departure. In addition, Vision aircraft also transported diplomatic and other personnel to and from Kabul and Baghdad.

46.     From the fall of 2006 through the spring of 2007, Vision collected a minimum of $104,000 per week in hazard pay from Capital Aviation, which the United States government provided to Capital Aviation for the benefit of, and to be paid to, Vision's employees. During this time period, the United States government indirectly provided Vision with a minimum of $5,928,000 in hazard pay that was to be passed through to its employees. Vision, however, wrongfully retained all of that money and never paid any of it to the employees who risked their lives as crew members on the flights to Kabul and Baghdad.

47.     Vision moved its flight operation from Bucharest to Bratislava, Slovakia, in the spring of 2007. Vision maintained the same flight schedule, operating flights twice weekly to Baghdad and Kabul.

48.     At the beginning of October 2007, however, Vision replaced one its Boeing 737s with a Boeing 767 aircraft. The remaining Boeing 737 was replaced by Vision with a Boeing 767 at the end of December 2007. Vision continued to fly twice weekly to Baghdad, and twice weekly to Kabul.

49.     Vision hired a handling company at the airport in Bratislava to load any cargo the

294790                                          13

United States government required transported to Baghdad or Kabul on Vision's Boeing aircraft, prior to each flight's departure to Baghdad and Kabul. Vision aircraft also transported diplomatic and other personnel to and from Kabul and Baghdad.

50. In the summer of 2007, Dr. Dan Carson, Vision's Director of Flight Operations, contacted Capital Aviation and inquired if the United States government provided hazard pay for Vision's employees who were flying into Baghdad and Kabul. Capital Aviation informed Dr. Carson that it had provided Vision with hazard pay for its employees since May 2005. Dr. Carson contacted the president of Vision, William Acor, to discuss the hazard pay. During that conversation, Mr. Acor instructed Dr. Carson to cease his inquiries into the hazard pay issue. Shortly thereafter, Vision terminated Dr. Carson.

51. In the summer of 2006, the government contractor changed from Capital Aviation to McNeil Technologies, Inc. ("McNeil"). While the government contractor changed, the terms of Vision's subcontract did not.

52. From the spring of 2007 through the spring of 2008, Vision collected a minimum of $104,000 per week in hazard pay from McNeil, which the United States government provided to McNeil for the benefit of, and payment to, Vision's employees. During this time period, the United States government indirectly provided Vision with a minimum of $5,096,000 in hazard pay for its employees. Vision, however, wrongfully retained all of that hazard pay and never paid any of it to its employees who risked their lives by working as crew members on the flights to and from Baghdad and Kabul.

53. Vision moved its flight operation from Bratislava to Bucharest, Romania in the spring of 2008, where it currently operates.

54. The weekly flight schedule remained the same for the trips to Baghdad and Kabul,

294790                                                                                     14

even though Vision changed its base of operation.

55.     Vision has hired a handling company at the airport in Bucharest to load any cargo the United States government requires transported to Baghdad or Kabul onto Vision's Boeing 767 prior to each flight's departure. In addition, Vision aircraft transports diplomatic and other personnel to and from Kabul and Baghdad through Bucharest.

56.     Since the spring of 2008, Vision has collected a minimum of $104,000 per week in hazard pay from McNeil on the United States contract, which the United States government provided McNeil for the benefit of, and to be paid to, Vision's employees. From the spring of 2008 through the date of the filing of this Complaint, the United States government indirectly provided to Vision a minimum of $4,004,000 in hazard pay for its employees who risked their lives as crew members on the flights to and from Baghdad and Kabul. Vision, however, has wrongfully retained all of that hazard pay and has never paid any of it to its employees.

57.     Since September 2005, the United States government has provided more than $21 million to Capital Aviation and McNeil on behalf of Vision's employees who risked their lives as crew members on the flights to Baghdad and Kabul. These funds were passed through to Vision, because the U.S. government required Vision to pass the funds through to its employees operating the air bridge. Vision, however, never paid any of its employees the hazard pay to which they are entitled, despite being provided more than $21 million in hazard pay for their benefit. Instead, Vision has wrongfully retained all of that money for its own benefit.

58.     This lawsuit seeks to end Vision's wrongful and exploitative conduct. As Congressman McNerney noted, payment of hazard pay to individuals who work in Iraq and Afghanistan is the "right thing to do." Accordingly, Plaintiff seeks to compel Vision to pay over the hazard pay it has collected on behalf of its employees to Plaintiff and the Class members,

294790                                                          15

now and in the future.

## CLASS ACTION ALLEGATIONS

59. The individual Class members are so numerous that joinder of all members is impracticable. Plaintiff brings this action against Defendant pursuant to Rules 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of himself and all other persons similarly situated. The Class which the Plaintiff seeks to represent is comprised of the following:

> All Vision employees who were crew members on flights to or from Iraq or Afghanistan between May 1, 2005, to the present. Excluded from the Class are (a) Vision, its directors of flight operations, corporate officers and directors, and their immediate family members, and (b) any governmental entity.

### Numerosity

60. The Class, upon information and belief, consists of at least 300 current and former Vision employees who were crew members on flights to and from Baghdad International Airport and Kabul International Airport. The names and addresses of all Class members can be identified in the business records maintained by Vision. The precise number of Class members will only be obtained through discovery but the numbers are clearly more than can be consolidated in one complaint, and it is impractical for each to bring suit individually. Plaintiff does not anticipate any difficulties in the management of the action as a class action.

### Commonality

61. There are questions of law and fact that are common to the claims of the Plaintiff and the entire Class. These common questions predominate over any questions that are particular to any individual member of the Class. Among such common questions of law and fact are the following:

> a. Whether Vision was required to pay hazard pay to its employees who were crew members on flights to and from Baghdad International and Kabul

International Airport;

b.   Whether Vision was unjustly enriched when it failed to pay any of the hazard pay it collected on behalf of its employees to its employees, and instead retained the hazard pay for its own benefit;

c.   Whether Vision held the hazard pay it was provided by various contractors in constructive trust for its employees who were crew members on the flights to and from Baghdad International Airport and Kabul International Airport;

d.   Whether quantum meruit requires Vision to pay over the hazard pay it collected to its employees who were crew members on the flights to and from the airports in Baghdad and Kabul;

e.   Whether Vision owes hazard pay to its employees who were crew members on flights to the airports in Baghdad and Kabul under the doctrine of money had and received;

f.   Whether Vision converted the hazard pay it received on behalf of its employees that were crew members on the flights to the airports in Baghdad and Kabul when it failed to pay that hazard pay to those employees; and

g.   The amount of damage members of the Class sustained as a result of Vision's wrongful conduct, and the proper measure of such damage.

## Typicality

62.   Plaintiff's claims are typical of the claims of the Class because of the similarity, uniformity, and common purpose of Vision's unlawful conduct. Each Class member has sustained damage as a result of Vision's wrongful conduct in the same manner as Plaintiff – that is, each Class member did not receive the hazard pay to which they were entitled for working as crew members on flights to and from Baghdad and Kabul because Vision wrongfully retained that hazard pay for its own benefit.

## Adequacy Of Representation

63. Plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class. Plaintiff is committed to the vigorous prosecution of this action and has retained competent counsel, experienced in litigation of this nature, to represent him. There is no hostility between Plaintiff and the unnamed Class members. Plaintiff anticipates no difficulty in the management of this litigation as a class action.

64. To prosecute this case, Plaintiff has chosen the law firms of Kozyak, Tropin & Throckmorton and the Goodman Law Group. These firms are experienced in class action litigation and have the financial and legal resources to meet the substantial costs and legal issues associated with this type of litigation.

## Requirements Of Fed. R. Civ. P. 23(b)(3)

i. Predominance

65. The questions of law or fact common to the claims of Plaintiff and the Class predominate over any questions of law or fact affecting only individual members of the class. All claims by Plaintiff and the unnamed Class members are based on Vision's failure to pay its employees the hazard pay, which Vision collected on behalf of its employees from various contractors, who in turn received those funds the United States government.

66. Common issues predominate when, as here, liability can be determined on a class-wide basis.

67. As a result, when determining whether common questions predominate, courts focus on the liability issue, and if the liability issue is common to the class, as it is in the case at bar, common questions will be held to predominate over individual questions.

68. Because all claims by Plaintiff and the unnamed Class members are based on the

same misconduct by Vision, in particular, that Vision failed to pay its employees hazard pay, which it collected on their behalf, and instead wrongfully retained that hazard pay for its own benefit, the predominance requirement of Fed. R. Civ. P. 23(b)(3) is satisfied.

    ii.    Superiority

    69.    A class action is superior to hundreds of individual actions in part because of the non-exhaustive factors listed below:

- a. Joinder of all Class members would create extreme hardship and inconvenience because of their geographical dispersion. Class members reside throughout the United States.

- b. Individual claims by the Class members are impractical because the costs to pursue individual claims exceed the value of what any one Class member has at stake. As a result, individual Class members have no interest in prosecuting and controlling separate actions.

- c. There are no known Class members who are interested in individually controlling the prosecution of separate actions.

- d. The interests of justice will be well served by resolving the common disputes of potential Class members in one forum.

- e. The action is manageable as a class action; individual lawsuits are not economically maintainable as individual actions.

### Requirements Of Fed. R. Civ. P. 23(b)(2)

    70.    Vision has acted or failed to act in a manner generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

## COUNT I
## UNJUST ENRICHMENT

    71.    Plaintiff realleges and incorporates Paragraphs 1 through 70 of this Complaint as if fully set forth herein.

72.     Vision received, and continues to receive, hazard pay from Capital Aviation, McNeil and other government contractors on behalf of the Class members. Vision is expected to pay these funds to its employees who served as crew members on flights to and from Baghdad International Airport and Kabul International Airport. Instead of paying those employees the hazard pay that Vision collected on their behalf, Vision has instead wrongfully retained that money for its own benefit.

73.     There is no employment contract between Vision and any of the Class members who served as crew members on the flights to and from the airports in Baghdad and Kabul.

74.     The United States government provided Capital Aviation and other government contractors hazard pay for the benefit of Vision's employees. Capital Aviation and the other contractors provided Vision with more than $21 million in hazard pay for its employees, which Vision knew and understood it received for the benefit of those employees who served as crew members on-board the flights to Baghdad and Kabul. Instead of paying its employees the hazard pay it collected on their behalf, Vision wrongfully retained that money for its own benefit. Accordingly, Vision received benefits that it unjustly retained at the expense of Plaintiff and the Class members.

75.     The circumstances are such that it would be inequitable to allow Vision to retain the hazard pay it collected on behalf of Plaintiff and the Class members without paying the value thereof to Plaintiff and the Class members. The hazard pay compensation was specifically provided by the United States government for the benefit of Vision's employees who risked their lives and worked as crew members on the flights to and from the airports in Baghdad and Kabul in support of the United States government's efforts in those countries. Moreover, Vision only received the benefit of the hazard pay because Plaintiff and the Class members were willing to

294790                                                    20

risk their lives as crew members on the flights to the airports in Baghdad and Kabul.

**WHEREFORE**, Plaintiff, on behalf of himself and all similarly situated individuals, demands judgment against Vision for compensatory damages, punitive damages, pre- and post-judgment interest, attorneys' fees, declaratory and injunctive relief, costs incurred in bringing this action, and any other relief the Court deems just and proper.

## COUNT II
## CONSTRUCTIVE TRUST

76.    Plaintiff realleges and incorporates Paragraphs 1 through 70 of this Complaint as if fully set forth herein.

77.    The United States government provided Capital Aviation and other brokers of the government contract hazard pay for the benefit of Vision's employees. Capital Aviation and the other contractors provided Vision with more than $21 million in hazard pay for its employees, which Vision collected on their behalf. Instead of paying its employees the hazard pay it collected on their behalf, Vision wrongfully retained that money for its own benefit.

78.    Accordingly, Vision obtained legal title to the hazard pay as a trustee, which it holds for its employees, who are in good conscience entitled to it.

79.    A confidential relationship exists between Vision and its employees, because of the confidential nature of the employment relationship.

80.    Vision obtained the hazard pay through that confidential relationship. The only reason Capital Aviation and the other government contractors provided Vision with the hazard pay was because the United States government provided those contractors with the hazard pay for the benefit of Vision's employees. Moreover, Vision never would have received any hazard

pay compensation had the United States government not provided it to the government contractors specifically for Vision's employees.

81.     Vision's retention of the hazard pay is inequitable, because Plaintiff and the Class members were the intended beneficiaries of the hazard pay since they risked their lives and performed the work in the combat zones.

82.     Justice is effectuated by establishing a constructive trust because the trust prevents Vision from profiting from its own wrong doing – the wrongful retention of Plaintiff and the Class members' hazard pay.

**WHEREFORE**, Plaintiff, on behalf of himself and all similarly situated individuals, demands imposition of a constructive trust and judgment against Vision for compensatory damages, punitive damages, pre- and post-judgment interest, attorneys' fees, declaratory and injunctive relief, costs incurred in bringing this action, and any other relief the Court deems just and proper.

## COUNT III
## MONEY HAD AND RECEIVED

83.     Plaintiff realleges and incorporates Paragraphs 1 through 70 of this Complaint as if fully set forth herein.

84.     Vision has obtained money that belongs to Plaintiff and the Class members through unfair, unreasonable and unconscionable means, and thus is obliged to pay that money to Plaintiff and the Class members. Vision has taken undue advantage of Plaintiff and the Class members, as set forth in the allegations above.

85.     The United States government provided Capital Aviation and other government contractors with hazard pay for the benefit of Vision's employees. Capital Aviation and the

other government contractors provided Vision with more than $21 million in hazard pay for Vision's employees, none of which Vision paid its employees. Accordingly, Vision has received money that belongs to the Class members, but which it has wrongfully retained.

86.     Moreover, Vision received the hazard pay on behalf of Plaintiff and the Class members because they were willing to risk their lives and work as crew members on flights to and from the airports in Baghdad and Kabul. Equity, therefore, demands that Vision pay the money it collected on behalf of its employees to the Plaintiff and the Class members since it was intended for their benefit.

**WHEREFORE**, Plaintiff, on behalf of himself and all similarly situated individuals, demands judgment against Vision for compensatory damages, punitive damages, pre- and post-judgment interest, attorneys' fees, declaratory and injunctive relief, costs incurred in bringing this action, and any other relief the Court deems just and proper.

## COUNT IV
## QUANTUM MERUIT

87.     Plaintiff realleges and incorporates Paragraphs 1 through 70 of this Complaint as if fully set forth herein.

88.     Vision has received a benefit, and continues to receive a benefit, by failing to pay to Plaintiff and the Class members the fair value of their services.

89.     There is no express agreement between the parties and Plaintiff and the Class members are entitled to reasonable compensation for their services. That amount includes the hazard pay that Vision collected on behalf of Plaintiff and the Class, and which Vision continues to collect on behalf of its employees.

90.     The circumstances are such that it would be inequitable for Vision to retain these

294790                                        23

benefits without paying Plaintiff and the Class members the value thereof.

**WHEREFORE**, Plaintiff, on behalf of himself and all similarly situated individuals, demands judgment against Vision for compensatory damages, punitive damages, pre- and post-judgment interest, attorneys' fees, declaratory and injunctive relief, costs incurred in bringing this action, and any other relief the Court deems just and proper.

## COUNT V
## CONVERSION

91.     Plaintiff realleges and incorporates Paragraphs 1 through 70 of this Complaint as if fully set forth herein.

92.     The United States government provided Capital Aviation and other brokers of the government contract hazard pay for the benefit of Vision's employees.  Specifically, Capital Aviation and the other contractors provided Vision with more than $21 million in hazard pay for its employees, which Vision collected on their behalf.

93.     Vision's employees had title to, and rights in, the hazard pay that Vision received for their benefit.

94.     Instead of paying its employees the hazard pay it collected on their behalf, Vision wrongfully retained that money for its own benefit and refused to pay any of it over to its employees.

95.     Accordingly, Vision has wrongfully exerted dominion over the hazard pay, thereby denying the employees title to, and their rights in, the hazard pay.

**WHEREFORE**, Plaintiff, on behalf of himself and all similarly situated individuals, demands judgment against Vision for compensatory damages, punitive damages, pre- and post-judgment interest, attorneys' fees, declaratory and injunctive relief, costs incurred in bringing

this action, and any other relief the Court deems just and proper.

## COUNT VI
## INJUNCTIVE RELIEF

96.     Plaintiff realleges and incorporates Paragraphs 1 through 70 of this Complaint as if fully set forth herein.

97.     Vision's scheme to deny its employees will continue to cause Class members significant economic loss.

98.     A money judgment will only compensate individual Class members for past losses. It will not stop Vision from denying the Class members their hazard pay in the future.

99.     No Class member has a practical or adequate remedy, either administratively or at law, to recover these future losses. The cost or pursuing such claims far exceeds the amount at issue.

100.    Even a class action such as the one contemplated in this case is a monumental undertaking that cannot be mounted on a regular basis.

101.    Where multiple lawsuits are required to redress repeated wrongs, there is no adequate remedy at law and irreparable harm exists.

102.    Requiring Vision to pay its employees their hazard pay does not place an undue hardship on Vision because it has already collected the hazard pay on behalf of the employees. Moreover, Vision's failure to pay its employees their hazard pay places a substantial and significant burden on them because it deprives them of income to which they are otherwise entitled.

103.    The public interest is not offended by requiring Vision to pay its employees their hazard pay.

**WHEREFORE**, Plaintiff, on behalf of himself and all similarly situated individuals, demands injunctive relief against Vision requiring it to pass through the hazard pay it receives to the employees entitled to it, and any other relief the Court deems just and proper.

## COUNT VII
## DECLARATORY RELIEF

104.   Plaintiff realleges and incorporates Paragraphs 1 through 70 of this Complaint as if fully set forth herein.

105.   The United States government provided Capital Aviation and other government contractors hazard pay for the benefit of Vision's employees. Capital Aviation and the other contractors provided Vision with more than $21 million in hazard pay for its employees, which Vision collected on their behalf.

106.   Instead of paying its employees the hazard pay it collected on their behalf, Vision wrongfully retained that money for its own benefit.

107.   Vision is required, pursuant to the terms of the federal contract between Capital Aviation and the other government contractors, to which Vision is a government subcontractor, to pay the hazard pay it has collected on behalf of its employees that served as crew on the flights to Baghdad and Kabul.

108.   Vision's scheme to deny its employees will continue to cause Class members significant economic loss.

109.   A money judgment will only compensate individual Class members for past losses. It will not stop Vision from denying the Class members their hazard pay in the future.

110.   No Class member has a practical or adequate remedy, either administratively or at law, to recover these future losses. The cost or pursuing such claims far exceeds the amount at

issue.

111.    Even a class action such as the one contemplated in this case is a monumental undertaking that cannot be mounted on a regular basis.

112.    Where multiple lawsuits are required to redress repeated wrongs, there is no adequate remedy at law and irreparable harm exists.

**WHEREFORE**, Plaintiff, on behalf of himself and all similarly situated individuals, demands declaratory and supplemental relief against Vision declaring that: (1) Vision received hazard pay for its employees which it wrongfully and unjustly retained and that it is required to pass through the hazard pay it collected on their behalf to those employees entitled to it; (2) Vision must pass through to its employees all hazard pay it collects on their behalf for all future flights to Baghdad and Kabul; and (3) any other relief the Court deems just and proper.

## RELIEF REQUESTED

Plaintiff respectfully requests that this Court:

a)    Certify this action as a class action under Federal Rule of Civil Procedure 23(a), (b)(2) and (b)(3).

b)    Declare that the Vision has been unjustly enriched by improperly retaining the hazard pay due its employees, and enjoin Vision from further engaging in such a pattern and/or practice.

c)    Award Plaintiff and the Class all common law damages as well as statutory remedies for the amounts of hazard pay they should have received for working as crew members on-board the flights to the airports in Baghdad and Kabul, including pre-judgment interest on these amounts.

d)    Award Plaintiff and the Class punitive damages.

e)    Award Plaintiff and the Class their attorney's fees, costs and expenses.

f)    Award Plaintiff and the Class such further relief as is appropriate in the interests of justice.

## DEMAND FOR JURY TRIAL

Demand is hereby made by Plaintiff for a jury trial on any and all counts for which trial

by jury is permitted by law.

Respectfully submitted this 16th day of January, 2009.

/s/ Ross C. Goodman
**Ross C. Goodman, Esq., Nevada Bar No. 7722**
**GOODMAN LAW GROUP**
520 South Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 383-5088
(702) 385-5088 (Facsimile)

**David M. Buckner, Esq., Florida State Bar No. 60550**
**Brett von Borke, Esq., Florida State Bar No. 44802**
**KOZYAK TROPIN & THROCKMORTON, PA**
2525 Ponce de Leon, 9th Floor
Miami, Florida 33134
(305) 372-1800
(305) 372-3508 (Facsimile)

**ATTORNEYS FOR PLAINTIFF**