Exhibit 1-A

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEVADA

CASE NO. 2:09-CV-00117-RLH-RJJ

GERALD HESTER, on behalf of himself
and all others similarly situated,

    Plaintiff,

vs.

VISION AIRLINES, INC.

    Defendant.

- - - - - - - - - - - - - - - - - x

**CERTIFIED TRANSCRIPT**

    2525 Ponce de Leon Boulevard
    Suite 900
    Coral Gables, Florida
    Friday, March 19, 2010
    9:46 a.m. - 11:57 a.m.
    1:15 p.m. - 5:15 p.m.

VIDEOTAPED DEPOSITION OF GERALD HESTER

  Taken before Sherilynn V. McKay, RMR, CRR, a Notary Public for the State of Florida at Large, pursuant to Notice of Taking Deposition filed in the above-styled cause.

2 (Pages 2 to 5)

**Page 2**

```
 1  PRESENT:
 2     DAVID M. BUCKNER, ESQ.
        BRETT E. VON BORKE, ESQ.
 3     Kozyak Tropin & Throckmorton, P.A.
        2525 Ponce de Leon Boulevard
 4     Suite 900
        Coral Gables, FL 33134
 5     (305) 372-1800
        dmb@kttlaw.com
 6     bvb@kttlaw.com
        Attorneys for the Plaintiff
 7
        HAROLD P. GEWERTER, ESQ.
 8     Harold P. Gewerter, Esq., Ltd.
        2705 Airport Drive
 9     North Las Vegas, NV 89032
        (702) 382-1714
10     harold@gewerterlaw.com
        Attorney for the Defendant
11
12  ALSO PRESENT:
13     Shelley Liebenberg
        William Acor
14     Brian Daggett
        Alejandro Montalvo, Videographer
15     Veritext/Florida Reporting Co.
16
17                    ---
18
19                  INDEX
20  EXAMINATION                              PAGE
     GERALD HESTER
21  DIRECT EXAMINATION BY MR. GEWERTER......  5
     CROSS-EXAMINATION BY MR. BUCKNER........ 216
22  REDIRECT EXAMINATION BY MR. GEWERTER.... 226
23
24                    ---
25
```

**Page 3**

```
 1              EXHIBITS
                                           PAGE
 2  Exhibit 37 .................................
        Composite exhibit Bates Nos. Hester 000028  14
 3      through 000045
 4  Exhibit 38 .................................
        Logbook pages                          43
 5
    Exhibit 39 .................................
 6      Earnings Statements                    48
 7  Exhibit 40 .................................
        W-2 Forms for 2006                     52
 8
    Exhibit 41 .................................
 9      W-2 Forms for 2007 and 2008            55
10  Exhibit 42 .................................
        FDA Mandated Anti-Drug Program         58
11      Acknowledgement
12  Exhibit 43 .................................
        Composite exhibit, top document letter dated  63
13      9/13/07 to Jim Maguire from Jerry Hester
14  Exhibit 44 .................................
        E-mail dated 10/15/07 to Gerald Hester re:  77
15      Revised Pay Structure & Guidelines for Boeing
        Pilots - Effective October 1, 2007
16
    Exhibit 45 .................................
17      Personnel Action Form                  91
18  Exhibit 46 .................................
        Classified Information Nondisclosure   94
19      Agreement
20  Exhibit 47 .................................
        Employee Non-Competition and Non-Disclosure  105
21      Agreement
22  Exhibit 48 .................................
        Employee Acknowledgement Form dated 3/1/07  108
23
    Exhibit 49 .................................
24      401(k) Salary Deferral Election Change Form  110
        dated 6/27/2007
25
```

**Page 4**

```
 1  Exhibit 50 .................................
        Separation Agreement and Full General  119
 2      Release with cover letter dated 9/3/06
 3  Exhibit 51 .................................
        Class Action Complaint Jury Demand     125
 4
    Exhibit 52 .................................
 5      Las Vegas Sun article dated 1/23/09    201
 6  Exhibit 53 .................................
        Las Vegas Sun article dated 1/30/09    209
 7
    Exhibit 54 .................................
 8      Counterdefendant Gerald Hester's       217
        Incorporated Memorandum of Law in Support of
 9      His Motion to Dismiss Counterclaimant Vision
        Airlines, Inc.'s Amended Counterclaims
10
11                    ---
12
```

**Page 5**

1  THE VIDEOGRAPHER: Good morning. We're now on
2  the video record. Today is Friday, March the 19th,
3  2010. The time is 9:45.
4     We're here to take the videotape deposition of
5  Gerald Hester in the matter of the case Hester
6  Gerald versus Vision Airlines.
7     Counsel please introduce themselves for the
8  record and ask that this court reporter will swear
9  in the witness.
10     MR. BUCKNER: David Buckner and Brett Von Borke
11  for plaintiff Jerry Hester and the class.
12     MR. GEWERTER: Harold Gewerter on behalf of the
13  defendant. Also present is Shelley Liebenberg,
14  Brian Daggett and William S. Acor.
15           GERALD HESTER
16  was called as a witness by the Defendant, and having
17  been first duly sworn, testified as follows:
18     THE WITNESS: I do.
19           DIRECT EXAMINATION
20  BY MR. GEWERTER:
21     Q Good morning, Mr. Hester.
22     A Good morning.
23     Q My name is Harold Gewerter. I'm the attorney
24  who represents Vision Airlines in this case.
25     You understand today you are here pursuant to

Page 6

1 the Rules of Civil Procedure to give your deposition in
2 this matter?
3    A  Yes.
4    Q  You also understand you just took an oath by
5 this court reporter, and this oath carries the same
6 force and effect as if you're in a courtroom?
7    A  Yes.
8    Q  And I don't mean to belabor the point, but it's
9 the same force and effect for perjury, truthfulness and
10 untruthfulness. You understand all that?
11   A  Yes.
12   Q  And this setting may seem somewhat informal,
13 but this may be used at some later proceeding in a court
14 case if this goes to trial. So I don't want the
15 informality of this to somehow dissuade you from giving
16 a correct answer or a very cavalier answer. You
17 understand that?
18   A  Yes.
19   Q  Okay. We're going to do this deposition today
20 under oath, and present there's a videographer, who's
21 videotaping this, along with the court reporter.
22 Everything you say and I say hopefully we'll get on the
23 record, but the one way we can do this is if I ask a
24 question, wait until I ask the question, and I will wait
25 until you answer the question, and hopefully we won't

Page 7

1 have competing arguments. Hopefully there will be no
2 arguments. But so you wait for my question, I'll wait
3 for your answer, and that also goes for Mr. Buckner. He
4 understands that. You understand that?
5    A  Yes.
6    Q  Have ever had your deposition taken before
7 today?
8    A  I was deposed once before.
9    Q  What case was that and when was that?
10   A  That was a couple years ago, Vision Airlines,
11 and it involved the leasing company that leased an
12 engine division.
13   Q  What was the name of that case?
14   A  I don't know.
15   Q  And where was that case and which jurisdiction?
16   A  I was deposed in Washington, DC.
17   Q  And what year was that? Do you remember?
18   A  It was two, two and a half years ago.
19   Q  And was Vision the plaintiff or the defendant?
20   A  I believe we were the defendant.
21   Q  And what was your testimony concerning
22 generally?
23   A  My knowledge of any abuse of that engine when
24 it was on a Vision aircraft.
25   Q  Have you ever been a party, whether as a

Page 8

1 defendant or a plaintiff, in any matter, other than this
2 case, in the last ten years?
3    A  No.
4    Q  Have you ever been a party to a class action
5 lawsuit before this case?
6    A  No.
7    Q  Weren't you a member of a lawsuit, of a
8 proposed class, in another matter?
9    A  Oh. I was not a lead plaintiff. I was a
10 member of a class, yes.
11   Q  What was the name of that case?
12   A  That was AirCal pilots versus American
13 Airlines.
14   Q  And what year was that?
15   A  That must have been about 1995.
16   Q  Just so you know, I don't want you to guess at
17 your answers today.
18   A  Okay. I'm sorry. I don't know. I don't
19 remember.
20   Q  That's fine. I just want your best answer
21 under oath. That's all I want.
22   A  Yeah.
23   Q  It was about 1995?
24   A  I believe so.
25   Q  And what was the basis of that case?

Page 9

1    A  We had -- AirCal had a long term disability
2 plan. One of the provisions of that plan was that when
3 the last pilot eligible to draw long term disability was
4 no longer eligible, any remaining funds in the plan
5 would be distributed amongst the remaining active AirCal
6 pilots.
7    Q  And did you receive any funds as a result of
8 that lawsuit?
9    A  Yes. We won that lawsuit.
10   Q  You personally, did you receive any funds as a
11 result of that lawsuit?
12   A  Yes, I did.
13   Q  And what year was that?
14   A  I don't recall.
15   Q  You don't remember how much money you received
16 as a result of that lawsuit?
17   A  No, I don't.
18   Q  What jurisdiction was that lawsuit in?
19   A  That was in Texas.
20   Q  When did you first come to work for Vision
21 Airlines?
22   A  September 24th, 2006.
23   Q  And who first interviewed you on behalf of
24 Vision Airlines?
25   A  Dan Carson.

4 (Pages 10 to 13)

## Page 10

1  Q  And did you know Dan Carson prior to that time?
2  A  No.
3  Q  How did you become aware that there was a job
4  opening at Vision Airlines for you to apply for?
5  A  I received a phone call from another pilot.
6  Q  Who was the pilot?
7  A  Dave Frohman.
8  Q  And Dave Frohman worked for Vision at the time?
9  A  No.
10 Q  Where did he work at the time?
11 A  I believe he was unemployed at the time.
12 Q  Did he ever come to work to Vision Airlines?
13 A  Yes.
14 Q  And did you work with him concurrently at
15 Vision Airlines?
16 A  Yes.
17 Q  What time period, if you remember?
18 A  I believe Dave was hired two to three months
19 after I was.
20 Q  Before I forget, what is your date of birth?
21 A  Date of birth is September 25th, 1940.
22 Q  So you're 69 years old. Correct?
23 A  Yes.
24 Q  Or I should say young, maybe.
25 A  Yes.

## Page 11

1  Q  I'm catching up.
2     And you came to work at Vision Airlines in what
3  job capacity?
4  A  Pilot.
5  Q  As chief pilot, copilot, what --
6  A  Captain.
7  Q  Captain. And you were hired by whom?
8  A  Dan Carson.
9  Q  And was there a specific job function you were
10 hired to perform, such as flying from a certain
11 destination to a certain destination?
12 A  Fly wherever I was assigned.
13 Q  And what was your compensation arrangement when
14 you first became a pilot at Vision Airlines?
15 A  I believe we were paid $100 an hour, flight
16 hour.
17 Q  And that was what you were promised when you
18 first came to work for Vision Airlines. Correct?
19 A  That's what I was told the pay was.
20 Q  Was that the pay you received?
21 A  Yes.
22 Q  Were you told anything other than a hundred
23 dollars per hour when you first came to work for Vision
24 Airlines?
25 A  There was per diem.

## Page 12

1  Q  Per diem is -- how did you view per diem?
2  A  Well, per diem is reimbursement for your
3  expenses.
4  Q  And was that a straight per diem or did you
5  have to justify your receipts?
6  A  No. It was just the straight per diem.
7  Q  So you got a hundred dollars per hour for
8  flight time. Correct?
9  A  Yes.
10 Q  Were you guaranteed a number of hours per
11 month --
12 A  No.
13 Q  -- or just as needed?
14 A  I'm sorry.
15    We were not guaranteed a certain number of
16 hours per month.
17 Q  So it could have been one hour or 80 hours and
18 that was your agreement that you made when you first
19 came to work at Vision Airlines?
20    MR. BUCKNER: Object to the form.
21    THE WITNESS: I didn't make --
22    MR. BUCKNER: Object to the form.
23    You can answer.
24    THE WITNESS: I didn't make an agreement.
25 That's what it was. I was an at-will employee.

## Page 13

1  BY MR. GEWERTER:
2  Q  You acknowledge you were an at-will employee.
3  Correct?
4  A  Yes.
5  Q  And you say you didn't make an agreement, but
6  that's what was offered to you, a hundred dollars per
7  hour, plus per diem. Correct?
8  A  Yes.
9  Q  And you accepted that pay structure. Correct?
10    MR. BUCKNER: Object to the form.
11 BY MR. GEWERTER:
12 Q  You can go ahead and answer.
13 A  Yes.
14 Q  Was there additional training that you were
15 required to undergo before you commenced work at Vision
16 Airlines?
17 A  Before I commenced work?
18 Q  You were first hired and then you underwent
19 some training through Vision Airlines. Is that correct?
20 A  That's correct.
21 Q  And you underwent that training before you
22 actually commenced flying as a pilot for Vision
23 Airlines. Is that correct?
24 A  That's correct.
25 Q  And who paid for that training?

**Page 14**

1  A  Vision Airlines.
2  Q  Did you ever reimburse Vision Airlines for that
3  training expense?
4  A  No.
5  Q  Would you give me the general nature of that
6  training that you undertook so you could work at Vision
7  Airlines?
8  A  It's recurrent training.
9  Q  Describe what you mean by recurrence training.
10  I'm not a pilot, so -- I'm a layperson, so you have to
11  explain these things to me.
12  A  If you're qualified on an airplane, you have
13  to, by regulations, undergo refresher training or
14  recurrent training.  And there are various schools that
15  take care of that.  And I was sent to one of those
16  schools to accomplish that training.
17      MR. GEWERTER:  Would you mark this, please.
18      (Deposition Exhibit 37 was marked for
19      identification.)
20  BY MR. GEWERTER:
21  Q  Sir, take a look at this document that's just
22  been marked as Exhibit No. 37.  In the bottom left
23  starts with Hester -- Bate stamped No. Hester 000028,
24  and ends with I believe it says Hester 000045.  I say
25  that because the page before is 44.  So I believe the

**Page 15**

1  last page would be 45.  Let me know when you've had a
2  chance to review that document for me, please.
3  A  Okay.
4  Q  Have you had a chance to review that document?
5  A  Yes.
6  Q  Let's go to the first page, page No. 28 on the
7  Bates stamping.  It looks like there's copies of three
8  ID cards.  The top one appears to be a driver's license.
9  Is that correct?
10  A  Yes.
11  Q  Are these documents that you gave to Vision
12  Airlines when you first applied for a job?
13  A  When I was hired.
14  Q  When you were hired?
15  A  Yes.
16  Q  The left -- the bottom left says King Schools.
17  Has your name.  What is that?
18  A  That's certificate of completed training for
19  RVS and air space.
20  Q  And what does that mean?
21  A  Reduced vertical separation minimums.
22  Q  And how often was that training required to
23  maintain your license?
24  A  I believe that's every two years.
25  Q  Are there some designations or training that is

**Page 16**

1  required to be renewed every year?
2  A  Proficiency check.
3  Q  Anything else?
4  A  Need a medical certificate.
5  Q  Look at the next page, which would be Hester
6  29, although the bottom seems to be cut off.  The top
7  says "United Services, Flight Training Services,
8  Emergency Procedures (EPT)."  Do you see that document?
9  A  Yes.
10  Q  And then it says -- there's a check mark next
11  to "evacuation and ditching training."  What is that?
12  A  We receive the training in evacuating and
13  ditching procedures.
14  Q  And this is training that was provided to you
15  through Vision Airlines?
16  A  Yes.
17  Q  And paid for by Vision Airlines?
18  A  Yes.
19  Q  The next document, it says King Schools
20  certification, and it has your name on there.  It says
21  Gerald Hester, pilot certificate number, has completed
22  the King Schools course reduced vertical separation
23  minimum.  Is that also training you received while at
24  Vision Airlines?
25  A  Yes.

**Page 17**

1  Q  Who paid for that training?
2  A  I believe Vision did.
3  Q  Did you pay for any training once you were
4  hired by Vision Airlines?
5  A  No.
6  Q  Go to the next document.  It says American
7  Airlines.  It was a letter from AP Madar, manager,
8  flight training/standards, to -- looks like the FAA,
9  dated November 7th, 1997.  Do you see that document?
10  A  Yes, I do.
11  Q  What is that document?
12  A  It was request for a designation as a check
13  airman, and it was approved.
14  Q  And this is more training provided to you by
15  Vision Airlines.  Correct?
16  A  No.
17  Q  Okay.  Who provided this?
18  A  This was American Airlines.
19  Q  Who paid for the training?
20  A  This was not training.  This was a request for
21  the FAA to appoint me as a proficiency check pilot to
22  provide check rides in a simulator and check rides in
23  the airplane to other American Airlines pilots.
24  Q  And who were you employed November 7th, 1997?
25  Were you employed by American Airlines?

6 (Pages 18 to 21)

**Page 18**

1     A   I was employed by American Airlines.
2     Q   And American Airlines also put you through
3 training. Correct?
4     A   Yes.
5     Q   Look at the next document. It's a certificate
6 of designation, Federal Aviation Administration, has
7 your name on there, and it says you designate as
8 training center evaluator, flight safety, Texas, Dallas,
9 Fort Worth Learning Center. Do you see that?
10    A   Yes.
11    Q   It's dated June 8th, 2005?
12    A   Yes.
13    Q   Who was your employer on June 8th, 2005?
14    A   Flight Safety.
15    Q   What kind of training was provided to authorize
16 you to receive this certificate?
17    A   I got a typed rating in an aircraft, which was
18 new to the DFW Learning Center for Flight Safety.
19    Q   You've gone through quite a bit of training
20 throughout your career as a pilot, haven't you?
21    A   Yes.
22    Q   You do recurring training and you've done a lot
23 of basic training. Correct?
24    A   Yes.
25    Q   And you're somewhat proficient with the rules

**Page 19**

1 and regulations of the FAA as it applies to pilots?
2       MR. BUCKNER: Object to the form.
3 BY MR. GEWERTER:
4     Q   You can answer the question.
5     A   Yes.
6     Q   And you understand the obligations of a pilot,
7 don't you?
8     A   Yes.
9     Q   In fact, you've even worked as an evaluator.
10 Correct?
11    A   Yes.
12    Q   You've worked as a trainer. Correct?
13    A   Yes.
14    Q   And you've worked as an on line pilot.
15 Correct?
16    A   Yes.
17    Q   There's another document, the next page, U.S.
18 Department of Transportation. It's a letter dated
19 June 8th, 2004. Do you see that?
20    A   Yes.
21    Q   That seems to be a document that goes on for a
22 couple pages. Actually, I'm sorry, that's one page, the
23 June 8th letter. What is that one-page document?
24    A   It's a letter of approval, approving me to act
25 as a training center evaluator, and it lists the checks

**Page 20**

1 that I was authorized to do.
2     Q   Not every kind of pilot has this kind of
3 designation, do they?
4     A   No, they don't.
5     Q   That takes them high level proficiency, doesn't
6 it?
7     A   Yes.
8     Q   It's something that you earned over a period of
9 time, both through education, skill, and experience.
10 Correct?
11    A   Yes.
12    Q   Look at the next page, March 31, 2006. It's
13 from the U.S. Department of Transportation, Federal
14 Aviation Administration. What is that document?
15    A   It's essentially the same thing. A renewal.
16    Q   Okay. Look at the next page, which is Bates
17 stamped No. Hester 000035, and the upper left says Sim
18 Center proficiency check record. Do you see that?
19    A   Yes.
20    Q   What is that document?
21    A   It was a check ride I took for the A310
22 aircraft.
23    Q   Look at the next page. That first document is
24 dated 3-31-2009. Do you see that?
25    A   Uh-huh.

**Page 21**

1     Q   The other thing, if you answer yes or no --
2     A   I'm sorry.
3     Q   It just makes for a cleaner record.
4     A   Yes.
5     Q   I'm sorry. I should have warned you on that.
6       Who was your employer on 3-31-2009.
7     A   I was contract employee for Sim Center.
8     Q   Have you worked as a pilot flying aircraft
9 since you left Vision Airlines?
10    A   No, I have not.
11    Q   Is there a reason for that?
12    A   Couldn't get a job.
13    Q   Have you applied?
14    A   Yes.
15    Q   Where have you applied since you left Vision
16 Airlines?
17    A   I've applied for work in many different places.
18    Q   Well, let's go with the first one you applied
19 to. Give me the list to the best of your recollection.
20    A   Maverick Racing.
21    Q   What is Maverick Race?
22    A   It's a company in the Dallas-Fort Worth area.
23    Q   And what's the nature of their business?
24    A   They fly -- it's a personal flight department
25 for an individual.

**Page 22**

1  Q  And were you given a reason why you were not
2  hired by Maverick Racing?
3  A  They were considering getting an airplane and
4  they never got it.
5  Q  What's the next job you applied for after
6  Maverick Racing?
7  A  I don't recall.
8  Q  About how many times have you applied for jobs
9  since leaving Vision Airlines?
10  A  I had applied two to three times per week.
11  Q  On line or in person?
12  A  On line and in person.
13  Q  And have you ever had any job interviews?
14  A  No.
15  Q  Were you ever given a reason why?
16  A  I've been given we're not hiring, and other
17  times there's been no reason given.
18  Q  Are these companies that are regulated by
19  Part 91 or Part 121 or Part 135, if you could tell me?
20      MR. BUCKNER:  Object to the form.  Object to
21  the form.
22      You may answer.
23      THE WITNESS:  Some were 91.  Some were 135.
24  BY MR. GEWERTER:
25  Q  And were some 121?

**Page 23**

1  A  I didn't apply as a pilot there.
2  Q  Why not?
3  A  Because I'm over the age limit for 121
4  operations.
5  Q  What is the age limit for a 121 operation?
6  A  Sixty-five.
7  Q  Was that ever age 60 in the last ten years?
8  A  Yes.
9  Q  Do you know when that changed?
10  A  I don't recall the exact date.
11  Q  So you're aware as an experienced pilot that
12  you are not able to work as a pilot, a line pilot, for a
13  company that's 121 certified?
14  A  That's correct.
15  Q  Yet you filed a complaint with the EEOC against
16  Vision Airlines claiming age discrimination.  Is that
17  correct?
18      MR. BUCKNER:  Objection.  Argumentative.
19  BY MR. GEWERTER:
20  Q  You can go ahead and answer.
21  A  I did.  Vision is not operating under 121.
22  Q  How do you know that?
23  A  They weren't at the time I was dismissed.
24  Q  And how do you know that?  You were just told
25  that or you believed it to be true?  Did you ask

**Page 24**

1  someone, for example?
2  A  Yes.  I was aware that there was -- they were
3  undergoing an application process, but the certificate
4  had not been granted.
5  Q  So you're aware they were undergoing an
6  application process to transition to a 121
7  certification --
8  A  Yes.
9  Q  -- at the time you left?
10  A  That's what I was told.
11  Q  And who told you that?
12  A  Jim Maguire.
13  Q  Anyone else?
14  A  Not at that time.
15  Q  Was Jim Maguire your immediate supervisor at
16  that time?
17  A  Yes.
18  Q  Let me go back to this document, Jerry.  Go to
19  what is marked as Hester 000038.  It's a document from
20  Higher Power Aviation B737, 300 training summary,
21  recency of experience.  Do you see that?
22  A  Yes.
23  Q  And student name, it has your name.  Correct?
24  A  Yes.
25  Q  And training date is 9-22-2006?

**Page 25**

1  A  Yes.
2  Q  And what is the nature or how did you receive
3  this document?
4  A  I underwent recency of experience training
5  there, three takeoffs and landings to a full stop.
6  Q  So you've done exactly what's marked on this
7  document?
8  A  Yes.
9  Q  And there are initials next to that.  Correct?
10  A  Yeah.  That's the instructor.
11  Q  And who was your employer on 9-22-2006?
12  A  I was not employed on that date.
13  Q  So why would you bother to do this if you
14  weren't employed?
15  A  I had been asked if I were available to fly a
16  charter flight from Dallas Love Field to JFK to Dulles.
17  Q  Who asked you to do that?
18  A  Dan Carson.
19  Q  So this is before you commenced employment with
20  Vision Airlines.  Correct?
21  A  Yes.
22  Q  How did you know Dan Carson if you weren't yet
23  employed by Vision Airlines?
24  A  I had spoken to him on the phone.
25  Q  While he worked for Vision Airlines?

8 (Pages 26 to 29)

Page 26

1  A  Yes.
2  Q  And what did he ask you to do?
3  A  He asked me if I would be available to fly
4  copilot on this trip.
5  Q  And your response was what?
6  A  Yes, but I'm not current on landings.
7  Q  Okay. And so you went for training at this
8  Higher Power Aviation?
9  A  Yes, I did.
10 Q  Who paid though that training?
11 A  Vision.
12 Q  You weren't yet hired by Vision but they paid
13 for your training?
14 A  That's correct.
15 Q  Go to the next page, please, Hester 39, Bates
16 stamp No. 39. I know it's a bad copy, and I apologize.
17 On the bottom of it it has medical certificate first
18 class. Do you see that?
19 A  Uh-huh, I do.
20 Q  What is the nature of that document?
21 A  You need a medical certificate to fly.
22 Q  And that's an annual requirement. Correct?
23 A  It depends on the operation you're in. In case
24 of Vision Airlines, yes, an annual requirement.
25 Q  Look at the next page. It says certificate of

Page 27

1  completion, level one awareness training, presented to
2  Gerald George Hester, October 29, 2007. Do you see
3  that?
4  A  Yes.
5  Q  What was the nature of that document?
6  A  That was some security training that we did on
7  the internet.
8  Q  When you say "we did," who are you referring
9  to?
10 A  I did.
11 Q  Who is your employer on October 29, 2007?
12 A  Vision.
13 Q  And was there a cost associated with this
14 training?
15 A  I don't think so.
16 Q  So anyone could go on line and take this class?
17 A  I don't recall.
18 Q  You say awareness training. Then you also said
19 security training. What do you mean by security
20 training?
21 A  About recognizing -- recognizing threats around
22 a building, around an airport.
23 Q  Have you ever received a security clearance
24 from any government agency?
25 A  Yes.

Page 28

1  Q  Which government agency and when?
2  A  I served 24 years in the military as an
3  officer, and I held a security clearance.
4  Q  And you were -- you received recurrence
5  training during that 24-year period. Correct?
6     MR. BUCKNER: Object to the form.
7  BY MR. GEWERTER:
8  Q  Did you receive recurrent aviation training
9  during that 24-year career in the military?
10 A  No.
11 Q  The military doesn't train like private
12 industry trains?
13 A  No.
14 Q  How was it different?
15 A  Go through an extensive initial training and
16 then are proficiency checked at the regular intervals.
17 Q  Were you a pilot in the military or were you a
18 navigator?
19 A  I was a navigator.
20 Q  What was the difference, generally?
21 A  A pilot flies the airplane, a navigator
22 provides the navigation.
23 Q  When did you become a pilot?
24 A  After I was released from active duty I
25 attended Embry-Riddle Aeronautical Institute and earned

Page 29

1  my pilot certificates there.
2  Q  What year was that, approximately?
3  A  It would have been '68, '69.
4  Q  Look at the next page, which is Hester 000041,
5  on the bottom right. In the upper left says airman
6  proficiency qualification check. What was the nature of
7  those documents?
8  A  That was my type rating check ride for 757,
9  767.
10 Q  Who was your employer on 11-27-07?
11 A  Vision Airlines.
12 Q  Who paid for this check?
13 A  Vision Airlines.
14 Q  Did you ever reimburse them?
15 A  No.
16 Q  Do you have any idea about how much Vision
17 Airlines has expended on you individually for all this
18 training that we've been talking about?
19 A  No.
20 Q  Have you ever asked?
21 A  No.
22 Q  Is there a reason why you haven't asked?
23 A  It's required training.
24 Q  Does it require that the employer pay for it or
25 is that just up for negotiation?

Page 30

1    MR. BUCKNER: Object to the form.
2  BY MR. GEWERTER:
3    Q  You can answer.
4    A  Employers traditionally pay for the training.
5    Q  There's no FAA regulation that requires that
6  the employer pay, though, is there?
7    A  Not to my knowledge.
8    Q  So it's something Vision did voluntarily. Is
9  that correct?
10   A  That's what most companies do if they wish to
11 retain qualified people.
12   Q  And you admit you're a qualified pilot, don't
13 you?
14   A  Yes.
15   Q  And you would never do anything to violate FAA
16 rules and regulations, would you?
17   A  I would never intentionally violate FAA rules
18 and regulations.
19   Q  As we sit here today, do you have any knowledge
20 that you have ever violated any FAA rules and
21 regulations?
22   MR. BUCKNER: Object to the form.
23 BY MR. GEWERTER:
24   Q  You can answer.
25   A  No.

Page 31

1    Q  Look at the next page, which says Aeroservice
2  Aviation Center, Bates stamp No. Hester 0000042.
3    A  42?
4    Q  Yes. The 42 is cut off a slight bit on the
5  bottom right.
6    A  Okay.
7    Q  The day of this document is 09-29-06. Do you
8  recognize this document?
9    A  Yes.
10   Q  What is the nature of this document?
11   A  It's airmen certification proficiency
12 evaluation.
13   Q  And what was this issued?
14   A  To enable me to fly as pilot in command.
15   Q  And who was your employer on 9-29-06?
16   A  Vision Airlines.
17   Q  And who paid for this training?
18   A  Vision Airlines.
19   Q  Look at the next page, Hester 0000043. It says
20 Aeroservice Aviation Center, it has your name on there,
21 it says B737 PIC recurrent training program. Do you see
22 that?
23   A  Yes, I do.
24   Q  So this is not new training, this is recurrent
25 training. Is that correct?

Page 32

1    A  That's correct.
2    Q  So you kept up with the rules and regulations
3  of the FAA. Is that correct?
4    A  Yes.
5    Q  Look at the next page. Hester 0000044. And it
6  says Vision Airlines, flight crew qualification form.
7  Do you see that?
8    A  Yes.
9    Q  And there's some hand writing in there. What
10 was the nature of this document?
11   A  This is a list of various trainings and it is
12 this training that I received at Aeroservice.
13   Q  I notice in the bottom left it's signed by a
14 person named Dan Carson. Do you see that?
15   A  Yes.
16   Q  When was the last time you spoke with Dan
17 Carson?
18   A  More than a year ago.
19   Q  And what was the nature of that conversation?
20   A  It was essentially social.
21   Q  Okay. Besides being essentially social, was
22 there a component that wasn't essentially social?
23   A  He asked how I was doing, if I had found a job,
24 and I said no. And I asked how he was doing. He said
25 he was working on something.

Page 33

1    Q  Did he say what that something was?
2    A  No. He played his cards very close to the
3  vest.
4    Q  Did he discuss this lawsuit or the potential of
5  a lawsuit with Vision Airlines during that social
6  meeting with Dan Carson?
7    MR. BUCKNER: Object to the form. It wasn't a
8  meeting.
9    MR. GEWERTER: It was a conversation.
10 BY MR. GEWERTER:
11   Q  During that conversation, did you have a
12 conversation, or a discussion with him, concerning the
13 potential of a lawsuit against Vision Airlines?
14   A  No.
15   Q  Did you discuss during that conversation an
16 allegation that either you or he were allegedly owed
17 money by Vision Airlines?
18   A  No.
19   Q  Did you discuss Vision Airlines at all during
20 that conversation?
21   A  No.
22   Q  It was strictly social is what you're saying?
23   MR. BUCKNER: Object to the form. That isn't
24 what he said.
25   THE WITNESS: It was a social conversation, and

10 (Pages 34 to 37)

Page 34

```
 1    also a discussion about possibilities for
 2    employment.
 3  BY MR. GEWERTER:
 4    Q  And where were you -- was it a telephone
 5  conversation or a personal meeting?
 6    A  It was a telephone conversation.
 7    Q  And who called whom?
 8    A  I don't recall.
 9    Q  How long did the conversation last,
10  approximately?
11    A  Five to seven minute.
12    Q  And prior to that meeting, or I'm sorry, that
13  conversation just over a year ago, when was the most
14  recent time prior to then that you had a conversation
15  about anything with Dan Carson?
16    A  I don't recall.
17    Q  Have you ever discussed compensation, or lack
18  thereof, with Dan Carson concerning your prior
19  employment with Vision Airlines?
20    A  Yes.
21    Q  When was that conversation?
22    A  Shortly before he is employment was terminated.
23    Q  And who contacted whom?
24    A  We were -- we just ran into each other.
25    Q  Where does he live?
```

Page 35

```
 1    A  I don't know.
 2    Q  Where do you live?
 3    A  I live in Texas.
 4    Q  He doesn't live in Texas, though, does he?
 5    A  No.
 6    Q  How do you just run into somebody in a
 7  different state? I'm curious.
 8    A  We were in the hotel in Washington, DC.
 9    Q  Why were you in the hotel in Washington, DC?
10    A  Because I was on duty with Vision Airlines.
11    Q  Okay. So you were still employed by Vision
12  Airlines?
13    A  Still employed by Vision Airlines.
14    Q  And he was still employed by Vision Airlines?
15    A  Yes.
16    Q  And you discussed compensation issues with Dan
17  Carson concerning Vision Airlines?
18    A  Yes.
19    Q  To the best of your recollection, what was said
20  by you and what was said by Mr. Carson?
21    A  I just asked him that I had heard rumors about
22  hazard pay.
23    Q  Where did you hear those rumors from?
24    A  Other pilots.
25    Q  Can you give me their names?
```

Page 36

```
 1    A  I don't recall. General conversation.
 2    Q  That seems like a big issue. Somebody
 3  allegedly owes you money and you don't remember who told
 4  you, who allegedly owes you money or why?
 5    A  I don't recall.
 6    Q  Was it ever Dan Carson?
 7    A  He mentioned that he thought we might be
 8  entitled to hazard pay.
 9    Q  And was it Mr. Borke?
10    A  Could have been Mr. Borke.
11    Q  You say "could have been." Either it was or it
12  wasn't.
13    A  I don't recall.
14    Q  Who else could it have been?
15       MR. BUCKNER: Object to form. Seeks
16  speculation.
17       MR. GEWERTER: As time goes on his memory seems
18  to get better, and you're coming up with names now.
19       MR. BUCKNER: Harold --
20       MR. GEWERTER: I want the answers.
21       MR. BUCKNER: -- he said he doesn't recall. If
22  he has the answers he'll give them to you. There's
23  no browbeating.
24       MR. GEWERTER: There's no browbeating that's
25  going to happen here.
```

Page 37

```
 1       MR. BUCKNER: I'm objecting to form. Seeks
 2  speculation.
 3       MR. GEWERTER: That's fine.
 4  BY MR. GEWERTER:
 5    Q  Go ahead. Answer the question.
 6    A  It could have been anyone with whom I flew.
 7    Q  Give me a list of all that group of people that
 8  you believe you could have discussed compensation issues
 9  with at Vision Airlines.
10       MR. BUCKNER: Object to the form. Seeks
11  speculation.
12       THE WITNESS: It could have been Gary Borke, it
13  could have been -- I'm trying to remember the
14  names -- could have been Mark Lippi, it could have
15  been Gary Vic, it could have been Dave Frohman,
16  could have been Bill Jordan. It could have been
17  anyone I've flew with. I don't remember the names
18  of all the pilots.
19  BY MR. GEWERTER:
20    Q  When did you first come to the conclusion that
21  Vision had not paid you all the money you felt you were
22  entitled to while working for Vision Airlines?
23       MR. BUCKNER: Object to the form.
24  BY MR. GEWERTER:
25    Q  You can answer it.
```

Page 38

1  A  When my attorneys discovered that was in fact
2  the case.
3  Q  Well, how would you have a lawyer if you didn't
4  know you had a case?
5  A  I didn't know if it were true or not.
6  Q  Okay. At some point in time, I want that time
7  period, to the best of your recollection, did you come
8  to the conclusion that you felt you were entitled to
9  additional money from Vision Airlines?
10     MR. BUCKNER: Objection. Asked and answered.
11     MR. GEWERTER: I haven't gotten a straight one
12  yet, so I want to hear the answer.
13     MR. BUCKNER: Harold, he said when he talked to
14  his attorneys. When his attorney --
15     MR. GEWERTER: You don't hire a lawyer unless
16  you first have a cause of action.
17     MR. BUCKNER: We're not going to debate why you
18  bring a cause of action. It's notice -- the motion
19  to dismiss was denied.
20     Go ahead.
21  BY MR. GEWERTER:
22  Q  Anything else you want to add to that?
23  A  No.
24  Q  When did you first contact this law firm that
25  currently represents you concerning this case?

Page 39

1  A  Late September of 2008.
2  Q  Did you contact them or did they contact you?
3  A  I don't remember who contacted me.
4  Q  And who did you speak with at this law firm
5  that currently represents you? I don't want to know
6  what was said. I just want to know who did you speak
7  with.
8  A  These two gentlemen here.
9  Q  What are their names?
10 A  David Buckner, Brett Von Borke.
11 Q  You know Mr. Von Borke's father was a pilot
12 that flew with you?
13 A  Yes.
14 Q  When did you first learn that?
15 A  When I met him.
16 Q  Did Mr. Borke ever tell you his son was a
17 lawyer?
18 A  Yes.
19 Q  When did he first tell you that?
20 A  I don't recall.
21 Q  Was it while you were employed at Vision
22 Airlines?
23 A  Yes.
24 Q  Other than your lawyers in this case, have you
25 ever talked to or personally met with Ross Goodman?

Page 40

1  A  I have not.
2  Q  Do you know who he is?
3  A  Yes.
4  Q  Who is he?
5  A  He is part of the attorney team.
6  Q  And how do you know that?
7  A  His name has been on the documents.
8  Q  Did you ever provide him with information --
9  don't tell me what was provided, if there was
10 anything -- but did you ever provide him with any
11 information concerning this lawsuit?
12 A  Via the attorneys here.
13 Q  But you never directly provided him with
14 information, did you?
15 A  I did not.
16 Q  Did you ever send him documents in the mail?
17 A  No.
18 Q  How about via e-mail?
19 A  No.
20 Q  How about via fax?
21 A  No.
22 Q  Ever talk to him on the telephone?
23 A  No.
24 Q  Ever meet him in person?
25 A  No.

Page 41

1  Q  So all the information you transmitted came
2  through your law firm in Florida. Correct?
3  A  That is correct.
4  Q  And other than the names you've mentioned so
5  far, who else have you talked to just prior to filing
6  this lawsuit?
7     MR. BUCKNER: Object to the form.
8  Mischaracterizes his testimony.
9  BY MR. GEWERTER:
10 Q  You can answer.
11 A  I don't think I spoke with anyone other than
12 the people I've mentioned.
13 Q  You understand that you are, for lack of a
14 better term, the lead plaintiff in this case?
15 A  Yes.
16 Q  And was that your decision to become the lead
17 plaintiff?
18 A  No.
19 Q  Who asked you to become the lead plaintiff?
20 A  These two gentlemen.
21 Q  Other than your conversation with these two
22 gentlemen, which I don't -- I'm not going to ask you
23 about -- did anyone else tell you why they wanted you to
24 become the lead plaintiff?
25 A  No.

12 (Pages 42 to 45)

Page 42

1  Q  And did you agree to become a lead plaintiff?
2  A  Yes.
3  Q  And before you became lead plaintiff, after you
4  spoke with these two gentlemen, did you speak with
5  anyone else in making that decision?
6  A  No.
7  Q  Did you speak with Mr. Borke, your copilot?
8  A  No.
9  Q  How about Mr. Dan Carson?
10  A  No.
11  Q  Are you aware that Mr. Carson calls himself
12  Dr. Carson?
13  A  Yes.
14  Q  Does he have a doctor degree?
15  A  I heard he has a doctorate in philosophy.
16  Q  A doctorate in philosophy. When was that
17  earned, or obtained, I should say?
18      MR. BUCKNER: Objection. Outside the witness'
19  knowledge.
20      MR. GEWERTER: I'm asking. If he doesn't know
21  he can tell me he doesn't know.
22      THE WITNESS: I have no idea.
23  BY MR. GEWERTER:
24  Q  Did he earn it while he was employed at Vision
25  Airlines?

Page 43

1  A  I have no idea.
2  Q  Okay. But he did refer to himself as
3  Dr. Carson?
4  A  Correct.
5  Q  And sometimes he calls himself Dr. Dan?
6  A  Correct.
7      MR. GEWERTER: Would you mark this next in
8  sequence.
9      (Deposition Exhibit 38 was marked for
10  identification.)
11      MR. GEWERTER: How are you doing on the time?
12      THE VIDEOGRAPHER: Fifteen more minutes.
13  BY MR. GEWERTER:
14  Q  Take a moment and look at this document that's
15  been marked as Exhibit No. 38. I don't need you to read
16  each and every line at this point. Just let me know if
17  you are familiar with this document.
18  A  Yes.
19  Q  What is the nature of this document?
20  A  It's copies of my logbook pages.
21  Q  Whose handwriting is in this document?
22  A  Mine.
23  Q  When you say logbook, again, I'm a layperson,
24  explain to me what a logbook is.
25  A  Logbook is a record that I keep of my flying.

Page 44

1  Q  And this is a logbook while at Vision Airlines?
2  A  Yes.
3  Q  And it shows pilot and copilot?
4  A  It -- it shows who I flew with.
5  Q  Okay. And there's some other names on there
6  also. Sometimes they're circled, sometimes they're not.
7  Who are those people?
8      MR. BUCKNER: Object to the form.
9  BY MR. GEWERTER:
10  Q  You can answer.
11  A  Flight attendants.
12  Q  And in the upper right-hand corner of each
13  page there appears to be a month and a year. Is it a
14  fair statement each one of these pages represents a
15  logbook for a month of a particular year?
16  A  No.
17  Q  So why are there dates in the upper right-hand
18  corner?
19  A  Well, the entire months flying doesn't go on
20  one page.
21  Q  Sometimes it's two pages?
22  A  Sometimes it takes two pages or three pages.
23  Q  But is it correct to say that that month and
24  year is an accurate reflection of your flight hours
25  while at Vision Airlines?

Page 45

1  A  Yes.
2  Q  And if I take all the hours in here -- this is
3  your handwriting. Correct?
4  A  Yes.
5  Q  This is something you prepared by yourself.
6  Correct?
7  A  Yes.
8  Q  So if I take all of your hours here, they
9  should tell me the number of hours you worked for Vision
10  Airlines for a particular time period and in total?
11      MR. BUCKNER: Object to the form.
12      THE WITNESS: It would detail the number of
13  flight hours I worked.
14  BY MR. GEWERTER:
15  Q  And you were paid how much per hour?
16      MR. BUCKNER: Object to the form. What time
17  period?
18  BY MR. GEWERTER:
19  Q  When you were first hired, what was your
20  promise for pay?
21      MR. BUCKNER: Object to the form.
22  BY MR. GEWERTER:
23  Q  Go ahead and answer, please.
24  A  $100 an hour.
25  Q  So if I take a hundred dollars per hour, and

Veritext Florida Reporting Co.
800-726-7007                                    305-376-8800

**46**

1  multiply the number of hours in here, I should then
2  determine how much time and money you earned while at
3  Vision Airlines?
4     A  Yes.
5     Q  Thank you.
6        Have you actually done that?
7     A  No.
8     Q  Is there a reason why you haven't done that?
9     A  I kept a separate record in addition to my
10 logbook. Or I made a notation of the time.
11    Q  Is your separate record different than this
12 record, based on hours?
13    A  No.
14    Q  So this record is an accurate reflection of
15 your hours while working at Vision Airlines?
16    A  Yes.
17    Q  And you have no reason to believe that that
18 document in front of you has been altered, have you?
19 Maybe take your time and look at it.
20    A  No. I have no reason to believe it's been
21 altered.
22    Q  So this is an accurate reflection of the number
23 of hours worked while employed at Vision Airlines.
24 Correct?
25       MR. BUCKNER: Object to the form.

**47**

1  BY MR. GEWERTER:
2     Q  What's your answer, sir?
3     A  Yes.
4     Q  Now, when you went to work for Vision Airlines,
5  did you receive a paycheck or did you get direct
6  deposits?
7     A  Direct deposit.
8     Q  Was that something that was offered or
9  something you requested?
10    A  It was offered.
11    Q  Have you ever gone back to check on your direct
12 deposits and make sure that there was no discrepancies
13 in pay?
14    A  When I got occasional e-mails from HR, and
15 said, you know, asked to verify this, then I did.
16    Q  As we sit here today, though, you have no
17 evidence or facts that your direct deposits somehow were
18 different than what you agreed to work for at Vision
19 Airlines. Correct?
20       MR. BUCKNER: Object to the form.
21       THE WITNESS: The pay that was offered is, I
22    believe, the pay that I received. Occasionally
23    there were errors, and I submitted the corrections
24    as requested.
25       MR. GEWERTER: Could you mark this next,

**48**

1     please.
2        (Deposition Exhibit 39 was marked for
3        identification.)
4  BY MR. GEWERTER:
5     Q  Sir, take a moment and look at the document,
6  and let me know when you've had a chance to review the
7  document. I know it's several pages long. Just take
8  your time.
9     A  Okay.
10    Q  Have you ever seen these documents before?
11 I'll represent that this document starts with Hester
12 000046, and it runs through Hester 000085.
13    A  Yes.
14    Q  What are these documents?
15    A  These are earnings statements.
16    Q  And you've seen these before. Is that correct?
17    A  Yes.
18    Q  Are these accurate?
19    A  Yes.
20    Q  Did you ever complain to anyone at Vision
21 Airlines that you were not receiving what you promised
22 to be received?
23    A  No.
24    Q  In here, for example, take the first page,
25 page 46 of Exhibit No. 49, it says regular earnings,

**49**

1  3,640, per diem, $800. Then in the right-hand side of
2  that column says taxes and deductions. Do you see that?
3     A  Yes.
4     Q  Is there any line in here, anywhere you can
5  show me that says hazard duty pay on this page?
6     A  No.
7     Q  Or any other page?
8     A  No.
9     Q  Well, aren't you suing over hazard duty pay?
10    A  Yes.
11    Q  So if you didn't agree to get hazard duty pay,
12 you agreed to work for a hundred dollars per hour, and
13 these documents are accurate, tell me the nature of your
14 lawsuit as to why you believe you're entitled to hazard
15 duty pay.
16       MR. BUCKNER: Object to form.
17 BY MR. GEWERTER:
18    Q  You can answer.
19    A  I was a pilot. I and the other pilots and the
20 flight attendants and the mechanics who did the
21 hazardous duty that would justify the receipt of hazard
22 pay should be the ones who receive it.
23    Q  But you were never promised that, though, were
24 you?
25    A  I was not promised that, but I expected the

**Page 50**

1  company to do the right thing.
2  Q  And later on your compensation changed, didn't
3  it, in 2007?
4  A  Yes.
5  Q  And, in fact, there was a pay increase.
6  Correct?
7     MR. BUCKNER: Object to the form.
8     THE WITNESS: There was a pay change.
9  BY MR. GEWERTER:
10 Q  How did it change in 2007? I believe it's
11 October.
12 A  They changed the pay scheme to include a base
13 amount and an hourly amount.
14 Q  Do you remember what that was?
15 A  I'd have to review the document.
16 Q  It was a pay increase, though, wasn't it?
17 A  It was a pay cut for me.
18 Q  Why was it a pay cut for you?
19 A  Because I was assigned as a crews captain,
20 international relief officer.
21 Q  And you acknowledge, as you said earlier, you
22 were an at-will employee. Correct?
23 A  Yes.
24 Q  And there's no guarantee of employment, was
25 there?

**Page 51**

1  A  No.
2  Q  And you understood at all times that Vision
3  could hire and fire any or all of its employees at will.
4  Correct?
5  A  Within the bounds of the law, yes.
6  Q  As an at-will employee, you understood you had
7  no guarantee of a job beyond that day, did you?
8  A  That's correct.
9     MR. GEWERTER: Let's mark this next, please.
10    Are we okay on time? Actually, let's stop now.
11    It my be a -- point, but that's all right.
12    THE VIDEOGRAPHER: Let me go off the record.
13    The time is 10:42.
14    (Recess taken.)
15    THE VIDEOGRAPHER: All right. We're now back
16 on the record. The time is 10:57.
17 BY MR. GEWERTER:
18 Q  Sir, we're back on the record now. Did you
19 discuss this case with anyone other than your lawyers
20 during the break?
21 A  I beg your pardon?
22 Q  Did you discuss -- did you discuss this case
23 with anyone other than your lawyers during the break?
24 A  No.
25 Q  You said earlier that when you first were

**Page 52**

1  contacted by Dan Carson that he wanted you to get
2  certified because he wanted you to run a charter.
3  A  Yes.
4  Q  Who was that charter for?
5  A  It was a Vision Airlines charter.
6  Q  How do you know that?
7  A  It was a Vision Airlines airplane.
8  Q  How do you know that? Did you actually fly the
9  charter?
10 A  Yes, I flew it.
11 Q  Was it marked Vision Airlines?
12 A  No. It was one of the Vision Airlines
13 aircraft.
14 Q  And you know that because you're a pilot and
15 you know from the -- from certain records you can tell?
16 A  It was an aircraft Vision Airlines operated.
17 Q  I understand what you're saying. I want to
18 know how you know that, though. What gave you special
19 knowledge to tell you that?
20 A  I flew the airplane on other trips after that.
21 Q  Okay. That's fine.
22    MR. GEWERTER: I'm going to mark another
23 exhibit. You can mark this next exhibit, please.
24    (Deposition Exhibit 40 was marked for
25 identification.)

**Page 53**

1  BY MR. GEWERTER:
2  Q  Let me know when you've had a chance to review
3  this document. It looks like W-2 wage and tax
4  statements for the year 2006.
5  A  Yes.
6  Q  Have you ever seen these documents before
7  today?
8  A  Yes.
9  Q  And when did you see them, approximately?
10 A  They would have been provided so we could
11 prepare our income tax.
12 Q  They were provided to you by Vision Airlines?
13 A  Yes.
14 Q  Are they accurate?
15    MR. BUCKNER: Object to the form. He hasn't
16 had a chance to review them until now.
17    MR. GEWERTER: He said he got them to prepare
18 his tax returns. They're your documents.
19    MR. BUCKNER: You didn't get this from us,
20 though, Harold. He doesn't know if this is his. I
21 don't know that you've done -- I don't know that
22 anybody has done anything with this or not. I don't
23 know where this came from.
24 BY MR. GEWERTER:
25 Q  Let me ask you another way. Is your name