Exhibit 1-C

**110**

1  Q  Is this a true and correct copy of the document
2  you signed on or about March 1, 2007?
3  A  I don't have a copy of it, so I can't
4  authenticate it.
5  Q  Do you have any reason to believe this is not
6  your signature?
7  A  No.
8  Q  Do you have any reason to believe that this
9  document has been falsified to insert your signature?
10 A  No.
11 Q  What is your current address?
12 A  7920 Bella Court, B-E-L-L-A, North Richland
13 Hills, Texas, 76182.
14 Q  And when did you move to that address from Mill
15 Crossing West?
16 A  November of last year.
17    MR. BUCKNER: Harold, wait one second. I want
18 to tell them to quiet down.
19    MR. GEWERTER: Absolutely.
20    Would you mark this next, please.
21    (Deposition Exhibit 49 was marked for
22    identification.)
23 BY MR. GEWERTER:
24 Q  Look at this document. It says "401(K) Salary
25 Deferral Election Change Form." Let me know when you've

**111**

1  had a chance to review this.
2  A  I have looked it over.
3  Q  Is that your signature that appears at the
4  bottom left-hand corner of the page?
5  A  That appears to be my signature.
6  Q  And you remember signing this document on or
7  about 6-27-07?
8  A  I remember signing information regarding the
9  401(k) plan.
10 Q  Was it your desire to decline to make
11 contributions to the plan?
12 A  Yes.
13 Q  Any reason for that?
14 A  I didn't want to participate in the plan.
15 Q  You wanted the maximum current compensation at
16 all times?
17 A  Yes.
18 Q  Speaking of compensation, over lunch I did some
19 quick math, and maybe you can help me out here. Let's
20 go back to Exhibit No. 44. Go to the second page. This
21 is the document between you and Vision Airlines that
22 came from Jim Maguire. Let me ask you a couple of
23 questions.
24    You said you weren't exactly sure how many
25 hours you flew each month because it changed. Is that

**112**

1  correct?
2  A  Yeah. It was a variable.
3  Q  Is 75 hours a month a fair approximation of
4  what you averaged?
5     MR. BUCKNER: Objection. Seeks speculation.
6     THE WITNESS: I really don't know.
7  BY MR. GEWERTER:
8  Q  Well, let's -- if you worked -- prior to
9  November 1 of 2007, if you worked 75 -- I'm sorry -- if
10 you flew in the aircraft 75 hours per month -- and you
11 made a hundred dollars an hour. Is that correct?
12 A  Yes.
13 Q  You should therefore gross how much?
14 Seventy-five times a hundred?
15 A  $7500.
16 Q  Right. Now, after November 1, the compensation
17 pay changed per this document, and you said your base
18 pay now became $40,000 per year, plus -- what was it?
19 $70 per hour?
20 A  Yes.
21 Q  Or was it $80 per hour for a 737 captain?
22 Which one was it?
23 A  It was $70 for a 767 first officer.
24 Q  But you also still flew as a captain on a 737,
25 though?

**113**

1  A  I did not after this date. I don't believe I
2  did.
3  Q  So afterwards your pay then becomes 40,000 per
4  year plus $70 per hour, times -- times 75 hours.
5  Correct?
6  A  40,000 per year base salary.
7  Q  Was your base, right.
8  A  Plus a flight hour rate of $70.
9  Q  And for about 75 hours per month. Correct?
10    MR. BUCKNER: Object to the form. He didn't
11 testify to that.
12    THE WITNESS: I don't know how many hours I
13 flew. If you wanted to take the time, I could
14 probably add them up.
15 BY MR. GEWERTER:
16 Q  But if I go back and add up those hours, that
17 should be your compensation, though. Would that be the
18 method to determine your compensation after November 1,
19 2007?
20 A  Yes.
21 Q  So just for clarity, I would take $70 per hour,
22 times number of hours per month, and that should give me
23 the hours pay per month -- per that month?
24 A  Yes.
25 Q  And then to that I'd add for the entire

**Page 114**

1   12-month period $40,000, and come up with that
2   calculation.
3       A   Yes.
4       Q   And that's what you agreed to work for as of
5   November 1, 2007. Correct?
6       A   Those -- that's the rate structure that was
7   unilaterally imposed by Vision Airlines.
8       Q   You didn't quit, though, did you, because of
9   that?
10      A   No.
11      Q   And, in fact, because there was a guaranteed
12  base, you could have made more money after November 1,
13  2007, because before there was no guarantee anything?
14      A   Not necessarily.
15      Q   There was a guarantee before November 1, 2007?
16      A   No. The reason you might necessarily -- might
17  not necessarily have made more is because the flight
18  hours were less on the 767 because it made fewer stops
19  and it flew at a higher speed.
20      Q   But you could have made more too. You don't
21  know the answer to that?
22      A   I don't know.
23      Q   But that's what you agreed to work for?
24      A   I worked for the money that they established
25  was the pay rate.

**Page 115**

1       Q   And you cashed those checks based on that
2   agreement, too. Right?
3       A   I cashed the checks that were paid.
4       Q   Did you ever lodge an objection with anyone in
5   the division saying you were not being paid what you
6   felt you agreed to pay?
7       A   I didn't agree. You keep saying "agree." This
8   is what was presented, and this is what I was paid.
9       Q   And you didn't quit --
10          MR. BUCKNER: Let him finish.
11  BY MR. GEWERTER:
12      Q   Did you quit?
13      A   No.
14      Q   And you kept taking money from Vision, though?
15      A   I kept earning money from Vision.
16          MR. BUCKNER: Object to the form.
17  BY MR. GEWERTER:
18      Q   And did you go to them and say I refuse to work
19  anymore unless you go back to the old pay structure?
20      A   No.
21      Q   Did you issue a letter to them or a memo or
22  anything saying I'm not going to work for that amount
23  anymore because that's not what I agreed to when I was
24  first hired?
25      A   No.

**Page 116**

1       Q   Did you lodge an objection verbally to anyone?
2       A   No.
3       Q   Such as Mr. Maguire?
4       A   No.
5       Q   How about Mr. Daggett?
6       A   No.
7       Q   Let me go to one clean-up matter. Earlier we
8   had an issue about the sleeping in the cockpit on
9   September 13th of 2007. Did you self-report that to the
10  FAA?
11      A   No.
12      Q   Are you aware of whether or not Vision reported
13  that to the FAA?
14      A   No.
15      Q   No, you're not aware of it?
16      A   I don't -- I'm not aware of it.
17      Q   Nobody from Vision told you that they reported
18  that to the FAA?
19      A   That's correct.
20      Q   Are you surprised to hear that it was reported?
21      A   I wasn't advised.
22      Q   Isn't sleeping on duty something that should be
23  reported to the FAA?
24      A   No.
25      Q   In all your years of experience, you don't find

**Page 117**

1   that to be a violation of FAA rules and regulations?
2           MR. BUCKNER: Object to form. Not an expert
3   witness.
4           MR. GEWERTER: His experience.
5           MR. BUCKNER: Lodging an objection, counsel.
6           THE WITNESS: No, I don't believe that is a
7   violation.
8   BY MR. GEWERTER:
9       Q   So you can sleep the entire trip and that's not
10  a violation?
11          MR. BUCKNER: Object to form. Mischaracterizes
12  his testimony.
13  BY MR. GEWERTER:
14      Q   You can answer.
15      A   I don't believe that's a violation.
16      Q   So there's nothing wrong with sleeping while
17  being employed by -- as an airline captain?
18          MR. BUCKNER: Object to the form.
19          THE WITNESS: Sleeping in the cockpit is not
20  the preferred thing. There is evidence and there is
21  a movement on the part of some aviation safety
22  organizations to get specific language which would
23  encourage and allow naps up to 40 minutes duration
24  to ensure that a pilot is at -- in a good rest state
25  for the critical stage of the flight.

**118**

1  BY MR. GEWERTER:
2   Q  Well, you fell asleep about three hours into
3  that flight, though, didn't you?
4   A  Probably a longer time frame than that.
5   Q  And before you took a nap did you tell
6  Mr. Borke you were going to take a nap?
7   A  Yes.
8   Q  What did he tell you?
9   A  He said, "I'm fine. Go ahead and take a nap."
10  Q  Did you tell him how long you were going to nap
11  for?
12  A  I don't recall.
13  Q  But you don't disagree with the fact that it
14  was the flight attendants that woke you up, and it
15  wasn't Mr. Borke that woke you up?
16  A  I do not disagree.
17  Q  It was, in fact, the flight attendants. Those
18  e-mails were accurate earlier. Is that correct? The
19  ones from the flight attendants about waking you up?
20  A  It was Amanda Bradley who woke me up.
21  Q  Are you aware of whether or not Mr. Borke tried
22  to wake you up?
23  A  I'm not aware of that.
24      MR. GEWERTER: Mark this next, please.
25      THE WITNESS: I'm just aware of his statement

**119**

1  that he was preparing to make me up because we were
2  approaching top of descent, and we had been cleared
3  down to flight level one zero zero, 10,000 feet.
4  BY MR. GEWERTER:
5   Q  That's something normally that the captain
6  should be aware of at all time. Correct?
7      MR. BUCKNER: Object to the form.
8  BY MR. GEWERTER:
9   Q  There's a question. Don't look at the document
10  yet. That's next. There was still a question.
11  A  Normally, yes, both pilots are aware of what
12  the clearances are.
13  Q  Both pilots at all times should be aware of all
14  the clearances. Is that correct?
15  A  I said normally both pilots are aware of what
16  the clearances are.
17  Q  And that's normal custom and practice in the
18  industry?
19  A  Yes. And that's what he told me. "I was going
20  to wake you up, we've been cleared down to 10,000 feet."
21      (Deposition Exhibit 50 was marked for
22      identification.)
23  BY MR. GEWERTER:
24  Q  Look at Exhibit No. 50, please. Just handed --
25  I think it's 50.

**120**

1      THE REPORTER: Yes.
2  BY MR. GEWERTER:
3   Q  Let me know when you've had a chance to look at
4  that document.
5   A  I have looked it over.
6   Q  And on page 1 of this document, which is four
7  pages -- I'm sorry, it's five pages. Page 1 is a cover
8  letter from you. Was that your signature?
9   A  Yes.
10  Q  And you're saying that you've returned all
11  requested items pertaining to the termination of your
12  employment with the exception of the separation
13  agreement, and full general release which you declined
14  to sign. Did you have a conversation with Mr. Daggett
15  or anyone else from Vision concerning your separation
16  agreements?
17  A  No.
18  Q  How did you receive a copy of it?
19  A  I don't recall if it came via mail or e-mail.
20  Q  But you did get this document or something very
21  similar to this document?
22  A  Yes.
23  Q  Is this an exact copy or you just don't
24  remember at this time?
25  A  I can't say that that is an exact copy of the

**121**

1  document. I don't recall.
2  Q  Tell me why you declined to sign this document
3  on or about September 3, 2008.
4  A  Because the company was offering $7500 as a
5  severance pay, and that would have precluded me from
6  collecting unemployment.
7  Q  So that's the only reason why, because you
8  wanted unemployment?
9  A  I wanted the unemployment, and I actually
10  became suspicious about this full and general release of
11  liability. I read through that and thought, "Are they
12  trying to hide something?"
13  Q  And did you write back or somehow communicate
14  with Mr. Daggett, and say, oh, by the way, I want my
15  hazard duty pay?
16  A  No. I didn't do that.
17  Q  Again, you may have answered this this morning,
18  and I apologize. When was the first time you came to
19  the conclusion you felt you were owed hazard duty pay?
20  A  The -- there was a question due to the
21  discussion that was going around in the company as to
22  whether we were entitled hazardous duty pay. I became
23  convinced of it upon information discovered by my
24  attorneys.
25  Q  When was that again?

**Page 122**

1    A   That was after they did their investigation,
2    and determined that it would be appropriate to proceed
3    with this lawsuit.
4    Q   And when did you first hire this law firm to
5    represent you?
6    A   I don't recall the date we signed the papers on
7    that.
8    Q   And what was your fee agreement with this law
9    firm?
10       MR. BUCKNER: Objection. This is privileged
11   information, Harold.
12       MR. GEWERTER: Well, no, it's not. I'll tell
13   you why.
14   BY MR. GEWERTER:
15   Q   You're seeking attorneys' fees in this case,
16   aren't you? In your complaint you're asking for
17   attorneys' fees.
18       MR. BUCKNER: You can answer if you know.
19       THE WITNESS: I'm not certain, but I think
20   that's correct.
21   BY MR. GEWERTER:
22   Q   What is your fee agreement with this law firm?
23       MR. BUCKNER: Again, objection, Harold. This
24   is attorney-client privileged communications.
25       MR. GEWERTER: No. It's discovery on damages.

**Page 123**

1    I have a right to know how much he's agreed to pay
2    you if you're seeking reimbursement from my client.
3    Otherwise I'm going to move to strike that part of
4    the complaint. So I have a right to know it.
5        MR. BUCKNER: There's a difference between his
6    fee arrangement with us and damages, as you know.
7    Attorneys' fees are not damages. And as you also
8    know, this is a certified class action. The Court
9    decides what award of attorneys' fees there will be.
10   So his agreement with us is a privileged matter
11   between us.
12       MR. GEWERTER: No, it's not. Because at some
13   point you're going to present that agreement to the
14   Court. That's just how it works. I've done these
15   before.
16       MR. BUCKNER: Why would I present the
17   agreement? I don't want to argue with you, but why
18   would --
19       MR. GEWERTER: You're going to present the
20   agreement, you're going to say I have an agreement
21   to X percent or X numbers of dollars.
22       MR. BUCKNER: No, no, no.
23   Could we go off the record for a second?
24       MR. GEWERTER: That's fine.
25       MR. BUCKNER: I don't want to have this debate

**Page 124**

1    on videotape.
2        THE VIDEOGRAPHER: Let me go off the record.
3    The time is 1:44.
4        (Discussion off the record.)
5        THE VIDEOGRAPHER: We're now back on the
6    record. The time is 1:46.
7        MR. BUCKNER: Before you start, Harold, let me
8    just put briefly on the record what I just offered
9    to you so you have it.
10       I said to you if you could find case law that
11   said that you were entitled to the fee arrangement
12   between us and our client, I'll be happy to give you
13   the fee arrangement between us and our client.
14       MR. GEWERTER: So my questions at this point in
15   time, on this date, you guys are refusing to answer
16   what the fee agreement is between yourself and this
17   client. Or actually between this client and this
18   law firm is what I should say.
19       MR. BUCKNER: That's correct. I believe it's
20   an attorney-client privileged matter, but if you
21   find case law that it isn't, I'll present you with
22   whatever documentation is necessary to establish
23   what that arrangement is.
24       MR. GEWERTER: Even though that's in the
25   complaint, this client is still refusing to answer?

**Page 125**

1        MR. BUCKNER: I'm instructing him not to answer
2    because it's privileged, and if you can find case
3    law that says you're entitled to it, I'll provide
4    you with that information.
5        MR. GEWERTER: Okay. That's fine.
6    BY MR. GEWERTER:
7    Q   Go back to Exhibit No. 50. Is there a reason
8    why you didn't put in this letter you declined to sign
9    because you want hazard duty pay?
10   A   The primary reason was that I could -- I felt
11   that I would get more money through unemployment. And
12   the secondary reason was I didn't like waiving all of my
13   rights, which -- what appears the full and general
14   release of liability appeared to do.
15   Q   One moment, please.
16       MR. GEWERTER: Would you mark this, please.
17       (Deposition Exhibit 51 was marked for
18   identification.)
19   BY MR. GEWERTER:
20   Q   You've just been handed what's been marked
21   Exhibit 51 by the court reporter. Take your time and
22   look at this document, please, which I believe is 28
23   pages in length.
24       You want to read this, I have no problem with
25   that.

**126**

1  Maybe we should take a quick break to give him
2  a chance to read it, instead of wasting everyone's time.
3  A  I don't need to waste your time. I'm -- I'm
4  ready to answer your questions.
5  Q  Okay. This says "Class Action Complaint, Jury
6  Demand." Do you see that?
7  A  Yes.
8  Q  And in the caption, it says "Gerald Hester, on
9  behalf of himself and all others similarly situated."
10 Do you see that?
11 A  Yes.
12 Q  Now, whose decision was it that you would be
13 the lead plaintiff in this case?
14 A  I was asked if I was willing to be the lead
15 plaintiff in this case.
16 Q  Again, who asked you that?
17 A  My attorneys.
18 Q  And is that in the very first conversation you
19 had with them or later on?
20 A  That was later on.
21 Q  And looking at the opening paragraph, "In the
22 years after the devastating attacks of September 11,"
23 who provided that information to put in this complaint?
24 A  I don't know. I was not the source.
25 Q  But you're the plaintiff in this case, though.

**127**

1  Correct?
2  A  I'm the plaintiff.
3  Q  SO looking at the first paragraph which starts
4  on page 1, and ends on page 2, which ends, "The United
5  States is engaged," did any of that information come
6  from you, that first full paragraph?
7  A  No. I'm sorry.
8     No, no, sir.
9  Q  The next paragraph, it starts "Vision Airlines,
10 Inc.," and at the very end it says "as to all other
11 matters," did any of that information come from you?
12 A  No.
13 Q  Let's go to paragraph No. 1, under "Parties,"
14 which starts on page 2, and ends on the top of page 3.
15 Take a look at that and let me know what information, if
16 any, came from you concerning the allegations in
17 paragraph numbered one?
18 A  I provided that information.
19 Q  All of it?
20 A  Up to 76, Boeing 767s.
21 Q  Where are you reading? The bottom of page 2?
22 A  Yes.
23 Q  Go up about five lines from there, it says
24 "he," which refers to you, "retired in September 2000
25 upon reaching the mandatory requirement age Congress

**128**

1  imposes on commercial airline pilots." Is that a
2  correct statement?
3  A  That is correct vis-a-vis airlines operating
4  under Part 121.
5  Q  So if an airline is under Part 21, you
6  acknowledge that there are age restrictions on pilots?
7  A  Under Part 121, yes, there are.
8  Q  And you're also aware under Part 121 that the
9  company has the option to adopt a policy of its own
10 concerning the age restrictions?
11    MR. BUCKNER: Object to form. He's not an
12 expert in the matter.
13    MR. GEWERTER: I'm just asking him if he's
14 aware.
15    THE WITNESS: I'm not aware of that.
16 BY MR. GEWERTER:
17 Q  And you knew that Vision was transitioning to
18 Part 121. Correct?
19 A  No.
20    MR. BUCKNER: Object to the form.
21 BY MR. GEWERTER:
22 Q  You did not know they were transitioning to
23 Part 121?
24 A  I do now. I didn't know when I was hired.
25 Q  Okay. And how old were you when you were hired

**129**

1  by Vision?
2  A  I was 65.
3  Q  And under Part 121, you already reached the
4  maximum age mandatory -- the mandatory age for
5  requirement. Correct?
6  A  Correct.
7  Q  And are you aware of any effort that the
8  client, the government client, wanted all pilots past
9  age 65 not to fly in their flights?
10 A  No, I'm not.
11 Q  Go to paragraph No. 3. I'm sorry. It's
12 paragraph No. 2 on page 3. It says, "Vision is a
13 specialty charter airline." Do you see that?
14 A  Yes, I do.
15 Q  What information, if any, did you provide that
16 went into that paragraph?
17 A  I did not provide any of that.
18 Q  Do you know where it came from?
19 A  It was developed by my attorneys.
20 Q  Did you read this complaint before it was filed
21 with the United States District Court?
22 A  I did read through it.
23 Q  And did you make any changes to it?
24 A  I made a couple of changes with respect to my
25 personal information.

**Page 130**

1  Q  But you read each and every line of each and
2  every page of this document that was filed on
3  January 20, 2009?
4     A  Yes, I did.
5     Q  And when you read this document, there's some
6  pretty sensitive information in here about where they
7  fly, where you flew, the nature of the flying, and the
8  nature of the program?
9        MR. BUCKNER: Object to the form.
10 BY MR. GEWERTER:
11    Q  Go back to the very first line of the first
12 page and take your time and go through.
13       MR. BUCKNER: I'm sorry. Do you want him to
14    read the whole thing?
15       MR. GEWERTER: No. Just go up until the top --
16    through paragraph numbered two for right now.
17       THE WITNESS: Okay. I have read up to
18    "parties."
19 BY MR. GEWERTER:
20    Q  It should be up to the word "jurisdiction."
21    A  Oh, you want me to go to "jurisdiction"?
22    Q  Yes.
23    A  Okay. I've read that.
24    Q  Do you believe any of the information contained
25 in that part of the complaint is covered by either of

**Page 131**

1  the two NDAs that you signed?
2     A  No, I did not.
3     Q  Did you read your NDAs again before you
4  approved this complaint?
5        MR. BUCKNER: Object to the form.
6  BY MR. GEWERTER:
7     Q  Go ahead and answer it.
8     A  I don't recall.
9     Q  In fact, you could not have, because you said
10 earlier you didn't have copies.
11    A  Yeah, I didn't have copies of those, so I
12 couldn't have.
13    Q  So the answer is you could not have reread your
14 two NDAs at the time this complaint was filed on
15 January 20, 2009, because you allege you didn't have
16 copies of them.
17    A  I didn't have copies, so I couldn't have read
18 it.
19    Q  So you had no basis to compare the NDAs to
20 information contained in this complaint do you -- or did
21 you at the time?
22    A  No, none other than my recollection of them.
23    Q  But earlier you couldn't recollect what was in
24 the documents, the NDAs?
25    A  That's true.

**Page 132**

1        MR. BUCKNER: Objection. It's argumentative.
2        MR. GEWERTER: It's not argumentative. It's
3     cross.
4        MR. BUCKNER: It's an objection, Harold. Not
5     arguing with you. It's an objection.
6  BY MR. GEWERTER:
7     Q  Let's go to the next paragraph, under
8  "jurisdiction." Do you see that in front of you?
9     A  Yes, I do.
10    Q  I don't care about the statutes. That's
11 nothing that I want to worry about in particular. But
12 it says the amount in controversy exceeds $75,000. Are
13 you alleging that you're owed a sum in excess of
14 $75,000?
15       MR. BUCKNER: Objection. Mischaracterizes.
16       MR. GEWERTER: I'm just asking him if he is.
17       MR. BUCKNER: Okay.
18       MR. GEWERTER: He can tell me whatever he likes
19    to tell me.
20       THE WITNESS: I'm uncertain as to how much I am
21    individually owed, but I believe that the amount for
22    the class is significantly in excess of 75,000.
23 BY MR. GEWERTER:
24    Q  Do you believe the amount in the class is
25 significantly in excess of $5 million?

**Page 133**

1     A  I don't know the amount at issue.
2     Q  In fact, it's a fair statement, when you filed
3  this complaint, you have no basis, factual basis, to
4  determine how much you are owed individually. Did you?
5     A  I did not.
6     Q  And you have no basis to determine what was
7  owed collectively to the proposed class at that time,
8  did you?
9     A  No. The amount of the hazard pay that Vision
10 collected was not disclosed to us employees.
11    Q  So you had no basis to put these numbers in
12 there, did you?
13       MR. BUCKNER: Object to the form.
14 BY MR. GEWERTER:
15    Q  You can answer.
16    A  Again, I rely on my counsel to make the
17 investigation and determination on that.
18    Q  But you provided facts to your counsel, though,
19 didn't you?
20    A  About myself.
21    Q  Who else provided facts to the same law firm?
22       MR. BUCKNER: Object to form.
23       Stop a second. You can answer the question if
24    you know it without having gotten it from us. If
25    you got it from a conversation from us, it's

Page 134

1  attorney-client privileged communication and I'm
2  instructing you not to answer.
3      THE WITNESS: You have to ask them. I don't
4  know where they got their information.
5  BY MR. GEWERTER:
6      Q  So they called you up and said do you want to
7  be a plaintiff in this case. Is that what happened?
8      MR. BUCKNER: Object to the form.
9      Mischaracterizes testimony.
10 BY MR. GEWERTER:
11     Q  Well, somehow information got on this complaint
12 that you allege did not come from you. Is that correct?
13     A  That is correct.
14     Q  Do you know where the information came from,
15 which individuals?
16     A  I do not.
17     Q  Did you ask that question before you authorized
18 the filing of this complaint in your behalf on
19 January 20th, 2009?
20     MR. BUCKNER: I'm going to object, because you
21     would have had to asked us. That's attorney-client
22     privilege. I'm instructing you not to answer.
23 BY MR. GEWERTER:
24     Q  Did you ask anyone other than your lawyer that
25 same question?

Page 135

1      A  No.
2      Q  Go to the bottom of page 3 under "facts."
3  Paragraph six. Do you see that?
4      A  Yes.
5      Q  Look at paragraph six. You can read it to
6  yourself, and you tell me where that information came
7  from, if you know.
8      A  I do not know.
9      Q  Did you provide any of the information this is
10 contained in paragraph six commencing on the bottom of
11 page 3?
12     A  No, I did not.
13     Q  Let's go to paragraph seven. Same question.
14 Do you know where that information came from?
15     A  No, I do not.
16     Q  Did you provide any of the information?
17     A  No, I did not.
18     Q  Go to paragraph eight. How do you know how
19 many soldiers have died in the wars in Iraq and
20 Afghanistan?
21     A  I don't know, but what information is in the
22 public record I would -- I would be comfortable with
23 that.
24     Q  And what does that have to do with you
25 receiving or alleging the receipt of hazard duty pay?

Page 136

1      MR. BUCKNER: Objection. He didn't draft the
2      complaint.
3      MR. GEWERTER: Oh, he's responsible for what's
4      in here. Make no mistake about that.
5      MR. BUCKNER: He didn't draft the complaint.
6      You can answer.
7      MR. GEWERTER: You're responsible for what your
8      lawyer does. I'll have that debate in front of any
9      court anywhere.
10     MR. BUCKNER: Okay.
11 BY MR. GEWERTER:
12     Q  In paragraph 8, it talks about in
13 February 2008, Reuters reported that more than a
14 thousand government contractors have died in
15 Afghanistan. How do you know that information? Did you
16 read the Reuters report yourself?
17     A  I did not.
18     Q  Do you know who did?
19     A  I did not.
20     Q  And how was that a basis or relevant in any
21 manner whatsoever to you receiving hazard duty pay?
22     MR. BUCKNER: Objection. Argumentative.
23 BY MR. GEWERTER:
24     Q  Go ahead and answer.
25     A  Hazard pay is pay for folks who undergo

Page 137

1  hazardous assignments.
2      Q  How do you define -- go ahead.
3      A  We -- our pilots, flight attendants and
4  mechanics -- to the best of my knowledge, were the only
5  people at Vision Airlines who undertook hazardous duty
6  and as such, if Vision received hazard pay, it
7  rightfully belongs to those people who endured the
8  hazard.
9      Q  How do you define the word "hazard"?
10     A  That would be a significant chance of injury or
11 harm from your activities.
12     Q  Has anyone at Vision been injured or harmed as
13 part of this Air Bridge program?
14     A  Yes.
15     Q  Whom?
16     A  Flight attendant was injured on a flight.
17     Q  How?
18     A  I believe she broke her hand or her wrist.
19     Q  Doing what?
20     A  She was just performing her duties in the
21 service.
22     Q  Had nothing to do with going into a war zone,
23 did it?
24     A  No.
25     Q  So it wasn't hazard-related, was it?

36 (Pages 138 to 141)

**Page 138**

1  A  That injury, no.
2  Q  Did you fly into both Baghdad and Kabul?
3  A  I did.
4  Q  Did all the pilots fly into both Baghdad and
5  Kabul?
6  A  The time I was there, yes.
7  Q  But you said at the time you were there. Did
8  that change or do you have any knowledge of that?
9  A  I don't know.
10 Q  How about the flight attendants?
11 A  Yes, I believe all the flight attendants went
12 into both locations.
13 Q  And what about the mechanics?
14 A  Yes, I believe they did.
15 Q  You believe or you're speculating or just not
16 sure?
17 A  I -- I would have to check the schedules to see
18 where they were assigned.
19 Q  Now, when you flew into Baghdad and Kabul, you
20 actually flew into a base that was protected by the U.S.
21 military. Is that correct?
22 A  There was a U.S. military presence there, yes.
23 Q  In fact, it's quite large, even at the time you
24 flew you there. Correct? You're shaking your head yes,
25 but I need an audible --

**Page 139**

1  A  I'm sorry. Yes, I believe so.
2  Q  Do you feel safe flying into a base that's
3  protected by the U.S. military?
4  A  The military is not always in total control.
5  Q  Wasn't my question. Was there a time period
6  that you flew into Baghdad or Kabul when the military
7  was not in control when you landed or took out?
8      MR. BUCKNER: Object to the form. Outside his
9  knowledge.
10     MR. GEWERTER: At the time you took off or
11 landed? That's directly within his knowledge?
12     MR. BUCKNER: Whether the military was in
13 control, Harold?
14     MR. GEWERTER: If he knows or doesn't know.
15 BY MR. GEWERTER:
16 Q  Was there chaos on the ground? Did it look
17 like a war zone or not a war zone or what did it look
18 like?
19     MR. BUCKNER: Same objection.
20     THE WITNESS: There were many times we were
21 vectored around due to active areas near the airport
22 where there was fighting. And we were directed away
23 and had to delay our arrival or were told to hold
24 off to the side.
25 BY MR. GEWERTER:

**Page 140**

1  Q  Who told you to vector away or hold off to the
2  side?
3  A  Air traffic controllers.
4  Q  Are those private contractors or are they
5  military?
6  A  I don't know.
7  Q  Well, you spoke with them, didn't, you on the
8  radio?
9  A  Yes.
10 Q  And you didn't have any conversation who they
11 worked for, who they were?
12 A  No.
13 Q  And were you ever shot at while flying a plane
14 into Baghdad or Kabul?
15 A  Not my knowledge.
16 Q  Well, you would know if you were shot at,
17 wouldn't you?
18 A  Not necessarily.
19 Q  Do you see someone shoot at you while you were
20 taking off or landing to either Kabul or Baghdad?
21 A  No.
22 Q  Did somebody tell you afterwards, oh, by the
23 way, you may not have known about it, but there's
24 missiles going by us here, we almost got killed?
25     You want to re-read the question back?

**Page 141**

1  A  Please.
2     MR. GEWERTER: Could you please read that back.
3     (The question was read by the reporter as above
4  recorded.)
5     THE WITNESS: No.
6  BY MR. GEWERTER:
7  Q  Do you have any knowledge that you ever
8  personally were in imminent danger of bodily harm or
9  death while you flew for Vision Airlines?
10 A  No.
11 Q  Look at paragraph No. 9 on the bottom of
12 page 4. Did any of that information come from you?
13 A  No.
14 Q  Do you know who it came from?
15 A  I do not.
16 Q  Look at paragraph No. 10. Did any of that
17 information come from you?
18 A  No.
19 Q  Do you know who it came from?
20 A  I do not.
21 Q  Did you read paragraph ten before this
22 complaint was filed?
23 A  Yes.
24 Q  Did you read this complaint line by line, word
25 by word, or you just kind of cursory looked at this

**142**

1  before it was filed?
2      A  No, I read it.
3      Q  And did you agree with the filing of this
4  complaint?
5      A  Beg your pardon?
6      Q  Did you agree to have this complaint filed in
7  your behalf?
8      A  Yes.
9      Q  But when you filed this complaint, you didn't
10  take into account your two NDAs that you signed, did
11  you?
12      MR. BUCKNER: Object to the form.
13  Mischaracterizes testimony.
14      THE WITNESS: There's nothing in this complaint
15  that violates either of those documents.
16  BY MR. GEWERTER:
17      Q  And you know that why?
18      A  I've reviewed it.
19      Q  Reviewed what? The NDAs or the complaint?
20      A  I've reviewed both of them now.
21      Q  That's now. But did you -- you didn't renew
22  the NDAs right before you filed this complaint, though,
23  did you?
24      A  No. But based on what I did know, or remember
25  about it, there's nothing in here that violated those.

**143**

1      MR. GEWERTER: I think we're being told we're
2  short on time with the tape, so let's take a break.
3      THE VIDEOGRAPHER: Going off the record. The
4  time is 2:11.
5      (Recess taken.)
6      THE VIDEOGRAPHER: We're now back on the
7  record. The time is 2:34.
8  BY MR. GEWERTER:
9      Q  Mr. Hester, before the break I was asking you
10  about flying into Kabul and to Baghdad, and you weren't
11  sure if the personnel were military or nonmilitary
12  personnel. Is that correct?
13      A  Correct, correct.
14      Q  Didn't you have a military call sign to get
15  into the airport in Baghdad?
16      A  We had a call sign that was not the N number of
17  the airport.
18      Q  Why was that?
19      A  I don't know.
20      Q  Didn't that raise any suspicions, because you
21  were an experienced pilot, on using the different call
22  sign that doesn't have the right N number? I mean,
23  you've been doing this for decades. That doesn't raise
24  any suspicions in your mind?
25      A  I can speculate on that, but I don't know why

**144**

1  they gave those call signs.
2      Q  But you knew if you were flying a regular
3  commercial flight that would be an improper call sign,
4  wouldn't it?
5      A  If you were flying a normal, regular scheduled
6  airline, that would be abnormal.
7      Q  And knowing that this would otherwise be
8  abnormal, you didn't ask that question of someone in
9  Vision?
10      A  I didn't ask that question.
11      Q  And you didn't ask whether or not the air
12  traffic controllers were private contractors or whether
13  they were government, military personnel?
14      A  I did not ask that question.
15      Q  Did you discuss that with anyone?
16      A  No.
17      Q  And you didn't discuss with anyone why you got
18  the call sign that had the different N number?
19      A  No, I didn't. I was told this is what we use
20  once we cross this fix.
21      Q  Who told you that?
22      A  The pilots who had been there before me, who
23  were training me.
24      Q  Did Jim Maguire tell you that?
25      A  No.

**145**

1      Q  Did Brian Daggett tell you that?
2      A  No.
3      Q  Did Dan Carson tell you that?
4      A  I don't recall.
5      Q  But somebody told you once you get past a
6  certain point in air space that you then change your
7  call sign numbers?
8      A  Yes.
9      Q  And that didn't raise any red flags in your
10  mind is what you're saying under oath?
11      A  What do you mean, "red flags"?
12      Q  You didn't say, gee, something is very
13  suspicious here? You didn't think that to yourself?
14  Why are we doing something that's not in the ordinary
15  course of what a pilot would normally act?
16      A  I figured that was to identify us in that air
17  space.
18      Q  Have you ever had that happen any time other in
19  your career?
20      A  No.
21      Q  And about how many flights did you fly before
22  you started working for Vision in your career?
23  Thousands?
24      A  Thousands.
25      Q  You say thousand or thousands?

**146**

1  A  Thousands.
2  Q  Of all those thousands of flights, this is the
3  first time that happened. Correct?
4  A  Yes.
5  Q  And that didn't raise any suspicions is what
6  you're saying?
7       MR. BUCKNER: Objection. Asked and answered.
8       THE WITNESS: That's the way they did it in
9  those areas.
10 BY MR. GEWERTER:
11 Q  What do you mean, "those areas"?
12 A  The destinations to which we were flying.
13 Q  How would you describe those destinations?
14 A  With respect to what?
15 Q  Were they tourists? What were these stops for?
16 It was to fly personnel for the government. Correct?
17 A  Yes.
18 Q  And you knew that all along?
19 A  Yes.
20 Q  And you knew there was special procedures that
21 were in place because of the government personnel?
22 A  Yes. Those were war zones.
23 Q  War zones. And when you landed you saw
24 military personnel there near the runway. Correct?
25 A  No, I didn't.

**147**

1  Q  You didn't see guys wearing green fatigues near
2  the airport?
3  A  No, I didn't.
4  Q  You never saw military hardware on the ground?
5  A  Yes, on occasion.
6  Q  What did you see? American Airlines and
7  Continental Airlines on the ground there?
8  A  No. Helicopters.
9  Q  What kind of helicopters? Government or
10 private helicopters?
11 A  As far as I could tell, they looked like they
12 were government helicopters.
13 Q  How can you tell that?
14 A  Paint scheme.
15 Q  What does that mean, "paint scheme"?
16 A  The way they were painted.
17 Q  And you're qualified to make that statement,
18 then, aren't you, because you were in the military for
19 24 years?
20 A  They looked like military helicopters to me.
21 Q  And did you discuss that with anyone else at
22 the time you were taking off or landing, this looks like
23 military helicopters that we're next to?
24 A  No.
25 Q  Did you discuss it with any copilots?

**148**

1  A  No.
2  Q  Was there a reason for that?
3  A  No.
4  Q  Just didn't think it was important or just no
5  reason?
6  A  Didn't come up.
7  Q  You didn't feel you were in danger at any time
8  when you did that either, did you? You didn't see guys
9  trying to shoot at you on the ground when you were
10 there, did you?
11       MR. BUCKNER: Objection. Asked and answered.
12       THE WITNESS: I didn't see anyone shooting at
13 us on the ground. We were encouraged to hustle up
14 and get out, because of activity near the airport on
15 occasion.
16 BY MR. GEWERTER:
17 Q  Look at page 5, paragraph ten, please, of --
18 I'm sorry, of Exhibit 51, which is the complaint on file
19 in this case, that was filed in your behalf.
20 A  Uh-huh.
21 Q  Did any of the information in paragraph ten
22 come from you?
23 A  No.
24 Q  Are you aware of such information?
25 A  What do you mean, am I aware?

**149**

1  Q  Let me ask you this. Is flying aircraft to and
2  from the airports in Baghdad and Kabul extremely
3  dangerous?
4  A  Yes, it is.
5  Q  It wasn't for you, though, was it?
6  A  Yes, it was. I was subject to the same dangers
7  as others.
8  Q  But you said earlier that you never had anyone
9  shoot at you and you never felt in imminent danger, did
10 you?
11       MR. BUCKNER: Objection. Mischaracterizes
12 testimony.
13       MR. GEWERTER: He used the word "imminent
14 danger."
15       MR. BUCKNER: Actually, you did.
16       MR. GEWERTER: And he agreed.
17       MR. BUCKNER: Mischaracterizes testimony.
18 BY MR. GEWERTER:
19 Q  And you agreed, sir, didn't you?
20 A  I didn't feel threatened on the ground other
21 than those occasions when we were told that we needed to
22 expedite our departure.
23 Q  And how many times were you told you needed to
24 expedite your departure?
25 A  Two or three times.

**150**

1  Q  And how many times did you fly in and out of
2  Baghdad and Kabul?
3  A  I don't recall.
4  Q  More than a hundred?
5  A  No.
6  Q  More than 50?
7  A  Yes.
8  Q  So it's a couple percent of the times then?
9  A  Yes.
10  Q  Look at the second page -- I'm sorry, second
11  line of paragraph ten. "Aircraft typically arrive or
12  depart these airports under the cover of darkness to
13  avoid light arms fire, rocket propelled grenades and
14  missile attacks."
15       You never saw any of that, though, did you?
16       MR. BUCKNER: Objection as to what "that" is.
17  BY MR. GEWERTER:
18  Q  Did you ever see any light arms fire, rocket
19  propelled grenades or missile attacks directed at you
20  flying in and out of Baghdad or Kabul?
21  A  I saw a lot of light arms fire. I couldn't
22  tell if it was directed at us.
23  Q  You heard gunshots. Right?
24  A  I didn't hear them. I saw -- I saw areas where
25  there were fire fights going on.

**151**

1  Q  At the airport?
2  A  In the vicinity of the airport.
3  Q  How do you define the word "vicinity"? How far
4  away in miles?
5  A  Two to three miles.
6  Q  Did you see where it came from or you were told
7  or heard?
8  A  You could see the flashes on the ground.
9  Q  Did anyone tell you what that was? Whether or
10  not it was light arms fire or whether it was rockets --
11  rockets or whether it was --
12  A  No.
13  Q  -- a late 4th of July or something else?
14  A  No.
15  Q  You see the next line, it says, "In fact all
16  flights arriving and departing from the airports in
17  Baghdad and Kabul must be authorized by either the
18  United States or British military operational command
19  centers located in those cities." Is that an accurate
20  statement?
21  A  I believe it is.
22  Q  And you know that why?
23  A  I believe that information is in the public
24  domain.
25  Q  Have you seen it yourself in the public domain

**152**

1  or is that just something you believe?
2  A  That's something I believe.
3  Q  You never actually researched this yourself,
4  did you?
5  A  No, I did not. I'm guided by my attorneys, who
6  I trust.
7  Q  So your attorneys told you that's in the public
8  domain?
9  A  Correct.
10  Q  The same paragraph, let's go up to the second
11  line. I asked you -- I'm going to ask you a different
12  question about the same sentence. "Aircraft typically
13  arrive or depart these airports under the cover of
14  darkness to avoid light arms fire, rocket propelled
15  grenades and missile attacks."
16       You don't feel that's confidential information,
17  to avoid somebody getting that in the public domain,
18  where there might be somebody's death or life at risk?
19       MR. BUCKNER: Object to the form.
20  BY MR. GEWERTER:
21  Q  Well, "under the cover of darkness," that
22  doesn't seem like some kind of secret; it shouldn't be
23  out in the public domain to save lives?
24       MR. BUCKNER: Object to the form.
25

**153**

1  BY MR. GEWERTER:
2  Q  You can answer.
3  A  That's when we went in. That's when I went in.
4  Q  Who told you to go under the cover of darkness?
5  A  Vision Airlines.
6  Q  Your employer told you to do that. Did they
7  tell you why?
8  A  It was understood that it was safer.
9  Q  It was a safety issue, wasn't it?
10  A  Uh-huh.
11  Q  Because you don't want the bad guys knowing
12  when you come in and out of Kabul and Baghdad, do you?
13  A  Right.
14  Q  And if they do find out, people's lives could
15  be at risk. Correct?
16       MR. BUCKNER: Objection. Seeks speculation.
17       THE WITNESS: If you come in under daylight
18  conditions it increases the risk.
19  BY MR. GEWERTER:
20  Q  So therefore you use a secret to come under
21  darkness to avoid the bad guys shooting at you.
22  A  It's not a secret. Just come in at night.
23  Q  Go to paragraph 11 on page 5, please. Did any
24  of that information come from you that went in this
25  complaint?

40 (Pages 154 to 157)

**Page 154**

1   A   No.
2   Q   Well, let me look at the first sentence of
3   paragraph 11 on page 5. "To reduce the likelihood of
4   rocket and missile attacks, aircraft arriving and
5   departing Baghdad International Airport must observe
6   blackout procedures, which required all exterior and
7   interior aircraft light (except for cockpit instruments)
8   to be turned off."
9       Well, you're talking about blackout procedures
10  here, don't you?
11      MR. BUCKNER: Object to the form.
12  BY MR. GEWERTER:
13  Q   Is that something that you utilized, a blackout
14  procedure?
15  A   Yes, I did.
16  Q   And why did you use blackout procedures?
17  A   I was told that was a standard procedure.
18  Q   For safety reasons. Right?
19  A   Uh-huh.
20  Q   In fact, safety to avoid the likelihood of
21  rockets and missile attacks. Correct?
22  A   Yes.
23  Q   You didn't find that to be confidential
24  information to keep out of the public domain?
25  A   No.

**Page 155**

1   Q   And then it says, "In addition, aircraft
2   arriving and departing Baghdad must utilize a dangerous
3   corkscrew procedure." What does that refer to, a
4   corkscrew procedure?
5   A   That's a spiral procedure where you circle over
6   the airport.
7   Q   That's not something that's only done with
8   commercial flights, is it?
9   A   That's not a normal arrival.
10  Q   In fact, that's done for safety reasons also.
11  Right?
12  A   Yes.
13  Q   And it's done for what reason? To avoid
14  aircraft fire at you?
15  A   Yes. To stay within a safer zone.
16  Q   That's to stay within the areas most heavily
17  fortified by the U.S. military. Correct?
18  A   Correct.
19  Q   And you knew you're flying into a
20  military-protected area. Correct?
21  A   Yes.
22  Q   Go to paragraph 12. Did anything in that
23  paragraph 12 on page 5 come from you?
24  A   No.
25  Q   You say in here that, "Despite flying under the

**Page 156**

1   cover of darkness and extensive security precautions,
2   numerous aircraft have been targeted and shot down
3   flying to and from the airports in Baghdad and Kabul."
4   Then you go into, "For example, November 22, 2003."
5       That was not a Vision Airlines flight, was it?
6       MR. BUCKNER: Object to the form.
7       THE WITNESS: That was not a Vision Airlines
8   flight.
9   BY MR. GEWERTER:
10  Q   And do you know whose flight that was?
11  A   That was DHL.
12  Q   How do you know that?
13  A   I read about it. I saw the pictures of it.
14  Q   How about the next one, "February 1, 2005, a
15  C-130 cargo plane crashed after takeoff....when it
16  sustained light arms fire, killing one of the crew
17  members onboard."
18      How do you know that information?
19      MR. BUCKNER: Object to form.
20      THE WITNESS: I didn't supply the information.
21  BY MR. GEWERTER:
22  Q   Do you know who the airline was?
23  A   No, I do not.
24  Q   Do you know whether it was even a government
25  plane or a private contracted plane?

**Page 157**

1   A   I do not.
2   Q   Did you ask that question before you authorized
3   this complaint to be filed on your behalf?
4   A   No.
5   Q   Go to paragraph 13. Right above it there's a
6   subheading called "Hazard Pay." Did you read paragraph
7   13 before it was filed with this court?
8   A   Yes.
9   Q   And paragraph 13 refers to hazard pay for
10  government employees. Correct?
11  A   Yes.
12  Q   You were never a government employee, were you,
13  during the time working for Vision?
14  A   No, I was not.
15  Q   So tell me why paragraph 13 is even in here but
16  doesn't apply to you.
17      MR. BUCKNER: Objection. You can't ask the
18  witness how the complaint got drafted. He's not a
19  lawyer.
20      MR. GEWERTER: I can ask him anything I want to
21  ask him.
22      MR. BUCKNER: Fine. Objection.
23      MR. GEWERTER: Go ahead and answer, please.
24      MR. BUCKNER: It's a ridiculous question.
25      MR. GEWERTER: I think it's a ridiculous

## Page 158

1  objection, it's a ridiculous complaint, but that's
2  another story.
3       THE WITNESS: I didn't supply this information.
4  You'll have to ask my attorneys.
5       MR. GEWERTER: They won't ask answer, therefore
6  I have to ask you.
7       THE WITNESS: Then would you repeat the
8  question?
9  BY MR. GEWERTER:
10  Q  Are you alleging that you're a government
11  employee entitled to hazard pay?
12       MR. BUCKNER: Object to the form.
13       THE WITNESS: I am not alleging I'm a
14  government employee.
15  BY MR. GEWERTER:
16  Q  Look at paragraph 14. Did any of that
17  information come from you?
18  A  No.
19  Q  Do you know whether or not that's true or
20  false?
21  A  I believe it to be true.
22  Q  And why do you believe it to be true?
23  A  Because I trust my attorneys.
24  Q  Is that where the information came from?
25  A  To the best of my knowledge, yes.

## Page 159

1  Q  Look at paragraph 16 on page 6 of the
2  complaint. It starts off by saying, "The United States
3  government recognizes that employees of government
4  contractors in Iraq and Afghanistan confront some of the
5  same dangerous conditions encountered by government
6  employees and members of the armed services."
7       How do you know that the United States
8  government recognizes that?
9       MR. BUCKNER: Object to the form.
10       THE WITNESS: I'm not the source of this
11  information. I believe it to be true, and I rely on
12  my attorneys for that.
13  BY MR. GEWERTER:
14  Q  Then it says, "Accordingly, the United States
15  government has extended the practice of paying hazard
16  and imminent danger pay to the employees of government
17  contractors that work in Iraq and Afghanistan."
18       How do you know that to be true?
19  A  Same answer.
20  Q  What is that answer?
21  A  I'm not the source of this information. I rely
22  on my attorneys. I believe it to be true.
23  Q  And you believe it to be true, but you have no
24  independent knowledge, do you have?
25  A  I have no independent knowledge, but I trust my

## Page 160

1  attorneys.
2  Q  Go to paragraph 17, the bottom of page 6. It
3  starts off by saying, "Moreover the danger of working in
4  Iraq and Afghanistan has made it difficult for
5  government contractors to recruit employees to work in
6  those countries."
7       How do you know that to be true?
8       MR. BUCKNER: Object to form.
9       THE WITNESS: I was not the source of this
10  information, and I believe it to be true.
11  BY MR. GEWERTER:
12  Q  Well, you wanted to work there, didn't you?
13  A  Did I want to work there?
14  Q  Yes. You wanted to work for Vision.
15  A  Yes, I wanted to work for Vision.
16  Q  And you were upset when you stopped working for
17  Vision?
18  A  I took the job. To say that I wanted to go
19  there would be incorrect. I was willing to go there.
20  Q  But you don't know whether or not it's hard for
21  government contractors to recruit employees to work in
22  those countries, did you?
23       MR. BUCKNER: Objection. Asked and answered.
24  BY MR. GEWERTER:
25  Q  You have no knowledge of that, do you?

## Page 161

1  A  I've seen advertisements that -- where there
2  are different companies offer inducements for people to
3  work over there, but I wasn't the source of this
4  information. I believe it to be true, and I rely on my
5  attorneys.
6  Q  And the next sentence, "Due to the United
7  States government's reliance on contractors, the
8  shortage of individuals willing to work in those
9  countries threatens the government's ability to
10  successfully implement its global defense strategy."
11       How do you know that to be true?
12  A  I was not the source of that information. I
13  believe it to be true.
14  Q  Well, what do you know about --
15  A  I rely on my attorneys.
16  Q  What do you know about the global defense
17  strategy of the United States government?
18  A  Are you speaking of the Bush Doctrine?
19  Q  I'm not speaking of anything other than what's
20  in your complaint. I didn't draft this, so I'm not the
21  one responsible for the wordage.
22  A  I didn't draft it either, sir.
23  Q  But you approved it, though.
24  A  Yes.
25  Q  Paragraph 18, on page 7. Did that information

**162**

```
 1  come from you?
 2     A  No, it did not.
 3     Q  How do you know in the second sentence of that
 4  paragraph, where it says, "Specifically the United
 5  States government provides the contractor with funds for
 6  the following: (1) the contracted services; and (2)
 7  hazard pay for the contractors' employees that work for
 8  Iraq and Afghanistan"?
 9     A  I was not the source of that information. I
10  believe it to be true, and I trust my attorneys.
11     Q  In fact --
12        THE REPORTER: I'm sorry. I didn't hear the end
13  of your answer.
14        THE WITNESS: I trust my attorneys to do the
15  research.
16        MR. BUCKNER: You got to let him finish,
17  Harold.
18        MR. GEWERTER: I apologize, go ahead. You're
19  correct on that one.
20        MR. BUCKNER: Wow.
21        MR. GEWERTER: You got one out of a hundred.
22  I'm proud of you.
23        MR. BUCKNER: I'm glad I made you proud.
24  Thanks.
25        You trust your attorneys. You were finishing
```

**163**

```
 1  the sentence and he talked over you. Did you have
 2  anything else?
 3        THE WITNESS: Almost sounds like my wife.
 4  But --
 5        MR. GEWERTER: I've been accused of a lot of
 6  things, but never that.
 7        THE WITNESS: I'm sorry?
 8        MR. GEWERTER: Go ahead.
 9        THE WITNESS: Did you get that?
10        THE REPORTER: I did.
11  BY MR. GEWERTER:
12     Q  When did you first come to the conclusion that
13  the United States government provides contractors with
14  hazard pay for contractors' employees that work in Iraq
15  and Afghanistan?
16        MR. BUCKNER: Objection. Mischaracterizes
17  testimony.
18        MR. GEWERTER: Well, it's in the complaint.
19        MR. BUCKNER: He didn't say he came to that
20  conclusion.
21        MR. GEWERTER: He's responsible for the
22  complaint.
23        MR. BUCKNER: It's a different thing, Harold.
24        MR. GEWERTER: Okay.
25
```

**164**

```
 1  BY MR. GEWERTER:
 2     Q  Answer the question, please.
 3     A  I had suspicions that we were entitled to
 4  hazard pay, and when my attorneys began researching the
 5  issue, and they discovered information that confirmed
 6  that suspicion.
 7     Q  Do you know what confirmation was made that
 8  confirmed that suspicion prior to filing this lawsuit?
 9        MR. BUCKNER: Object. I object to the extent
10  that it's conversation between us and you. I'd
11  instruct you not to answer. If you know of some
12  other source of information, that's fine.
13        THE WITNESS: It's just between my attorney and
14  I.
15  BY MR. GEWERTER:
16     Q  So you did no independent research on this
17  issue of hazard pay, other than what you learned from
18  your attorneys. Is that correct?
19     A  No. I did attempt to learn about this, but my
20  efforts didn't bear fruit.
21     Q  What were your efforts?
22     A  Researching on the internet.
23     Q  Did you talk to anyone other than your lawyer
24  about this?
25     A  No.
```

**165**

```
 1     Q  Talk to Dan Carson?
 2     A  When he was at Vision Airlines, yes.
 3     Q  How about Gary Borke?
 4     A  Yes.
 5     Q  How about Juan Mayoral?
 6     A  I don't recall.
 7     Q  How about Gwen Carson?
 8     A  No.
 9     Q  Do you know who Gwen Carson is?
10     A  Yes.
11     Q  Who is she?
12     A  Dan Carson's daughter.
13     Q  Did she work at Vision Airlines?
14     A  Yes.
15     Q  Do you know what her capacity was?
16     A  I don't recall her title. She was like an
17  assistant to Mr. Carson and took care of the payroll, I
18  believe, and other administrative tasks.
19     Q  Do you know what else she took care of?
20     A  I don't know.
21     Q  Do you know she was caught pilfering documents
22  from Vision Airlines?
23     A  I'm not aware of that.
24     Q  Have you ever heard that allegation before
25  today?
```