Exhibit 1-D

166

1    A  No, I have not.
2    Q  Go to paragraph 20, please, on page 7.  Where
3  does that information come from, if you know?
4    A  I do not know.
5    Q  Did it come from you?
6    A  No, it did not.
7    Q  Go to paragraph 21 on the bottom of page 7.
8  Did that information come from you?
9    A  No, it did not.
10    Q  Do you know where it came from?
11    A  No, I do not.
12    Q  Look at paragraph 22, on page 8.  Do you see
13  that?
14    A  Yes.
15    Q  Do you see where it says, "Hazard pay through
16  compensation is incorporated into a pass-through
17  provision contained in the contract between the
18  government and the contractor"?  Is that a true
19  statement?
20    A  I wasn't the source of that information.
21    Q  Have you ever seen the contract between Vision
22  and any other contractor or the United States
23  government?
24    A  No, I have not.
25    Q  So you don't know whether or not there's a

167

1  pass-through provision contained in any such contract,
2  do you?
3    A  No, but I believe it to be true, based on the
4  research accomplished by my attorneys.
5    Q  Was that research done before or after the
6  complaint was filed?
7    MR. BUCKNER:  I'm going to object, Harold.  You
8  can't ask him about conversations between him and
9  us.
10    MR. GEWERTER:  I can ask him when something
11  took place.  He said the conversation took place.
12  He admitted it, he volunteered it.  Now I want to
13  know when the conversation took place.
14    MR. BUCKNER:  I'm telling you it's privileged,
15  and I'm instructing him not to answer.
16    MR. GEWERTER:  The date of the conversation is
17  not privileged.
18    MR. BUCKNER:  It's a conversation between us
19  and him.
20    MR. GEWERTER:  I didn't ask for the contents or
21  the communication.
22    MR. BUCKNER:  Fine.
23    MR. GEWERTER:  I asked when it took place.
24    MR. BUCKNER:  You can tell him, if you recall,
25  the date of any conversation between us --

168

1    MR. GEWERTER:  Don't testify for him, you know,
2  knock this off.  No.
3    MR. BUCKNER:  I'm instructing him as to how far
4  he can go, because this is a privileged matter.  You
5  can't just inquire on privilege.  You know that.
6    MR. GEWERTER:  It's not privileged.  The date
7  of a conversation is not privileged.
8    MR. BUCKNER:  I'm just telling him, Harold,
9  that he can answer as to the date but nothing more.
10    MR. GEWERTER:  Go ahead, please.
11    THE WITNESS:  I don't recall the date.
12  BY MR. GEWERTER:
13    Q  So you don't know whether or not it was before
14  or after the complaint was filed?
15    A  I do not.
16    Q  The second sentence, "Accordingly, if the
17  contractor subcontracts with another company to perform
18  the contracted services, the pass-through provision
19  requires that the contractor 'pass through' the hazard
20  pay that it collects from the United States government
21  to the subcontractor; i.e., the contractor pays the
22  subcontractor the hazard pay."  And it goes on.
23    Where did you learn that information from?
24    A  I am not the source of that information.
25    Q  So for clarity, have you ever seen any

169

1  contracts between Vision and any other government
2  contractor?
3    A  No, I have not.
4    Q  And clearly you didn't see any before the
5  complaint was filed?
6    A  I have not seen a contract between Vision and
7  any government agency or subcontractor.
8    Q  And paragraph 23, on page 8.  Are you the
9  source of that information?
10    A  No, I was not.
11    Q  Do you know who was?
12    A  No, I do not.
13    Q  And looking at paragraph 24 on page 8.  Look at
14  the third line, where it says, "Accordingly, the United
15  States government has standardized the amount of hazard
16  pay that crew members on the flights to Baghdad and
17  Kabul receive for every takeoff and landing.
18  Specifically, every captain, first officer,
19  international relief officer receives $2,500 each for
20  every takeoff and landing at these airports in Baghdad
21  and Kabul, making a total of $5,000 in hazard pay per
22  round trip."
23    Is that a true statement?
24    A  I was not the source of that information.
25    Q  Do you know who was?

44 (Pages 170 to 173)

170

1    A   I do not.
2    Q   When did you first learn of such information,
3    of those $5,000 per round trip?
4    A   That information was part of the rumor
5    discussion.
6    Q   What rumor discussion is that?
7    A   Which I answered to earlier.
8    Q   Oh, the pilots and copilots?
9    A   Pilots and copilots.  That's where I first
10   heard those numbers.
11   Q   A bunch of men and women while working for
12   Vision gossiping, is that how you would describe it?
13   A   They were talking about something that they
14   believed to be true.
15   Q   Even though your agreement you signed says that
16   you're not supposed to discuss pay with other employees?
17   A   It says we're not supposed to discuss salaries
18   with other employees.
19   Q   Okay.  And you don't think hazard pay is part
20   of salary?
21   A   Hazard pay is a separate item.
22   Q   Well, if you get hazard pay you would pick it
23   up on your income tax return, wouldn't you?
24   A   I don't know.
25   Q   You think it's free money?

171

1    A   It's -- I believe that a certain -- at least a
2    certain portion of it is exempt from tax.
3    Q   How do you come to that conclusion?
4    A   A pilot who does his own taxes indicated that
5    he had raised that question with Jim Maguire to see what
6    percentage of his pay, if any, would be exempt from tax
7    because it was hazard pay.
8    Q   Well, Jim Maguire is not an accountant, is he?
9    A   He's the chief pilot.
10   Q   Was this other pilot that you spoke about, is
11   he an accountant?
12   A   I don't believe so.
13   Q   And who was that pilot that you had this
14   conversation with?
15   A   That was Dave Pritchard.
16   Q   Would you hand this witness Exhibit No. 34?
17   Do you have the exhibits from earlier?
18   THE REPORTER:  We did.  They're in a stack
19   somewhere.
20   MR. GEWERTER:  Oh, no.  Brett's got them.
21   You can hand it to him.
22   BY MR. GEWERTER:
23   Q   Take a moment, look at this letter from Captain
24   DC Jensen dated September 3, 2005.  Read it to yourself
25   and let me know when you're through, please.

172

1    A   I've read it.
2    Q   Have you ever seen that letter before today's
3    date?
4    A   No, I have not.
5    Q   Are you aware of its existence before today's
6    date?
7    A   No.
8    Q   Do you see where it says "to" and it has
9    cockpit crew personnel and an N number?
10   A   Yes.
11   Q   What does that N number refer to?
12   A   An aircraft.
13   Q   Which particular aircraft?
14   A   November three six eight --
15   Q   I can read the numbers too.
16   A   Okay.
17   Q   Describe the nature of the aircraft.
18   A   737.
19   Q   Where was that flying?
20   A   We flew that airplane.
21   Q   Flew it where?
22   A   From Dulles to Kabul and to Baghdad.
23   Q   And is that the numbers that you would use when
24   you flew into Baghdad?
25   A   No.

173

1    Q   In fact, that's the official FAA number, but
2    when you went in for landing you used a different N
3    number.  Correct?
4    MR. BUCKNER:  Objection.  Asked and answered.
5    MR. GEWERTER:  I want to know if it's a
6    different number than this number right here.
7    MR. BUCKNER:  You've asked, it's answered.
8    MR. GEWERTER:  No.  He said there were
9    different numbers, but which number is it?  Is this
10   the covert number or is this the public number?
11   MR. BUCKNER:  You can answer if you know.
12   THE WITNESS:  That's the registration number of
13   the aircraft.
14   BY MR. GEWERTER:
15   Q   Registered with whom?
16   A   Federal Aviation Administration.
17   Q   And you see where it says in this letter, "Bill
18   Acor, president of Vision Airlines Holdings and Premier
19   Aircraft Management, has authorized me to convey the pay
20   compensation for flights to Iraq"?
21   A   Yes.
22   Q   And the next paragraph says, "The first trip,
23   which takes place on Monday, '05, September 2005,
24   cockpit crew members will receive an additional sum of
25   $5,000 USD in addition to normal flight paid for the

174

1  trip."
2      A  Yes.
3      Q  Do you know where that number came from?
4      A  You mean where they got the information?
5      Q  Yes.  Whatever was conveyed to you, of the
6  $5,000.
7      A  No.  I did not.
8      Q  So when you compare that letter to paragraph 24
9  of your complaint, it has a $5,000 figure also, per
10  hazard pay?
11      A  Yes.
12      Q  And this says for the first trip.  You see that
13  letter?
14      A  Yes.
15      Q  And sometime later Jim Maguire sent a memo out
16  or a document out, that you signed, that had everybody's
17  pay structure.  Correct?
18      A  Yes.
19      Q  Look at paragraph 25, in the bottom of page 8.
20  Have you ever seen a contract between United States
21  government and Capital Aviation that's dated sometime in
22  2004?
23      A  No.
24      Q  So how are you aware of its existence?
25      A  I was not the source of this information.

175

1      Q  You do understand, sir, that you're responsible
2  for what's filed on your behalf in a courtroom?
3      A  I don't know that that's accurate.
4      Q  Okay.
5      A  It says here at the beginning that information
6  that is not personal to me is filed upon information and
7  belief, based upon the investigation of counsel.  And
8  that's the truth.
9      Q  How about where it says the contract provided
10  funds to Capital Aviation in the following manner, one,
11  payment for air transport services to Baghdad and Kabul
12  twice weekly, and, two, hazard pay for the crew members
13  on the flights to and from Baghdad and Kabul?  How do
14  you know that's in that contract with Capital
15  Aviation, those provisions?
16      A  I'm not the source of this information.  I rely
17  upon the investigation of my attorneys.
18      Q  And you've never seen that contract, have you?
19      A  I have not.
20      Q  Would you be surprised to know that there's no
21  hazard pay for the crew members on the flights to and
22  from Baghdad and Kabul in this contract we're referring
23  to?
24      MR. BUCKNER:  Object to form.  And I think you
25  mischaracterize all the evidence of the last three

176

1  days.
2      You can answer.
3      MR. GEWERTER:  I think I accurately summarized
4  it.
5  BY MR. GEWERTER:
6      Q  Are you aware of that, sir?
7      A  No.
8      Q  Look at paragraph No. 26, on page 9.
9  "Specifically, the contract between the United States
10  government and Capital Aviation provided that every
11  pilot, first officer, and international relief officer
12  would receive $2,000 (sic) for every takeoff and landing
13  in the Baghdad and Kabul airports, making a total of
14  $5,000 in hazard pay per round trip."
15      Are you aware of -- have you ever seen the
16  contract between the United States government and
17  Capital Aviation?
18      MR. BUCKNER:  Asked and answered like a dozen
19  times.
20      MR. GEWERTER:  It's a new paragraph.
21  BY MR. GEWERTER:
22      Q  Have you ever seen that?
23      MR. BUCKNER:  Same question, though.  Asked and
24  answered.
25

177

1  BY MR. GEWERTER:
2      Q  You can go ahead and answer it, please.
3      A  No, I have not.
4      Q  So you don't know whether that $2,500 figure
5  and $5,000 figure exists between the United States
6  government and Capital Aviation, do you?
7      A  No, I do not.
8      Q  Paragraph 27 on page 9.  "In contracting with
9  Capital Aviation from air transport services, the United
10  States government incorporated the hazard pay into a
11  pass-through provision of the contract."
12      How do you know that to be true?
13      A  I'm not the source for this information.  I
14  believe it to be true based upon information, belief and
15  research accomplished by my attorneys.
16      Q  And then the next sentence says, "Because the
17  employee hazard pay was incorporated into a pass-through
18  provision, it required Capital Aviation to pay the
19  hazard pay it received from the United States government
20  to any subcontractor, who was required to pass those
21  funds through to the air crews completing the work."
22      Do you know if that's a true or false
23  statement?
24      A  Same answer, Mr. Gewerter.
25      Q  And what is that answer?

178

1    A  I wasn't the source of this information. I
2  believe it to be true based upon the investigation done
3  by my attorneys.
4    Q  Any other investigation, or just by your
5  attorney?
6    A  My attorneys.
7    Q  Anyone -- anyone other than your attorneys?
8    A  No.
9    Q  Look at paragraph 30 at the bottom of the page.
10 "In addition, Capital Aviation provided Vision the
11 hazard pay that the United States government gave
12 Capital Aviation for the benefit of Vision's employees,
13 which Vision was required to distribute to those crew
14 members on the flights to Baghdad and Kabul."
15     Do you know if that's a true or false
16 statement?
17    A  I was not the source of that information. I
18 believe it to be true based on the research done by my
19 attorneys.
20    Q  Now, are those words you keep saying or is that
21 somebody else told you to say those words?
22    A  Those are -- those are the words that express a
23 succinct answer to your question.
24    Q  That doesn't answer my question. Are those
25 your words, or are those words someone else gave you to

179

1  say?
2    A  It's a combination.
3    Q  And if it came from your attorney, I don't want
4  to know. But was it from somebody other than your
5  attorneys, some of those words?
6    A  No.
7    Q  Look at paragraph No. 34. Actually, let's back
8  up to paragraph 33 first, on page 10. "In addition to
9  transporting cargo, Vision flew diplomatic and other
10 personnel to and from Kabul." Do you see that?
11    A  Yes.
12    Q  How do you know who these personnel were?
13    A  I don't.
14    Q  Do you know today who they were?
15    A  No.
16    Q  You just assumed this or you relied upon your
17 attorney again?
18    A  I relied upon the attorney.
19    Q  Did you ever talk to any of the personnel when
20 you were flying?
21    A  Only to the extent necessary to respond to
22 their questions.
23    Q  Look at paragraph 36 on page 11. "According
24 plea, Capital aviation provided Vision with a minimum of
25 $54,000 per week in hazard pay meant for Vision's

180

1  employees."
2    Q  How do you know that money was meant for Vision
3  employees?
4    A  I'm not the source of this information. I
5  believe it to be true, based on the investigation of my
6  attorneys.
7    Q  Look at paragraph 38 on page 11. "In
8  August 2005, Vision decided that it would capture a
9  financial windfall if it simply retained all the hazard
10 pay it collected from Capital Aviation for its own
11 benefits."
12     What information do you have that Vision
13 obtained a financial windfall?
14    A  I was not the source of this information.
15    Q  What information do you have that Vision
16 received any hazard pay they collected -- I'm sorry,
17 what information do you have that Vision received any
18 hazard pay?
19    A  I'm not the source of this information.
20    Q  Later in that same paragraph, it says,
21 "Moreover, Vision fired all the crew members that knew
22 about or had previously received hazard pay for flying
23 to Kabul and replaced them with employees who did not
24 know that they were entitled to receive hazard pay."
25     Who are those employees that were fired?

181

1    A  I don't know.
2    Q  How do you know this to be a true or false
3  statement then?
4    A  I was not the source of this information.
5    Q  Let me ask you a simple question, without
6  belaboring this. Like having a deposition with a guy
7  that pleads the fifth, every time you ask a question --
8    MR. BUCKNER:  You know, Harold, really, that's
9  not necessary.
10 BY MR. GEWERTER:
11    Q  What information do you have personal knowledge
12 of in this complaint?
13    A  The information concerning myself.
14    Q  And that's it, then?
15    A  That's it.
16    Q  Nothing about the contract between the
17 government and Capital. Correct?
18    A  That's correct.
19    Q  Nothing about the contract between Capital and
20 Vision. Correct?
21    A  Correct.
22    Q  And nothing about hazard pay. Correct?
23    A  Correct.
24    Q  Now, there's a whole other section starting on
25 page 12, it's after paragraph No. 39, which talks about

182

1  Iraq, before we were talking about Afghanistan, and it's
2  somewhat similar. I assume your answers will be the
3  same?
4      A  Yes, sir.
5      Q  So you have no additional knowledge concerning
6  Iraq that you do not have concerning Afghanistan. Is
7  that correct? Is the answer going to be you relied upon
8  your attorney?
9      A  Correct.
10     Q  Go to page 14, please, paragraph 50.
11         MR. GEWERTER: How much time is it?
12         MR. VON BORKE: Twenty.
13  BY MR. GEWERTER:
14     Q  Do you have paragraph 50 in front of you?
15     A  Yes, I do, I'm reading it now.
16     Q  "In the summer of 2007, Dr. Dan Carson,
17  Vision's director of flight operations contacted Capital
18  Aviation and inquired if the United States government
19  provided hazard pay for Vision's employees who were
20  flying into Baghdad and Kabul."
21         How do you know that to be a true statement?
22     A  I wasn't the source of this information.
23     Q  Did you ever talk to Dr. Dan Carson about this
24  at any time period whatsoever?
25     A  Yes.

183

1      Q  When was that, and where were you?
2      A  That was briefly, or shortly before he was
3  terminated.
4      Q  And what did he tell you?
5      A  He said that he had -- I'm trying to get this
6  accurate, it's been some time.
7      Q  Take your time, sir.
8      A  He made a reference to hazard pay, and I don't
9  recall if he said he had learned or thought that we were
10  entitled to it.
11     Q  Are you aware of a lawsuit where Dan Carson was
12  found to have forged Mr. Acor's signature?
13     A  No, I'm not.
14     Q  Have you ever heard that statement before
15  today?
16     A  No, I have not.
17     Q  Did you refer to Dan Carson as Dr. Carson?
18     A  I don't recall.
19     Q  How did you refer to him then?
20     A  Dan.
21     Q  So you do recall that at least?
22     A  Yes.
23     Q  And then it says, "Dr. Carson contacted the
24  president of Vision, William Acor, to discuss the hazard
25  pay. During that conversation, Mr. Acor instructed

184

1  Dr. Carson to cease his inquiries into the hazard pay
2  issue."
3         Now, who told you that?
4      A  I wasn't the source of this information.
5      Q  Okay. So you never heard that then?
6      A  No.
7      Q  And then it says, "Shortly thereafter Vision
8  terminated Dr. Carson." How do you know that statement
9  to be true or false?
10     A  I wasn't the source of that information.
11     Q  Go to page 15, paragraph 58, please. Do you
12  see that?
13     A  Paragraph 58, page 15?
14     Q  Yes, sir.
15     A  Yes.
16     Q  You state in your lawsuit that, "This lawsuit
17  seeks to end Vision's wrongful and exploitive conduct."
18         Describe for me what you mean by that, please.
19     A  Again, I wasn't the source of the information
20  here in this part of the complaint.
21     Q  Well, were you exploited by Vision?
22     A  When --
23     Q  It's either a yes or no, and then you can
24  explain. Were you exploited by Vision?
25     A  Yes.

185

1      Q  Tell me how you were exploited by Vision.
2      A  Vision collected hazard pay which by right
3  should have been for the people who actually performed
4  the hazardous duty.
5      Q  And you believe that why? Because of the
6  contract that you signed says that?
7      A  I didn't sign a contract.
8      Q  You have no documents in your hand that
9  verifies or backs up what you just said under oath, do
10  you?
11     A  I don't. I rely on information discovered by
12  my attorney.
13         MR. GEWERTER: Is this a convenient time for a
14  break now?
15         THE VIDEOGRAPHER: You got ten more minutes.
16         MR. GEWERTER: We'll go ahead a little bit
17  farther then.
18  BY MR. GEWERTER:
19     Q  Typically when you fly an aircraft into Kabul
20  and Baghdad, you're talking about a crew as a generic
21  term. How would you describe the crew? List for me
22  what you consider to be the crew members.
23     A  Pilot, copilot, possibly a relief pilot, flight
24  attendants.
25     Q  How many flight attendants?

48 (Pages 186 to 189)

186

1    A  That varies.
2    Q  Is there a formula that's used based on the
3  number of passengers or is it just discretionary?
4    A  In Part 121 operations it's based on the number
5  of seats.
6    Q  And what is that?  How does that work?
7    A  One per fifty.
8    Q  Okay.
9    A  And it can include a flight mechanic.
10    Q  Now, in all the flights you flew to Baghdad and
11  Kabul, was there always a flight mechanic onboard?
12    A  Not always.
13    Q  Did it stop at some point or was it just
14  inconsistent or how would you describe it?
15    A  It really -- I believe it became commonplace
16  with the advent of the 767 operation.
17    Q  How many 767 flights did you fly on,
18  approximately?
19    A  I don't recall.
20    Q  That was a minority number of the flights,
21  though, wasn't it, for you?
22    A  Yes, for me it was a minority number.
23    Q  You said and I forgot, you may have told me
24  this, and I'm sure your counsel will jump up and yell at
25  me if I ask it again.  You said it's around 50-plus

187

1  flights that you flew to Baghdad and Kabul combined?
2    MR. BUCKNER:  Objection.
3    THE WITNESS:  Yes.
4  BY MR. GEWERTER:
5    Q  When I say "50-plus," let me -- and I don't
6  mean to belabor the point -- you mean between 50 and 70?
7  Or just give me the best estimate you can give me.
8    A  I don't really recall.
9    Q  And most of those flights were 737 flights,
10  though.  Correct?
11    A  Yes.
12    Q  Was it less than ten percent were 767 flights?
13    A  I don't know.
14    Q  But you never captained the 767 aircraft, did
15  you?
16    A  No, I did not.
17    Q  And all of your flights on the 767 took place
18  after October 1, 2007.  Correct?
19    A  Yes.
20    Q  And they all took place after the time you
21  admitted to sleeping on the aircraft a few weeks prior
22  while being a pilot on a 737.  Correct?
23    A  Yes.
24    MR. GEWERTER:  This is a good time for a break
25    right here.

188

1    THE VIDEOGRAPHER:  Let me go off the record.
2    The time is 3:31.
3    (Recess taken.)
4    THE VIDEOGRAPHER:  All right.  We're now back
5    on the record.  The time is 3:50.
6  BY MR. GEWERTER:
7    Q  We're back on the record now.  Have you
8  discussed this case with anyone other than your lawyers
9  during the break?
10    A  No.
11    Q  Look at page 19, please, of the complaint.
12    (Discussion off the record.)
13    THE WITNESS:  Which page was that?
14  BY MR. GEWERTER:
15    Q  Page 19, paragraph 71.  See where it says
16  Count I, "Unjust Enrichment"?
17    A  Yes.
18    Q  I don't want a legal definition, which I'm sure
19  I'll get an objection to anyhow, but what is your
20  understanding of what you're suing for when you allege
21  that there's been unjust enrichment in this case, the
22  layman's term, if you understand?
23    MR. BUCKNER:  And I object to the extent it
24    seeks a legal conclusion.
25    THE WITNESS:  Now do I answer?

189

1    MR. BUCKNER:  You can answer.
2    THE WITNESS:  That Vision has benefitted,
3    profited, unjustly or unfairly, monies that should
4    have gone to someone else.
5  BY MR. GEWERTER:
6    Q  And the someone else being yourself and others
7  like you?
8    A  Class members.
9    Q  And that's all based on the hazard pay theory.
10  Right?
11    A  Yes.
12    Q  Anything other than the hazard pay you felt
13  Vision has been unjustly enriched for?
14    A  No.
15    Q  So this entire case revolves around hazard pay.
16  Correct?
17    A  Yes.
18    Q  And you do admit you're an at-will employee.
19  Correct?
20    A  Yes.
21    Q  And admit that all employees for Vision were
22  at-will employees?
23    A  Yes.
24    Q  And they all signed employee handbooks similar
25  to the ones you signed, as far as you know?

190

1     MR. BUCKNER: Objection. Outside his
2   knowledge.
3   BY MR. GEWERTER:
4     Q   If you know.
5     A   I don't know.
6     Q   Are you aware if all pilots and crew members
7   signed agreements similar to the one that was drafted by
8   Jim Maguire that you signed effective November 1, 2007?
9     MR. BUCKNER: Object to the form.
10     THE WITNESS: It's not an agreement, it was a
11   memo that I received.
12   BY MR. GEWERTER:
13     Q   Well, you received and you signed it.
14     A   And I signed, acknowledged receipt of the memo.
15     Q   Okay. Let's go back to it then. You say you
16   just acknowledged receipt?
17     A   Acknowledged receipt of the memo.
18     Q   Okay. That's No. 44. That's your signature --
19   I'm sorry. Look at Exhibit No. 44, please.
20     A   Yes.
21     Q   That's your signature that appears in the
22   bottom of page 2?
23     A   Yes. "I have read and acknowledged receipt of
24   the memo regarding the Revised Pay Structure and
25   Guidelines for Boeing pilots that went into effect on

191

1   October 1, 2007."
2     Q   And based on this memo, you received
3   compensation as set forth in the top of page 2.
4   Correct?
5     MR. BUCKNER: Objection. Asked and answered.
6   BY MR. GEWERTER:
7     Q   Is that correct, sir?
8     A   Yes, that's correct.
9     Q   Go to page 21, please. Let me know if you can
10   answer this question. I'm not looking for a legal
11   conclusion. I just want your best understanding on
12   paragraph 79, on page 21, of Exhibit No. 51, the
13   complaint. "A confidential relationship exists between
14   Vision and its employees because of the confidential
15   nature of the employment relationship."
16     Do you know what that means in layman's terms?
17     MR. BUCKNER: Objection to the extent it seeks
18   a legal conclusion.
19     You can answer.
20     THE WITNESS: To me it means that we didn't
21   advertise our activities.
22   BY MR. GEWERTER:
23     Q   And why is that?
24     A   There was no benefit to drawing attention to
25   ourselves.

192

1     Q   But, in fact, your lawsuit did draw attention
2   to yourself.
3     A   The lawsuit is an exercise of my legal rights.
4     Q   Is giving press releases also an exercise of
5   your legal rights?
6     A   Press releases?
7     Q   Interviews to newspapers.
8     MR. BUCKNER: Objection. No foundation.
9   BY MR. GEWERTER:
10     Q   Is it proper to give interviews to newspapers
11   about your prior employment with Vision?
12     MR. BUCKNER: Objection. Same basis.
13   BY MR. GEWERTER:
14     Q   You can go ahead and answer, though.
15     A   No. And I didn't do that.
16     Q   That's for the Court to decide, sir.
17     A   No. That's the truth.
18     Q   Go to page 23 of this complaint, please,
19   Exhibit No. 51. Again, I'm not looking for your legal
20   conclusion, just your best understanding of what you
21   mean when you're suing Vision for quantum meruit.
22     MR. BUCKNER: Objection. Seeks a legal
23   conclusion.
24     MR. GEWERTER: If he has a layman's answer,
25   that's fine.

193

1     MR. BUCKNER: Same objection.
2   BY MR. GEWERTER:
3     Q   You can go ahead and answer.
4     A   My understanding would be it simply isn't fair
5   for Vision to keep money that was earned through the
6   actions of other employees and that the hazard pay was
7   earned by the action of the flight crew members and it
8   should go to the flight crew members.
9     Q   You want additional compensation is what you're
10   really suing over, isn't it?
11     A   No. That's -- has -- if Vision collected
12   hazard pay, the money should go to the people who
13   performed the hazardous duty. That's simply commonsense
14   and equity in my view.
15     Q   Go ahead.
16     A   I'm finished.
17     Q   Okay. And what if Vision did not collect
18   hazard pay?
19     A   If they did not collect hazard pay, then they
20   don't owe it.
21     Q   Go to page 24, please, Count V. It says,
22   "Conversion." Do you have a layman's term of what
23   you're suing for here for conversion?
24     MR. BUCKNER: Objection. Seeking legal
25   conclusions. It's like a legal pop quiz. I should

50 (Pages 194 to 197)

---

**194**

1    ask you what "conversion" means.
2        MR. GEWERTER: I may not know the answer.
3        MR. BUCKNER: You may not.
4    BY MR. GEWERTER:
5        Q  All I want to know is your understanding of
6    what you're suing for in Count V.
7        MR. BUCKNER: Same objection. Seeks a legal
8    conclusion.
9    BY MR. GEWERTER:
10       Q  Go ahead and answer, please.
11       A  Vision took money that was intended for the
12   flight crew who performed hazardous duty and retained it
13   for their own benefit.
14       Q  You're reading it from the complaint basically?
15       A  The legal term I guess is "conversion."
16       Q  It's almost like accusing somebody of stealing,
17   isn't it?
18       MR. BUCKNER: Objection. Seeks a legal
19   conclusion?
20   BY MR. GEWERTER:
21       Q  Go ahead and answer, please.
22       A  That's your characterization.
23       Q  That's a serious allegation, isn't it?
24       A  Yes, I believe it is.
25       Q  And you believe you have a basis in good faith

---

**195**

1    to do that, don't you?
2        A  Yes. I believe that in good faith that this
3    is -- this lawsuit was pursued in good faith.
4        Q  You still believe that to be the case today?
5        A  Yes, I do.
6        Q  Again, when was the last time you spoke with
7    Dan Carson?
8        A  It's been quite a long time.
9        Q  You're not sure where he's living these days?
10       A  I do not know where he's living or what he's
11   doing.
12       Q  The last time you spoke with Gary Borke was
13   when?
14       A  Several months ago.
15       Q  Before or after the lawsuit was filed?
16       A  After.
17       Q  How many times after the lawsuit was filed have
18   you spoken with Gary Borke?
19       A  Two to four.
20       Q  And in any of those two to four conversations,
21   did you discuss with Mr. Borke this lawsuit?
22       A  Only the fact that it had been filed. No
23   details of it.
24       Q  Did you discuss the merits of the lawsuit with
25   Mr. Borke after it was filed?

---

**196**

1        A  No.
2        Q  Did you discuss the merits of the lawsuit with
3    Mr. Borke prior to this being filed on January 20th,
4    2009?
5        A  No.
6        Q  Did you discuss hazard pay leading to -- let me
7    clarify that. Did you discuss the possibility of filing
8    a hazard pay lawsuit prior to the time it was filed with
9    Mr. Borke?
10       A  Yes.
11       Q  And how many times did you discuss that
12   possibility of filing a lawsuit?
13       A  Once.
14       Q  And when was that?
15       A  I don't recall.
16       Q  How much prior, if you remember, to
17   January 20th, 2009, did you have that conversation with
18   Mr. Borke about filing a lawsuit?
19       A  I don't recall.
20       Q  Was it days, months, or a year?
21       A  Before the lawsuit was filed?
22       Q  Before the lawsuit was filed.
23       A  Months.
24       Q  And did he discuss with you during that
25   conversation the concept of hazard duty pay?

---

**197**

1        A  No.
2        Q  What did you discuss about filing a lawsuit
3    with Mr. Borke prior to the time it was filed?
4        A  Just that there -- that I -- that I didn't know
5    whether a lawsuit would or would not be filed.
6        Q  What do you mean, you didn't know? I'm not
7    understanding.
8        A  I didn't know if there would be a lawsuit filed
9    or if there would not, but it was a possibility.
10       Q  That's what he told you or you told him or
11   both?
12       A  That's what I told him.
13       Q  And during that conversation, did you discuss
14   with him the concept of you being the lead plaintiff in
15   a potential class action lawsuit?
16       A  No.
17       Q  The first time you heard about that, I think
18   you said earlier today, was from your lawyer, about you
19   being the lead member in the class?
20       A  Yes.
21       Q  And you were asked to be the lead member by
22   your lawyer?
23       A  Yes.
24       Q  Turn to page 27 of this complaint, please. Do
25   you see where it says "Relief Requested," and there's a

---

198

1  series of items?
2     A  Yes.
3     Q  Do you see under subpart E, as in Edward, or I
4  should say echo in this case, it says you're asking for
5  an award of -- to award plaintiff and the class their
6  attorneys' fees, costs and expenses?
7     A  Yes.
8     Q  What have your attorneys' fees been to date in
9  this case?
10    A  I do not know.
11    Q  Have you paid any?
12       MR. BUCKNER:  Objection.  You're again
13  inquiring into attorney-client privileged
14  communications, Harold.  If you want to --
15       MR. GEWERTER:  Listen, you put it in the
16  complaint.  I want the back-up for this complaint.
17  If you want to remove it from the complaint I won't
18  ask him for it.
19       MR. BUCKNER:  No.  As you know, Harold, that's
20  just not the way it works.
21       MR. GEWERTER:  Actually, it is the way it
22  works.
23       MR. BUCKNER:  Okay.  Provide me with the case
24  law and I'll provide you with the agreement.
25       MR. GEWERTER:  If you ask for attorneys' fees,

199

1  I have the right to inquire about attorneys' fees.
2  And I don't have to wait until trial to ask that
3  question.
4     MR. BUCKNER:  No, you don't have to wait until
5  trial.  You give me case law, I'll give you the
6  documentation.
7  BY MR. GEWERTER:
8     Q  Have you paid any costs in this case so far?
9     A  No.
10    Q  Who has paid the costs in this case so far?
11    A  To the best of my knowledge, the law firm.
12    Q  Which law firm is that?  There's two law firms
13  here.
14    A  Kozyak Throckmorton and Tropin.
15    Q  When you say the best of your knowledge, have
16  you received statements to that effect?
17    A  No.
18    Q  So how do you believe that to be the case then?
19    A  I don't have any information to the contrary.
20    Q  Has anyone told you that they're going to pay
21  the costs in this case?
22       MR. BUCKNER:  I'm going to object, because
23  you're -- now again you're trying to get at what his
24  discussions with us are.
25       MR. GEWERTER:  No.  Let me tell you, the law is

200

1  real clear in the Ninth Circuit, the source and
2  payment of attorneys' fees is not privileged.
3  Communications are privileged, but the source and
4  payment are not privileged.
5     MR. BUCKNER:  You can ask him if he's paid
6  attorneys' fees.  Go ahead.
7     MR. GEWERTER:  I asked about costs now.
8     MR. BUCKNER:  Okay.
9     MR. GEWERTER:  Costs related to attorneys'
10  fees, under the same case law.
11       MR. BUCKNER:  Source and payment.  You asked
12  him if he paid any.
13  BY MR. GEWERTER:
14    Q  You haven't paid any attorneys' fees so far.
15  Correct?
16    A  That's correct.
17    Q  You haven't paid any costs so far.  Is that
18  correct?
19    A  Just my personal expenses in traveling here.
20    Q  And have you paid any other expenses so far in
21  relation to this lawsuit?
22    A  No.
23    Q  And do you know who has paid all these such
24  expenses so far?
25    A  No, I do not.

201

1     Q  But you believe it to be your law firm here in
2  Miami.  Correct?
3     A  Correct.
4     Q  Has the law firm in Las Vegas paid any of those
5  expenses or costs?
6     A  I do not know.
7     Q  Have you received any itemized statements so
8  far concerning attorneys' fees, costs or expenses
9  related to this lawsuit?
10    A  No.
11    Q  Have you discussed that matter with Gary Borke?
12    A  No.
13    Q  Ever?
14    A  No.
15    Q  How about Dan Carson?
16    A  No.
17    Q  Anyone else other than your lawyers?
18    A  No.
19    Q  We're actually done with that exhibit.
20       (Deposition Exhibit 52 was marked for
21  identification.)
22  BY MR. GEWERTER:
23    Q  You were just handed what's been marked as
24  Exhibit No. 52, which is a copy of a newspaper article
25  from the Las Vegas Sun, dated January 23, 2009.  Do you

52 (Pages 202 to 205)

202

1   see that?
2       A  Yes, I have.
3       Q  Have you ever seen this article before today's
4   date?
5       A  Yes, I have.
6       Q  When did you first see this article?
7       A  I don't recall.
8       Q  Was it shortly after it was published or was it
9   sometime recently?
10      A  It was provided by my attorneys.
11      Q  Which attorneys? These gentlemen here?
12      A  These gentlemen here.
13      Q  Do you see -- go to paragraph five, where it
14  says, "'Vision's employees risked their lives by flying
15  missions into Iraq and Afghanistan in support of the
16  United States government operations in those countries,'
17  Goodman said. 'In return, the government provided
18  Vision with hazard pay for those employees.'"
19      The next paragraph: "'Vision betrayed the
20  trust of its people when it decided to keep the hazard
21  pay for itself, he said.'"
22      Do you see that quote?
23      A  Yes, I do.
24      Q  Did you authorize Mr. Goodman to make that
25  statement to the press?

203

1       A  I did not.
2       Q  When you became aware of this statement did you
3   express any displeasure with anyone about this being
4   published?
5       A  I spoke to my attorneys about this.
6       Q  Which attorneys?
7       A  Brett Von Borke.
8       Q  You see a couple paragraphs down it says, "One
9   of the plaintiffs, who spoke on the condition he not be
10  named, is a former Vision pilot who believes he is owed
11  hundreds of thousands of dollars." Do you see that?
12      A  Yes.
13      Q  Who is that, who's one of the plaintiffs?
14      A  I have no idea.
15      Q  Well, at the time this article came out, which
16  is January 23, 2009, there's only one named plaintiff,
17  wasn't there?
18      A  Yes.
19      Q  And that was you?
20      A  Yes. I was the named plaintiff.
21      Q  And who else do you believe was the other
22  plaintiffs at that time?
23      A  I have -- there was the members of the class.
24      Q  Well, there was no class yet at that time.
25      Do you have the names of any individuals who

204

1   could have been one of the plaintiffs that's referred to
2   in this newspaper article?
3       MR. BUCKNER: Objection. Seeks speculation.
4       MR. GEWERTER: I said if he has any
5   information.
6       MR. BUCKNER: I'm objecting that seeks
7   speculation.
8       MR. GEWERTER: That's fine.
9       THE WITNESS: I have no idea who spoke with
10  this reporter.
11  BY MR. GEWERTER:
12      Q  Well, it says Mr. Good --
13      A  It was not me.
14      Q  It says Mr. Goodwin did at least. So we know
15  one person did.
16      A  Okay. Disregarding Mr. Goodwin. You're
17  talking about the plaintiffs. I had -- I have no idea
18  who spoke with this person.
19      Q  Just prior to you filing this lawsuit on
20  January 20th, 2009, other than your lawyers, both in Las
21  Vegas and in Miami, who was aware that lawsuit was about
22  to be filed?
23      A  I don't know.
24      Q  In the month leading up to the filing of this
25  lawsuit, who did you discuss this lawsuit with, other

205

1   than your lawyers?
2       A  No one.
3       Q  And go down two more paragraphs. It says, "The
4   pilot, who said one flight outside of Kabul came under
5   machine gunfire that missed his plane, said all the
6   landings and takeoffs in the war zones were done at
7   night using tight, difficult approaches, and departures
8   for security reasons."
9       Isn't that similar to what you testified
10  earlier to today?
11      MR. BUCKNER: Objection. Mischaracterizes.
12  Doesn't have a foundation.
13  BY MR. GEWERTER:
14      Q  Go ahead and answer, please.
15      A  That's similar, but I never testified about
16  coming under machine gunfire.
17      Q  Well, you said you were coming into the airport
18  once and you saw light fire on the ground.
19      A  Yes, in the vicinity.
20      Q  But it wasn't directed at you, though?
21      A  No. It was a fight on the ground.
22      Q  You believe that to be true, but you're not
23  sure of that, though, either, are you, that there was a
24  fight on the ground?
25      A  I believe that, yes. It appeared to be a fight

206

1    on the ground.
2        Q   When you were in the military, were you
3    involved in any war-type military-related activities?
4        A   Yes.
5        Q   Where?
6        A   Vietnam.
7        Q   What year was that?  Not that I'm trying to do
8    a memory quiz, but I'm curious because it changed over
9    there.
10       A   '66, '67.
11       Q   Were you a pilot over there?
12       A   Navigator.
13       Q   And which division of the military were you in
14   again?
15       A   Navy.
16       Q   You were a Navy navigator.  Okay.
17       A   Yes.
18       Q   Was there anything in this article
19   exhibit marked as Exhibit No. 52 that was authorized by
20   you prior to it being published?
21       A   No.
22       Q   Are you aware that some of these items are from
23   a mysterious source and some come from your lawsuit that
24   you filed?
25       A   Yes.

207

1        Q   So your lawsuit made public certain information
2    that was otherwise not public related to Vision.  Is
3    that correct?
4            MR. BUCKNER:  Objection.
5    BY MR. GEWERTER:
6        Q   You can answer.
7        A   No.
8        Q   Okay.  Look at the top of the second page of
9    Exhibit No. 52, where it says, "Aircraft typically
10   arrive or depart these airports under the cover of
11   darkness to avoid light armed fire, rocket propelled
12   grenades and missile attacks."  Keep reading.  That's
13   word for word almost from your complaint, isn't it?
14       A   Yes.
15       Q   And that was all public knowledge about Vision
16   before this was published on January 20th -- before your
17   lawsuit was filed January 20th, 2009?
18           MR. BUCKNER:  Objection.  Mischaracterizes the
19   complaint.  Didn't say "Vision."
20   BY MR. GEWERTER:
21       Q   You can go ahead, please.
22       A   That information was public knowledge for many
23   flights operating in and out of those airports.
24       Q   How do you know it's public knowledge, because
25   you said earlier today you didn't do any internet

208

1    research concerning this?
2            MR. BUCKNER:  Objection.  Totally
3    mischaracterizes his testimony.
4    BY MR. GEWERTER:
5        Q   Go ahead and answer, please.
6        A   I did research about the hazard pay.
7        Q   That was it.
8        A   And I've read other things.
9        Q   What have you read?
10       A   I can't remember specifically, but these --
11   this is -- was a standard procedure.
12       Q   Standard if you're involved in that arena, not
13   standard for people like me that aren't involved in that
14   arena?
15           MR. BUCKNER:  Object to the form.
16   BY MR. GEWERTER:
17       Q   Is that a correct statement?
18       A   For people who operate in and out of these
19   airports, that was standard.
20       Q   And that's a very small number of people based
21   on the population of the United States, isn't it?
22       A   Yes.
23       Q   And the next paragraph says, "Aircraft must
24   observe blackout procedures."  I don't want to read the
25   whole paragraph.  That also is language from your

209

1    complaint, isn't it?
2        A   It appears to be.
3            (Deposition Exhibit 53 was marked for
4            identification.)
5    BY MR. GEWERTER:
6        Q   Would you take a look at this document that's
7    been marked as Exhibit No. 53.  This is an article from
8    the Las Vegas Sun dated a week later on January 30th,
9    2009.  And take a look at that and let me know when
10   you're done reviewing it, please, sir.  Just let me know
11   when you're through there.
12       A   I'm almost there.
13       Q   I'm not rushing you.  Take your time.
14       A   I finished reading it.
15       Q   Have you ever seen this article before today's
16   date?
17       A   Yes.
18       Q   And when did you first see this article?
19       A   It was provided by my attorneys.  I don't
20   recall the date.
21       Q   Have you ever spoke with any -- I mean you
22   personally and directly -- spoke with any reporter for
23   the Las Vegas Sun?
24       A   I have never spoken with any reporter from the
25   Las Vegas Sun or any other newspaper.

54 (Pages 210 to 213)

210

1    Q  I'm sorry. I didn't mean you to cut you off.
2    Q  Or any other newspaper regarding Vision
3  Airlines.
4    Q  Did you authorize your lawyers to speak with
5  the Las Vegas Sun reporters?
6    A  No, I did not.
7    Q  You're aware that one of them at least, Ross
8  Goodwin, has filed -- I'm sorry, has spoken with the Las
9  Vegas Sun?
10   A  According to that article, yes.
11   Q  You understand the filing of your lawsuit has
12  caused several newspaper articles to be published
13  concerning Vision's Air Bridge program?
14      MR. BUCKNER: Objection. No foundation.
15  BY MR. GEWERTER:
16   Q  Are you aware of that?
17   A  No.
18   Q  Well, there's several articles discussed in
19  your lawsuit. Correct?
20   A  I have only seen these.
21   Q  You're not aware of any more than these two
22  articles?
23   A  I have read only these two.
24   Q  And as we sit here today, are you aware of who
25  else other than Ross Goodman has discussed Vision issues

211

1  with the press?
2    A  No, I am not.
3    Q  Did Dan Carson ever tell you he discussed this
4  with the press?
5    A  No.
6    Q  How about Gary Borke?
7    A  No.
8    Q  Any other former or present employees of Vision
9  who told you they discussed these issues with the press?
10   A  No.
11   Q  Do you have any suspicions who those people
12  might be?
13      MR. BUCKNER: Objection. Seeks speculation.
14      THE WITNESS: No.
15  BY MR. GEWERTER:
16   Q  When was the last time you've spoken with Juan
17  Mayoral?
18   A  Long time ago. I don't recall exactly.
19   Q  What does a long time ago mean? A year, a
20  month, two years?
21   A  Over a year.
22   Q  Was it before or after the filing of this
23  lawsuit?
24   A  I think it was before.
25   Q  Much more? I'm not trying -- I understand

212

1  you --
2    A  I'm sorry. I just don't recall.
3    Q  And you -- did you discuss with Mr. Mayoral the
4  possibility of filing a class action lawsuit against
5  Vision Airlines at any time?
6    A  No, I have not.
7    Q  Did you ever discuss the hazard duty pay with
8  Juan Mayoral?
9    A  I don't recall.
10   Q  You're not certain either way?
11   A  I'm not certain.
12   Q  And you worked with Juan Mayoral while employed
13  with Vision? Correct?
14   A  Yes.
15   Q  Did you ever fly any aircraft with him, as
16  pilot/copilot?
17   A  Yes.
18   Q  Do you know where he's working today?
19   A  The last I heard, he was flying for some
20  company that provided transportation services for the
21  United Nations.
22   Q  Do you know what the name of that company is?
23   A  No, I don't.
24   Q  Do you know where he resides?
25   A  No, I do not.

213

1    Q  Do you know that he resides in southern
2  Florida?
3    A  He used to live in southern Florida.
4    Q  Has he moved?
5    A  I don't -- I believe he and his wife are
6  divorced and he's no longer living there.
7    Q  Do you know when they got divorced?
8    A  I believe it was sometime last year.
9    Q  Has he left the country or you're just not
10  certain where he's living?
11   A  I don't know. We've had no contact.
12   Q  Since just before filing this lawsuit, though.
13  Correct?
14      MR. BUCKNER: Objection.
15      THE WITNESS: Yes.
16      MR. BUCKNER: Mischaracterizes his testimony.
17  BY MR. GEWERTER:
18   Q  When was the last time you had a conversation
19  with him? Maybe I forgot. I could be confused.
20      MR. BUCKNER: He said he didn't recall, but you
21    can ask him again.
22      THE WITNESS: I don't recall.
23  BY MR. GEWERTER:
24   Q  It was just before filing the lawsuit, though,
25  is what your statement was?

214

1      A  I believe it was approximately that time frame.
2      Q  And did he tell you that he thought he was
3  entitled to hazard duty pay from Vision?
4      A  No.
5      Q  Have you ever discussed that with him while you
6  worked together at Vision?
7      A  Only as, "Have you heard the rumor?"
8      Q  Heard what rumor?
9      A  That there's supposed to be hazard pay involved
10  in this operation.
11      Q  And who brought that topic up between the two
12  of you?
13      A  I don't remember.
14      Q  So you either approached him or he approached
15  you. Is that your understanding?
16      MR. BUCKNER:  Objection. Mischaracterizes
17  testimony.
18      MR. GEWERTER:  Well, somebody had to approach
19  somebody.
20      MR. BUCKNER:  Could have just been sitting
21  there, Harold, but whatever. Objection.
22  BY MR. GEWERTER:
23      Q  Who started the conversation about hazard duty
24  pay?
25      A  I don't recall.

215

1      Q  Who else was present besides the two of you?
2      A  I don't recall.
3      Q  Was there anyone else present?
4      A  I don't recall.
5      Q  Where were you when you had this conversation?
6      A  I don't recall.
7      Q  Were you on Vision property?
8      A  I believe we were overseas.
9      Q  On down time or while flying the aircraft?
10      A  I'm not certain.
11      Q  Did you ever discuss with anyone hazard duty
12  pay while flying on a Vision aircraft on duty?
13      A  I don't recall.
14      Q  So you're not certain that you did not then?
15      A  I'm not certain that I did not.
16      MR. GEWERTER:  I have no other questions for
17  you at this time, sir. Thank you very much for your
18  time.
19      MR. BUCKNER:  Let's take two minutes. Let's
20  see if I've got anything. Is that all right?
21      MR. GEWERTER:  Yeah, that's fine, but if you
22  do, I may have. That's all.
23      MR. BUCKNER:  Seriously, you're not.
24      THE VIDEOGRAPHER:  Going off the record. The
25  time is 4:28.

216

1      (Recess taken.)
2      THE VIDEOGRAPHER:  All right. We're now back
3  on the record. The time is 4:44.
4      CROSS-EXAMINATION
5  BY MR. BUCKNER:
6      Q  All right, sir. You're obviously still under
7  oath. I have a few questions for you.
8      A  Okay.
9      Q  Much earlier today you testified that Mr. Acor
10  of Vision Airlines told you that there were two things
11  that were classified about the Air Bridge program: The
12  people you were flying, and who you were flying for.
13      A  Yes.
14      Q  With regard to who you were flying for, what of
15  that did he explain to you was classified?
16      A  That's the agency, the specific government
17  unit --
18      Q  Okay.
19      A  -- that had the passed down the contract.
20      Q  Okay. But the fact that you were flying for
21  the United States government, did he ever tell you that
22  that part was classified?
23      A  No.
24      Q  Just the specific agency?
25      A  Yes.

217

1      Q  Do you know what specific agency Vision
2  Airlines was flying for?
3      A  No.
4      Q  The second thing I want to ask you about is
5  some stuff that's been filed in this case. Have you
6  been keeping up with the pleadings in this case?
7      A  Yes, I've tried to keep up to date.
8      Q  Are you aware that at one point Vision sought
9  to have the complaint in this case sealed?
10      A  Yes.
11      Q  Are you aware that the Court subsequently
12  unsealed the complaint when Vision failed to produce
13  information to support the sealing?
14      A  Yes.
15      MR. BUCKNER:  Can you hand me -- what number
16  exhibit are we on?
17      THE REPORTER:  The next one will be 54.
18      (Deposition Exhibit 54 was marked for
19  identification.)
20      MR. BUCKNER:  We're not going all the way
21  through this.
22      THE WITNESS:  Thank God.
23  BY MR. BUCKNER:
24      Q  Okay. Handing you what's been marked as a copy
25  of Exhibit 54, sir. I'm not going to ask you to go all

56 (Pages 218 to 221)

218

1  the way through it.
2      A  Good.
3      Q  All right.  Do you recognize this as the
4  memorandum of law in support of your motion to dismiss
5  Vision's amended counterclaims?
6      A  Yes.
7      Q  This was filed with the Court in this case.  Is
8  that correct?
9      A  January -- yes, January 11th of this year.
10     Q  Okay.  Like I said, we're not going to go all
11 the way through it, because there's a lot of legal stuff
12 in here.  I just want to look at a couple of documents
13 with you.  If you flip back, there's an Exhibit D, as in
14 David.  It's pretty far back.  There you go.
15     A  Here it is.
16     Q  Okay.  And do you recognize Exhibit D as a news
17 item off the foxnews.com website?
18     A  Yes.
19     Q  And it's an interview with Hillary Rodham
20 Clinton?
21     A  Yes.
22     Q  Who is Hillary Rodham Clinton?
23     A  She's Secretary of State.
24     Q  What's the date on that interview?
25     A  January 19th, 2007.

219

1      Q  Okay.  If you go part way down the page, you'll
2  see there's a line from the interviewer, Van Susteren,
3  that says, "While you are in the air."  Do you see that?
4      A  Yes.
5      Q  If you go to the next paragraph, over to the
6  right-hand side, where it starts, "When you fly," would
7  you read that sentence?  I'll help you (indicating).
8  Right there.  Right here where it says --
9      A  "When you fly into a war zone like Baghdad, and
10 I've done it numerous times now, there and elsewhere,
11 you know, the C-130 does a kind of corkscrew landing,
12 and my colleague, Senator Bayh, from Indiana, said to
13 the crew he said, "You know, if you see an openings -
14 beers for everybody if you can get in."
15     Q  Would you turn with me now to Exhibit E?  Are
16 you familiar with a publication Army Magazine?
17     A  Yes.
18     Q  And is that publication a generally available
19 publication?
20     A  Yes.
21     Q  It's not classified?
22     A  It's not classified.
23     Q  Would you turn with me to page 22.
24        Actually, before you do that, on the first
25 page, on the bottom, can you see what the date of this

220

1      article is?
2      A  February 2005.
3      Q  Okay.  What's the title of this article?
4      A  "U.S. Military Engineers in Iraq."
5      Q  Okay.  Turn with me to page 22, would you?  At
6  the top of the page there, the second full paragraph in
7  the left-hand side starts with, "Within 24 hours."
8      A  Yes.
9      Q  Okay.  You see there where it says, "late in
10 the night"?
11     A  Yes.
12     Q  Would you read from there to the end of the
13 paragraph?
14     A  "Late in the night on April 12th, this
15 28-person team designated Joint Task Force Fajr,
16 (pronounced 'FA-JER' and meaning 'dawn' or 'new light'
17 in Arabic), boarded a C-130 aircraft and began their
18 journey to the newly renamed Baghdad International
19 Airport (BIAP) that had opened to U.S. aircraft several
20 days earlier.  After a three-hour flight, the pilots,
21 wearing night vision goggles and flying in total
22 blackout conditions, guided their aircraft into a
23 corkscrew descent and safely delivered my team at 2:30
24 in the morning on April 13th, at BIAP."
25     Q  That's very similar to the allegation in the

221

1      complaint, is it not, with regard to what aircraft do in
2  approaching and flying into Baghdad?
3      A  Yes.
4      Q  If you turn with me to Exhibit F, please.
5      A  F.
6      Q  Do you recognize that as an article from the
7  MSNBC.com website?
8      A  Yes.
9      Q  Okay.  What's the date on that article?
10     A  November 26th, 2004.
11     Q  Would you read the first paragraph where it
12 says, "Over Baghdad"?
13     A  "Traffic!  Traffic!' blares the cockpit's
14 automated collision warning system just as the pilots of
15 Royal Jordanian flight 814 pull their airliner from its
16 steep corkscrew descent and begin the final approach to
17 Baghdad International Airport."
18     Q  Let me ask you something.  Who is Royal
19 Jordanian?  Do you know?
20     A  It's an airline in Jordan.
21     Q  Commercial airline.  Correct?
22     A  A Commercial airline.
23     Q  It's not a military airline?
24     A  Not military.
25     Q  And according to this article, they too were

222

1  following the corkscrew descent into Baghdad. Correct?
2      A  Yes.
3      Q  Do you know if anybody at Royal Jordanian
4  Airlines has a security clearance from the United States
5  government?
6         (Interruption in proceedings.)
7      MR. GEWERTER: It's beyond his knowledge, and
8  it's beyond speculation.
9  BY MR. BUCKNER:
10     Q  If you know.
11     A  I don't know.
12     Q  Would you turn with me now to Exhibit G. Do
13  you recognize this as a report of the European
14  Parliament from 2006?
15     A  Yes.
16     Q  I assume you had no hand in writing this
17  report?
18     A  No.
19     Q  Never worked with the European Parliament?
20     A  No, I have not.
21     Q  If you would turn with me to page 12. It's at
22  the bottom. It's 12 of 64. 12/64.
23     A  Okay.
24     Q  You see there at the bottom, where it says
25  November three six eight Charlie echo?

223

1      A  Yes.
2      Q  Do you recall recognize that number?
3      A  Yes, I do.
4      Q  How do you recognize that number?
5      A  I flew that airplane for Vision Airlines.
6      Q  Is it a 737?
7      A  Yes.
8      Q  And, in fact, the next paragraph discusses
9  Vision Airlines and Premier Aircraft Management.
10  Correct?
11     A  Yes.
12     Q  Did you supply any of this information to the
13  European Parliament?
14     A  No.
15     Q  If you go to the top of the next page, could
16  you read the first bullet?
17     A  "It is surprising to notice the routes made by
18  the November three six eight Charlie echo from June 2005
19  to November 2005. It made almost daily the route
20  Frankfurt (Germany) - Ashkhadad (Turkmenistan). From
21  September 2005 to end of November 2005, the aircraft
22  made the almost daily route Frankfurt - Ashkhabad -
23  Frankfurt and Frankfurt - Baghdad - Frankfurt."
24     Q  Do you know how the European parliament got
25  that information?

224

1      A  I have no idea.
2      MR. GEWERTER: Objection. Speculation.
3      MR. BUCKNER: I asked if he knew.
4  BY MR. BUCKNER:
5      Q  Was it you?
6      A  No.
7      Q  Finally, if you turn with me to Exhibit 8. You
8  got to keep going back.
9      A  Approximately what page out of the full?
10     Q  I'm sorry. It's actually in a separate
11  exhibit, so it won't be paginated. It's Exhibit 90-8.
12     A  Exhibit H.
13     Q  It's a statement to the Committee on
14  International Relations of the U.S. House of
15  Representatives. What's the date on that statement?
16     A  April 1, 2004.
17     Q  Whose testimony is it?
18     A  Ambassador J. Cofer Black.
19     Q  Earlier today you referred to I believe -- I
20  don't want to get it wrong, but I believed you referred
21  to the Bush Doctrine. Correct?
22     A  Yes.
23     Q  And you were referring to a discussion in the
24  complaint about the war on terror as devised by the
25  United States. Correct?

225

1      A  Yes.
2      Q  Would you go to page 5 of 7 of that same
3  document you're in? You see under the heading of
4  "Strategy to Defeat Terrorism"?
5      A  Yes.
6      Q  You see where it says, "Following the
7  September 11th attacks"?
8      A  Yes.
9      Q  Can you read that first sentence?
10     A  "Following the September 11th attacks, we have
11  forcefully applied the Bush Doctrine. Any person or
12  government that supports, protects or harbors terrorists
13  is complicit in the murder of the innocent and will be
14  held to account."
15     Q  And is that in fact very similar to the
16  statement in that regard in the complaint that was filed
17  on your behalf with the Court in this case?
18     A  Yes, I believe it is.
19     Q  Did you have anything to do with acquiring that
20  document, the statement of J. Cofer Black before the
21  United States House of Representatives, Committee on
22  International Relations?
23     A  No, I did not.
24     MR. BUCKNER: Thanks. That's all I have.
25     MR. GEWERTER: I have a few follow-up now that

58 (Pages 226 to 229)

226

1   you asked those.
2       MR. ACOR: Harold, can I speak to you for a
3   second? Can I talk to you?
4       MR. GEWERTER: Yes. Take a quick break.
5       Off the record, please.
6       THE VIDEOGRAPHER: Off the record. The time is
7   4:57.
8       (Recess taken.)
9       THE VIDEOGRAPHER: All right. We're now back
10  on the record. The time is 5:07.
11          REDIRECT EXAMINATION
12  BY MR. GEWERTER:
13      Q  Mr. Hester, would you look at Exhibit D that
14  your attorney had you look at on Exhibit 54?
15      A  Exhibit D?
16      Q  D, yes. It's an article from foxnews.com.
17      A  Yes.
18      Q  When was the first time you saw this article?
19      A  I don't recall the first time I saw it.
20      Q  Did you see it prior to January 20, 2009?
21      A  I don't know.
22      Q  Did you rely upon this article when filing your
23  complaint in this case?
24      MR. BUCKNER: Objection. Mischaracterizes
25  testimony.

227

1       MR. GEWERTER: I didn't say he testified either
2   way. I'm just asking if he did.
3       THE WITNESS: I did not file the complaint, and
4   I wasn't the source for the information.
5   BY MR. GEWERTER:
6       Q  Go to Exhibit E, as in echo. When -- I'm
7   sorry. That's it. When was the first time you saw a
8   copy of this article?
9       A  This article, I don't recall exactly when I saw
10  this for the first time.
11      Q  Was it before or after you filed your complaint
12  in this case?
13      A  After.
14      Q  Okay. Go to Exhibit F.
15      A  Yes.
16      Q  Same question. When was the first time you saw
17  a copy of this article from MSNBC.com?
18      A  Again, I'm not sure.
19      Q  Did you see it before or after you filed your
20  complaint in this case?
21      A  I believe it was after.
22      Q  Go to Exhibit G. Do you remember the first
23  time you saw a copy of this document?
24      A  I saw this sometime ago.
25      Q  What does that mean, "sometime ago"?

228

1       A  Prior to the filing of the lawsuit.
2       Q  How do you know that?
3       A  Well, I remember reading it in electronic
4   format.
5       Q  When it first came out or at some later date?
6       A  Some later date.
7       Q  But you believe the date was before
8   January 20th, 2009?
9       A  Oh, yes.
10      Q  Why are you so certain of that?
11      MR. BUCKNER: Objection. Asked and answered.
12  BY MR. GEWERTER:
13      Q  You can answer that.
14      A  I just remember coming across this on the
15  internet.
16      Q  You just periodically check the internet for
17  stuff about Iraq and Baghdad, or I should say
18  Afghanistan?
19      MR. BUCKNER: Objection. Badgering the
20  witness.
21      MR. GEWERTER: That's not badgering. Come on.
22      MR. BUCKNER: You're still not getting the
23  answer you like so you got to keep asking.
24  Objection.
25      MR. GEWERTER: I've asked it once.

229

1   BY MR. GEWERTER:
2       Q  Go ahead and answer.
3       A  I don't remember how I came across this
4   article.
5       Q  Go to page 12 of 64 of that article.
6       A  Yes.
7       Q  You see where there's an N number, N368CE?
8       A  Yes.
9       Q  Did you ever fly that aircraft?
10      A  Yes.
11      Q  Is that the N number you used when you made
12  your approach into Baghdad?
13      A  No.
14      Q  You changed it, didn't you?
15      A  We had a different call sign.
16      Q  Which is out of the ordinary. Correct?
17      MR. BUCKNER: Objection. Asked and answered.
18  BY MR. GEWERTER:
19      Q  It's out of the ordinary, wasn't it?
20      A  It was normal for operations in Iraq and
21  Afghanistan.
22      Q  But it's not normal for commercial flights,
23  though, is it?
24      A  Not normal for commercial flights, which we
25  were not commercial flight.

230

1  Q  You were specialty here, weren't you?
2  A  Yes.
3  Q  So special that the government had to give you
4  a security clearance before you could fly over there.
5  Correct?
6  A  No.
7  Q  You never had a security clearance?
8  A  I was informed via e-mail that my security
9  clearance had been granted, and that was sometime late
10  in 2007.
11  Q  But you got a security clearance at some point.
12  Correct?
13  A  I was told I had a security clearance.
14  Q  And you knew you that was required to fly into
15  Afghanistan and into Baghdad. Correct?
16  A  I was flying into those locations for a year
17  prior to that without being told I had a security
18  clearance.
19  Q  Without being told, but you don't know whether
20  or not it was actually given to you or not.
21  A  I don't know.
22  Q  And having a security clearance gives you
23  special obligations, doesn't it? The average person
24  doesn't get a security clearance?
25  A  That's true.

231

1  Q  And that gives you special obligations to
2  comply with, doesn't it?
3  A  Yes.
4  Q  It gives you special obligations in favor of
5  the United States government, doesn't it?
6  A  Yes.
7  Q  And you hold those seriously?
8  A  Yes.
9  Q  And it gives you special obligations in favor
10  of your employer Vision Airlines. Correct?
11  MR. BUCKNER: Objection. Totally
12  mischaracterizes the law.
13  BY MR. GEWERTER:
14  Q  You can answer.
15  A  Would you say that again?
16  MR. GEWERTER: Could you read that back to him,
17  please?
18  (The question was read by the reporter as above
19  recorded.)
20  MR. BUCKNER: Same objection.
21  THE WITNESS: Vision Airlines, to the best of
22  my knowledge, never had any classified information.
23  BY MR. GEWERTER:
24  Q  You signed a classified agreement with the
25  United States government. Correct?

232

1  A  Yes.
2  Q  And that was -- in that agreement who was the
3  contractor or subcontractor?
4  A  Vision was listed.
5  Q  Vision is a party to that contract, aren't
6  they?
7  MR. BUCKNER: Objection. Seeks a legal
8  conclusion.
9  THE WITNESS: I don't know if legally that
10  makes them a party to that contract or not.
11  BY MR. GEWERTER:
12  Q  But you didn't work for the United States
13  government, even though your agreement was with the
14  United States government. Correct?
15  A  That's true.
16  Q  And your agreement with the United States
17  government, while you signed your agreement with the
18  United States government, you actually worked for Vision
19  Airlines. Correct?
20  A  Yes.
21  MR. GEWERTER: I have no other questions.
22  Thank you.
23  MR. BUCKNER: Great. We're done.
24  MR. GEWERTER: Done for now, anyhow.
25  MR. BUCKNER: We're done for today.

233

1  THE VIDEOGRAPHER: Going off the record. The
2  time is 5:15.
3  (The taking of the deposition was concluded.)
4       - - -

60 (Page 234)

```
                                                      234
1              CERTIFICATE OF OATH
2
3
4
   STATE OF FLORIDA:
5  COUNTY OF MIAMI-DADE:
6
7       I, the undersigned authority, certify that
8  GERALD HESTER personally appeared before me and was duly
9  sworn.
10
11      WITNESS my hand and official seal March 31,
12 2010.
13
14
15 ------------------------------------
16 SHERILYNN V. McKAY, RMR, CRR
17 Notary Public - State of Florida
18 My Commission No.: DD541258
19 Expires: June 28, 2010
20
21
22
23
24
25
```

235

REPORTER'S DEPOSITION CERTIFICATE

STATE OF FLORIDA:
COUNTY OF MIAMI-DADE:

I, SHERILYNN V. McKAY, Registered Merit

Reporter and Certified Realtime Reporter, certify that I

was authorized to and did stenographically report the

deposition of GERALD HESTER; that review of the

transcript was not requested; and that the foregoing 234

pages, inclusive, is a true record of my stenographic

notes.

I further certify that I am not a relative,

employee, attorney or counsel of any of the parties, nor

a relative or employee of any of the parties' attorney

or counsel connected with the action, nor am I

financially interested in the action.

DATED March 31, 2010.

--------------------------------
SHERILYNN V. McKAY, RMR, CRR



23800 Wind Sock Drive, Suite 370 – Dulles, VA 20166 – (703) 661-8244

**To:** Gerald Hester

**From:** Jim Maguire

**Date:** October 15, 2007

**RE:** Revised Pay Structure & Guidelines for Boeing Pilots – Effective October 1, 2007

With the transition from the Boeing 737s currently being utilized for our Dulles Operation to Boeing 767s, a new pay structure has been established.

The first noticeable change in the pay structure is that pilots will now be compensated with a base salary in addition to flight pay. Once all B767 aircraft have been put into service, the schedule will be produced in advance with all pilots working for three weeks on and two weeks off. Because of the base pay, pilots will be expected to report to work according to the published schedule. (Trip trades will be allowed with the concurrence of crew scheduling.)

## Implementation of New Salary Structure

With the change in pay structure outlined below, pay dates will also change. Direct deposits will be transmitted to your bank on the 15th and last day of the month. If either of these days falls on a weekend or a holiday, the payday will be on the next business day. (This is a change from the current system that requires the five-day wait for processing.) In order to effectively capture actual time worked, the pay structure will move to a system of paying in arrears. See below for the specific timetable:

- 10/19/07 – You will receive your semi-monthly salary (see chart for annual amount) plus flight time and per diem for the period from 10/1 to 10/15. (pay period ends 10/15, checks will be received 10/19)

- 10/31/07 – You will also receive your semi-monthly salary.

- 11/15/07 – You will receive your semi-monthly salary plus flight time and per diem for the period from 10/16 through 10/31.

- 11/30/07 – You will receive your semi-monthly salary.

- 12/17/07 – You will receive your semi-monthly salary plus flight time and per diem for the period from 11/1 through 11/30. (Note: the 15th falls on a Saturday)

- 12/31/07 – You will receive your semi-monthly salary.

Please see below for more guidelines:

**Training** will be paid at two hours per day, based on the chart below.

**Crew movement** will be paid at one-half the employee's hourly rate for required company travel. Time for travel to and from work and training will no longer be compensated.

**Transportation** for air travel to and from work will be arranged and paid by the company. Employees who drive will be reimbursed at the published federal government mileage rate.

**Hotel accommodations** will be paid by the Company for pilots while on-duty or in training.



EXHIBIT

44- Hester
LM 3/19/10

Hester 000086

**Revised Pay Structure & Guidelines for Boeing Pilots**
**Page two**

**Per Diem** rates will be paid at $55 per day for domestic travel and $100 per day for international travel.

The chart below outlines the pay structure for the Vision Airlines Boeing pilots.

| Years of Service Starting NOV 1 | All Captains Annual Base Salary | B767 Captains Flight Hour Rate | All First Officers Annual Base Salary | B767 First Officers Flight Hour Rate | B737 Hourly Rates Captain | First Officer |
|---|---|---|---|---|---|---|
| 1 | $60,000 | $100.00 | $40,000 | $ 70.00 | $80.00 | $56.00 |
| 2 | 61,200 | 102.00 | 40,800 | 71.40 | N/A | N/A |
| 3 | 62,424 | 104.04 | 41,616 | 72.83 | N/A | N/A |
| 4 | 63,672 | 106.12 | 42,448 | 74.28 | N/A | N/A |
| Per Diem | Effective 11/1/07 – per diem will be paid at the following rate: $55/day domestic and $100/day international  Effective 1/1/08– per diem will be calculated by the hour starting 2 hours prior to departures from IAD and ending 2 hours following arrivals into IAD | | | | | |

Adjustments to base salary will be made in the following circumstances:

- For each day there may be a delay in returning to work, there will be a two-hour deduction of pay.
- If a flight is delayed into one's scheduled day off, after 12 hours, pilots will be compensated for a minimum of two hours per day or the actual flight time, whichever is greater.

Please sign below acknowledging receipt of this new policy. Return the signed document via fax to Lara Arthur at 703-661-6642. You may also scan the signed acknowledgment and return it to her via email (larthur@visionairlines.com).

If you have any questions regarding the new salary structure, please feel free to contact me. Thank you for your continued support as we move forward with the second phase of our international charter operation.

✂ - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

I have read and acknowledge receipt of the memo regarding the Revised Pay Structure & Guidelines for Boeing Pilots that went into effect on October 1, 2007.

By: _____
Gerald Hester

Date: _11-9-07_

---

*(from the Vision Airlines Employee Handbook dated October, 2006)*

**DISCUSSING SALARIES**

Vision Airlines respects the privacy of its employees, and it is expected that the employees of Vision Airlines respect the privacy of others as well. Individual salaries and hourly pay scales are private, personal information. Pay rates are a subject that should only be discussed between individual employees and their supervisor or manager. Therefore, employees are not permitted to discuss their salaries with their co-workers. Failure to comply with this policy may result in disciplinary actions up to and including termination.

Hester 000087