# Exhibit “2-A”

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEVADA

CASE NO. 2:09-CV-00117-RLH-RJJ

GERALD HESTER, on behalf of himself and all others similarly situated,

Plaintiff,

vs.

VISION AIRLINES, INC.

Defendant.

------------------x

**CERTIFIED TRANSCRIPT**

2525 Ponce de Leon Boulevard
Suite 900
Coral Gables, Florida
Friday, March 19, 2010
9:46 a.m. - 11:57 a.m.
1:15 p.m. - 5:15 p.m.

VIDEOTAPED DEPOSITION OF GERALD HESTER

Taken before Sherilynn V. McKay, RMR, CRR, a Notary Public for the State of Florida at Large, pursuant to Notice of Taking Deposition filed in the above-styled cause.

PRESENT:

DAVID M. BUCKNER, ESQ.
BRETT E. VON BORKE, ESQ.
Kozyak Tropin & Throckmorton, P.A.
2525 Ponce de Leon Boulevard
Suite 900
Coral Gables, FL 33134
(305) 372-1800
dmb@kttlaw.com
bvb@kttlaw.com
Attorneys for the Plaintiff

HAROLD P. GEWERTER, ESQ.
Harold P. Gewerter, Esq., Ltd.
2705 Airport Drive
North Las Vegas, NV 89032
(702) 382-1714
harold@gewerterlaw.com
Attorney for the Defendant

ALSO PRESENT:

Shelley Liebenberg
William Acor
Brian Daggett
Alejandro Montalvo, Videographer
Veritext/Florida Reporting Co.

- - -

INDEX

EXAMINATION PAGE
GERALD HESTER
DIRECT EXAMINATION BY MR. GEWERTER ........... 5
CROSS-EXAMINATION BY MR. BUCKNER ........... 216
REDIRECT EXAMINATION BY MR. GEWERTER ........... 226

- - -

EXHIBITS

PAGE
Exhibit 37 ..............................
Composite exhibit Bates Nos. Hester 000028 through 000045 14
Exhibit 38 ..............................
Logbook pages 43
Exhibit 39 ..............................
Earnings Statements 48
Exhibit 40 ..............................
W-2 Forms for 2006 52
Exhibit 41 ..............................
W-2 Forms for 2007 and 2008 55
Exhibit 42 ..............................
FDA Mandated Anti-Drug Program Acknowledgement 58
Exhibit 43 ..............................
Composite exhibit, top document letter dated 9/13/07 to Jim Maguire from Jerry Hester 63
Exhibit 44 ..............................
E-mail dated 10/15/07 to Gerald Hester re: Revised Pay Structure & Guidelines for Boeing Pilots - Effective October 1, 2007 77
Exhibit 45 ..............................
Personnel Action Form 91
Exhibit 46 ..............................
Classified Information Nondisclosure Agreement 94
Exhibit 47 ..............................
Employee Non-Competition and Non-Disclosure Agreement 105
Exhibit 48 ..............................
Employee Acknowledgement Form dated 3/1/07 108
Exhibit 49 ..............................
401(k) Salary Deferral Election Change Form dated 6/27/2007 110

Exhibit 50 ..............................
Separation Agreement and Full General Release with cover letter dated 9/3/06 119
Exhibit 51 ..............................
Class Action Complaint Jury Demand 125
Exhibit 52 ..............................
Las Vegas Sun article dated 1/23/09 201
Exhibit 53 ..............................
Las Vegas Sun article dated 1/30/09 209
Exhibit 54 ..............................
Counterdefendant Gerald Hester's Incorporated Memorandum of Law in Support of His Motion to Dismiss Counterclaimant Vision Airlines, Inc.'s Amended Counterclaims 217

- - -

THE VIDEOGRAPHER: Good morning. We're now on the video record. Today is Friday, March the 19th, 2010. The time is 9:45.

We're here to take the videotape deposition of Gerald Hester in the matter of the case Hester Gerald versus Vision Airlines.

Counsel please introduce themselves for the record and ask that this court reporter will swear in the witness.

MR. BUCKNER: David Buckner and Brett Von Borke for plaintiff Jerry Hester and the class.

MR. GEWERTER: Harold Gewerter on behalf of the defendant. Also present is Shelley Liebenberg, Brian Daggett and William S. Acor.

GERALD HESTER

was called as a witness by the Defendant, and having been first duly sworn, testified as follows:

THE WITNESS: I do.

DIRECT EXAMINATION

BY MR. GEWERTER:

Q Good morning, Mr. Hester.

A Good morning.

Q My name is Harold Gewerter. I'm the attorney who represents Vision Airlines in this case.

You understand today you are here pursuant to

the Rules of Civil Procedure to give your deposition in this matter?
A Yes.
Q You also understand you just took an oath by this court reporter, and this oath carries the same force and effect as if you're in a courtroom?
A Yes.
Q And I don't mean to belabor the point, but it's the same force and effect for perjury, truthfulness and untruthfulness. You understand all that?
A Yes.
Q And this setting may seem somewhat informal, but this may be used at some later proceeding in a court case if this goes to trial. So I don't want the informality of this to somehow dissuade you from giving a correct answer or a very cavalier answer. You understand that?
A Yes.
Q Okay. We're going to do this deposition today under oath, and present there's a videographer, who's videotaping this, along with the court reporter. Everything you say and I say hopefully we'll get on the record, but the one way we can do this is if I ask a question, wait until I ask the question, and I will wait until you answer the question, and hopefully we won't

have competing arguments. Hopefully there will be no arguments. But so you wait for my question, I'll wait for your answer, and that also goes for Mr. Buckner. He understands that. You understand that?
A Yes.
Q Have ever had your deposition taken before today?
A I was deposed once before.
Q What case was that and when was that?
A That was a couple years ago, Vision Airlines, and it involved the leasing company that leased an engine division.
Q What was the name of that case?
A I don't know.
Q And where was that case and which jurisdiction?
A I was deposed in Washington, DC.
Q And what year was that? Do you remember?
A It was two, two and a half years ago.
Q And was Vision the plaintiff or the defendant?
A I believe we were the defendant.
Q And what was your testimony concerning generally?
A My knowledge of any abuse of that engine when it was on a Vision aircraft.
Q Have you ever been a party, whether as a

defendant or a plaintiff, in any matter, other than this case, in the last ten years?
A No.
Q Have you ever been a party to a class action lawsuit before this case?
A No.
Q Weren't you a member of a lawsuit, of a proposed class, in another matter?
A Oh. I was not a lead plaintiff. I was a member of a class, yes.
Q What was the name of that case?
A That was AirCal pilots versus American Airlines.
Q And what year was that?
A That must have been about 1995.
Q Just so you know, I don't want you to guess at your answers today.
A Okay. I'm sorry. I don't know. I don't remember.
Q That's fine. I just want your best answer under oath. That's all I want.
A Yeah.
Q It was about 1995?
A I believe so.
Q And what was the basis of that case?

A We had -- AirCal had a long term disability plan. One of the provisions of that plan was that when the last pilot eligible to draw long term disability was no longer eligible, any remaining funds in the plan would be distributed amongst the remaining active AirCal pilots.
Q And did you receive any funds as a result of that lawsuit?
A Yes. We won that lawsuit.
Q You personally, did you receive any funds as a result of that lawsuit?
A Yes, I did.
Q And what year was that?
A I don't recall.
Q You don't remember how much money you received as a result of that lawsuit?
A No, I don't.
Q What jurisdiction was that lawsuit in?
A That was in Texas.
Q When did you first come to work for Vision Airlines?
A September 24th, 2006.
Q And who first interviewed you on behalf of Vision Airlines?
A Dan Carson.

Q And did you know Dan Carson prior to that time?
A No.
Q How did you become aware that there was a job opening at Vision Airlines for you to apply for?
A I received a phone call from another pilot.
Q Who was the pilot?
A Dave Frohman.
Q And Dave Frohman worked for Vision at the time?
A No.
Q Where did he work at the time?
A I believe he was unemployed at the time.
Q Did he ever come to work to Vision Airlines?
A Yes.
Q And did you work with him concurrently at Vision Airlines?
A Yes.
Q What time period, if you remember?
A I believe Dave was hired two to three months after I was.
Q Before I forget, what is your date of birth?
A Date of birth is September 25th, 1940.
Q So you're 69 years old. Correct?
A Yes.
Q Or I should say young, maybe.
A Yes.

Q I'm catching up.
And you came to work at Vision Airlines in what job capacity?
A Pilot.
Q As chief pilot, copilot, what --
A Captain.
Q Captain. And you were hired by whom?
A Dan Carson.
Q And was there a specific job function you were hired to perform, such as flying from a certain destination to a certain destination?
A Fly wherever I was assigned.
Q And what was your compensation arrangement when you first became a pilot at Vision Airlines?
A I believe we were paid $100 an hour, flight hour.
Q And that was what you were promised when you first came to work for Vision Airlines. Correct?
A That's what I was told the pay was.
Q Was that the pay you received?
A Yes.
Q Were you told anything other than a hundred dollars per hour when you first came to work for Vision Airlines?
A There was per diem.

Q Per diem is -- how did you view per diem?
A Well, per diem is reimbursement for your expenses.
Q And was that a straight per diem or did you have to justify your receipts?
A No. It was just the straight per diem.
Q So you got a hundred dollars per hour for flight time. Correct?
A Yes.
Q Were you guaranteed a number of hours per month --
A No.
Q -- or just as needed?
A I'm sorry.
We were not guaranteed a certain number of hours per month.
Q So it could have been one hour or 80 hours and that was your agreement that you made when you first came to work at Vision Airlines?
MR. BUCKNER: Object to the form.
THE WITNESS: I didn't make --
MR. BUCKNER: Object to the form.
You can answer.
THE WITNESS: I didn't make an agreement. That's what it was. I was an at-will employee.

BY MR. GEWERTER:
Q You acknowledge you were an at-will employee. Correct?
A Yes.
Q And you say you didn't make an agreement, but that's what was offered to you, a hundred dollars per hour, plus per diem. Correct?
A Yes.
Q And you accepted that pay structure. Correct?
MR. BUCKNER: Object to the form.
BY MR. GEWERTER:
Q You can go ahead and answer.
A Yes.
Q Was there additional training that you were required to undergo before you commenced work at Vision Airlines?
A Before I commenced work?
Q You were first hired and then you underwent some training through Vision Airlines. Is that correct?
A That's correct.
Q And you underwent that training before you actually commenced flying as a pilot for Vision Airlines. Is that correct?
A That's correct.
Q And who paid for that training?

A Vision Airlines.
Q Did you ever reimburse Vision Airlines for that training expense?
A No.
Q Would you give me the general nature of that training that you undertook so you could work at Vision Airlines?
A It's recurrent training.
Q Describe what you mean by recurrence training. I'm not a pilot, so -- I'm a layperson, so you have to explain these things to me.
A If you're qualified on an airplane, you have to, by regulations, undergo refresher training or recurrent training. And there are various schools that take care of that. And I was sent to one of those schools to accomplish that training.
MR. GEWERTER: Would you mark this, please.
(Deposition Exhibit 37 was marked for identification.)
BY MR. GEWERTER:
Q Sir, take a look at this document that's just been marked as Exhibit No. 37. In the bottom left starts with Hester -- Bate stamped No. Hester 000028, and ends with I believe it says Hester 000045. I say that because the page before is 44. So I believe the

last page would be 45. Let me know when you've had a chance to review that document for me, please.
A Okay.
Q Have you had a chance to review that document?
A Yes.
Q Let's go to the first page, page No. 28 on the Bates stamping. It looks like there's copies of three ID cards. The top one appears to be a driver's license. Is that correct?
A Yes.
Q Are these documents that you gave to Vision Airlines when you first applied for a job?
A When I was hired.
Q When you were hired?
A Yes.
Q The left -- the bottom left says King Schools. Has your name. What is that?
A That's certificate of completed training for RVS and air space.
Q And what does that mean?
A Reduced vertical separation minimums.
Q And how often was that training required to maintain your license?
A I believe that's every two years.
Q Are there some designations or training that is

required to be renewed every year?
A Proficiency check.
Q Anything else?
A Need a medical certificate.
Q Look at the next page, which would be Hester 29, although the bottom seems to be cut off. The top says "United Services, Flight Training Services, Emergency Procedures (EPT)." Do you see that document?
A Yes.
Q And then it says -- there's a check mark next to "evacuation and ditching training." What is that?
A We receive the training in evacuating and ditching procedures.
Q And this is training that was provided to you through Vision Airlines?
A Yes.
Q And paid for by Vision Airlines?
A Yes.
Q The next document, it says King Schools certification, and it has your name on there. It says Gerald Hester, pilot certificate number, has completed the King Schools course reduced vertical separation minimum. Is that also training you received while at Vision Airlines?
A Yes.

Q Who paid for that training?
A I believe Vision did.
Q Did you pay for any training once you were hired by Vision Airlines?
A No.
Q Go to the next document. It says American Airlines. It was a letter from AP Madar, manager, flight training/standards, to -- looks like the FAA, dated November 7th, 1997. Do you see that document?
A Yes, I do.
Q What is that document?
A It was request for a designation as a check airman, and it was approved.
Q And this is more training provided to you by Vision Airlines. Correct?
A No.
Q Okay. Who provided this?
A This was American Airlines.
Q Who paid for the training?
A This was not training. This was a request for the FAA to appoint me as a proficiency check pilot to provide check rides in a simulator and check rides in the airplane to other American Airlines pilots.
Q And who were you employed November 7th, 1997? Were you employed by American Airlines?

A I was employed by American Airlines.
Q And American Airlines also put you through training. Correct?
A Yes.
Q Look at the next document. It's a certificate of designation, Federal Aviation Administration, has your name on there, and it says you designate as training center evaluator, flight safety, Texas, Dallas, Fort Worth Learning Center. Do you see that?
A Yes.
Q It's dated June 8th, 2005?
A Yes.
Q Who was your employer on June 8th, 2005?
A Flight Safety.
Q What kind of training was provided to authorize you to receive this certificate?
A I got a typed rating in an aircraft, which was new to the DFW Learning Center for Flight Safety.
Q You've gone through quite a bit of training throughout your career as a pilot, haven't you?
A Yes.
Q You do recurring training and you've done a lot of basic training. Correct?
A Yes.
Q And you're somewhat proficient with the rules

and regulations of the FAA as it applies to pilots?
MR. BUCKNER: Object to the form.
BY MR. GEWERTER:
Q You can answer the question.
A Yes.
Q And you understand the obligations of a pilot, don't you?
A Yes.
Q In fact, you've even worked as an evaluator. Correct?
A Yes.
Q You've worked as a trainer. Correct?
A Yes.
Q And you've worked as an on line pilot. Correct?
A Yes.
Q There's another document, the next page, U.S. Department of Transportation. It's a letter dated June 8th, 2004. Do you see that?
A Yes.
Q That seems to be a document that goes on for a couple pages. Actually, I'm sorry, that's one page, the June 8th letter. What is that one-page document?
A It's a letter of approval, approving me to act as a training center evaluator, and it lists the checks

that I was authorized to do.
Q Not every kind of pilot has this kind of designation, do they?
A No, they don't.
Q That takes them high level proficiency, doesn't it?
A Yes.
Q It's something that you earned over a period of time, both through education, skill, and experience. Correct?
A Yes.
Q Look at the next page, March 31, 2006. It's from the U.S. Department of Transportation, Federal Aviation Administration. What is that document?
A It's essentially the same thing. A renewal.
Q Okay. Look at the next page, which is Bates stamped No. Hester 000035, and the upper left says Sim Center proficiency check record. Do you see that?
A Yes.
Q What is that document?
A It was a check ride I took for the A310 aircraft.
Q Look at the next page. That first document is dated 3-31-2009. Do you see that?
A Uh-huh.

Q The other thing, if you answer yes or no --
A I'm sorry.
Q It just makes for a cleaner record.
A Yes.
Q I'm sorry. I should have warned you on that. Who was your employer on 3-31-2009.
A I was contract employee for Sim Center.
Q Have you worked as a pilot flying aircraft since you left Vision Airlines?
A No, I have not.
Q Is there a reason for that?
A Couldn't get a job.
Q Have you applied?
A Yes.
Q Where have you applied since you left Vision Airlines?
A I've applied for work in many different places.
Q Well, let's go with the first one you applied to. Give me the list to the best of your recollection.
A Maverick Racing.
Q What is Maverick Race?
A It's a company in the Dallas-Fort Worth area.
Q And what's the nature of their business?
A They fly -- it's a personal flight department for an individual.

Q And were you given a reason why you were not hired by Maverick Racing?
A They were considering getting an airplane and they never got it.
Q What's the next job you applied for after Maverick Racing?
A I don't recall.
Q About how many times have you applied for jobs since leaving Vision Airlines?
A I had applied two to three times per week.
Q On line or in person?
A On line and in person.
Q And have you ever had any job interviews?
A No.
Q Were you ever given a reason why?
A I've been given we're not hiring, and other times there's been no reason given.
Q Are these companies that are regulated by Part 91 or Part 121 or Part 135, if you could tell me?
MR. BUCKNER: Object to the form. Object to the form.
You may answer.
THE WITNESS: Some were 91. Some were 135.
BY MR. GEWERTER:
Q And were some 121?

A I didn't apply as a pilot there.
Q Why not?
A Because I'm over the age limit for 121 operations.
Q What is the age limit for a 121 operation?
A Sixty-five.
Q Was that ever age 60 in the last ten years?
A Yes.
Q Do you know when that changed?
A I don't recall the exact date.
Q So you're aware as an experienced pilot that you are not able to work as a pilot, a line pilot, for a company that's 121 certified?
A That's correct.
Q Yet you filed a complaint with the EEOC against Vision Airlines claiming age discrimination. Is that correct?
MR. BUCKNER: Objection. Argumentative.
BY MR. GEWERTER:
Q You can go ahead and answer.
A I did. Vision is not operating under 121.
Q How do you know that?
A They weren't at the time I was dismissed.
Q And how do you know that? You were just told that or you believed it to be true? Did you ask

someone, for example?
A Yes. I was aware that there was -- they were undergoing an application process, but the certificate had not been granted.
Q So you're aware they were undergoing an application process to transition to a 121 certification --
A Yes.
Q -- at the time you left?
A That's what I was told.
Q And who told you that?
A Jim Maguire.
Q Anyone else?
A Not at that time.
Q Was Jim Maguire your immediate supervisor at that time?
A Yes.
Q Let me go back to this document, Jerry. Go to what is marked as Hester 000038. It's a document from Higher Power Aviation B737, 300 training summary, recency of experience. Do you see that?
A Yes.
Q And student name, it has your name. Correct?
A Yes.
Q And training date is 9-22-2006?

A Yes.
Q And what is the nature or how did you receive this document?
A I underwent recency of experience training there, three takeoffs and landings to a full stop.
Q So you've done exactly what's marked on this document?
A Yes.
Q And there are initials next to that. Correct?
A Yeah. That's the instructor.
Q And who was your employer on 9-22-2006?
A I was not employed on that date.
Q So why would you bother to do this if you weren't employed?
A I had been asked if I were available to fly a charter flight from Dallas Love Field to JFK to Dulles.
Q Who asked you to do that?
A Dan Carson.
Q So this is before you commenced employment with Vision Airlines. Correct?
A Yes.
Q How did you know Dan Carson if you weren't yet employed by Vision Airlines?
A I had spoken to him on the phone.
Q While he worked for Vision Airlines?

A Yes.
Q And what did he ask you to do?
A He asked me if I would be available to fly copilot on this trip.
Q And your response was what?
A Yes, but I'm not current on landings.
Q Okay. And so you went for training at this Higher Power Aviation?
A Yes, I did.
Q Who paid though that training?
A Vision.
Q You weren't yet hired by Vision but they paid for your training?
A That's correct.
Q Go to the next page, please, Hester 39, Bates stamp No. 39. I know it's a bad copy, and I apologize. On the bottom of it it has medical certificate first class. Do you see that?
A Uh-huh, I do.
Q What is the nature of that document?
A You need a medical certificate to fly.
Q And that's an annual requirement. Correct?
A It depends on the operation you're in. In case of Vision Airlines, yes, an annual requirement.
Q Look at the next page. It says certificate of



completion, level one awareness training, presented to Gerald George Hester, October 29, 2007. Do you see that?
A Yes.
Q What was the nature of that document?
A That was some security training that we did on the internet.
Q When you say "we did," who are you referring to?
A I did.
Q Who is your employer on October 29, 2007?
A Vision.
Q And was there a cost associated with this training?
A I don't think so.
Q So anyone could go on line and take this class?
A I don't recall.
Q You say awareness training. Then you also said security training. What do you mean by security training?
A About recognizing -- recognizing threats around a building, around an airport.
Q Have you ever received a security clearance from any government agency?
A Yes.



Q Which government agency and when?
A I served 24 years in the military as an officer, and I held a security clearance.
Q And you were -- you received recurrence training during that 24-year period. Correct?
MR. BUCKNER: Object to the form.
BY MR. GEWERTER:
Q Did you receive recurrent aviation training during that 24-year career in the military?
A No.
Q The military doesn't train like private industry trains?
A No.
Q How was it different?
A Go through an extensive initial training and then are proficiency checked at the regular intervals.
Q Were you a pilot in the military or were you a navigator?
A I was a navigator.
Q What was the difference, generally?
A A pilot flies the airplane, a navigator provides the navigation.
Q When did you become a pilot?
A After I was released from active duty I attended Embry-Riddle Aeronautical Institute and earned



my pilot certificates there.
Q What year was that, approximately?
A It would have been '68, '69.
Q Look at the next page, which is Hester 000041, on the bottom right. In the upper left says airman proficiency qualification check. What was the nature of those documents?
A That was my type rating check ride for 757, 767.
Q Who was your employer on 11-27-07?
A Vision Airlines.
Q Who paid for this check?
A Vision Airlines.
Q Did you ever reimburse them?
A No.
Q Do you have any idea about how much Vision Airlines has expended on you individually for all this training that we've been talking about?
A No.
Q Have you ever asked?
A No.
Q Is there a reason why you haven't asked?
A It's required training.
Q Does it require that the employer pay for it or is that just up for negotiation?

MR. BUCKNER: Object to the form.
BY MR. GEWERTER:
Q You can answer.
A Employers traditionally pay for the training.
Q There's no FAA regulation that requires that the employer pay, though, is there?
A Not to my knowledge.
Q So it's something Vision did voluntarily. Is that correct?
A That's what most companies do if they wish to retain qualified people.
Q And you admit you're a qualified pilot, don't you?
A Yes.
Q And you would never do anything to violate FAA rules and regulations, would you?
A I would never intentionally violate FAA rules and regulations.
Q As we sit here today, do you have any knowledge that you have ever violated any FAA rules and regulations?
MR. BUCKNER: Object to the form.
BY MR. GEWERTER:
Q You can answer.
A No.

Q Look at the next page, which says Aeroservice Aviation Center, Bates stamp No. Hester 0000042.
A 42?
Q Yes. The 42 is cut off a slight bit on the bottom right.
A Okay.
Q The day of this document is 09-29-06. Do you recognize this document?
A Yes.
Q What is the nature of this document?
A It's airmen certification proficiency evaluation.
Q And what was this issued?
A To enable me to fly as pilot in command.
Q And who was your employer on 9-29-06?
A Vision Airlines.
Q And who paid for this training?
A Vision Airlines.
Q Look at the next page, Hester 0000043. It says Aeroservice Aviation Center, it has your name on there, it says B737 PIC recurrent training program. Do you see that?
A Yes, I do.
Q So this is not new training, this is recurrent training. Is that correct?

A That's correct.
Q So you kept up with the rules and regulations of the FAA. Is that correct?
A Yes.
Q Look at the next page. Hester 0000044. And it says Vision Airlines, flight crew qualification form. Do you see that?
A Yes.
Q And there's some hand writing in there. What was the nature of this document?
A This is a list of various trainings and it is this training that I received at Aeroservice.
Q I notice in the bottom left it's signed by a person named Dan Carson. Do you see that?
A Yes.
Q When was the last time you spoke with Dan Carson?
A More than a year ago.
Q And what was the nature of that conversation?
A It was essentially social.
Q Okay. Besides being essentially social, was there a component that wasn't essentially social?
A He asked how I was doing, if I had found a job, and I said no. And I asked how he was doing. He said he was working on something.

Q Did he say what that something was?
A No. He played his cards very close to the vest.
Q Did he discuss this lawsuit or the potential of a lawsuit with Vision Airlines during that social meeting with Dan Carson?
MR. BUCKNER: Object to the form. It wasn't a meeting.
MR. GEWERTER: It was a conversation.
BY MR. GEWERTER:
Q During that conversation, did you have a conversation, or a discussion with him, concerning the potential of a lawsuit against Vision Airlines?
A No.
Q Did you discuss during that conversation an allegation that either you or he were allegedly owed money by Vision Airlines?
A No.
Q Did you discuss Vision Airlines at all during that conversation?
A No.
Q It was strictly social is what you're saying?
MR. BUCKNER: Object to the form. That isn't what he said.
THE WITNESS: It was a social conversation, and

also a discussion about possibilities for employment.
BY MR. GEWERTER:
Q And where were you -- was it a telephone conversation or a personal meeting?
A It was a telephone conversation.
Q And who called whom?
A I don't recall.
Q How long did the conversation last, approximately?
A Five to seven minute.
Q And prior to that meeting, or I'm sorry, that conversation just over a year ago, when was the most recent time prior to then that you had a conversation about anything with Dan Carson?
A I don't recall.
Q Have you ever discussed compensation, or lack thereof, with Dan Carson concerning your prior employment with Vision Airlines?
A Yes.
Q When was that conversation?
A Shortly before he is employment was terminated.
Q And who contacted whom?
A We were -- we just ran into each other.
Q Where does he live?

A I don't know.
Q Where do you live?
A I live in Texas.
Q He doesn't live in Texas, though, does he?
A No.
Q How do you just run into somebody in a different state? I'm curious.
A We were in the hotel in Washington, DC.
Q Why were you in the hotel in Washington, DC?
A Because I was on duty with Vision Airlines.
Q Okay. So you were still employed by Vision Airlines?
A Still employed by Vision Airlines.
Q And he was still employed by Vision Airlines?
A Yes.
Q And you discussed compensation issues with Dan Carson concerning Vision Airlines?
A Yes.
Q To the best of your recollection, what was said by you and what was said by Mr. Carson?
A I just asked him that I had heard rumors about hazard pay.
Q Where did you hear those rumors from?
A Other pilots.
Q Can you give me their names?

A I don't recall. General conversation.
Q That seems like a big issue. Somebody allegedly owes you money and you don't remember who told you, who allegedly owes you money or why?
A I don't recall.
Q Was it ever Dan Carson?
A He mentioned that he thought we might be entitled to hazard pay.
Q And was it Mr. Borke?
A Could have been Mr. Borke.
Q You say "could have been." Either it was or it wasn't.
A I don't recall.
Q Who else could it have been?
MR. BUCKNER: Object to form. Seeks speculation.
MR. GEWERTER: As time goes on his memory seems to get better, and you're coming up with names now.
MR. BUCKNER: Harold --
MR. GEWERTER: I want the answers.
MR. BUCKNER: -- he said he doesn't recall. If he has the answers he'll give them to you. There's no browbeating.
MR. GEWERTER: There's no browbeating that's going to happen here.

MR. BUCKNER: I'm objecting to form. Seeks speculation.
MR. GEWERTER: That's fine.
BY MR. GEWERTER:
Q Go ahead. Answer the question.
A It could have been anyone with whom I flew.
Q Give me a list of all that group of people that you believe you could have discussed compensation issues with at Vision Airlines.
MR. BUCKNER: Object to the form. Seeks speculation.
THE WITNESS: It could have been Gary Borke, it could have been -- I'm trying to remember the names -- could have been Mark Lippi, it could have been Gary Vic, it could have been Dave Frohman, could have been Bill Jordan. It could have been anyone I've flew with. I don't remember the names of all the pilots.
BY MR. GEWERTER:
Q When did you first come to the conclusion that Vision had not paid you all the money you felt you were entitled to while working for Vision Airlines?
MR. BUCKNER: Object to the form.
BY MR. GEWERTER:
Q You can answer it.

A When my attorneys discovered that was in fact the case.
Q Well, how would you have a lawyer if you didn't know you had a case?
A I didn't know if it were true or not.
Q Okay. At some point in time, I want that time period, to the best of your recollection, did you come to the conclusion that you felt you were entitled to additional money from Vision Airlines?
MR. BUCKNER: Objection. Asked and answered.
MR. GEWERTER: I haven't gotten a straight one yet, so I want to hear the answer.
MR. BUCKNER: Harold, he said when he talked to his attorneys. When his attorney --
MR. GEWERTER: You don't hire a lawyer unless you first have a cause of action.
MR. BUCKNER: We're not going to debate why you bring a cause of action. It's notice -- the motion to dismiss was denied.
Go ahead.
BY MR. GEWERTER:
Q Anything else you want to add to that?
A No.
Q When did you first contact this law firm that currently represents you concerning this case?

A Late September of 2008.
Q Did you contact them or did they contact you?
A I don't remember who contacted me.
Q And who did you speak with at this law firm that currently represents you? I don't want to know what was said. I just want to know who did you speak with.
A These two gentlemen here.
Q What are their names?
A David Buckner, Brett Von Borke.
Q You know Mr. Von Borke's father was a pilot that flew with you?
A Yes.
Q When did you first learn that?
A When I met him.
Q Did Mr. Borke ever tell you his son was a lawyer?
A Yes.
Q When did he first tell you that?
A I don't recall.
Q Was it while you were employed at Vision Airlines?
A Yes.
Q Other than your lawyers in this case, have you ever talked to or personally met with Ross Goodman?

A I have not.
Q Do you know who he is?
A Yes.
Q Who is he?
A He is part of the attorney team.
Q And how do you know that?
A His name has been on the documents.
Q Did you ever provide him with information -- don't tell me what was provided, if there was anything -- but did you ever provide him with any information concerning this lawsuit?
A Via the attorneys here.
Q But you never directly provided him with information, did you?
A I did not.
Q Did you ever send him documents in the mail?
A No.
Q How about via e-mail?
A No.
Q How about via fax?
A No.
Q Ever talk to him on the telephone?
A No.
Q Ever meet him in person?
A No.

Q So all the information you transmitted came through your law firm in Florida. Correct?
A That is correct.
Q And other than the names you've mentioned so far, who else have you talked to just prior to filing this lawsuit?
MR. BUCKNER: Object to the form. Mischaracterizes his testimony.
BY MR. GEWERTER:
Q You can answer.
A I don't think I spoke with anyone other than the people I've mentioned.
Q You understand that you are, for lack of a better term, the lead plaintiff in this case?
A Yes.
Q And was that your decision to become the lead plaintiff?
A No.
Q Who asked you to become the lead plaintiff?
A These two gentlemen.
Q Other than your conversation with these two gentlemen, which I don't -- I'm not going to ask you about -- did anyone else tell you why they wanted you to become the lead plaintiff?
A No.

Q And did you agree to become a lead plaintiff?
A Yes.
Q And before you became lead plaintiff, after you spoke with these two gentlemen, did you speak with anyone else in making that decision?
A No.
Q Did you speak with Mr. Borke, your copilot?
A No.
Q How about Mr. Dan Carson?
A No.
Q Are you aware that Mr. Carson calls himself Dr. Carson?
A Yes.
Q Does he have a doctor degree?
A I heard he has a doctorate in philosophy.
Q A doctorate in philosophy. When was that earned, or obtained, I should say?
MR. BUCKNER: Objection. Outside the witness' knowledge.
MR. GEWERTER: I'm asking. If he doesn't know he can tell me he doesn't know.
THE WITNESS: I have no idea.
BY MR. GEWERTER:
Q Did he earn it while he was employed at Vision Airlines?

A I have no idea.
Q Okay. But he did refer to himself as Dr. Carson?
A Correct.
Q And sometimes he calls himself Dr. Dan?
A Correct.
MR. GEWERTER: Would you mark this next in sequence.
(Deposition Exhibit 38 was marked for identification.)
MR. GEWERTER: How are you doing on the time?
THE VIDEOGRAPHER: Fifteen more minutes.
BY MR. GEWERTER:
Q Take a moment and look at this document that's been marked as Exhibit No. 38. I don't need you to read each and every line at this point. Just let me know if you are familiar with this document.
A Yes.
Q What is the nature of this document?
A It's copies of my logbook pages.
Q Whose handwriting is in this document?
A Mine.
Q When you say logbook, again, I'm a layperson, explain to me what a logbook is.
A Logbook is a record that I keep of my flying.

Q And this is a logbook while at Vision Airlines?
A Yes.
Q And it shows pilot and copilot?
A It -- it shows who I flew with.
Q Okay. And there's some other names on there also. Sometimes they're circled, sometimes they're not. Who are those people?
MR. BUCKNER: Object to the form.
BY MR. GEWERTER:
Q You can answer.
A Flight attendants.
Q And in the upper right-hand corner of each page there appears to be a month and a year. Is it a fair statement each one of these pages represents a logbook for a month of a particular year?
A No.
Q So why are there dates in the upper right-hand corner?
A Well, the entire months flying doesn't go on one page.
Q Sometimes it's two pages?
A Sometimes it takes two pages or three pages.
Q But is it correct to say that that month and year is an accurate reflection of your flight hours while at Vision Airlines?

A Yes.
Q And if I take all the hours in here -- this is your handwriting. Correct?
A Yes.
Q This is something you prepared by yourself. Correct?
A Yes.
Q So if I take all of your hours here, they should tell me the number of hours you worked for Vision Airlines for a particular time period and in total?
MR. BUCKNER: Object to the form.
THE WITNESS: It would detail the number of flight hours I worked.
BY MR. GEWERTER:
Q And you were paid how much per hour?
MR. BUCKNER: Object to the form. What time period?
BY MR. GEWERTER:
Q When you were first hired, what was your promise for pay?
MR. BUCKNER: Object to the form.
BY MR. GEWERTER:
Q Go ahead and answer, please.
A $100 an hour.
Q So if I take a hundred dollars per hour, and

multiply the number of hours in here, I should then determine how much time and money you earned while at Vision Airlines?
A Yes.
Q Thank you.
Have you actually done that?
A No.
Q Is there a reason why you haven't done that?
A I kept a separate record in addition to my logbook. Or I made a notation of the time.
Q Is your separate record different than this record, based on hours?
A No.
Q So this record is an accurate reflection of your hours while working at Vision Airlines?
A Yes.
Q And you have no reason to believe that that document in front of you has been altered, have you? Maybe take your time and look at it.
A No. I have no reason to believe it's been altered.
Q So this is an accurate reflection of the number of hours worked while employed at Vision Airlines. Correct?
MR. BUCKNER: Object to the form.

BY MR. GEWERTER:
Q What's your answer, sir?
A Yes.
Q Now, when you went to work for Vision Airlines, did you receive a paycheck or did you get direct deposits?
A Direct deposit.
Q Was that something that was offered or something you requested?
A It was offered.
Q Have you ever gone back to check on your direct deposits and make sure that there was no discrepancies in pay?
A When I got occasional e-mails from HR, and said, you know, asked to verify this, then I did.
Q As we sit here today, though, you have no evidence or facts that your direct deposits somehow were different than what you agreed to work for at Vision Airlines. Correct?
MR. BUCKNER: Object to the form.
THE WITNESS: The pay that was offered is, I believe, the pay that I received. Occasionally there were errors, and I submitted the corrections as requested.
MR. GEWERTER: Could you mark this next,

please.
(Deposition Exhibit 39 was marked for identification.)
BY MR. GEWERTER:
Q Sir, take a moment and look at the document, and let me know when you've had a chance to review the document. I know it's several pages long. Just take your time.
A Okay.
Q Have you ever seen these documents before? I'll represent that this document starts with Hester 000046, and it runs through Hester 000085.
A Yes.
Q What are these documents?
A These are earnings statements.
Q And you've seen these before. Is that correct?
A Yes.
Q Are these accurate?
A Yes.
Q Did you ever complain to anyone at Vision Airlines that you were not receiving what you promised to be received?
A No.
Q In here, for example, take the first page, page 46 of Exhibit No. 49, it says regular earnings,

3,640, per diem, $800. Then in the right-hand side of that column says taxes and deductions. Do you see that?
A Yes.
Q Is there any line in here, anywhere you can show me that says hazard duty pay on this page?
A No.
Q Or any other page?
A No.
Q Well, aren't you suing over hazard duty pay?
A Yes.
Q So if you didn't agree to get hazard duty pay, you agreed to work for a hundred dollars per hour, and these documents are accurate, tell me the nature of your lawsuit as to why you believe you're entitled to hazard duty pay.
MR. BUCKNER: Object to form.
BY MR. GEWERTER:
Q You can answer.
A I was a pilot. I and the other pilots and the flight attendants and the mechanics who did the hazardous duty that would justify the receipt of hazard pay should be the ones who receive it.
Q But you were never promised that, though, were you?
A I was not promised that, but I expected the

company to do the right thing.
Q And later on your compensation changed, didn't it, in 2007?
A Yes.
Q And, in fact, there was a pay increase. Correct?
MR. BUCKNER: Object to the form.
THE WITNESS: There was a pay change.
BY MR. GEWERTER:
Q How did it change in 2007? I believe it's October.
A They changed the pay scheme to include a base amount and an hourly amount.
Q Do you remember what that was?
A I'd have to review the document.
Q It was a pay increase, though, wasn't it?
A It was a pay cut for me.
Q Why was it a pay cut for you?
A Because I was assigned as a crews captain, international relief officer.
Q And you acknowledge, as you said earlier, you were an at-will employee. Correct?
A Yes.
Q And there's no guarantee of employment, was there?

A No.
Q And you understood at all times that Vision could hire and fire any or all of its employees at will. Correct?
A Within the bounds of the law, yes.
Q As an at-will employee, you understood you had no guarantee of a job beyond that day, did you?
A That's correct.
MR. GEWERTER: Let's mark this next, please. Are we okay on time? Actually, let's stop now. It my be a -- point, but that's all right.
THE VIDEOGRAPHER: Let me go off the record. The time is 10:42.
(Recess taken.)
THE VIDEOGRAPHER: All right. We're now back on the record. The time is 10:57.
BY MR. GEWERTER:
Q Sir, we're back on the record now. Did you discuss this case with anyone other than your lawyers during the break?
A I beg your pardon?
Q Did you discuss -- did you discuss this case with anyone other than your lawyers during the break?
A No.
Q You said earlier that when you first were

contacted by Dan Carson that he wanted you to get certified because he wanted you to run a charter.
A Yes.
Q Who was that charter for?
A It was a Vision Airlines charter.
Q How do you know that?
A It was a Vision Airlines airplane.
Q How do you know that? Did you actually fly the charter?
A Yes, I flew it.
Q Was it marked Vision Airlines?
A No. It was one of the Vision Airlines aircraft.
Q And you know that because you're a pilot and you know from the -- from certain records you can tell?
A It was an aircraft Vision Airlines operated.
Q I understand what you're saying. I want to know how you know that, though. What gave you special knowledge to tell you that?
A I flew the airplane on other trips after that.
Q Okay. That's fine.
MR. GEWERTER: I'm going to mark another exhibit. You can mark this next exhibit, please.
(Deposition Exhibit 40 was marked for identification.)

BY MR. GEWERTER:
Q Let me know when you've had a chance to review this document. It looks like W-2 wage and tax statements for the year 2006.
A Yes.
Q Have you ever seen these documents before today?
A Yes.
Q And when did you see them, approximately?
A They would have been provided so we could prepare our income tax.
Q They were provided to you by Vision Airlines?
A Yes.
Q Are they accurate?
MR. BUCKNER: Object to the form. He hasn't had a chance to review them until now.
MR. GEWERTER: He said he got them to prepare his tax returns. They're your documents.
MR. BUCKNER: You didn't get this from us, though, Harold. He doesn't know if this is his. I don't know that you've done -- I don't know that anybody has done anything with this or not. I don't know where this came from.
BY MR. GEWERTER:
Q Let me ask you another way. Is your name