Exhibit "2-B"

54

1  Gerald Hester?
2     A  Yes.
3     Q  Do you reside at 208 Mill Crossing, West
4  Colleyville, Texas 740 —76034?
5     A  No.
6     Q  Did you ever?
7     A  Yes.
8     Q  Did you reside there in 2006?
9     A  Yes.
10    Q  Was that a correct address for you for 2006?
11    A  Yes.
12    Q  And was Vision Airlines located at 2634 Airport
13 Drive, D-106, North Las Vegas, Nevada, 89032 in 2006?
14    A  Yes.
15    Q  Look at this document, please. There's two
16 W-2's on there. Take all the time you need. Let me
17 know if you find any discrepancies to the best of your
18 recollection whether or not this is a true and correct
19 statement that you received from Vision Airlines.
20    A  I can't. I have -- I don't have my own
21 document to compare it to.
22    Q  Do you know about how much money you made in
23 the year 2006 from Vision Airlines?
24    A  Not exactly, no.
25    Q  Do you have an approximation?

55

1     A  This looks like it would be approximately
2  correct.
3     Q  So if you add up these numbers here, that looks
4  like it's fairly accurate then. Correct?
5        MR. BUCKNER: Object to the form.
6        THE WITNESS: This could be correct.
7  BY MR. GEWERTER:
8     Q  As we sit here today, you have no reason to
9  believe that these documents are incorrect, though, do
10 you?
11    A  No.
12       MR. GEWERTER: Mark this next one, please.
13       (Deposition Exhibit 41 was marked for
14    identification.)
15 BY MR. GEWERTER:
16    Q  Let me know when you've had a chance to review
17 document No. 41.
18    A  I have.
19    Q  Have you ever seen these documents before? One
20 is a W-2 statement for 2007, and one is a W-2 statement
21 for 2008.
22    A  They look like W-2's for those years.
23    Q  Do they look like they're accurate to the best
24 of your recollection as you sit here today?
25       MR. BUCKNER: Object to the form.

56

1        THE WITNESS: I don't remember the money I made
2    in those years.
3  BY MR. GEWERTER:
4     Q  Does this look like approximately the amount of
5  money you made in those years from Vision Airlines?
6     A  It could be.
7     Q  You have no reason to believe these documents
8  are inaccurate, though, do you, as you sit here today?
9     A  No, I don't.
10    Q  And if I take all the hours from your logbook
11 and multiply it by the hourly rate, I should come up
12 with these same numbers. Is that correct?
13       MR. BUCKNER: Objection. Totally
14    mischaracterizes how this works.
15       MR. GEWERTER: Well, that's your testifying
16    objection. But that's not reality.
17 BY MR. GEWERTER:
18    Q  Answer the question, sir.
19    A  The pay was changed.
20    Q  When was the pay changed?
21    A  October 1st of 2007.
22    Q  Why was it changed?
23    A  I don't know.
24    Q  And you accepted the pay change. Correct?
25       MR. BUCKNER: Object to the form.

57

1        THE WITNESS: I was an at-will employee.
2        MR. GEWERTER: That's fine.
3  BY MR. GEWERTER:
4     Q  Now, as part of you being a pilot, you
5  understand there's an anti-drug program in effect by the
6  FAA?
7     A  Yes.
8     Q  And that's something that's very -- held to
9  very high standard with the FAA and with the airline
10 industry?
11    A  Yes.
12    Q  Why is that? Do you know?
13    A  Impair a person's ability to perform.
14    Q  In fact, the issue is impairment of a pilot
15 while on duty. Correct? That's why there's drug and
16 alcohol policies?
17    A  Yes.
18    Q  And any form of impairment could endanger the
19 lives not only of yourself but of your passengers?
20 Correct?
21       MR. BUCKNER: Object to the form.
22 BY MR. GEWERTER:
23    Q  Is that correct?
24    A  It could.
25    Q  So if you're on an aircraft and you knew your

16 (Pages 58 to 61)

**58**

1  pilot was smoking crack cocaine an hour before, you
2  wouldn't fly on that plane, would you?
3      A. No. I would not.
4      Q. And if you knew he was drunk or had several
5  drinks within the last couple hours, you wouldn't fly on
6  that plane either, would you?
7      A. No, I would not.
8      Q. Why is that?
9      A. Be inable to perform.
10     MR. GEWERTER: Would you mark this next,
11  please.
12     (Deposition Exhibit 42 was marked for
13  identification.)
14  BY MR. GEWERTER:
15     Q. Look at this document and let me know when
16  you've had a chance to review it.
17     MR. BUCKNER: Harold, I'm going to object. I
18  don't think you've ever produced these documents to
19  us, and they're not Bates stamped. Have you
20  produced these to us?
21     MR. GEWERTER: I can't give you an answer right
22  now. This came out of his personnel file, and his
23  personnel file was produced. Can I verify each
24  document? No. But I can tell you these came out of
25  his personnel file. We can take it up at a later

**59**

1  time.
2      MR. BUCKNER: Well, no, you can't, because you
3  can't use documents in deposition you haven't
4  produced to me that you've withheld.
5      MR. GEWERTER: Oh, yes I can. And nothing has
6  been withheld.
7      BUCKNER: That's an interesting --
8      MR. GEWERTER: You can take it up with the
9  judge if you don't like my question.
10  BY MR. GEWERTER:
11     Q. Look at this document, please, sir.
12     A. I am.
13     Q. Is that your signature that appears at the
14  bottom?
15     A. Yes.
16     Q. Did you sign this document on or about
17  9-22-2006?
18     A. That's my signature. If -- I have no way to
19  establish whether the rest of the wording on here is the
20  same as what I signed.
21     Q. And what is the purpose of this document, if
22  you know?
23     A. It's information regarding changes in FAA's
24  anti-drug program and advice that that's been
25  incorporated into company policy.

**60**

1      Q. And this is acknowledgment that you're aware of
2  the company policy based on these FAA changes. Correct?
3      A. Yes.
4      Q. And the purpose of these policies that are held
5  very precious by the FAA is impairment, as you said
6  earlier. That was your word. Correct?
7      MR. BUCKNER: Object to form.
8      THE WITNESS: Yes.
9  BY MR. GEWERTER:
10     Q. And you would never fly with a pilot who was
11  impaired, would you?
12     A. No.
13     Q. You said earlier today, I asked you a question,
14  did you ever violate FAA policy, you said no. Is that a
15  true statement or a false statement?
16     MR. BUCKNER: Object to the form.
17  Mischaracterizes his testimony.
18  BY MR. GEWERTER:
19     Q. Did you ever violate FAA policies?
20     MR. BUCKNER: Object to the form.
21  BY MR. GEWERTER:
22     Q. You can answer the question.
23     A. I never intentionally violated FAA policies.
24     Q. My question did not say "intentionally." The
25  question is did you ever violate FAA policies.

**61**

1      MR. BUCKNER: Objection. Asked and answered.
2      MR. GEWERTER: No. He answered a different
3  question.
4      MR. BUCKNER: Objection. Asked and answered.
5  BY MR. GEWERTER:
6      Q. Go ahead. Answer it, please.
7      A. What policy --
8      Q. Any policy. As you sit here today, with the
9  benefit of hindsight, are you aware of any policies
10  while working at Vision Airlines that violated FAA rules
11  and regulations that you violated?
12     MR. BUCKNER: Object to form. Asked and
13  answered.
14     THE WITNESS: I fell asleep in the cockpit.
15  BY MR. GEWERTER:
16     Q. Okay. When did you fall asleep in the cockpit?
17     A. September 13th, 2007.
18     Q. And you fell asleep in the cockpit while on
19  duty flying for Vision Airlines?
20     A. Yes.
21     Q. And you had customers or clients onboard at
22  that time, didn't you?
23     A. Yes.
24     Q. And clearly if you fell asleep, you must have
25  been impaired then. Right?

62

1  MR. BUCKNER: Object to form. That's
2  ridiculous, Harold.
3  BY MR. GEWERTER:
4  Q  Did you have your full mental faculties while
5  you were sleeping to operate an aircraft?
6  MR. BUCKNER: Objection.
7  BY MR. GEWERTER:
8  Q  Answer it, please.
9  MR. BUCKNER: Badgering the witness.
10  MR. GEWERTER: No badgering. I haven't started
11  yet.
12  THE WITNESS: No.
13  BY MR. GEWERTER:
14  Q  I'm sorry. "No" to what? You did not have
15  your full mental faculties, did you, while you were
16  sleeping?
17  A  Not when I was asleep, no.
18  MR. BUCKNER: Object to the form.
19  BY MR. GEWERTER:
20  Q  Do you know how long you slept for?
21  A  About 30 minutes.
22  Q  And were you the sole pilot or was there a
23  copilot?
24  A  There was a copilot.
25  Q  Who was the copilot?

63

1  A  Gary Borke.
2  Q  Did he also sleep during that same time period?
3  A  I don't know.
4  Q  Well, when you woke up after 30 minutes, did
5  you wake up on your own or did somebody wake you up?
6  A  Flight attendant woke me up.
7  Q  Why didn't Gary Borke wake you up, if you know?
8  A  When the flight attendant woke me up, she -- I
9  don't recall what she said, but I spoke to her, and the
10  next words I heard were from Gary Borke, who said I'm
11  "I was about to wake you up. We're nearing top of
12  descent."
13  Q  Are you aware whether or not Gary Borke slept
14  during that same flight?
15  A  No. I was asleep.
16  Q  So you have no knowledge of that, then, do you?
17  A  I have no knowledge.
18  MR. GEWERTER: Would you mark this next,
19  please.
20  (Deposition Exhibit 43 was marked for
21  identification.)
22  BY MR. GEWERTER:
23  Q  Take a look at the first page, if you could,
24  sir.
25  A  Yes.

64

1  Q  Is this a letter that you wrote?
2  Just for clarity, this document contains six
3  pages, but I'm just having you look at the first page.
4  MR. BUCKNER: I'm going to -- you're obviously
5  doing this as a composite, because these are all
6  different documents.
7  MR. GEWERTER: They all relate to one issue.
8  MR. BUCKNER: Yeah. I was going to say, again,
9  there are documents here that haven't been produced.
10  MR. GEWERTER: You don't know that, because
11  this came from his personnel file, and his personnel
12  file has been produced.
13  MR. BUCKNER: We'll check. We've been through
14  it, Harold, but I'm pretty sure you haven't produced
15  it.
16  MR. GEWERTER: That's fine. How about we
17  answer some questions?
18  BY MR. GEWERTER:
19  Q  Take a look at the first page, please.
20  A  I am reading it.
21  Q  Thank you.
22  A  Okay. I'm finished.
23  Q  What was the first line of this letter -- first
24  of all, is that your signature that appears in the
25  bottom left-hand side?

65

1  A  Yes.
2  Q  And your name, and you're Jerry Hester,
3  captain, Vision Airlines. Correct?
4  A  Yes.
5  Q  And you wrote this letter on September 30th,
6  2007?
7  A  Yes.
8  Q  It says "Dear Jim." Who was Jim?
9  A  Captain Jim Maguire, chief pilot, Vision
10  Airlines.
11  Q  What does the first sentence of this letter
12  say?
13  A  During your flight earlier today, I slept in
14  the cockpit.
15  Q  Look at the first paragraph, please. You see
16  that, where it starts with "Gary Borke"?
17  A  Yes. Oh.
18  Q  I'm sorry, I apologize. It's the fourth
19  paragraph.
20  A  Fourth paragraph. Okay.
21  Q  Read the second line to me.
22  A  "It is not my practice to sleep in the cockpit,
23  and I resisted the urge to sleep."
24  Q  Keep reading, please.
25  A  "During the flight, I noticed Gary would close

18 (Pages 66 to 69)

66

1  his eyes and I questioned if he was asleep."
2  Q  Thank you.
3  A  "However, every time" --
4  Q  There's nothing else.  There's not a question.
5  Thank you.  I appreciate the offer.
6  A  Okay.
7  MR. BUCKNER: The witness can finish answering
8  his question.
9  MR. GEWERTER: If there's a question.
10  MR. BUCKNER: He's finishing his statement.
11  You can go ahead and finish.
12  MR. GEWERTER: You can cross-examine him at the
13  appropriate time.
14  MR. BUCKNER: He can finish answering the
15  question.
16  Go ahead, Mr. Hester, you can finish.
17  MR. GEWERTER: He's reading, not answering a
18  question.
19  MR. BUCKNER: He's responding to your question.
20  You can finish, Mr. Hester.
21  BY MR. GEWERTER:
22  Q  Is there something else you'd like to say about
23  this?
24  A  "However, every time we received a radio call,
25  he would respond immediately.  He told me he had -- he

67

1  has a problem with dry eyes, said his medication had run
2  out, and closing his eyes helped soothe them."
3  Q  Who is the "he" we're referring to here?
4  A  Gary Borke.
5  Q  So he admitted to you that he closed his eyes
6  while flying as a pilot in an aircraft for Vision
7  Airlines?
8  A  Yes.
9  Q  Thank you.
10  Did you ever talk to Mr. Borke whether or not
11  he slept or took catnaps while flying with you on those
12  same flights?
13  A  I asked him and he --
14  Q  What did he tell you?
15  A  He said no, he had not.
16  Q  Go to the next page, please.  It's a letter,
17  I'll represent was written by Captain Gary Borke, dated
18  9-13-2007.  The same date your letter is written.
19  A  Okay.
20  Q  Go down about three or four inches, and let me
21  read this to you.  Tell me if this is accurate or not.
22  "I do admit that because of the dry eye I did
23  keep my eyes closed for periods of time to moisten my
24  eyeballs."
25  Was that an accurate statement to the best you

68

1  recollected?
2  MR. BUCKNER: Objection.  This is not the
3  competent witness to answer the question of what
4  somebody else did.
5  MR. GEWERTER: He flew next to him.  He was
6  next to him for the hours on a flight over the
7  Atlantic Ocean.  He's not competent?
8  MR. BUCKNER: It isn't his document.  He's not
9  competent to know what somebody else's eyes --
10  (Interruption in proceedings.)
11  MR. GEWERTER: Now that you're done testifying
12  for him, the question is does he have any knowledge
13  of that statement being true or false.
14  MR. BUCKNER: You can ask that question.
15  Object to the form.  If the witness knows.
16  MR. GEWERTER: Okay.  I'm not going to tolerate
17  you testifying all day long.  I will depose you if
18  need be.  Let's just knock it off now.
19  MR. BUCKNER: Harold, if the witness knows.
20  It's outside his competence.  That's my objection.
21  MR. GEWERTER: Thank you for testifying again.
22  BY MR. GEWERTER:
23  Q  Let me ask you this question.  If a pilot comes
24  to work, whether it be yourself or anyone, industry
25  standards, and they say I'm tired, should they still go

69

1  fly a lengthy flight or they should -- or should they
2  decline to take that flight?
3  MR. BUCKNER: Objection.  Seeks expert
4  testimony.  He's not certified as an expert.
5  BY MR. GEWERTER:
6  Q  Go ahead and answer.
7  A  Pilots often fly tired.  And it was commonplace
8  at Vision in the 737 operation for pilots to take naps
9  en route.  The days were long, flight hours were long,
10  and duty day was very long.  We operated primarily with
11  two pilots, or as the 76, with the shorter flight times,
12  and shorter duty days, operated with three and sometimes
13  four pilots.
14  Q  Did you ever object to that policy or procedure
15  at Vision Airlines?
16  A  I did comment that it would be better if we
17  could operate with three pilots, but the --
18  Q  Would you want to fly in an aircraft as a
19  passenger knowing your pilot showed up and the copilot
20  showed up, both tired?
21  MR. BUCKNER: Objection.  Seeks speculation.
22  BY MR. GEWERTER:
23  Q  You can answer.
24  A  It would depend on their level of tiredness.
25  Q  Do you know a person named Forrest Powars?

70

1    A  Yes.
2    Q  Who is Forrest Powars?
3    A  Forest was a desk clerk at the hotel where we
4  stayed in Virginia who was hired as a flight attendant.
5    Q  Was Forrest Powars a flight attendant at the
6  time period -- on the same flight where you fell asleep?
7    A  Yes, I believe he was.
8    Q  Would you look at the next page, please. It's
9  an e-mail. The top says from Catherine Burnett to Jim
10  Maguire, copy Brian Daggett. And you go farther down it
11  says from Forrest Powars to Catherine Burnett, there's a
12  date, September 13th, 2007. Do you see that?
13    A  Yes.
14    Q  Go halfway down the e-mail, and I'll read you
15  something. Tell me if to the best of your knowledge
16  this is true or correct: "Both Gary Borke and Jerry
17  Hester were sound asleep, eyes closed, heads tilted,
18  deep breathing...asleep." Is that a true or false
19  statement made by Forrest Powars, the flight attendant
20  on your flight?
21    MR. BUCKNER: Objection. Seeks speculation,
22  outside the witness' competence.
23  BY MR. GEWERTER:
24    Q  You can answer that.
25    MR. BUCKNER: And object to form.

71

1    THE WITNESS: I do not know.
2  BY MR. GEWERTER:
3    Q  So you don't know whether or not Gary Borke was
4  asleep while you were asleep, do you?
5    A  No, I do not.
6    Q  And you have no knowledge whether or not both
7  of you were asleep at the same time while flying a
8  client across the ocean, do you?
9    A  I cannot speak as to what anyone else was doing
10  during the time that I took my nap.
11    Q  Do you know a Ryan Corson?
12    A  Yes.
13    Q  Who is Ryan Corson?
14    A  Ryan Corson was a desk clerk at the hotel who
15  was hired as a flight attendant.
16    Q  Was Ryan Corson also a flight attendant on that
17  same flight where you fell asleep?
18    A  Yes.
19    Q  Go to the next page. It's an e-mail from Ryan
20  Corson, dated 9-13-2007, to Catherine Burnett. Do you
21  see that?
22    A  Yes.
23    Q  At the very bottom, it says "Ryan Corson" with
24  a telephone number. If you would go to paragraph four.
25  It says -- it starts "at this point." Do you see that

72

1  paragraph?
2    A  Yes, I do.
3    Q  Would you read the first -- actually, read that
4  paragraph to me, please.
5    A  "At this point, Amanda had woken up and was
6  approaching the front galley. When she entered, past
7  the closed curtain, we informed her that the pilots were
8  asleep, and she entered the cockpit and tried to wake
9  them. She first called Jerry's name, but after there
10  was no response she grabbed his shoulder and began to
11  shake him. I was surprised that it took several seconds
12  (at least five to ten seconds) of considerable shaking
13  to wake him. I was alarmed to the extent that I began
14  to wonder if they were only sleeping. It was hard to
15  imagine that they were in a deep enough sleep that it
16  was as difficult as it was to wake them."
17    Q  Do you have any opinion as to whether that is
18  true or false, that paragraph?
19    MR. BUCKNER: Objection. Seeks an opinion for
20  which he's not qualified.
21    MR. GEWERTER: I'll rephrase it.
22  BY MR. GEWERTER:
23    Q  Do you have any knowledge whether or not
24  there's any false statement in that paragraph?
25    MR. BUCKNER: Object to the form. Outside the

73

1  witness' competence.
2  BY MR. GEWERTER:
3    Q  You can answer.
4    A  I was asleep.
5    Q  And the rest of that you have no statement for.
6  Is that correct?
7    MR. BUCKNER: Objection.
8  BY MR. GEWERTER:
9    Q  Do you know an Amanda Bradley?
10    A  Yes.
11    Q  Who is Amanda Bradley?
12    A  Flight attendant.
13    Q  On the same flight where you were asleep?
14    A  Yes.
15    Q  Look at the next page of that package. There's
16  an e-mail from Amanda Bradley to Catherine Burnett,
17  dated Thursday, 13th September, 2008, 8:37, pacific
18  daylight time. Do you see that?
19    MR. BUCKNER: Object to the form. He's not
20  qualified to authenticate this document.
21  BY MR. GEWERTER:
22    Q  Do you see those -- do you see that
23  nomenclature?
24    A  Oh. Would you say that again, please?
25    Q  Do you see an e-mail from Amanda Bradley to

20 (Pages 74 to 77)

74

1  Catherine Burnett, subject, in-flight incident report,
2  dated Thursday, September 13, 2007.
3      A  Yes.
4      Q  And Amanda Bradley also flew on that same
5  flight. Correct?
6      A  Yes.
7      Q  Let me read you the statement, and you let me
8  know if you have any knowledge whether or not it's true
9  or false.
10     "As I was getting up to go to the front of the
11 plane to check with the crew to see if our arrival time
12 had changed, both flight attendants hurriedly came to me
13 and told me both the pilots were asleep, and they didn't
14 know what they should do. I promptly went to the
15 cockpit (where the door was wide open for some reason)
16 and confirmed both pilots were asleep. First I tried
17 making some noises to wake them up. When that didn't
18 work, I started shaking Captain Hester. The first shake
19 didn't wake him up, but the second one did. As soon as
20 Captain Hester awoke and said something, Captain Borke
21 opened his eyes and worked on the radio right away. It
22 was apparent they didn't want to acknowledge what had
23 just happened, so we left and let them work on the
24 approach into Iceland."
25         Is anything in there that's true or false or

75

1  just no knowledge of that?
2      A  I have no knowledge.
3      MR. BUCKNER: Objection to form. And asked and
4  answered.
5      MR. GEWERTER: That was a new e-mail.
6      MR. BUCKNER: Objection to form, and asked and
7  answered.
8  BY MR. GEWERTER:
9      Q  And what was your opinion -- I'm sorry. What
10 was your statement?
11     A  I can't testify to anything when -- during the
12 time that I was asleep.
13     Q  Thank you.
14     A  But --
15     Q  There's no question pending. Thank you.
16         Just one moment, please.
17         At sometime earlier we had a conversation
18 about -- I'm sorry, you stated that when you first were
19 hired it was a hundred dollars per hour plus per diem.
20 Correct?
21     MR. BUCKNER: Objection. What time?
22     MR. GEWERTER: The word "first" meaning at the
23 inception.
24     THE WITNESS: No.
25     MR. BUCKNER: No foundation.

76

1      Go ahead.
2      MR. GEWERTER: You don't need to throw your pen
3  down either, David, it's not necessary.
4      MR. BUCKNER: I'm not throwing my pen down. I
5  put my pen down, Harold. Relax.
6  BY MR. GEWERTER:
7      Q  Do you remember saying when you were first
8  hired you were hired at the rate of $100 per hour,
9  flight time, plus a per diem?
10     A  Yes.
11     Q  You also said that changed at some time. Is
12 that correct?
13     A  Yes.
14     Q  Do you know when it changed? I think you said
15 it was October 2007?
16     A  I believe that's correct.
17     Q  Do you know -- were you given a reason why it
18 changed?
19     A  No.
20     Q  Who told you it changed?
21     A  I received a memo.
22     Q  A memo from whom?
23     A  From Jim Maguire.
24     Q  And you received that how? Via e-mail or how
25 did you receive it?

77

1      A  I don't recall.
2      Q  But you did receive it, though, correct?
3      A  I did receive it.
4      Q  And that memo outlined a new pay structure? Or
5  I should say revised pay structure.
6      A  Yes.
7      MR. GEWERTER: Would you mark this next in
8  sequence, please.
9      (Deposition Exhibit 44 was marked for
10 identification.)
11 BY MR. GEWERTER:
12     Q  Take a moment, or as long as you like, and look
13 at what's been marked as Exhibit 44 to this deposition.
14     A  Okay.
15     Q  Have you ever seen this document before today?
16     A  Yes.
17     Q  Look at the second page, please. Is that your
18 signature that appears at the bottom right-hand side?
19     A  Yes.
20     Q  And did you sign this document on or about
21 11-9-07?
22     A  Yes.
23     Q  Let's go back to the first page. First of all,
24 let me ask you, do you have any recollection now as to
25 how you received this document, what method?

78

```
1     A  No, I don't.
2     Q  But you did receive it and you did sign it,
3  though. Correct?
4     A  Yes.
5     Q  And is this an accurate copy of what you
6  received and did sign back in the end of 2007?
7     A  Yes.
8     Q  Nothing has been changed on there, has it?
9     A  No.
10     Q  Let's go back to the first page. This is from
11  whom?
12     A  Jim Maguire.
13     Q  And Jim Maguire then was your immediate
14  supervisor at this time?
15     A  Yes.
16     Q  He was in charge of the pilots at that time?
17     A  He was chief pilot.
18     Q  Chief pilot. Thank you.
19        Okay. It says, "With the transition from the
20  Boeing 737s currently being utilized for our Dulles
21  operation to Boeing 767s, a new pay structure has been
22  established."
23        Do you see that?
24     A  Yes.
25     Q  And you understood that was going on at the
```

79

```
1  time. Correct?
2     A  When I got this, yes.
3     Q  Next paragraph says, "The first noticeable
4  change in the pay structure is that pilots will now be
5  compensated with a base salary in addition to flight
6  pay."
7        Do you see that?
8     A  Yes.
9     Q  Is that your understanding of the change?
10     A  Yes.
11     Q  Once all 767 -- I'm sorry, "Once all B767
12  aircraft have been put into service, the schedule will
13  be produced in advance with all pilots working for three
14  weeks on and two weeks off. Because of the base pay,
15  pilots will be expected to report to work according to
16  the published schedule. (Trip trades will be allowed
17  with the concurrence of crew scheduling.)"
18        Do you see that?
19     A  Yes.
20     Q  Is that one of the changes or revisions that
21  took place on or about that time period?
22     A  Yes, it is.
23     Q  And did that actually go into effect?
24     A  Yes.
25     Q  Then it says, "Implementation of New Salary
```

80

```
1  Structure." Do you see that?
2     A  Yes.
3     Q  What I want to do is go to the second page. Do
4  you see what I call a grid, a chart of some kind?
5     A  Yes.
6     Q  Let's go through that. Up until this time
7  period, what was your compensation at Vision Airlines?
8     A  It was $100 per flight hour, plus per diem.
9     Q  As of -- starting November 1, 2007, you were a
10  captain. Correct?
11     A  Yes.
12     Q  How did your compensation change now?
13     A  737 pay went to $80 an hour, and I was also
14  assigned as a crews captain or international relief
15  officer on the 767, and that position was compensated at
16  first officer pay rates.
17     Q  And there's also a base, annual base salary
18  too. Correct?
19     A  Yes.
20     Q  So that's the first time that went into effect?
21     A  Correct.
22     Q  So now before -- before you -- November 1,
23  2007, you received an hourly rate, but effective
24  November 1, 2007, and henceforth you received an annual
25  base salary plus an annual -- I'm sorry, plus an hourly
```

81

```
1  pay. Correct?
2     A  Correct.
3     Q  So based on this grid, there should be a pay
4  increase for pilots?
5        MR. BUCKNER: Objection. Outside his
6     competence.
7  BY MR. GEWERTER:
8     Q  Well, it was a pay increase for you, wasn't
9  there?
10     A  No. I ended up with a pay decrease.
11     Q  Because your job title had changed. Correct?
12     A  Because my job title had changed.
13     Q  It had changed just weeks after you were caught
14  sleeping in the cockpit, didn't it? You were caught
15  sleeping in the cockpit September 13th, 2007, this memo
16  comes out October 15th, a month later, of 2007, and goes
17  in effect November 1, 2007?
18        MR. BUCKNER: Objection. You're mixing apples
19     and oranges, Harold. Mischaracterizes.
20        MR. GEWERTER: That's fine.
21  BY MR. GEWERTER:
22     Q  Go ahead and answer the question, please.
23     A  It was decided to not qualify me as a captain
24  immediately. Jim was bringing in pilots who were
25  already qualified on the 767. As we saw in the training
```

22 (Pages 82 to 85)

**82**

1  records, I had just gotten my type rating in the 767, in
2  I believe it was November of '07. So I didn't have a
3  lot of experience on that aircraft.
4      But the day after the sleeping incident
5  occurred I had been scheduled to go back out on another
6  trip as a copilot. After meeting with Jim Maguire and
7  submitting my letter, which explained the difficulties
8  in getting proper predeparture crew rest, Jim changed
9  the schedule, and instead of going out as a copilot, I
10  was sent out as a training captain, charged with the
11  responsibility of showing the ropes to a pilot who was
12  brand-new to the company.
13      Q  So the company did not fire you as a result of
14  you sleeping, did they?
15      A  No, they did not. It was a common practice for
16  people to sleep in the cockpit due to the extended duty
17  days and extended flight hours.
18      Q  It's a common practice to sleep while flying.
19  Is that what you're saying?
20      A  It was.
21      Q  Is that common industry practice?
22      A  In normal -- this is an unusual operation,
23  which involves longer days and longer flight hours than
24  would be permitted under regular airline regulations.
25      Q  Why is that?

**83**

1      A  Because there's a safety issue involved with
2  being on duty for very long periods and having very long
3  flight times.
4      Q  But, sir, you're aware that falling asleep
5  while being the captain of an aircraft can be grounds
6  for immediate termination?
7      MR. BUCKNER: Object to the form.
8  BY MR. GEWERTER:
9      Q  You're aware of that, aren't you?
10      MR. BUCKNER: What company?
11      MR. GEWERTER: Industry standards.
12  BY MR. GEWERTER:
13      Q  If you worked for American Airlines and you
14  were caught sleeping in the cockpit while flying a
15  hundred people behind you in a 737, any knowledge of
16  what they would do?
17      A  There are a variety of things they could do,
18  but I would not be assigned to fly more than eight hours
19  in a duty period, and I wouldn't have a duty day longer
20  than 11 hours.
21      Q  And is one of the things they could do is fire
22  you?
23      A  They could.
24      MR. BUCKNER: Object to the form.
25      MR. GEWERTER: Thank you. He said yes, they

**84**

1  could.
2  BY MR. GEWERTER:
3      Q  The very bottom of this document, and it's kind
4  of outlined in a box, and it says, "From the Vision
5  Airlines employee handbook dated October 2006." Would
6  you read that to me, please?
7      A  "Discussing salaries. Vision Airlines respects
8  the privacy of its employees, and it is expected that
9  the employees of Vision Airlines respect the privacy of
10  others as well. Individual salaries and hourly pay
11  scales are private, personal information. Pay rates are
12  a subject that should only be discussed between
13  individual employees and their supervisor or manager.
14  Therefore, employees are not permitted to discuss their
15  salaries with their coworkers."
16      Q  And you had received a copy of the Vision
17  Airlines employee handbook dated October 2006. Is that
18  correct?
19      A  Yes.
20      Q  And you signed an acknowledgment form saying
21  you had received it. Correct?
22      A  I believe I did.
23      Q  Go back to the grid on the top of the same
24  page. Tell me where in this grid, which column you come
25  under.

**85**

1      MR. BUCKNER: Objection. Time period.
2      MR. GEWERTER: For compensation period?
3      MR. BUCKNER: Objection. It doesn't state a
4  time period.
5      MR. GEWERTER: As of November 1, 2007.
6      THE WITNESS: Starting November 1, 2007, I fell
7  under all first officers annual base salary, and
8  depending on the airplane that I was flying, that
9  pay rate for that equipment.
10  BY MR. GEWERTER:
11      Q  So you were now guaranteed, whether you flew or
12  not, as long as you were employed, an annual salary of
13  40,000 a year based on this schedule. Correct?
14      MR. BUCKNER: Object to the form.
15      THE WITNESS: Yes.
16  BY MR. GEWERTER:
17      Q  And prior to November 1, 2007, in spite of the
18  fact you were caught sleeping and acknowledged it, you
19  had no guarantee of any minimum, did you?
20      MR. BUCKNER: Object to the form.
21      MR. GEWERTER: You can have a standing
22  objection for every question I ask if you like.
23      MR. BUCKNER: If you're asking objectionable
24  questions I'll object and make a record.
25      MR. GEWERTER: I think the objection is

Page 86

1  objectionable, but go ahead and answer.
2       THE WITNESS: Yes.
3  BY MR. GEWERTER:
4     Q  So for the first time now you received a
5  guaranteed pay while at Vision, effective November 1,
6  2007?
7       MR. BUCKNER: Objection. Seeks a legal
8  conclusion.
9  BY MR. GEWERTER:
10    Q  Is that what this grid says to you?
11    A  It -- it established that there was a base pay.
12    Q  Plus you received an hourly pay, depending on
13  which aircraft you flew. Correct?
14    A  Correct.
15    Q  And that could be anywhere from $56 an hour to
16  a hundred dollars an hour. Correct?
17    A  It would have been a hundred dollars an hour,
18  if you were assigned as a 767 captain.
19    Q  So you could make 40,000, guaranteed, plus a
20  hundred dollars per hour for each flight hour. Correct?
21    A  No. I was not a captain on the 767.
22    Q  Which one were you?
23    A  First officer.
24    Q  So that's $70 per hour. Correct?
25    A  Correct.

Page 87

1     Q  So now you're making -- up until this time
2  period, you made $100 per hour. Correct?
3     A  Correct.
4     Q  Then one day you go from a hundred dollars per
5  hour to a guaranteed 40,000 per year plus $70 per hour?
6       MR. BUCKNER: Objection. Seeks a legal
7  conclusion.
8  BY MR. GEWERTER:
9     Q  Is that the answer?
10    A  Correct.
11    Q  How many hours, approximately, did you fly a
12  month prior to September of 2007?
13    A  I don't -- I don't recall.
14    Q  Was it more than 80 hours a month?
15    A  On an average?
16    Q  On an average, yes.
17    A  No.
18    Q  Do you remember how many hours on the average
19  you flew per month for the year prior to September or
20  prior to October 2007?
21    A  No.
22    Q  So had your position not changed, this salary
23  grid would have given you a pay raise, actually, because
24  the captain got 60,000 per year, plus a hundred dollars
25  per hour. Correct?

Page 88

1       MR. BUCKNER: Objection. Seeks speculation.
2  BY MR. GEWERTER:
3     Q  What did a captain get effective November 1,
4  2007?
5     A  Which equipment, sir?
6     Q  All captains, annual base salary. What does
7  that say?
8     A  60,000.
9     Q  B767 captains' flight rate hourly, what does
10  that say?
11    A  $100.
12    Q  And that's -- so prior to this time period, you
13  made a hundred dollars per hour and that's it. Correct?
14    A  That's correct.
15    Q  And now there was the opportunity to make
16  60,000 a year plus a hundred dollars per hour, the
17  amount you made before?
18    A  That was not my opportunity.
19    Q  Because you fell asleep. That's why.
20       MR. BUCKNER: Objection. Mischaracterizes
21  testimony.
22       THE WITNESS: No.
23  BY MR. GEWERTER:
24    Q  Because you're an at-will employee. Correct?
25    A  Because I was assigned as a first officer.

Page 89

1     Q  Which Vision had the right to do. Correct?
2     A  Yes.
3     Q  Later on in this document, on the same page, it
4  says, "Please sign below acknowledging receipt of this
5  new policy." You did sign and return this to Vision,
6  didn't you?
7     A  I did.
8     Q  And it went to a person named Laura Arthur? Or
9  do you remember how you sent this back?
10    A  I'm not certain. I may have. I'm not certain.
11    Q  But there's no question but that you sent this
12  back. Correct?
13    A  That's correct.
14    Q  And once you -- once this policy went into
15  effect, November 1, 2007, did you receive all
16  compensation as set forth in this agreement?
17       MR. BUCKNER: Object to the form. Seeks a
18  legal conclusion.
19       MR. GEWERTER: No, it doesn't. It's math.
20       MR. BUCKNER: I just called it an agreement,
21  Harold. He's not testifying --
22       MR. GEWERTER: "Document." We'll change the
23  word.
24       MR. BUCKNER: Fine.
25

24 (Pages 90 to 93)

---

**90**

BY MR. GEWERTER:

1  BY MR. GEWERTER:
2      Q  Effective November 1, 2007, did you receive all
3  compensation as set forth in this two-page document
4  signed by you?
5      A  Yes.
6      Q  Are you making any allegation whatsoever in
7  this lawsuit that you did not receive any money
8  whatsoever not set forth in this two-page document Bates
9  stamped Hester 00086 and 87?
10     MR. BUCKNER:  Object to the form.
11     THE WITNESS:  Would you re --
12     MR. GEWERTER:  Can you read that back to him,
13  please?
14     (The question was read by the reporter as above
15  recorded.)
16     MR. GEWERTER:  I'm sorry -- that's correct.
17     MR. BUCKNER:  Object to the form.
18     MR. GEWERTER:  You can answer.
19     THE WITNESS:  Well, I'm not sure I
20  understand --
21     MR. GEWERTER:  I'll change the question, since
22  there seems to be some confusion.
23  BY MR. GEWERTER:
24     Q  Did you receive all money as set forth in this
25  grid, on page 2?

---

**91**

1      MR. BUCKNER:  Object to form.
2      THE WITNESS:  I believe I was paid in
3  accordance with that grid.
4  BY MR. GEWERTER:
5      Q  Did you receive a base salary in accordance
6  with this grid on page 2?
7      A  Yes.
8      Q  Did you receive an hourly salary in accordance
9  with this grid on page 2 of this document marked
10  Exhibit 44?
11     A  Yes.
12     Q  Do you have any knowledge whatsoever that you
13  did not receive every penny of the base salary as set
14  forth in this grid?
15     A  No.
16     Q  Do you have any knowledge whatsoever that you
17  did not receive any money whatsoever for the hourly
18  component of this grid on page 2 of Exhibit 44?
19     A  No.
20     MR. GEWERTER:  How much time do you have on the
21  tape?
22     THE VIDEOGRAPHER:  Fifteen.
23     MR. GEWERTER:  Fifteen.  Okay.
24     (Deposition Exhibit 45 was marked for
25  identification.)

---

**92**

BY MR. GEWERTER:

1  BY MR. GEWERTER:
2      Q  Take a moment and look at this
3  one-page document, and let me know when you've had a
4  chance to review it.
5      I'm sorry.  Did you have a chance to review it?
6      A  Yes.
7      Q  This is dated 9-24-06.  Is that on or about the
8  date your employment with Vision commenced?
9      A  Yes.
10     Q  And this is a personnel action form.  Do you
11  see that?
12     A  Yes.
13     Q  And comments, reasons for change, it says new
14  hire.  Do you see that?
15     A  Yes.
16     Q  And department, it says flight operations.  Do
17  you see that?
18     A  Yes.
19     Q  Supervisor, Jim Maguire?
20     A  That's not true.
21     Q  What's not true?
22     A  Jim Maguire was not my supervisor when I was
23  hired.
24     Q  Who was your supervisor when you were hired?
25     A  Dan Carson.

---

**93**

1      Q  And how do you know that?
2      A  Dan Carson was the director of operations.  Jim
3  Maguire was a line pilot.
4      Q  Wasn't he also the chief pilot?
5      A  No.
6      Q  When did he become chief pilot?
7      A  After Dan Carson's employment terminated.
8      Q  And when you were first hired by Vision, did
9  you account to Jim Maguire for anything whatsoever in
10  the way of employment?
11     A  No.
12     Q  Do you see where it says new rate on here,
13  40,000 plus flight hours -- I shouldn't say -- 40 K plus
14  flight hours?
15     A  Yes.
16     Q  Do you know what that means?
17     MR. BUCKNER:  Objection.  Outside the witness'
18  competence.
19     MR. GEWERTER:  I'm just asking if he knows.
20     A  I -- if he doesn't know, he doesn't know.
21     MR. BUCKNER:  You hasn't even established that
22  he's seen this document before.
23     MR. GEWERTER:  That was the next question.
24  Stay tuned.
25     MR. BUCKNER:  You probably ought to start with

---

Veritext Florida Reporting Co.

800-726-7007                                              305-376-8800

---

**94**

1  that one. But okay.
2      MR. GEWERTER: I thought we start with the
3  questions I ask.
4  BY MR. GEWERTER:
5      Q  Have you ever seen this document before today's
6  date?
7      A  I don't know that I have.
8      Q  So you have no knowledge either way?
9      A  No.
10      Q  That's fine.
11      MR. GEWERTER: Mark this next, please.
12      (Deposition Exhibit 46 was marked for
13  identification.)
14  BY MR. GEWERTER:
15      Q  Take a moment and look at this document, which
16  is marked Exhibit 46, which is comprised of two pages,
17  and let me know when you've had a chance to review this
18  document.
19      A  Okay.
20      Q  Have you ever seen this document before today's
21  date?
22      A  I can't be sure. This is the document that I
23  have seen before.
24      Q  Well, let's look at page 2. Do you see a
25  signature on there?

---

**95**

1      A  Yes.
2      Q  In fact, you see your signature on there twice?
3      A  Yes.
4      Q  The first time it appears is about a third down
5  on page 2, and there's a date next to it. What is that
6  date?
7      A  7-25-07.
8      Q  Is that your Social Security number to the
9  right of it?
10      A  Yes, it is.
11      Q  Is that your signature of to the left of it?
12      A  Yes.
13      Q  Let's go down to the very end. It says
14  security debriefing acknowledgments. Is that your
15  signature?
16      A  Yes.
17      Q  What date is that?
18      A  September 3rd of 2008.
19      Q  You're not sure if you saw this document before
20  today or not the exact one or a similar one or what is
21  the answer?
22      MR. BUCKNER: Object to the form.
23      THE WITNESS: I didn't get a copy of this
24  document, so I can't be certain that this is an
25  exact replica of what I exactly signed.

---

**96**

1  BY MR. GEWERTER:
2      Q  How did you know you did not receive a copy?
3  You have no recollection of that or you're certain you
4  didn't receive a copy?
5      A  I have no recollection of having received a
6  copy, and I did not find a copy when I searched for all
7  my documents.
8      Q  Look at the very first page, the very top. It
9  says "Classified Information Nondisclosure Agreement."
10  That's preprinted on the firm. Then it says, "An
11  agreement between," and it's typed in the name "Gerald
12  George Hester and the United States." And beneath it it
13  says "Name of Individual - Printed or Typed." Do you
14  see that?
15      A  Yes.
16      Q  Is your name Gerald George Hester?
17      A  Yes.
18      Q  Are there any other people working at Vision
19  Airlines who have the same last name as "Hester"?
20      A  No.
21      Q  Do you remember signing a document that looks
22  similar to this, that had your name typed in there?
23      A  Yes.
24      Q  Did it have the same number of paragraphs on
25  the left-hand side, that is nine paragraphs, the

---

**97**

1  document you remember signing and seeing?
2      A  I don't recall.
3      Q  But it's the same format, though, that you do
4  remember?
5      A  It looked similar.
6      Q  Do you know what the purpose of this document
7  is?
8      MR. BUCKNER: Object to the form.
9      THE WITNESS: It's a classified information
10  nondisclosure agreement.
11  BY MR. GEWERTER:
12      Q  And that's the nature of the work you were
13  doing. Correct?
14      MR. BUCKNER: Objection. Mischaracterizes his
15  testimony.
16      THE WITNESS: I was told there were two aspects
17  of Vision Airlines' operations that were classified:
18  One, who we flew for; and two, who we flew as
19  passengers. And that was the only things that were
20  classified.
21  BY MR. GEWERTER:
22      Q  But you acknowledge those two things were
23  classified. Correct?
24      A  That's what I was told.
25      Q  Who told you that?

---

**98**

1   A  Bill Acor.
2   Q  And you understand what "classified" means?
3   A  Yes.
4   Q  What does it mean?
5   A  It means it's not to be disclosed, except to a
6   person who has an appropriate security clearance, and a
7   need to know.
8   Q  And you knew that even without Bill Acor
9   telling you that. Correct?
10   A  Yes.
11   Q  Because you had worked for the government
12   prior.
13   A  Yeah, twenty-four years in the military.
14   Q  And you understand sensitivity of documents and
15   sensitivity of information, don't you?
16       MR. BUCKNER: Object to the form.
17       THE WITNESS: Yes.
18   BY MR. GEWERTER:
19   Q  And you understand that disclosure of
20   classified information can jeopardize people's lives?
21       MR. BUCKNER: Objection. Seeks speculation.
22       MR. GEWERTER: 24-year career in the military?
23       MR. BUCKNER: He's not an expert.
24       MR. GEWERTER: He can testify within his own
25   ambit of his own knowledge.

**99**

1       MR. BUCKNER: Just putting an objection on the
2   record, Harold, I'm not arguing with you. Same
3   objection.
4       THE WITNESS: There are a number of
5   consequences that are possible with a disclosure of
6   classified information.
7   BY MR. GEWERTER:
8   Q  And death or mayhem could be two of the
9   possibilities. Right?
10       MR. BUCKNER: Object to the form.
11       THE WITNESS: Under some circumstances, yes.
12   BY MR. GEWERTER:
13   Q  You were debriefed on this, weren't you?
14       MR. BUCKNER: Object to the form.
15       THE WITNESS: Via an e-mail, yes.
16   BY MR. GEWERTER:
17   Q  You were debriefed via e-mail?
18   A  Yes.
19   Q  Would you go to page 2 of this document,
20   please. I want you to -- the very bottom, "security
21   debriefing acknowledgment." Do you see that?
22   A  Yes.
23   Q  Is that your signature that appears there?
24   A  Yes.
25   Q  I want you to read that paragraph right above

**100**

1   your signature to me.
2   A  "I reaffirm that the provisions of the
3   espionage laws, other federal criminal laws and
4   executive orders applicable to the safeguarding of
5   classified information have been made available to me; I
6   have returned all classified information in my custody;
7   that I will not communicate or transmit classified
8   information to any unauthorized person or organization;
9   that I will promptly report to the Federal Bureau of
10   Investigation any attempt by an unauthorized person to
11   solicit classified information, and that I
12   have....received a security debriefing."
13   Q  So you acknowledge receiving a security
14   debriefing. Correct?
15   A  Yes.
16   Q  And then you signed that after you read this.
17   Correct?
18       MR. BUCKNER: Object to the form.
19   Mischaracterizes prior testimony.
20       MR. GEWERTER: Maybe he's changing his
21   testimony. I don't know.
22   BY MR. GEWERTER:
23   Q  You acknowledge by signing this that you had a
24   security debriefing. Correct?
25       THE REPORTER: That he what?

**101**

1       MR. GEWERTER: That he changed his testimony.
2       MR. BUCKNER: No, he testified that --
3       MR. GEWERTER: I don't need you to tell me what
4   he testified to. That's not necessary?
5       MR. BUCKNER: I'm trying to help you.
6       MR. GEWERTER: Don't help me. I don't need the
7   help.
8       MR. BUCKNER: Object to form.
9       MR. GEWERTER: Help your client. Don't help
10   me.
11       MR. BUCKNER: Mischaracterizes testimony.
12   BY MR. GEWERTER:
13   Q  Did you receive a security debriefing
14   concerning your work at Vision Airlines?
15   A  Via e-mail, yes.
16   Q  I didn't ask you how, I asked you if you
17   received it.
18       And did you sign this acknowledgment stating
19   that you received a security debriefing?
20   A  Yes.
21   Q  And is that your signature next to the date or
22   you're not certain?
23   A  That looks like my signature.
24   Q  Okay. I'm sorry. I meant as to the
25   handwriting of the date also. Can you tell whose that

102

1 is or just don't know?
2     A  That looks like mine.
3     MR. GEWERTER:  At this time we're going to take
4 a break, because we're running out of time on the
5 tape.
6     THE VIDEOGRAPHER:  Going off the record.  The
7 time is 11:56.
8     (Lunch recess was taken from 11:57 a.m. to
9 1:15 p.m.)
10     THE VIDEOGRAPHER:  All right.  Good afternoon.
11 We're now back on the record.  The time is 1:14.
12 BY MR. GEWERTER:
13     Q  Mr. Hester, we just completed a lunch break.
14 And other than your lawyers, did you discuss this case
15 with anyone?
16     A  No.
17     Q  Go back to Exhibit No. 46, which is where we
18 left off.
19     A  Uh-huh.
20     Q  Have you ever worked for any other companies
21 besides Vision where you had to sign a document similar
22 to this, classified information, nondisclosure
23 agreement?
24     A  No.
25     Q  Have you ever signed any other nondisclosure

103

1 agreements of any type whatsoever with any other
2 employer other than with Vision?
3     A  I don't think so.
4     Q  You don't think so or you just can't remember?
5     A  I can't remember.
6     Q  Go to page 2 of this document, Exhibit 46,
7 please.  You signed this as part of your employment with
8 Vision.  Is that correct?
9     A  Yes.
10     MR. BUCKNER:  Object to the form.
11 BY MR. GEWERTER:
12     Q  And, in fact, right beneath your signature the
13 first time, which you said you signed, it says,
14 "Organization of contractor, licensee, grantee or agent
15 provide name address, if applicable," and so forth.
16 What name do you see preprinted on that form?
17     A  Vision Airlines.
18     Q  And you knew you were doing this nondisclosure
19 with the United States government because of your
20 employment with Vision Airlines.  Correct?
21     MR. BUCKNER:  Object to the form.
22 BY MR. GEWERTER:
23     Q  Is that correct?
24     A  Yes.
25     Q  And on the right-hand side, it says,

104

1 "Acceptance.  The undersigned accepted this agreement on
2 behalf of the United States government."  Do you see
3 that?
4     A  Yes.
5     Q  What company did that?
6     A  McNeil Technologies.
7     Q  And who did you understand McNeil Technologies
8 was when you signed this document on 7-25-07?
9     A  These were the people who did the briefing and
10 I believe they were the folks who -- with whom Vision
11 Airlines had an agreement for the services that were
12 provided.
13     Q  When you say "agreement," they're the ones in
14 fact who briefed you on this classified agreement.
15 Correct?
16     A  Yes.
17     Q  It's not Mr. Acor, was it?
18     A  Pardon?
19     Q  It wasn't Mr. Acor who briefed you, it was
20 McNeil Technologies?
21     A  With respect to this agreement, no, it was
22 McNeil Technologies.
23     Q  To the best of your knowledge, did you comply
24 with this agreement?
25     A  Yes.

105

1     MR. GEWERTER:  You can mark this No. 47,
2 please.
3     (Deposition Exhibit 47 was marked for
4 identification.)
5 BY MR. GEWERTER:
6     Q  Mr. Hester, the court reporter just handed you
7 a document, the first page says "Employee Noncompetition
8 and Nondisclosure Agreement," which is four pages in
9 length.  Would you please look at this document?
10     A  Okay.  I've looked at it.
11     Q  Is this a copy of what you signed with Vision
12 Airlines?
13     A  Since I didn't get a copy of the document when
14 I signed it, I can't compare it to see if there's been
15 any changes made in it.
16     Q  But you did sign a document that had this
17 title.  Correct?
18     A  I did.
19     Q  And where were you when you signed it?
20     A  At Vision Airlines.
21     Q  Which office?
22     A  In Dulles.
23     Q  And who handed you the document?
24     A  Bill Acor.
25     Q  Were you told the reason for this document?

---

**106**

1      A  It was -- we had -- they wanted to protect
2  their interests. We had to sign it or not be employed.
3      Q  And did you agree to sign this agreement?
4      A  I signed it because I wanted to keep my job.
5      Q  And you knew at any time you could lose it
6  because you were an at-will employee?
7      A  Correct.
8      Q  And you did -- that is your signature on
9  page 4. Correct? I know it's a little smudged. It
10  didn't start out that way, but the blue ink, because
11  this is a copy of the blue, in traveling.
12     A  Okay.
13     Q  But does that look like, to the best of your
14  ability, does that look like your signature, the part
15  you can read?
16     A  That looks like my signature.
17     Q  You go to the very first page, on page 104,
18  it's also printed in blue. Do you know whose printing
19  that is?
20     A  That looks like my printing.
21     Q  So except for any signatures under Vision
22  Airlines on page 4, all the insertions and signatures
23  appear to be your handwriting and your printing?
24        MR. BUCKNER: Object to the form.
25        You can answer.

---

**107**

1        THE WITNESS: Yes, they do.
2  BY MR. GEWERTER:
3      Q  Go to page 3 of 4. Do you see where it says
4  paragraph six, "Governing Law and Jurisdiction"?
5      A  Yes.
6      Q  Would you read that, please?
7      A  "This agreement shall be governed, construed
8  and interpreted by, through and under the Laws of the
9  State of Nevada, Clark County. The employee expressly
10  consents to the personal jurisdiction and venue of any
11  Local, State and Federal Courts in Nevada for any
12  dispute arising out of this agreement."
13     Q  You understood what that meant when you signed
14  this. Is that correct?
15     A  Yes.
16     Q  It means you subjected yourself to the courts
17  of Clark County, Nevada, for anything that's covered by
18  this agreement. Was that your understanding?
19     A  Yes.
20     Q  And your employer was a Nevada corporation
21  also?
22     A  Yes.
23     Q  And your paycheck emanated from where?
24     A  Nevada.
25     Q  Do you know the bank that cut the checks? If

---

**108**

1  you don't, that's fine.
2      A  I don't.
3      Q  Go to page 2 of 4, please, where it says "At
4  Will." Would you read that?
5      A  "Employee acknowledges employee's employment is
6  'at will,' subject to applicable law, and either
7  Employer or Employee may terminate employment at any
8  time, with or without notice, for any reason or no
9  reason. Nothing in this agreement shall constitute a
10  promise of employment for any particular duration or
11  rate of pay. The termination of the employment
12  relationship by Employee or Employer will not affect the
13  continued enforceability of this Agreement regarding its
14  restrictions and remedies."
15        MR. GEWERTER: Would you mark that next,
16        please.
17        (Deposition Exhibit 48 was marked for
18        identification.)
19  BY MR. GEWERTER:
20     Q  Take a moment, look at the document, please,
21  which is Entitled, "Employee Acknowledgment Form." Let
22  me know when you've had a chance to review that.
23     A  I've looked it over.
24     Q  Is that your signature that appears in the
25  middle of the page?

---

**109**

1      A  That appears to be my signature.
2      Q  And your name is Gerald G. Hester. Is that
3  correct?
4      A  Yes, it is.
5      Q  Would you please read -- it's a three-paragraph
6  contract. Would you please read that?
7      A  "I understand that the policies in this
8  employee handbook in no way modify my status as an
9  at-will employee, and in no way imply, infer, or
10  guarantee my continued employment for any definite term.
11  I may be dismissed at the discretion of the company for
12  other reasons than failing to following the terms of
13  these policies.
14        "The company reserves the right to modify,
15  revoke, suspend, terminate, interpret, or change any or
16  all portions of these policies with or without notice.
17  The language used in these policies is not intended to
18  constitute a contract of employment, either express or
19  implied.
20        "I have received a copy of the Vision Airlines
21  Employee Handbook. I acknowledge that I have read the
22  policies included in the handbook. I understand the
23  contents of these policies and that failure to comply
24  with the guidelines may lead to disciplinary action up
25  to and including termination of employment."

---