**Ross C. Goodman, Esq., Nevada State Bar No. 7722**
**GOODMAN LAW GROUP**
520 South Fourth Street
Las Vegas, Nevada 89101
(702) 383-5088
(702) 385-5088 (Facsimile)

**David M. Buckner, Esq., Florida State Bar No. 60550**
**Brett E. von Borke, Esq., Florida State Bar No. 44802**
**KOZYAK TROPIN & THROCKMORTON, PA**
2525 Ponce de Leon, 9th Floor
Miami, Florida 33134
(305) 372-1800
(305) 372-3508 (Facsimile)

**ATTORNEYS FOR THE CLASS**

<div style="text-align:left; margin-left:2em;">
GOODMAN LAW GROUP
A Professional Corporation
520 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 383-5088
</div>

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

GERALD HESTER, on behalf of himself and
all others similarly situated,

                Plaintiff,

v.

VISION AIRLINES, INC.,

                Defendant.

Case No.: 2:09-CV-00117-RLH-RJJ

## THE CLASS'S RESPONSE TO DEFENDANT VISION AIRLINES, INC.'S, MOTION TO DISQUALIFY HESTER AS CLASS REPRESENTATIVE AND OTHER APPROPRIATE REMEDIES

I

GOODMAN LAW GROUP
A Professional Corporation
520 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 383-5088

The Class, by and through undersigned counsel, respectfully submits its Response to Defendant Vision Airlines, Inc.'s ("Vision"), Motion to Disqualify Gerald Hester ("Hester") as Class Representative and Other Appropriate Remedies ("Response"). Although Vision's Motion is styled as a Motion for Disqualification, it is really Vision's latest attempt to re-litigate the Court's Order Denying Vision's Motion to Dismiss Plaintiff's Complaint [D.E. 46] and its Order Granting Plaintiff's Motion for Class Certification [D.E. 86]. Having lost both those arguments on the law, Vision now engages in a series of ad hominem attacks against Hester, the absent Class members, and Class counsel as its legal basis for decertification. These personal attacks, however, are insufficient to carry its substantial legal burden of demonstrating that decertification is appropriate. Accordingly, without any support in the law for its arguments, Vision's Motion is entirely without merit and should be denied.

## I.   STATEMENT OF FACTS

Even though Vision has produced only a few documents in this case,[1] those documents, along with the documents produced by third parties, clearly substantiate the allegations in the Complaint and establish Vision's liability to the Class. Thus, Vision's continued argument that the Class's Complaint is frivolous, is contradicted by the overwhelming weight of the evidence. The documents and deposition testimony prove the following propositions: (1) Vision billed the upstream contractors for hazard pay for its employees who operated the flights to Baghdad, Iraq and Kabul, Afghanistan ("Air Bridge Program"); (2) the upstream contractors paid Vision hazard pay for its Air Bridge Program employees; (3) the upstream contractors expected Vision to pay its Air Bridge Program employees all of the hazard pay that Vision invoiced and collected from them; and (4) Vision failed to pay the Air Bridge Program employees the hazard pay that it

---

[1] The Class's Renewed Motion to Compel [D.E. 93], filed on January 20, 2010, as supplemented by the Class's Supplement in Support of the Class's Renewed Motion to Compel [D.E. 106] on April 9, 2010, seeks to remedy this situation, and awaits a ruling.

312990

collected on their behalf.

A.   *Background on the Air Bridge Program*

Vision operates as a subcontractor for the United States government and provides air transport services to Baghdad and Kabul. (Deposition of Laura Feigin, attached as Ex. 1, at 13.) Vision has operated the Air Bridge Program since May 2005. (Deposition of Brian Dagget,[2] attached as Ex. 2, at 33.) The Air Bridge Program is divided into four phases that correspond to the following time periods: (1) Phase I – June 2005 through April 30, 2006 (*id.*); (2) Phase II – May 1, 2006 through July 14, 2006 (CSC's Phase II Bid Proposal, attached as Ex. 3, at CSC 0023); (3) Phase III – July 15, 2006 through July 31, 2007 (collectively Phases I-III ("CSC Phase")) (CSC Phase III Bid Proposal, attached as Ex. 4, at CSC 0040); and (4) Phase IV – August 1, 2007 through the present ("McNeil Phase") (Ex. 4, at CSC  0040; Ex. 2, at 33). Computer Sciences Corporation ("CSC") held the direct contract with the United States government for the Air Bridge Program for Phases I-III. (Ex. 1, at 16.)  McNeil Technologies, Inc. ("McNeil"), however, replaced CSC as the party in direct contract with the United States government for the Air Bridge Program on August 1, 2007. Even though the prime contractor changed from CSC to McNeil, Vision continued to operate the Air Bridge Program throughout all phases. (Dagget Dep., Ex. 2, at 33-34.)

In each phase of the Air Bridge Program, Vision invoiced and collected hazard pay for the Air Bridge Program employees.  This hazard pay was allocated for Vision's employees and paid to Vision on their behalf by the upstream contractors for operating flights into and out of the war zones in Baghdad and Kabul. (Feigin Dep., Ex. 1, at 33.) The contracts and invoices for the Air Bridge Program, which reflect how hazard pay was billed for, changed and evolved

---

[2] Dagget testified as one of Vision's 30(b)(6) witnesses.  He is Vision's Air Bridge Program Manager, but used to work for Capital Aviation in a similar capacity.

GOODMAN LAW GROUP
A Professional Corporation
520 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 383-5088

312990

throughout the phases. The cost components and line items in Phase I were different from those in Phases II and III. The cost line items for Phases II and III were identical. (*Compare* Ex. 3, at CSC 0033 with Ex. 4, at CSC 0057.) (Feigin Dep., Ex.1, at 17-18.) The cost line items and invoices changed from Phase III to the McNeil Phase of the Air Bridge Program (*Compare* Exs. 3 & 4 with Ex. 5, Vision's Price Basis to McNeil). Nonetheless, throughout the phases, Vision billed for and collected hazard pay on behalf of its Air Bridge Program employees.

B.    *Phase I of the Air Bridge Program*

The United States government, in 2005, contracted with CSC to operate the Air Bridge Program. (Dagget Dep., Ex. 2, at 33.) CSC, in turn, subcontracted with Capital Aviation, Inc. ("Capital Aviation"), which subcontracted with Vision. (*See* Feigin Dep., Ex. 1, at 14-15.) Thus, Vision was responsible for operating the Air Bridge Program flights. (*Id.* at 14.) Pursuant to Vision's contract with Capital Aviation, Vision's price to and invoicing of Capital Aviation included amounts for hazard pay. (Vision's contract with Capital Aviation, attached as Ex. 6, at 3.) Specifically, that contract provided:

> The price to Capital includes all fuel, fluids, fuel surcharges, etc. necessary to operate the aircraft, including the salaries of the pilots and crew and all insurance premiums, handling fees, international fees, landing and parking fees, permits, crew living expense, ***crew hazard pay***, etc.

In accordance with its contract, the invoices Vision submitted to Capital Aviation during Phase I included amounts for hazard pay, even though those amounts were not specifically identified on Vision's invoices. (Vision's Phase I invoices, attached as Ex. 7.) In reliance on Vision's invoices, Capital Aviation billed CSC and specifically identified "crew hazard pay" as part of its invoice. (Capital Aviation Invoice dated October 11, 2005, billing for "crew hazard pay," attached as Ex. 8.) CSC prepared its invoices based on the information contained in Vision's and Capital Aviation's invoices, and submitted its invoices to the United States government for payment. (*See* Feigin Dep., Ex. 1, at 15.) Based on CSC's invoices, the United

GOODMAN LAW GROUP
A Professional Corporation
520 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 383-5088

312990

3

GOODMAN LAW GROUP
A Professional Corporation
520 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 383-5088

States government paid CSC. (*See id.*); (Dagget Dep., Ex. 2, at 111.)  CSC paid Capital Aviation the amount it invoiced, and Capital Aviation, in turn, paid Vision its invoiced amounts.  (*See id.* at 26.)

In accordance with its obligation to pay its employees hazard pay, Vision's Chief Executive Officer, William Acor ("Acor"), authorized his director of flight operations to inform Vision's Air Bridge Program flight deck and cabin crews that they would receive hazard pay in the amounts of "$5,000 USD" and "$2,500 USD," respectively, "in addition to normal flight pay" for the Air Bridge Program flights to Baghdad. (Letter from DC Jensen to Cockpit Crew and Cabin Crew dated September 3, 2005, attached as Ex. 9.)  In certain instances early in the program, Vision paid its Air Bridge Program Employees these amounts. (Threat of litigation if Vision did not pay $5,000 hazard pay to Frank Reno, attached as Ex. 10).  Vision, however, stopped paying the Air Bridge Program employees hazard pay after these initial payments.

C.   *Phase II of the Air Bridge Program*

The United States government, in 2006, issued a Request for Proposal for Phases II and III of the Air Bridge Program in order to modify the program's billing components to include the following: (1) Firm Fixed Costs; (2) Variable Costs; and (3) Other Direct Costs. (*See* Ex 3 at CSC 0035, Ex. 4 at 42.)   CSC's Program Director, William Vigil ("Vigil"), provided David Meers ("Meers"), Vision's Senior Vice President, and Acor, with a spreadsheet identifying the various cost line items that were to be included as part of the billing components for Phases II and III of the Air Bridge Program. (Vigil e-mail to Acor and Meers dated June 16, 2006, attached as Ex. 11.)  Vigil informed Vision that it could "add or subtract any cost elements . . . to meet [its] proposal." (*Id.*)  Specifically, within the spreadsheet that Vigil sent Vision were line items for flight deck and cabin crew salaries and "hazardous duty pay." (*Id.*)  Vision modified the proposal Vigil sent it and allocated specific amounts for the Air Bridge Program's

312990                                                    4

GOODMAN LAW GROUP
A Professional Corporation
520 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 383-5088

flight deck and cabin crew salaries and "hazardous duty bonus." (E-mail from Meers to Daggett dated June 26, 2006, attached as Ex. 12.) Vision submitted this proposal to Capital Aviation and CSC. (Deposition of David Meers, attached as Ex. 13, at 389.)

In reliance on Vision's bid proposal, CSC prepared its bid proposal for Phase II, which it submitted to the United States government. (Feigin Dep., Ex. 1, at 18.) In its Bid Narrative, CSC stated that it "subcontracts with Capital Aviation as a broker in this effort, with Vision Air as the operator of the aircraft under subcontract to Capital Aviation . . . Vision Air's costs as shown in the summary spreadsheets [include] . . . Flight deck and cabin crew direct labor costs not including benefits and hazardous duty . . ." (CSC Phase II Bid Narrative, attached as Ex. 14, at CSC 0368.) Specifically, the Phase II bid proposal that CSC submitted to the United States government included cost line items with amounts for flight deck and cabin crew salaries and "hazardous duty" pay. (Ex. 3, at CSC 0033). These amounts were identical to the numbers provided to the upstream contractors by Vision. (*See* Ex. 12.)

CSC's 30(b)(6) corporate representative testified that Vision was expected to pay the Air Bridge flight deck and cabin crew the total amount of salary and hazard pay identified on those cost line items for Phases II and III of the Air Bridge Program.[3] (Feigin Dep., Ex. 1, at 24-

---

[3] Question (Buckner): So when it says here, for example, under the, again, the firm fixed price component here, flight deck crew, is that the line item for payments of salaries of flight deck personnel?

Answer (CSC): Yes.

Question (Buckner): And with regard to hazardous duty, two lines under that, is it correct that that is the amount of money allocated for the payment of hazardous duty pay to the flight deck crew?

Answer (CSC): Yes.

Question (Buckner): And, below that it says cabin crew, is that the line item allocating funds to pay salaries of cabin crew personnel?

Answer (CSC): Yes.

Question (Buckner): And with regard, two lines down from that, hazardous duty cabin crew, that line item was for the payment of hazardous duty pay to cabin crew operating the flights to and from Baghdad and Kabul?

Answer (CSC): Yes.
312990

5

25, 33, 37.) Specifically, when asked, CSC stated:

> Question (Buckner): So, for example, if one item is hazardous duty bonus, it was CSC's expectation that the money paid for that line item was going to be paid as a hazardous duty bonus to the people operating the Air Bridge program to Kabul and Baghdad?
>
> Answer (CSC): Yes. (*Id.* at 33.)

Vision invoiced and received payment from the upstream contractors for operating the Air Bridge Program flights in accordance with the line items and amounts identified in CSC's bid proposal, including amounts for flight deck and cabin crew salaries and hazardous duty pay. (*Id.* at 33.) Vision, however, failed to pay the Air Bridge Program employees the total amount it billed for salary and none of the amount it billed for hazardous duty pay during Phase II. (Preliminary Expert Report of Barry Mukamal, attached as Ex. 15, at 7.)[4]

D.   *Phase III of the Air Bridge Program*

The billing components adopted for the Air Bridge Program in Phase II, including all of the cost line items, remained identical in Phase III. (Feigin Dep., Ex. 1, at 17-18.) CSC again relied on the bid proposal that it received from Vision in preparing its Phase III bid proposal that it submitted to the United States government. (Compare Ex. 12 with Ex. 4 at CSC 0057.); (*See*

---

Question (Buckner): And again, all of this is for the payment of the people operating the flights to and from Baghdad and Kabul under the Air Bridge Program, correct?

Answer (CSC): Yes. (Feigin Dep., Ex. 1, at 24-25.)

Question (Buckner): All right. And with regard to these individual line items, was it required that the amount of money that was paid for these individual line items actually be spent on the item actually described there?

Answer (CSC): Yes. (*Id.* at 28.)

Question (Buckner): What would you have done with regard to your responsibilities here at CSC had someone from Vision or elsewhere told you that Vision was, in fact, not paying the individual line items in the firm fixed price in the manner set forth within the invoicing?

Answer (CSC): I would have reported that to my management as possible ethics violations. (*Id.* at 37.)

[4] This report is preliminary because the Class is still awaiting documents in their non-redacted form from Vision, which Vision has made clear it will not produce without an order from this Court. The Class's Renewed Motion to Compel is pending. [D.E. 93.]

GOODMAN LAW GROUP
A Professional Corporation
520 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 383-5088

312990

GOODMAN LAW GROUP
A Professional Corporation
520 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 383-5088

*also* Dagget Dep., Ex. 2, at 111.)  In that bid proposal, CSC identified specific line items for flight deck and cabin crew salaries and hazardous duty pay, which Vision had provided to it. (Ex. 12.)  Specifically, CSC allocated $2,400,000 for flight deck salary and $750,000 for flight deck hazardous duty pay.  (Ex. 4. at CSC 57.)  CSC also allocated $1,296,000 for cabin crew salary and $500,000 for cabin crew hazardous duty pay.  (*Id.*)  While Vision marked up certain cost line items under the Air Bridge Program, Vision did not mark up the line items for flight deck and cabin crew salaries or hazardous duty pay.  (*Id.*)  ("Vision Fee %" markup on "Flight Deck Crew," Flight Deck "hazardous duty," "Cabin Crew," and Cabin Crew "hazardous duty" is "0%.")  As CSC's 30(b)(6) representative testified, those line items were to be paid in their entirety to Vision's Air Bridge Program flight deck and cabin crew without any markup by Vision.  (*See* Feigin Dep., Ex. 1, at 24-25, 28, 33.)  The profit markup on these line items was "0%," because Vision's profit is included in the line item entitled "Vision Program Management."  (*Id.* at 30.)  For managing the Air Bridge Program, Vision received $5,038,800 in Phase III alone, and was also permitted to mark up certain other cost line items at cost plus 10% percent. (Ex. 4 at CSC 0057.)

Consistent with its proposal to CSC, and in accordance with CSC's bid to the United States government, Vision submitted invoices on a weekly and quarterly basis and billed for flight deck and cabin crew salaries and hazardous duty pay.  (Vision Phase III invoices, attached as Ex. 16.); (Dagget Dep., Ex. 2, at 111.)  Vision typically submitted these invoices to Capital Aviation, but from time to time, would also directly submit them to CSC.  (Feigin Dep., Ex. 1, at 35.)  Upon receiving Vision's invoices, Capital Aviation would generate its own invoices based on Vision's invoices and would bill CSC for salaries and hazardous duty pay for Vision's flight deck and cabin crews.  (Capital Aviation Phase III Invoices, attached as Ex. 17.)  Once Capital Aviation prepared its invoice, it would submit it, along with Vision's invoice, to CSC.  In

312990

7

reliance on those invoices, CSC would submit its invoice to the United States government for payment. (Feigin Dep., Ex. 1, at 15.) Once the United States government received CSC's invoice, it made payment to CSC. (*Id.*) After receiving payment, CSC would pay Capital Aviation, who in turn, would pay Vision. (*Id.* at p. 33.) Despite being paid the full line item amounts for flight deck and cabin crew salaries and "hazardous duty" pay (*id.* at 15), Vision failed to pay all of the salaries and none of the hazard pay that it billed for and collected on their behalf to the Air Bridge Program employees. (Mukamal Preliminary Expert Report, Exhibit 15, at 4.)

   E.  *Vision Claims it Paid the Hazard Pay to the Air Bridge Program Employees*

   On May 14, 2007, Vision's director of Flight Operations, Daniel Carson ("Carson"), had the following e-mail exchange with Vigil, on which Brian Dagget ("Dagget"), Vision's Air Bridge Program Manager, was copied:

> Carson (Vision): Question: we are not and have not paid any hz duty pay. What is our exposure in audit or contract obligations
>
> Vigil (CSC): Are you kidding me? We have been charged Hazardous duty pay throughout the program, Phase 3 alone would be in excess of $1.25 million. This has to be addressed immediately as it could be a disaster, either retroactive or refunded.

(May 14, 2007 e-mail, attached as Ex. 18.) Dagget testified that after receiving Vigil's response, he spoke directly with Vigil about whether Vision had paid the Air Bridge Program employees the hazard pay Vision billed for and collected. (Ex. 2, at 247.) Specifically, Dagget testified that he informed Vigil "not to be alarmed" because Vision had "paid" the Air Bridge Program employees the hazard pay. (*Id.*) This, however, was not true.

   F.  *The Class's Expert Determined that Vision Failed to Pay the Air Bridge Program Employees Hazard Pay for Phases II and III*

   CSC's 30(b)(6) representative testified that Vision was expected to pay its Air Bridge Program employees the full amounts budgeted and billed for on the line items for flight deck and

GOODMAN LAW GROUP
A Professional Corporation
520 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 383-5088

312990

8

GOODMAN LAW GROUP
A Professional Corporation
520 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 383-5088

cabin crew salaries and hazardous duty pay in Phases II and III of the Air Bridge Program. (Feigin Dep., Ex. 1, at 24-25, 33, 38.)  Consistent with that expectation, Vision's CEO, Acor, testified that if the Class added up the line items for flight deck and cabin crew salary and hazardous duty pay, for which Vision billed the upstream contractors, and compared those numbers with Vision's payroll, it would reveal that Vision actually paid its employees an amount equal to or more than the amount it billed for and collected in flight deck and cabin crew salary and hazardous duty pay from the upstream contractors.  (Deposition of William Acor, attached as Ex. 19, at 600-602.)  This is not true either.

The Class's expert analyzed Vision's payroll records and flight logs and determined that Vision failed to pay the flight deck and cabin crew any hazardous duty pay for Phases II and III of the Air Bridge Program.  (Mukamal Preliminary Report, Ex. 15, at 4, 7-8.)  In fact, Vision did not even pay the Air Bridge Program employees the full amount it billed for their salaries.  (*Id.*) Specifically, for the short period of Phase II, Vision invoiced for and collected $564,591.67 more in flight deck and cabin crew salaries and hazardous duty pay than it paid out to the Air Bridge Program flight deck and cabin crews.  (*Id.* at 7-8.)  Vision billed for and collected $258,613.12 in hazard pay and an additional $305,978.65 in salary for the Air Bridge Program employees, which it failed to pay to them.  (*Id.*)  In Phase III of the Air Bridge Program, Vision collected $2,710,239.70 more in flight deck and cabin crew salaries and hazardous duty pay than it actually paid to the Air Bridge Program employees.  (*Id.* at 5.)  Specifically, Vision invoiced for and collected $1,309,027.46 in hazardous duty pay and an additional $1,401,212.33 in salary for the Air Bridge Program employees, which it failed to pay to them.  (*Id.*)

Furthermore, Vision never even intended to pay the Air Bridge Program employees any hazard pay.  As the Class's expert stated, "Vision's Flight Deck and Cabin Crew Payroll Expense per flight hour of $377.40 (Scenario 1) or $507.47 (Scenario 2), based on actual pay to

its flight deck and cabin crew, was below the rate of $591.56 per flight hour at which Vision billed Capital Aviation for Flight Deck and Cabin Crew payroll, <u>even without inclusion</u> of Hazardous Duty Bonus." (*Id.* at 4) (emphasis in original.)

>   G.      The McNeil Phase of the Air Bridge Program[5]

The United States government changed contractors from CSC to McNeil in the summer of 2007. (Dagget Dep., Ex. 2, at 33.) Meers testified that Vision was involved in the bid process and that one of the documents Vision produced to the Class related to Vision's bid to McNeil. (Meers Dep., Ex. 13, at 427.) That document identifies "hazardous duty bonus – flight crew" and "hazardous duty bonus – cabin crew." (Ex. 5.) However, Vision has redacted most of the pertinent information from the document, preventing the Class from fully understanding it, and Meers was unable to testify knowledgably about it. (*See* Ex. 5, Ex. 13, at 425-429.) The payroll records produced by Vision do not suggest that it has paid its Air Bridge Program employees any hazard pay during the McNeil Phase. As the Class's expert stated in the affidavit that he filed with the Court in support of the Class's Second Motion for Extension of Rule 26(a)(2) Disclosures, the Class is unable to determine its damages for the McNeil Phase until the Court rules on the Class's Renewed Motion to Compel and orders Vision to produce its documents in their non-redacted format. (Affidavit of Barry Mukamal, attached as Ex. 20.)

## II.    HESTER'S DEPOSITION

Vision distorts Hester's deposition testimony, and ironically blames Hester for not understanding the full extent of Vision's illegal behavior. Of course, the mere fact that Hester was unable to determine the total amount of hazard pay that Vision deprived him of is not surprising, since Vision concealed that information from its employees and continues to conceal

---

[5]In its first production of documents to the Class, Vision withheld all documents related to its contract with McNeil. In its supplemental production, Vision produced some documents but has unilaterally redacted most of the relevant information from them. (*See* Renewed Motion to Compel) [D.E. 93] (discussing Vision's discovery abuses)

GOODMAN LAW GROUP
A Professional Corporation
520 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 383-5088

1    that information from Class counsel.

2        A.      *Vision Misstates Hester's Deposition Testimony*

3        Vision    repeatedly    misstates    Hester's    deposition    testimony.[6]    These    various

4    mischaracterizations include:

5

6    •   Vision states that "HESTER could not remember any specific individual that he spoke to

7        at VISION regarding alleged 'hazard pay.'" (Mtn. at 4.)  Hester actually testified that, "I

8        just asked [Carson] that I had heard rumors about hazard pay."  (Deposition of Gerald

9        Hester, attached as Ex. 21, at 35.)  He also testified that he heard rumors from other

10       Vision employees but could not remember their names.  (*Id.* at 36.)  Hester testified that

11       while employed at Vision he spoke with Dave Pritchard, an Air Bridge Program pilot at

12       Vision, about Pritchard's discussions with James Maguire, Vision's Director of Flight

13       Operations, about hazard pay.  (*Id.* at 171.)

14

15   •   Vision argues that "HESTER only believed that he was entitled to 'hazard pay' after he

16       spoke with the attorneys in this case." (Mtn. at 4-5.)  Hester actually testified that he

17       knew that he might be entitled to hazard pay based on his conversations with Dan Carson,

18       Dave Pritchard, and others. (Hester Dep., Ex. 21, at 35-36, 171).  Hester contacted his

19       attorneys to determine if he had a viable legal claim against Vision for hazard pay, and as

20

21   ────────────────────────

22   [6] Vision argues that it learned during Hester's deposition for the first time that "Hester revealed . . . in no uncertain
     terms, that other than personal information regarding himself, he possessed no knowledge or information regarding
     the factual basis for this lawsuit . . ." [D.E. 120 at 3.] (emphasis in original.) First, this mischaracterizes Hester's

23   testimony.  Second, the Class's Complaint states, "Plaintiff Gerald Hester . . ., on behalf of himself and all other
     similarly situated, sues Vision, and alleges as follows on personal knowledge as to all matters relating to himself,

24   *and on information and belief based upon the investigation of his counsel as to all other matters.*" [D.E. at 2.]
     (emphasis added.)  Furthermore, the information that Vision complains that Hester did not know is supported by the

25   documents and deposition testimony developed through discovery.  For example, Vision argues that Hester did not
     have knowledge about whether Carson contacted the upstream contractors about Vision's failure to pay its

26   employees hazard pay.  (Mtn at 8.)  While Hester was not aware of this fact because he was not involved in that
     communication, it is undeniably true that Carson e-mailed Vigil on May 14, 2007, and inquired about Vision's

27   failure to pay its employees hazard pay, to which Vigil responded that Vision's failure to pay its employees hazard
     pay was "a disaster." (Ex. 18.)

28

GOODMAN LAW GROUP
A Professional Corporation
520 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 383-5088

312990                                               11

Hester testified, it was his belief that, "if Vision collected hazard pay, the money should go to the people who performed the hazardous duty." (*Id.* at 193.)

- Vision claims that "Hester does not know the amount at issue in the case for himself or for the class." (Mtn. at 5.)  Hester testified that, "I'm uncertain as to how much I am individually owed," because, "[t]he amount of the hazard pay that Vision collected was not disclosed to us employees." (Hester Dep., Ex. 21, at 132.)

- Vision argues that Hester did not authorize the filing of the Complaint. (Mtn. at 10.) Hester in fact testified that he "approved" the filing of the Complaint. (Hester Dep., Ex. 21, at 161.)

- Vision also claims that "[d]espite, [sic] the colorful language in the Complaint regarding war ridden airports in Iraq and Afghanistan, Plaintiff HESTER has no information regarding military activities in those areas at the time of his employment with Vision." (Mtn. at 5.)  Hester actually testified that he knew that he was flying into a "military-protected" area when he flew into Baghdad (Ex. 21 at 155), that he saw gun fire near the airport (*id.* at 205-206), and that he believed he saw military helicopters and hardware at the airport based on their paint schemes (*id.* at 147).

## III.   ARGUMENT

"[T]o prevail on its decertification motion, defendant faces a heavy burden because doubts regarding the propriety of class certification should be resolved in favor of certification." *Gonzales v. Arrow Fin. Servs. LLC,* 489 F. Supp. 2d. 1140, 1154 (S. D. Cal. 2007).  Thus, the burden now shifts to Vision to prove that class certification is no longer appropriate. *See id.* at 1153. To determine whether continued certification is proper, the Court again applies the requirements of Fed. R. Civ. P. 23. *O'Conner v. Boeing N. Am., Inc.,* 197 F.R.D. 404, 410 (C.D. Cal. 2000).  Moreover, in deciding a motion for decertification, the Court "is bound to take the

GOODMAN LAW GROUP
A Professional Corporation
520 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 383-5088

substantive allegations of the complaint as true." *Blackie v. Barrack*, 524 F.2d 891, 901 n.17 (9th Cir. 1975). Nonetheless, the Court may "consider evidence which goes to the requirements of Rule 23 even though the evidence may also relate to the underlying merits of the case." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 509 (9th Cir. 1992). However, weighing competing evidence is not appropriate. *Wang v. Chinese Daily News, Inc.*, 231 F.R.D. 602, 605 (C.D. Cal. 2005). Here, Vision's Motion should be denied because it has once again utterly failed to carry its burden and demonstrate that Hester or Class counsel are inadequate.[7]

A.     *Hester is a More than Adequate Class Representative*

Vision failed to carry its heavy burden and demonstrate that Hester is not an adequate class representative. *Gonzales*, 489 F. Supp. 2d at 1155. In determining whether a class representative will fairly and adequately protect the interests of the class, courts must ensure that the class representative: (1) "appear[s] able to prosecute the class action vigorously through qualified counsel;" and (2) "does not have antagonistic or conflicting interests" with the other members of the Class. *Leveril v. Inflight Motion Pictures, Inc.*, 852 F.2d 507, 512 (9th Cir. 1978). Vision challenges Hester's adequacy based on his deposition testimony that he does not have personal knowledge of some of the allegations in the Complaint. However, the law of this Circuit simply does not require a class representative to possess this type of detailed knowledge.[8]

The threshold of knowledge required to qualify as a class representative is low, *Moeller v. Taco Bell Corp.*, 220 F.R.D. 604, 611 (N.D. Cal. 2004), and courts in this Circuit find that class representatives can adequately represent the interests of the class unless they demonstrate "striking unfamiliarity" with the facts and the law of their case. *Txirekize v. Syntx-Brazilian*

---

[7] Vision's Motion argues that decertification is appropriate only because Hester and Class counsel are inadequate. Accordingly, the Class will not address the other Rule 23 requirements for class certification.

[8] Vision does not allege that Hester has any interests antagonistic to the Class, and thus has not advanced this argument.

GOODMAN LAW GROUP
A Professional Corporation
520 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 383-5088

*Corp.*, No. 07-02204-PHX-FMJ, 2009 WL 2151838, at *5 (D. Ariz. July 17, 2009); *Moeller*, 220 F.R.D. at 611 (a plaintiff "will be deemed inadequate only if she is 'startlingly unfamiliar' with the case."). Particularly in complex cases, courts recognize that the "representative need not have extensive knowledge of the case in order to be an adequate representative." *Txirekize*, 2009 WL 2151838, at *5 (quoting *In re Nature's Sunshine Prods., Inc., Sec. Litig.*, 251 F.R.D. 656, 658 (D. Utah 2008)).

The United States Supreme Court affirmed this basic principle in *Surowitz v. Hilton Hotels, Corp.*, 383 U.S. 363, 370 (1966), where the Court reversed the Seventh Circuit's determination that an uneducated woman, who spoke English as a second language, and had relied almost exclusively on the advice of her son-in-law and lawyers in filing her complaint and prosecuting her lawsuit, could not be an adequate class representative. Since the Court's decision in *Surowitz*, "courts have consistently refused to deny class certification on the basis of defendants' contention that a plaintiff is uninformed." *Yamner v. Boich*, No. C-92-20597 RPA, 1994 WL 514035, at *7 (N.D. Cal. Sep. 15, 1994); *see also e.g., Txirekidze*, 2009 WL 2151838, at *5 (finding lead plaintiff adequate where his testimony showed that "he is aware of the general allegations in the complaint, although not the specific misrepresentation," the amount of his company's stock losses, and was updated regularly on the case and monitored his attorneys' work); *Alba v. Papa John's USA, Inc.*, No. CV-5-7487 GAF(CTz), 2007 WL 953849, at *9 (C.D. Cal. Feb. 7, 2007) (assuming that even if the proposed class representatives did not understand the legal issues of their case, they would still be adequate because "[t]he adequacy of a putative class representative does not depend on his legal knowledge or on whether he knows all the facts about the class as a whole."); *In re First Am. Corp. ERISA Litig.*, 258 F.R.D. 610, 619-620 (C.D. Cal. 2009) ("a named plaintiff does not need to have special knowledge of the case or possess a detailed understanding of the legal or factual basis on which a class action is

GOODMAN LAW GROUP
A Professional Corporation
520 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 383-5088

maintained"); *Buus v. WAMU Pension Plan*, 251 F.R.D. 578, 587-88 (W.D. Wash. 2008) (finding an ERISA lead plaintiff adequate who did not know what plan she participated in, or whether she received a distribution, was unsure of her remedies, and who only "believe[d]" she reviewed the complaint before it was filed, because she was able to summarize generally what the litigation was about, and understood her obligation to assist her attorneys).

More importantly, courts have held that in complex lawsuits, such as this one, where the defendant's liability can be established only after a great deal of investigation and discovery by counsel against a backdrop of legal knowledge, the class representative need not have extensive knowledge of the facts of the case in order to adequately represent the interests of the class. 32B *Am. Jur., 2d* Federal Courts § 1640; *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417 (4th Cir. 2003) (finding defendant's attack on plaintiff's lack of knowledge "particularly meritless," because there is no requirement that the plaintiff, rather than counsel, investigate the merits of a case); *Yamner*, 1994 WL 514035, at *7 ("Plaintiff's reliance on his counsel to investigate and litigate this case is appropriate, and does not render him an inadequate representative."). For example, in *Lewis v. Curtis,* 671 F.2d 779, 781 (3d Cir. 1982), the proposed class representative admitted that aside from reading a *Wall Street Journal* article, he left the entire investigation of his Complaint to his attorneys. The Third Circuit found that the District Court abused its discretion in finding that the plaintiff's investigation was insufficient, and held that it was unconcerned about the proposed class representative's "complete ignorance of the facts concerning the transaction that he was challenging," at his deposition. *Id.* at 789. This is because the "adequacy of representation test is not concerned [with] whether plaintiff personally derived the information pleaded in the complaint or whether he will personally assist his counsel," *id.* at 789, so long as the plaintiff does not have interests antagonistic to the class. *Yamner*, 1994 WL 514035, at *6-7; 32 *Am. Jur. 2d* Federal Courts § 1640.

312990

15

GOODMAN LAW GROUP
A Professional Corporation
520 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 383-5088

It is against this backdrop that the Court must judge Hester's adequacy. Here, Hester initiated this action by contacting counsel over his concerns that Vision wrongfully deprived him and the Class of the hazard pay that they earned while operating the Air Bridge Program flights. (Affidavit of Gerald Hester, attached hereto as Ex. 22, at ¶ 3). Hester also understands his obligations as the Class representative, as he agreed to serve as class representative, he reviewed the Complaint prior to its filing (*id.* at ¶ 5), and provided Class counsel with the information that related to himself for the Complaint. (Ex. 21, at 181.) Furthermore, Hester has assisted counsel in responding to Vision's interrogatories, requests for admission, document requests (Ex.21, at ¶ 7-8), reviewed the Class's pleadings prior to their filing (*id.* at ¶ 6), and sat for an eight hour deposition (*id.* at ¶ 11). Hester has demonstrated that he is a more than adequate class representative. *See Yammer,* 1994 WL 514035, at *7; *see also, Txirekidze,* 2009 WL 2151838, at *5; *Alba,* 2007 WL 953849, at *9; *Buus v. WAMU Pension Plan*, 251 F.R.D. 578, 587-88 (W.D. Wash. 2008).

Hester also demonstrated an understanding of the factual and legal basis of the lawsuit brought on behalf of the Class. During Hester's deposition, counsel for Vision asked Hester to explain some of the counts contained within the Complaint. Specifically, in responding to counsel for Vision's question about what *quantum meruit* was, Hester stated, "it simply isn't fair for Vision to keep money that was earned through the actions of other employees . . . if Vision collected hazard pay, the money should go to the people who performed the hazardous duty. That's simply commonsense and equity in my view." (Ex 21, at 193.) Similarly, when asked what conversion was, Hester responded, "Vision took money that was intended for the flight crew who performed hazardous duty and retained it for their own benefit." (*Id.* at 194.) Through these answers, Hester demonstrated that he has a command and understanding of the lawsuit's factual and legal basis beyond that of many litigants and sufficient to satisfy Rule 23(a)(4)'s

GOODMAN LAW GROUP
A Professional Corporation
520 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 383-5088

312990

16

GOODMAN LAW GROUP
A Professional Corporation
520 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 383-5088

1   adequacy requirement. *See In re First Am.,* 258 F.R.D. at 619-620; *Buus,* 251 F.R.D. at 587-88.

2       Finally, Vision's attack on Hester's lack of knowledge with regard to certain allegations

3   contained within the Complaint is "particularly meritless," because there is no requirement that

4   Hester, rather than counsel, investigate the merits of the case.[9]  *See Gunnells,* 348 F.3d at 417.

5   Hester's "reliance on his counsel to investigate and litigate this case is appropriate, and does not

6   render him an inadequate representative," especially where he has otherwise been an active class

7   representative. *Yamner v. Boich,* No. C-92-20597 RPA, 1994 WL 514035, at *7 (N.D. Cal. Sep.

8   15, 1994).

9

10       B.    *Class Counsel is More than Adequate*

11       Vision's argument that Class counsel is inadequate and should be disqualified because

12   Gary Borck ("Borck"), an *absent* Class member, is the father of one of Class counsel, Brett von

13   Borke ("von Borke"),[10] is without any support in the law.[11]  Vision failed to cite a single case

14

15   [9] Vision demonstrates how rare it is for a court to find a class representative inadequate, as it could cite only two
16   cases disqualifying a class representative. Two of the four cases Vision cites decline to disqualify the lead plaintiff,
     *Unger v. Amedisys, Inc.,* 401 F.3d 316 (5th Cir. 20005); *Morgan v. Laborers Pension Trust Fund for N. Cal.,* 81
17   F.R.D. 669 (N.D. Cal. 1979), and the other two cases are extremes.  For example in *Sicinski v. Reliance Funding
     Corp.,* 82 F.R.D. 730, 732-34 (S.D.N.Y. 1979), the proposed class representative could not even "articulate in
18   layman's terms what her claims [were]," and her class action claim was otherwise riddled with problems.  This
     finding of inadequacy must be read in conjunction with the fact that the court also found that the plaintiff was
19   subject to atypical defenses, plaintiff's counsel was inadequate because he was likely to be a fact witness at trial, and
     that common questions of law and fact did not predominate.  *Id.*  Furthermore, the court in *Jarigui v. Az. Bd. of
20   Regents,* 82 F.R.D. 64, 66 (D. Ariz 1979), found the class representative inadequate when he had completely
     abdicated his responsibility to prosecute the litigation, deferred to counsel consistently, and delayed in seeking class
21   certification for over two years.  These two cases could not be further from the facts of this case.

22   [10] Brett von Borke graduated in 2007 and is one of several associates at Kozyak Tropin & Throckmorton ("KTT")
     assisting with the litigation against Vision. Lead counsel, as reflected by all of the filings in this case, is David M.
23   Buckner ("Buckner"), who graduated from law school in 1995.  Accordingly, Buckner is responsible for directing
     this litigation.  In addition, von Borke was identified on the Class Notice as the attorney to contact at KTT because it
24   is more cost effective for an associate, rather than a partner, to handle these inquiries and answer any questions the
     Class may have.

25   [11] Vision again completely misstates the record.  Vision claims that "[i]n a noteworthy twist of facts, during Plaintiff
26   Hester's deposition, Defendant Vision's counsel learned that another class member, Gary Borke [sic], is the father of
     one of Plaintiff's counsel in this case, Brett von Borke." (Mtn. at 12.)  Counsel for Vision's claim that he learned
27   this information during Hester's deposition is simply not true.  In fact, counsel for Vision has previously indicated
     that he was aware that von Borke's father is an absent Class member, a fact which von Borke has discussed with
28   counsel for Vision prior to Hester's deposition.  As has become Vision's practice in this case, it once again makes
     completely unsupported accusations.

312990                                                17

GOODMAN LAW GROUP
A Professional Corporation
520 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 383-5088

disqualifying class counsel based on counsel's relationship with an absent class member. Vision's failure to cite any supporting case law is not surprising, as the weight of authority supports the Class's argument. The case law holds that there is no conflict where absent class members are related to class counsel. Furthermore, the Ninth Circuit requires a showing of actual, rather than speculative or hypothetical, conflict between a *lead* plaintiff and class counsel to justify disqualification. Thus, the existence of a familial relationship with an absent class member fails to demonstrate actual conflict under this Circuit's precedent. Even if Borck were the class representative, which he is not, he would not automatically be an inadequate class representative. It follows, therefore, that under no interpretation of the law of this Circuit could Class counsel be disqualified based on his relationship with an absent class member.

Courts are concerned where class representatives have close ties to class counsel because where "the possible recovery of the class representative is far exceeded by potential attorneys' fees, courts fear that a class representative who is closely associated with the class attorney would allow settlement on terms less favorable to the interests of absent class members." *Susman v. Lincoln Am. Corp.*, 561 F.2d 86, 91 (7th Cir. 1977). However, this concern does not exist where there are close ties between class counsel and an absent class member, because absent class members do not control the course of the litigation. Accordingly, even courts that have found a particular lead plaintiff inadequate have permitted the class action to go forward under the direction of a different class representative, with the inadequate former named plaintiff continuing to remain in the action as an absent class member. *Kirby v. Cullinet Software, Inc.*, 116 F.R.D. 303, 310 (D. Mass. 1987); *Swift v. First USA Bank*, No. 98 C 8238, 1999 WL 1212561, at *6 (N.D. Ill. 1999) (denying class certification based on lead plaintiff's inadequacy because of his familial relationship with class counsel, "without prejudice and granting counsel thirty days to re-file this motion while naming a new class representative. . . ."); *In re Discovery*

312990

18

*Zone Securities Litig.*, 169 F.R.D. 104 (N.D. Ill. 1996) (declining to deny class certification based on the relationship between class counsel and the named plaintiff and granting plaintiff sixty days to replace the lead plaintiff with new representatives). Here, Borck is an absent class member and is not responsible for the prosecution of this case, as that is Hester's responsibility. Borck's presence as an absent class member does not create any conflict because he has no decision-making authority, and he, like every other absent Class member, recovers only if the Class as a whole does. The litigation decisions here are made by Hester in consultation with Class counsel and not by any absent Class member. Furthermore, as Hester testified, he did not discuss his decision to serve as class representative with Borck (Hester Dep., Ex. 21, at 42) nor has he discussed the merits of the lawsuit since it was filed with Borck (*id.* at 195-197). Accordingly, Vision's argument that von Borke should be disqualified as Class counsel is baseless. *See Kirby*, 116 F.R.D. at 310; *Swift*, 1999 WL 1212561, at *6; *In re Discovery Zone*, 169 F.R.D. at 104.

Even the sole case cited by Vision challenging the adequacy of Class counsel is inapposite. Instead of following the law of the Ninth Circuit, Vision relies on *Zylstra v. Safeway Stores, Inc.*, 578 F.2d 102, 103-04 (5th Cir. 1978), a Fifth Circuit case that applies a *per se* rule disqualifying class counsel where a *lead plaintiff* is related to class counsel or is in fact class counsel himself. *Id.* Rather, the controlling Ninth Circuit law rejects this rule, and instead requires an actual, as opposed to a speculative, conflict before rendering a class representative inadequate. *Cummings v. Connell*, 316 F.3d 886, 896 (9th Cir. 2003) ("this Circuit does not favor denial of class certification on the basis of speculative conflicts"); *see also Soc. Servs. Union, Local 535 v. County of Santa Clara*, 609 F.2d 944, 948 (9th Cir. 1979); *Blackie*, 524 F.2d at 909 ("potential conflicts" do not present a valid reason for refusing to certify a class).

Consistent with this rule, district courts throughout the Ninth Circuit have refused to

GOODMAN LAW GROUP
A Professional Corporation
520 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 383-5088

312990

19

GOODMAN LAW GROUP
A Professional Corporation
520 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 383-5088

1    disqualify a class representative based solely upon a familial relationship with class counsel.

2    Recently, in *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. M 07-1827 SI, 2010 WL 1286478,

3    at *9 (N.D. Cal. Mar. 28, 2010), the court stated that "'courts routinely observe" that "a named

4    plaintiff will not be disqualified simply because of a close or familial relationship with one of the

5    attorneys representing the class.'" (quoting *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 326,

6    337 (E.D. Mich. 2001)).   The court observed that "'it would seem a bit anomalous that an

7    individual whose uncle has developed a reputation as a competent securities lawyer should be

8    prohibited from turning to his uncle for assistance if he has a legitimate claim.'" *Id.* (quoting

9    *Lewis v. Goldsmith*, 95 F.R.D. 15, 20 (D.N.J. 1982)).   The real inquiry must remain whether an

10   actual conflict is likely to arise; that is, whether "the financial interests of the class representative

11   may conflict with those of the class." *Id.*   Accordingly, in *In re TFT-LCD*, the court held that

12   even though two of the named plaintiffs were represented by family members, this did not render

13   them inadequate. 2010 WL 1286478, at *9.  Similarly, in *In re Static Random Access Memory*

14   *(SRAM) Antitrust Litig.*, 264 F.R.D. 603, 609 (N.D. Cal. Nov. 25, 2009), the court found class

15   counsel adequate even though the class representative was his nephew.   Here, Vision has failed

16   to demonstrate any actual conflict beyond the existence of a familial relationship between an

17   absent class member and one of Class counsel, and this alone is insufficient under the case law to

18   find an actual conflict of interest.   Moreover, there is no actual, or even potential or hypothetical,

19   conflict of interest because Borck, as an absent class member, has no power to control the course

20   of this litigation, or to compromise the interests of the Class, and recovers only if the rest of the

21   Class does.[12]

---

[12] Courts outside this Circuit have taken a similar approach, often allowing relatives of class counsel to serve as lead plaintiffs in class actions, so long as there is no actual conflict of interest. *See, e.g., Malchman v. Davis*, 761 F.2d 893, 898-900 (2d Cir. 1985) (finding adequate representation where one class representative was the brother of class counsel, another was the sister of class counsel's chauffer, another was the mother-in-law of class counsel, and another was class counsel's close personal friend); *Lewis*, 95 F.R.D. at 20 ("I do not believe that because plaintiff is the nephew of his counsel he must be disqualified as a representative plaintiff."); *Fischer v. Int'l Tel. & Tel.*

312990

C.      *Vision may Not Depose Absent Class Members*

In its Motion, Vision seeks permission to depose any absent Class member.  Vision, however, fails to set forth the cause required in order to justify this dramatic and extraordinary remedy.  Of course, Vision fails to offer any basis because none exists.  The burden to obtain discovery of any kind from absent class members is very high, *see, e.g., Phillips Petroleum v. Shutts*, 472 U.S. 797, 810 n.2 (1985), and therefore "separate discovery of individual class members not representatives is ordinarily not permitted." *In re Worlds of Wonder Sec. Litig.*, No. C-87-5491 SC (FSL), 1992 WL 330411, at *2 (N.D. Cal. July 9, 1992) (citing *Wainwright v. Kraftco Corp.*, 54 F.R.D. 532, 534 (N.D. Ga. 1972)); *On the House Syndication, Inc. v. Fed. Express Corp.*, 203 F.R.D. 452, 455 (S.D. Cal. 2001).  This is because:

> 'One objective of Rule 23 is the avoidance of multiplicity of actions.  The satisfaction of this goal is hindered by encouraging exclusion when absent class members are forced to participate in the discovery process . . . If a class member is intimidated to the point [of exclusion], another goal of Rule 23, the resolution of common claims, will be defeated.'

*In re Worlds of Wonder Sec. Litig.*, 1992 WL 330411, at *2 (quoting 2 *Newberg of Class Actions*, § 16.01, at 267 (2d ed., 1985)).  Accordingly, there are "limitations on absent class member discovery inherent in Fed. R. Civ. P. 23," *Pierce v. County of Orange*, 526 F.3d 1190, 1202 n.9 (9th Cir. 2008), and generally absent members are not required to do anything.  *Phillips Petroleum Co.*, 472 U.S. at 810.

Under special circumstances, a defendant can take discovery of absent class members, with leave of the court; however these circumstances are limited to those occasions where the proponent can show:

---

*Corp.*,72 F.R.D. 170, 174 (E.D.N.Y. 1976) (finding the class representative to be adequate where class counsel was his son because defendant failed to prove an actual conflict of interest).

GOODMAN LAW GROUP
A Professional Corporation
520 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 383-5088

(1) the discovery is not designed to take undue advantage, of class members or to reduce the size of the class; (2) the discovery is necessary; (3) responding to the discovery requests would not require the assistance of counsel or other technical advice; and (4) the discovery seeks information that is not already known by the proponent.

*On the House Syndication*, 203 F.R.D. 452, 456 (S.D. Cal. 2001); *see also Baldwin & Flynn v. Nat'l Safety Assocs.*, 149 F.R.D. 598, 600 (N.D. Cal. 1993) (citing *Clark v. Universal Builders, Inc.*, 501 F.2d 324, 340-41 (7th Cir. 1974)) ("discovery is both necessary and for a purpose other than taking undue advantage of class members.").

Vision cannot offer any evidence that satisfies the special or unique circumstances required to justify taking the depositions of absent Class members. Vision's request represents just another attempt to threaten, intimidate, and harass the Class members who seek to assert their rights against Vision through this lawsuit. Vision has already sued Hester, Carson, Carson's daughter, two absent class members, an absent class member's corporation, and an absent class member's ex-wife in Nevada state court a mere six weeks after the Complaint was filed. (Nevada state court complaint, attached as Ex. 23.) Furthermore, Vision does not need to depose the absent class members, because all of the information verifying the allegations in the Complaint are in Vision's possession, were concealed from the Class by Vision, and much of it is now in the Court record. Accordingly, far from showing the special circumstances required under the case law, the facts of this case demonstrate that the discovery Vision seeks from the absent class members is unnecessary and nothing more than harassment and a waste of time.[13] Vision has made no showing, and this demand must therefore be denied.

_____

[13] This explains why Vision has not been able to cite a single case supporting its request to depose absent class members. These requests are granted only in rare and unique circumstances, and the district courts in this Circuit regularly deny them. *See, e.g., In re Worlds of Wonder Sec. Litig.*, 1992 WL 330411, at *6 (quashing subpoenas issued to absent class members finding that defendants had "failed to show the necessity for this highly irregular discovery."); *Baldwin & Flynn*, 149 F.R.D. at 601 ("Defendants have failed to demonstrate the need for depositions of unnamed class members."); *Doe v. Arizona Hospital & Healthcare Ass'n*, No. CV 07-1292-PHX-SRB, 2009 WL 1423378, at *14 (D. Ariz. Mar. 19, 2009) ("Defendants have not met the substantial burden required to compel an

GOODMAN LAW GROUP
A Professional Corporation
520 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 383-5088

1

GOODMAN LAW GROUP
A Professional Corporation
520 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 383-5088

### D.     *Vision may Not Depose Class Counsel*

There is a general presumption that lawyers should not be called to testify in cases where their client is a party because doing so "compromises the standards of the legal profession." *Fausto v. Credigy Servs. Corp.*, No. C 07-5658 JW(RS), 2008 WL 4793467, at *1 (N.D. Cal. Nov. 3, 2008) (quoting *Mustang Mktg., Inc. v. Chevron Prods. Co.*, No. SA CV 02-485 DOC (MLGx), 2006 WL 5105559, at *3 (C.D. Cal. Feb. 28, 2006)).   Accordingly, courts in this Circuit routinely deny requests to depose opposing counsel.   *See, e.g., Fausto*, 2008 WL 4793467, at *2 ("in balancing the strong presumption against requiring the testimony of counsel of record against the marginal need Credigy has shown for such testimony, an order quashing the Letona deposition is warranted."); *Mass Mutual Live Ins. Co. v. Cerf*, 177 F.R.D. 472, 481-82 (N.D. Cal. 1998) (grating protective order where party seeking to depose opposing counsel failed to show counsel had information crucial to the preparation of its case).

Although the Ninth Circuit has yet to rule on the issue, the district courts in the Ninth Circuit have almost universally followed the widely-cited Eighth Circuit case *Shelton v. American Motors Corp.*, 805 F.2d 1323 (8th Cir. 1987).   *See, e.g., Bybee Farms LLC v. Snake River Sugar Co.*, No. CV-06-5007-FVS, 2008 WL 820186, at *1 n.1 (E.D. Wash. Mar. 26, 2008) (collecting cases); *FMC Tech., Inc.*, 2007 WL 836709, at *3. *Nocal, Inc. v. Sabercat Ventures, Inc.*, No. C 04-0240 PJH(JL), 2004 WL 3174427, at *2 (N.D. Cal. Nov. 15, 2004)  ("Defendant attorney Beard is entitled to a presumption against compelling his deposition testimony because Plaintiff fails to satisfy the *Shelton* test."); *FMC Tech., Inc. v. Edwards*, No. C05-946C, 2007 WL 836709, at *5 (W.D. Wash. March 15, 2007) ("Because they have failed on both the first and the third elements, they have failed to satisfy *Shelton* and they may not depose Ms. Kennar."); *Graff v. Hunt & Henriques*, No. C 08-0908 JF (PVT), 2008 WL 2854517, at *2 (N.D.

---

absent plaintiff to submit to discovery, particularly a deposition."); *On the House Syndication,* 203 F.R.D. at 457-58.
312990

GOODMAN LAW GROUP
A Professional Corporation
520 S. Fourth Street, 2ⁿᵈ Floor
Las Vegas, Nevada 89101
(702) 383-5088

Cal. July 23, 2008) ("Because Defendants have failed to identify any relevant information which they can only obtain by deposing Plaintiff's counsel, the *Shelton* criteria are not met and requiring Plaintiff's trial counsel to submit to a deposition imposes an undue burden on the Plaintiff.")  While the *Shelton* court declined to hold opposing counsel absolutely immune from deposition, it severely limited the circumstances under which opposing counsel can be deposed to those where the party seeking to take the deposition demonstrates: "(1) no other means exist to obtain the information than to depose opposing counsel; (2) the information sought is relevant and non-privileged; and (3) the information is crucial to the preparation of the case."  805 F.2d at 1327.   All three prongs must be satisfied for the deposition of opposing counsel to be appropriate, *see id.*, and the burden is on the party seeking to take the deposition to show the propriety and the need for deposing opposing counsel, *see FMC Techs.*, 2007 WL 836709, at *2 (citing *Am. Casualty Co. v. Krieger*, 160 F.R.D. 582, 588 (S.D. Cal. 1995)).

Because Vision has not even alleged that these three prongs have been satisfied, it could not possibly have carried its burden of showing the propriety and need for deposing Class counsel.   The only basis Vision advances as cause for deposing Class counsel is because "Plaintiffs' counsel has the information regarding the factual basis for the claims in this case . . ." (Mtn. at 13.) This is both clearly insufficient and simply not true, as the information that supports the Class's claims, as demonstrated above, is contained in the limited documents produced to date by Vision, documents produced by third-parties, and deposition testimony.  In *Bybee Farms, LLC v. Snake River Sugar Co.*, No. CV-06-5007-FVS, 2008 WL 820186, at *2 (E.D. Wash. Mar. 26, 2008), the court held that counsel could not be deposed even though counsel verified various discovery responses because the facts sought to be discovered were available in the discovery responses themselves.  Accordingly, the defendant failed to satisfy the first factor of the *Shelton* test because the information was available "by other means."  *Id.*  Likewise, the facts sought to

312990

24

be discovered in this case are available in the documents provided during the course of discovery. Indeed, the documents containing the facts alleged in the Complaint have been in Vision's possession throughout the course of these proceedings. For example, Vision complains that it must depose Class counsel because Hester did not know where the $5,000 and $2,500 figures for hazard pay came from. (*See* mtn at 7.) The deposition of Class counsel is not necessary to determine this fact, as those figures came from letters authorized by Acor and sent to the Air Bridge Program employees. (*See* Ex. 9.) The first factor of the *Shelton* test is not satisfied, because the facts alleged in the Complaint are available to counsel by other means.

Furthermore, Vision failed to satisfy the remaining prongs. As to the second prong, the information sought is protected by the attorney-client and work-product privileges. Vision cannot be allowed to seek the content of confidential communications between Class counsel and the absent Class members, especially where the facts supporting the Complaint are in the record or within Vision's possession or knowledge. Finally, because the facts necessary to litigate this claim are not located in the Complaint, but are rather contained in the documents produced during discovery, the information that Vision seeks to uncover through deposing Class counsel is irrelevant and not necessary to the prosecution or defense of any of the claims in this case. Accordingly, Vision has failed to satisfy any of the *Shelton* factors and its request to depose Class counsel must be denied.[14]

---

[14] *Conkling v. Turner*, 883 F.2d 431 (1989), cited by Vision, is inapposite for two reasons. First, it does not apply the *Shelton* test, which has been nearly uniformly adopted by the district courts in this Circuit. Additionally, the circumstances present in *Conkling*, unlike those presented here, would likely satisfy the *Shelton* test. In *Conkling*, the plaintiff claimed that he relied on his attorney's advice in order to avoid the application of a statute of limitations defense. *Id.* at 432-33. However, he declined to allow his attorney to be deposed about what that advice was. Finding that there was a waiver of the attorney-client privilege because the client put the information at issue, the *Conkling* court found that it would be "manifestly unfair," to deny the defendant discovery from the plaintiff's counsel. *Id.* at 434. That is, counsel in *Conkling* was an essential fact witness, not simply an advocate. Here, on the other hand, Class counsel, like all lawyers do, simply drafted the Complaint. If that were enough to permit the deposition, then the exception would swallow the rule.

GOODMAN LAW GROUP
A Professional Corporation
520 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 383-5088

GOODMAN LAW GROUP
A Professional Corporation
520 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 383-5088

E.    *Hester's Retainer Agreement with Class Counsel is Not Discoverable*

At Hester's deposition, for the first time, Vision demanded Hester's retainer agreement. However, the retainer agreement entered into between Hester and Class counsel is protected by the attorney-client privilege and is not discoverable by Vision. For example, in *Sanderson v. Winner*, 507 F.2d 477, 480 (10th Cir. 1974), the court issued a writ of mandamus and prohibition to the district court finding that discovery into the proposed class representative's retainer agreement with counsel constituted a judicial "usurpation of power." As the court there noted, "[n]either the court nor the defendant has legitimate concern as to the propriety of the arrangement under the code of responsibility." *Id.* This is especially true in the class action context, because the court reviews and approves any award of attorneys' fees to class counsel. *See Staton v. Boeing Co.,* 327 F.3d 938, 945 (9th Cir 2003). Thus, attorneys' fees in class actions do not derive from contract, but principles of equity. *In re FPI/Agretech Sec. Litig.*, 105 F.3d 469, 474 (9th Cir. 1997) (citing *Boeing Co. v. van Gemert,* 444 U.S. 472, 478 (1980) (holding that attorneys' fees in common fund cases are allowed by virtue of equitable exception to the American rule that prevailing parties are not awarded attorneys' fees).

Here, Hester's retainer agreement is not discoverable because it is wholly irrelevant to the litigation and Vision has no "legitimate concern as to the propriety of the agreement." *See Winner*, 507 F.2d at 480. Vision argues that if it does not obtain the fee agreement that it will "be without any basis to challenge the validity of any requested attorneys' fees." (Mtn. at 14.) Vision's argument, however, is unavailing, because any payment of attorneys' fees is not based on Class counsel's agreement with Hester but is within the equitable discretion of the Court. *See In re FPI/Agretech Sec. Litig.*, 105 F.3d at 474.[15]

---

[15] Vision's reliance on *Reiserer v. U.S.*, 479 F.3d 1160, 1165 (9th Cir. 2007) is unavailing. There, the Internal Revenue Service was investigating a law firm and an attorney in connection with the promotion of illegal offshore tax shelters. *Id.* at 1162. The law firm and the attorney sought to quash a third-party summons issued to a bank seeking account information. *Id.* The information sought from the bank would reveal the identities of the law firm's

312990

GOODMAN LAW GROUP
A Professional Corporation
520 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 383-5088

F.    *Vision has Established No Grounds for Sanctions*

Finally, Vision asks this Court to strike the Class's Complaint because Hester did not provide all of the information in it, even though the law does not require him to, and for "clear violation[s]" of the discovery procedures. (Mtn. at 15.)  However, a review of the cases Vision cites, and a review of the proceedings in this case, demonstrate how baseless this contention is. As explained more fully above, the allegations in the Class's Complaint have been fully supported by the facts contained in the limited documents and deposition testimony provided by Vision and third-parties.   The Class has also provided timely and complete responses to all of Vision's discovery requests.  Although the Class has fully complied with its discovery obligations, ironically it is Vision that has failed to engage in good faith discovery.

In order to impose sanctions under Rule 37(b)(2)(A), to which Vision cites, there must be a violation of a Court Order compelling discovery, Fed. R. Civ. P. 37(b)(2)(A), and a showing that the violation was willful.  *Hyde & Drath v. Baker*, 24 F.3d 1162, 1166 (9th Cir. 1994). Neither of these requirements is satisfied in this case.[16]  Here, the Class is incapable of violating Rule 37(b)(2)(A) because the Court has not entered an Order compelling the Class to produce

---

and attorney's clients.  *Id.*  The law firm and the attorney argued that disclosure of such documents violated the attorney-client privilege.  *Id.* at 1165.  The Court held that the disclosure of the identities of the clients through the subpoenaed materials was not protected by the attorney-client privilege because those communications were not confidential and had been turned over to third parties.  *Id.*  Here, Hester's retainer agreement with Class counsel has not been disclosed to any third-party.  Vision also cites *In re Oracle Sec. Litig.* 131 F.R.D. 688, 691 (N.D. Cal. 1990), for the proposition that class counsel is required to price its services in advance of litigation.  In that very unusual case, however, there were twenty-five attorneys seeking to be Class counsel and the Court had the attorneys price their services to provide the Class with the most reasonable attorneys' fees.  Here, however, there are only two firms that have brought this case in conjunction with each other.  Vision also cites to *Klein v. Henry S, Miller Residential Servs., Inc.* 82 F.R.D. 6, 8-9 (N.D. TX 1978).  There, however, the Court only required that the retainer agreement be produced to the Court for an *in camera* review.  Finally, *In re Mid-Atl. Toyota Antitrust Litig.*, 93 F.R.D. 485 (D.C. Md. 1982), the Court held that the fee agreement between the attorneys' and the class representative violated certain rules not applicable in the 9th Circuit.

[16] Vision also suggests that sanctions could be appropriate under Rule 11 of the Federal Rules of Civil Procedure. As demonstrated above, sanctions are not appropriate because Hester and the Class have complied with all of their discovery obligations and the allegations in the Complaint have been substantiated by the evidence.  Procedurally, Rule 11 sanctions are also not appropriate because Vision failed to make it a separate motion, did not serve it on opposing counsel in advance of filing, and did not provide opposing counsel with twenty-one days to correct the challenged practice.  *See* Fed. R. Civ. P. 11(c)(1).

312990

GOODMAN LAW GROUP
A Professional Corporation
520 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 383-5088

discovery. In fact, the Court denied [D.E. 82] Vision's Motion to Compel [D.E. 59]. Thus, it is impossible for the Class to have violated Rule 37(b)(2)(A) because no Order compelling discovery has been entered by the Court and the Class, unlike Vision, has complied with all of its discovery obligations under the Federal Rules of Civil Procedure.

Furthermore, the two cases Vision cites in support of its request that the Court strike the Class's Complaint demonstrate just how off-base Vision's argument is, though, these cases do more properly apply to Vision's conduct. In *Chrysler Corp. v. Carey*, 186 F.3d 1016, 2021 (8th Cir. 1999), the court entered an order striking the defendants' answer after reviewing the evidence of "widespread abuse of the discovery process." During the course of discovery, the *Chrysler* court entered various orders compelling discovery from the Defendants, *id.* at 120 n.5., however defendants refused to turn over responsive documents, claiming that "[n]o such documents exist."[17] *Id.* at 1019. At trial, where Chrysler introduced forty-two letters and correspondence responsive to the discovery requests, the court reviewed the record as a whole and found the defendants engaged in systematic conduct that evidenced "blatant disregard of the Court's orders and the discovery rules." *Id.* at 1020. Likewise, in *Payne v. Exxon Corp.*, 121 F.3d 503- 505-06 (9th Cir. 1997), the Ninth Circuit upheld the lower court's order striking the plaintiff's complaint based on evidence demonstrating "the refusal of a plaintiff to comply with three separate orders wherein the record is full of evasion and dilatory tactics, and the discovery requested is relevant to the fact issue." In both of these cases, as required under the Rule, the sanctioned party disobeyed the requirements of a Court Order. *Id.*; *Chrysler Corp. v. Carey*, 186 F.3d at 120 n.5.

This conduct is not even remotely similar to the Class's but does bear a striking

---

[17] Similarly, in Vision's Response to the Class's First Request for Production of Documents, Vision stated that it "has no documents or communications relating to 'hazard pay' . . ." (Vision's Response to the Class's First Request for Production of Documents, attached as Ex. 24 at 3.) This statement, however, is demonstrably false. (*See* Ex. 16.)

312990

28

GOODMAN LAW GROUP
A Professional Corporation
520 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 383-5088

1   resemblance to Vision's behavior.[18]   Vision has utterly failed to abide by the discovery rules,

2   which operate under the assumption that "[m]utual knowledge of all the relevant facts gathered

3   by both parties is essential to proper litigation.   To that end, either party may compel the other to

4   disgorge whatever facts he has in his possession." *Hickman v. Taylor*, 329 U.S. 495, 506 (1947).

5   Vision's conduct during discovery has been aimed towards obscuring the facts and issues.

6   Vision's various discovery violations can be reduced into four main categories, which have been

7   briefed throughout the course of this litigation and of which the examples are legion.   First,

8   Vision has failed to engage in a good faith search for and production of responsive documents,

9   despite its agreement to do so.   *See* [D.E. 106 at 2-5.]   Second, Vision produced five unprepared

10   30(b)(6) witnesses, which is tantamount to failing to appear and is sanctionable under Fed. R.

11   Civ. P. 37(d).   *Black Horse Lane Assoc., L.P. v. Dow Chem. Corp.*, 228 F.3d 275, 304 (3d Cir.

12   2000) (affirming monetary sanction). (*See* Class's Supplement in Support of its Renewed Motion

13   [D.E. 106] to Compel, at 2-5.)[19]   Third, Vision has still failed to produce the portions of the

---

[18]   The Class completed its production to Vision nearly a year ago.   However, Vision's discovery abuses have required the Class to seek relief from the Court on multiple occasions.   The Class filed its Motion to Compel [D.E. 49] on June 9, 2009, and the Court heard oral argument on the Class's Motion to Compel on October 23, 2009.   At that hearing, the Court instructed the parties to continue to confer.   The Class significantly reduced the categories of documents it was seeking and Vision agreed to produce those documents, which was reflected in a letter agreement dated November 20, 2009.   Vision, however, failed to produce those documents and the Class filed its Renewed Motion to Compel [D.E. 93] on January 20, 2010.   At a hearing on March 2, 2010, the Court stated that it would "rule on the motion right away – the renewed motion, and give [the Class] that – that help there."   (March 2, 2010 Hr. Trans. attached as Ex. 25 at p. 27.)   The Court has not yet ruled on the Class's Renewed Motion to Compel. Because Vision has failed to produce its documents, the Class's expert was unable to determine the damages for the McNeil Phase of the Air Bridge Program.   The Class filed an unopposed Motion to Extend Rule 26(a)(2) Disclosure Deadlines [105] due on April 24, 2010, on April 9, 2010.   The Court denied the Class's unopposed motion on April 14, 2010.   At that hearing, however, the Court invited the Class to file a second motion requesting an extension of time to file Rule 26(a)(2) disclosures.   The Class filed its Second Motion to Extend Rule 26(a)(2) Disclosures [D.E. 110] on April 15, 2010.   The Court has not yet ruled on this motion and the Class filed its preliminary Rule 26(a)(2) disclosures on April 29, 2010.   Vision's abusive discovery tactics are well-documented.   *See, e.g.,* [D.E. 49, 50, 54, 56, 60, 61, 64, 93, 96, 99, 106, 110, 117.]

[19]   Vision failed to produce a 30(b)(6) corporate representative able to testify knowledgably on the topics identified in the Class's Notice, including what efforts Vision undertook to search for and produce documents responsive to the Class's Narrowed Requests, because Vision did not prepare any of its 30(b)(6) corporate representatives. Daggett spent "[l]ess than an hour" preparing to testify as Vision's 30(b)(6) corporate representative (Dagget Dep., Ex. 2, at 39), reviewed only "one document" in preparation for the deposition (*id.* at 38), and did not speak with any other Vision personnel in preparation for the deposition (*id.* at 38-39).   Meers spent only "ten minutes" preparing for the deposition, did not review any documents prior to the deposition, and did not undertake any additional efforts to

312990

29

GOODMAN LAW GROUP
A Professional Corporation
520 S. Fourth Street, 2ⁿᵈ Floor
Las Vegas, Nevada 89101
(702) 383-5088

various documents it claimed were privileged, despite having waived its claim to any privilege, by failing to provide the Class with a privilege log.  *See Burlington Northern & Santa Fe Railway Co. v. U.S. Dist. Co. for the Dist. of Mont.,* 408 F.3d 1142, 1147 (9th Cir. 2005).  (*See* Plaintiff's Motion to Compel [D.E. 49] at 12-13.)  And finally, Vision has unilaterally redacted documents without any basis in privilege, a procedure that has been universally condemned by the courts.  *Howell v. City of New York*, No. CV-06-6347 (ERK)(VVP), 2007 WL 2815738, at *2 (E.D.N.Y. Sept. 25, 2007).  (*See* Class's Supplement in Support of its Renewed Motion to Compel [D.E. 106] at pp. 2-5.)[20]

## IV.    CONCLUSION

Vision failed to pay the Class the hazard pay it collected on its behalf, even though it was required to do so.  Now, instead of accepting responsibility for its wrongful conduct, a fact it had successfully covered up until the filing of this lawsuit, Vision comes before the Court and attempts to put the victims on trial.  In an effort to avoid liability, Vision seeks to decertify the Class on the basis of factual distortions and misapplication or ignorance of the law.  Accordingly, Vision's Motion should be denied.

---

prepare to testify as Vision's 30(b)(6) corporate representative. (Meers Dep., Ex. 13, at 268.) Similarly, Acor did "very little" to prepare to testify as Vision's 30(b)(6) corporate representative and did not meet with counsel prior to testifying because counsel "was late for breakfast." (Acor Dep., Ex 19, at p. 531.)

[20] Vision has redacted pertinent information from nearly every document it has produced to the Class that relates to the McNeil Phase.  For example, Vision redacted all of the pertinent financial information from the McNeil contract.  Vision also redacted all of the financial information from the invoices it produced to the Class (McNeil invoices attached hereto as Ex. 26) and redacted all of the financial information from what is believed to be the bid proposal Vision submitted to McNeil (Ex. 5).  Vision has never produced any of the modifications to its contract with McNeil, of which there are 26. (Meers Dep., Ex. 13, at 417.) Vision has also unilaterally redacted documents relating to Phases II and III, including the amounts Vision billed for hazard pay.  (*See* Vision Redacted Invoices, attached as Ex. 27.)

312990

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

GOODMAN LAW GROUP
A Professional Corporation
520 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 383-5088

Respectfully submitted,

KOZYAK TROPIN & THROCKMORTON, P.A.
Counsel for the Plaintiff
2525 Ponce de Leon, 9th Floor
Coral Gables, Florida 33134
Telephone: (305) 372-1800
Fax: (305) 372-3508

ROSS C. GOODMAN
GOODMAN LAW GROUP
520 South Fourth Street
Las Vegas, Nevada 89101
(702) 383-5088
(702) 385-5088 (Facsimile)

By: /s/ David M. Buckner
       David M. Buckner
       Florida Bar No. 60550
       Brett E. von Borke
       Florida Bar. No. 0044802

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true copy of the foregoing has been served via the Court's CM/ECF system on May 17, 2010 on Harold P. Gewerter, Esq., 2705 Airport Drive, North Las Vegas, Nevada 89032.

By: /s/ David M. Buckner
       David M. Buckner

312990

31