**Ross C. Goodman, Esq., Nevada State Bar No. 7722**
**GOODMAN LAW GROUP**
520 South Fourth Street
Las Vegas, Nevada 89101
(702) 383-5088

**David M. Buckner, Esq., Florida State Bar No. 60550**
**Brett E. von Borke, Esq., Florida State Bar No. 44802**
**KOZYAK TROPIN & THROCKMORTON, PA**
2525 Ponce de Leon, 9th Floor
Miami, Florida 33134
(305) 372-1800
(305) 372-3508 (Facsimile)

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

GERALD HESTER, on behalf of himself
and all others similarly situated,

                    Plaintiff,

v.

VISION AIRLINES, INC.,

                    Defendant.

Case No.: 2:09-CV-00117-RLH-RJJ

GOODMAN LAW GROUP
A Professional Corporation
520 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 383-5088

## THE CLASS'S INCORPORATED MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

The Class, by and through undersigned counsel, respectfully submits its Incorporated Memorandum of Law in Support of its Motion for Summary Judgment ("Motion"). The undisputed facts demonstrate that Vision Airlines, Inc. ("Vision"), received hazard pay for the Class's benefit, that Vision was expected to pay those monies earmarked for hazard pay to the Class, and that Vision failed to pay any hazard pay to the Class even though it told the upstream contractors that it had. The Class, comprised of Vision's flight deck and cabin crew personnel, risked their lives to fulfill Vision's obligations and flew dangerous missions to Baghdad, Iraq and Kabul, Afghanistan in support of the United States government's operations there. This very risk, which the Class undertook in flying to these locations, was the basis for the payment of

1

hazard pay by the upstream contractors to Vision for the Class's benefit.  Instead of paying the Class the hazard pay that it collected on the Class's behalf, Vision retained that hazard pay for itself – obtaining a financial windfall from its wrongful conduct.   Accordingly, the Class respectfully requests that the Court order Vision to pay the Class the hazard pay that it is has earned and to which it is entitled.

## I.   STATEMENT OF UNDISPUTED FACTS[1]

### A.   Background on the Air Bridge Program

1.   Vision is a subcontractor for the United States government and provides air transport services to Baghdad and Kabul ("Air Bridge Program").  (Deposition of Laura Feigin, attached as Ex. 1, at 13.)

2.   Vision has operated the Air Bridge Program since May 2005. (Deposition of Brian Dagget,[2] attached as Ex. 2, at 33.)

3.   The Air Bridge Program flights to Kabul require the aircraft to fly a tight approach between a narrow opening in a mountain rage, which exposes the aircraft to attack from light arms fire and rocket propelled grenades due to the close proximity of the approach to the mountains. (Deposition of David Pritchard, attached as Ex. 3, at 35); (Deposition of Darrel Jensen, attached as Ex. 4, at 22, 24-25.)

4.   In order to avoid attack from insurgents, the Air Bridge Program crews fly into Kabul at night and without any cockpit lighting. (Deposition of James Maguire (former Vision director of flight operations and current Vision executive), attached as Ex. 5, at 31.)

---

[1] The Class's Renewed Motion to Compel [D.E. 93], filed on January 20, 2010, as supplemented by the Class's Supplement in Support of the Class's Renewed Motion to Compel [D.E. 106] on April 9, 2010, seeks to remedy Vision's lack of production and failure to tender adequately knowledgeable Rule 30(b)(6) witnesses, and awaits a ruling from the Court.

[2] Dagget testified as one of Vision's 30(b)(6) witnesses and is Vision's Air Bridge Program Manager.  Dagget, however, previously worked for Capital Aviation in a similar capacity.

GOODMAN LAW GROUP
A Professional Corporation
520 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 383-5088

314797

2

5.      The crews operating the Air Bridge Program flights to Kabul routinely encounter hazardous conditions. (Pritchard Dep., Ex. 3, at 35-38.)  For example, after landing in Kabul, Davis Pritchard ("Pritchard"), an Air Bridge Program captain, was informed by military personnel that a rocket attack at the airport was imminent and that he had fifteen minutes to either move his passengers and crew to a bomb shelter or to leave the airport.  (*Id.* at 37-38.)

6.      The Air Bridge Program flights to Baghdad were equally hazardous.  (Jensen Dep., Ex. 4, at 26-27.)  The Air Bridge Program crews flying into and out of Baghdad were required to arrive at night and employed a corkscrew maneuver to arrive and depart Baghdad International Airport. (Maguire Dep., Ex. 5, at 31-32); (Jensen Dep., Ex. 4, 29-30, 36.) The Air Bridge Program crews utilized this procedure to stay within an area protected by the United States military in order to diminish the likelihood of attack.  (Jensen Dep., Ex. 4, at 36); (Maguire Dep., Ex. 5, at 31-32.)

7.      The Air Bridge Program crews were concerned about their safety because an airplane operated by DHL Express had been shot down by a surface-to-air missile while departing Baghdad International Airport.  (Jensen Dep., Ex. 4, at 26, 28-32.)

8.      In addition, Air Bridge Program crews routinely witnessed explosions and light arms fire on the ground as they arrived and departed Baghdad International Airport.  (Maguire Dep., Ex. 5, at 33.)

9.      The Air Bridge Program is divided into four phases that correspond to the following time periods: (1) Phase I – June 2005 through April 30, 2006 (Deposition of William Acor, attached as Ex. 6, at 557); (2) Phase II – May 1, 2006 through July 14, 2006 (CSC's Phase II Bid Proposal, attached as Ex. 7, at CSC 0023); (3) Phase III – July 15, 2006 through July 31, 2007 (collectively Phases I-III ("CSC Phase")) (CSC Phase III Bid Proposal, attached as Ex. 8, at CSC 0040); and (4) Phase IV – August 1, 2007 through the present ("McNeil Phase") (Maguire

GOODMAN LAW GROUP
A Professional Corporation
520 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 383-5088

314797
3

Dep., Ex. 5, at 42).

10.     Computer Sciences Corporation ("CSC") held the direct contract with the United States government for the Air Bridge Program for Phases I-III. (Feigin Dep., Ex. 1, at 16.)

11.     McNeil Technologies, Inc. ("McNeil"), however, replaced CSC as the party in direct contract with the United States government for the Air Bridge Program on August 1, 2007. (Maguire Dep., Ex. 5, at 42.)

12.     Even though the prime contractor changed from CSC to McNeil, Vision continued to operate the Air Bridge Program throughout all of its phases. (Dagget Dep., Ex. 2, at 33-34.)

13.     In each phase of the Air Bridge Program, Vision collected hazard pay on behalf of the Air Bridge Program flight deck and cabin crews. (Vision's Invoices to Capital Aviation and CSC, attached as Ex. 9); (Affidavit of McNeil, attached as Ex. 10, at ¶ 6-7.)

14.     This hazard pay was allocated for Vision's Air Bridge Program crews and paid to Vision on their behalf by the upstream contractors. (Feigin Dep., Ex. 1, at 33.)

15.     The Air Bridge Program contracts and invoices changed and evolved throughout the phases (compare CSC Phase III Submission to United States government, attached as Ex. 8, with Vision's Aircraft Quote to McNeil, attached as Ex. 11), as the cost line items were different in Phase I than Phases II and III (*See* CSC's Phase II Bid Proposal, Ex. 7), the cost line items for Phases II and III were identical (compare Ex. 7, at CSC 0033 with Ex. 8, at CSC 0057); (Feigin Dep., Ex. 1, at 17-18), and the cost line items and invoices changed from Phase III to Phase IV of the Air Bridge Program (compare Exs. 7 & 8 with Vision's Aircraft Quote to McNeil, Ex. 11).

16.     Nonetheless, throughout the phases, Vision billed for and collected hazard pay on behalf of its Air Bridge Program employees. (Preliminary Expert Report of Barry Mukamal, attached as Ex. 12, at 4-5, 7-8); (Supplemental Expert Report of Barry Mukamal, attached as Ex.

GOODMAN LAW GROUP
A Professional Corporation
520 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 383-5088

314797                                                    4

13, at 4-6.)

B.      *Phase I of the Air Bridge Program*

17.      In 2005, the United States government contracted with CSC to operate the Air Bridge Program. (Dagget Dep., Ex. 2, at 33.)

18.      CSC, in turn, subcontracted with Capital Aviation, Inc. ("Capital Aviation"), which subcontracted with Vision (*see* Feigin Dep., Ex. 1, at 14-15) and Vision operated the Air Bridge Program flights (*id.* at 14).

19.      Pursuant to Vision's contract with Capital Aviation, Vision's price to and invoicing of Capital Aviation included amounts for hazard pay. (Vision's contract with Capital Aviation, attached as Ex. 14, at 3.)   Specifically, that contract provided:

> The price to Capital includes all fuel, fluids, fuel surcharges, etc. necessary to operate the aircraft, including the salaries of the pilots and crew and all insurance premiums, handling fees, international fees, landing and parking fees, permits, crew living expense, ***crew hazard pay***, etc.

(*Id.*) (emphasis added.)

20.      In accordance with its contract, Vision submitted invoices to Capital Aviation for the Air Bridge Program. (Vision's Phase I invoices, attached as Ex. 15.)

21.      In reliance on Vision's invoices, Capital Aviation billed CSC and specifically identified "crew hazard pay" as part of its invoice. (Capital Aviation Invoice dated October 11, 2005, billing for "crew hazard pay," attached as Ex. 16, at CAI 24591.)   CSC prepared its invoices based on the information contained in Vision and Capital Aviation's invoices, and submitted its invoices to the United States government for payment. (*See* Feigin Dep., Ex. 1, at 15.) Based on CSC's invoices, the United States government paid CSC. (*See id.*); (Dagget Dep., Ex. 2, at 111.)   CSC paid Capital Aviation the amount it invoiced, and Capital Aviation, in turn, paid Vision its invoiced amounts. (*See* Feigin Dep., Ex. 1, at 26.)

22.      In accordance with its obligation to pay its employees hazard pay, Vision's Chief

GOODMAN LAW GROUP
A Professional Corporation
520 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 383-5088

GOODMAN LAW GROUP
A Professional Corporation
520 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 383-5088

Executive Officer, William Acor ("Acor"), authorized his director of flight operations, Darrel Jensen ("Jensen"), to inform Vision's Air Bridge Program flight deck and cabin crews that they would receive hazard pay in the amounts of "$5,000 USD" and "$2,500 USD," respectively, "in addition to normal flight pay" for the Air Bridge Program flights to Baghdad. (Letter from DC Jensen to Cockpit Crew and Cabin Crew dated September 3, 2005, attached as Ex. 17.)

23.     These amounts were for hazard pay and were intended to compensate the Air Bridge Program flight deck and cabin crews for the additional risk incurred in flying into and out of the war zone in Baghdad.  (Jensen Dep., Ex. 4, at 42, 46.)

24.     In addition, Vision promised its Air Bridge Program flight deck and cabin crews that "[f]or second and subsequent trips a different compensation structure is being created that factor in Kabul trips."  (Ex. 17.)

25.     In certain limited instances early in the program, but only after the threat of litigation, did Vision pay its Air Bridge Program employees the hazard pay previously promised. (Letter from Frank Reno, attached as Ex. 18.)

C.     *Phase II of the Air Bridge Program*

26.     In 2006, the United States government issued a Request for Proposal for Phases II and III of the Air Bridge Program in order to modify the program's billing components to include the following: (1) Firm Fixed Costs; (2) Variable Costs; and (3) Other Direct Costs. (*See* Ex 7 at CSC 0035, Ex. 8 at CSC 0042.)

27.     CSC's Program Director, William Vigil ("Vigil"), provided David Meers ("Meers"), Vision's Vice President, and Acor, with a spreadsheet identifying the various cost line items that were to be included as part of the billing components for Phases II and III of the Air Bridge Program. (Vigil e-mail to Acor and Meers dated June 16, 2006, attached as Ex. 19, at Vision 013324.)

314797

28.     Vigil informed Vision that it could "add or subtract any cost elements . . . to meet [its] proposal." (*Id.*)  Specifically, within the spreadsheet that Vigil sent Vision were cost line items for flight deck and cabin crew salaries and "hazardous duty pay." (*Id.*, at Vision 013326.)

29.     Vision modified the proposal Vigil sent it and earmarked specific amounts for the Air Bridge Program's flight deck and cabin crew salaries and "hazardous duty bonus." (E-mail from Meers to Daggett dated June 26, 2006, attached as Ex. 20, at CAI 27885.)   Vision submitted this proposal to Capital Aviation and CSC. (Deposition of David Meers, attached as Ex. 21, at 389.)

30.     In reliance on Vision's bid proposal, CSC prepared its bid proposal for Phase II, which it submitted to the United States government. (Feigin Dep., Ex. 1, at 18.)

31.     The Phase II bid proposal that CSC submitted to the United States government included cost line items with amounts for flight deck and cabin crew salaries and "hazardous duty" pay. (Ex. 7, at CSC 0033.)

32.     These amounts were identical to the numbers provided to the upstream contractors by Vision. (*See* Ex. 20, at CAI 27885-91.)

33.     CSC's 30(b)(6) corporate representative testified that Vision was expected to pay the Air Bridge Program flight deck and cabin crews the total amount of salary and hazard pay identified on those cost line items for Phases II and III of the Air Bridge Program. (Feigin Dep., Ex. 1, at 24-25, 33, 37.)  Specifically, CSC testified:

> Question (Class): So when it says here, for example, under the, again, the firm fixed price component here, flight deck crew, is that the line item for payments of salaries of flight deck personnel?

> Answer (CSC): Yes.

> Question (Class): And with regard to hazardous duty, two lines under that, is it correct that that is the amount of money allocated for the payment of hazardous duty pay to the flight deck crew?

> Answer (CSC): Yes.

GOODMAN LAW GROUP
A Professional Corporation
520 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 383-5088

Question (Class): And, below that it says cabin crew, is that the line item allocating funds to pay salaries of cabin crew personnel?

Answer (CSC): Yes.

Question (Class): And with regard, two lines down from that, hazardous duty cabin crew, that line item was for the payment of hazardous duty pay to cabin crew operating the flights to and from Baghdad and Kabul?

Answer (CSC): Yes.

Question (Class): And again, all of this is for the payment of the people operating the flights to and from Baghdad and Kabul under the Air Bridge Program, correct?

Answer (CSC): Yes. (*Id.*, at 24-25.)

Question (Class): All right.  And with regard to these individual line items, was it required that the amount of money that was paid for these individual line items actually be spent on the item actually described there?

Answer (CSC): Yes. (*Id.* at 28.)

Question (Class): So, for example, if one item is hazardous duty bonus, it was CSC's expectation that the money paid for that line item was going to be paid as a hazardous duty bonus to the people operating the Air Bridge program to Kabul and Baghdad?

Answer (CSC): Yes. (*Id.* at 33.)

Question (Class): What would you have done with regard to your responsibilities here at CSC had someone from Vision or elsewhere told you that Vision was, in fact, not paying the individual line items in the firm fixed price in the manner set forth within the invoicing?

Answer (CSC): I would have reported that to my management as possible ethics violations. (*Id.* at 37.)

34.    Vision invoiced and received payment from the upstream contractors for operating the Air Bridge Program flights in accordance with the cost line items and amounts identified in CSC's bid proposal, including amounts for flight deck and cabin crew salaries and hazardous duty pay. (*Id.* at 33.)

35.    Vision, however, failed to pay the Air Bridge Program employees the total amount it billed for salary and none of the amount it billed for hazardous duty pay during Phase II. (Preliminary Mukamal Report, Ex. 12, at 7.)

GOODMAN LAW GROUP
A Professional Corporation
520 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 383-5088

314797

8

D.   *Phase III of the Air Bridge Program*

36.   The billing components adopted for the Air Bridge Program in Phase II, including all of the cost line items, remained identical for Phase III. (Feigin Dep., Ex. 1, at 17-18.)

37.   CSC again relied on the bid proposal that it received from Vision in preparing its Phase III bid proposal that it submitted to the United States government. (Comp. Ex. 20, at CAI 27885-91, and Ex. 8, at CSC 0057); (*See also* Dagget Dep., Ex. 2, at 111.)

38.   In that bid proposal, CSC identified specific cost line items for flight deck and cabin crew salaries and hazardous duty pay, which Vision had provided to it. (Comp. Ex. 20, at CAI 27885-91, and Ex. 8, at CSC 0057.) Specifically, CSC allocated $2,400,000 for flight deck crew salary and $750,000 for flight deck crew hazardous duty pay. (Ex. 8, at CSC 0057.) CSC also allocated $1,296,000 for cabin crew salary and $500,000 for cabin crew hazardous duty pay. (*Id.*)

39.   While Vision marked up certain cost line items in Phases II and III, Vision did not mark up the cost line items for flight deck and cabin crew salaries or hazardous duty pay. (*Id.*) ("Vision Fee %" markup on "Flight Deck Crew," Flight Deck "hazardous duty," "Cabin Crew," and Cabin Crew "hazardous duty" is "0%.") Those cost line items were to be paid in full to Vision's Air Bridge Program flight deck and cabin crews without any markup by Vision. (Feigin Dep., Ex. 1, at 24-25, 28, 33.)

40.   The profit markup on these line items was "0%," because Vision's profit was included in the cost line item entitled "Vision Program Management." (*Id.* at 30.)

41.   For managing the Air Bridge Program for Phase III alone, Vision received, a minimum of $5,038,800, and was also permitted to mark up certain other cost line items at cost plus 10%. (Ex. 8, at CSC 0057.) Consistent with its proposal to CSC, and in accordance with CSC's bid to the United States government, Vision submitted invoices on a weekly and quarterly

GOODMAN LAW GROUP
A Professional Corporation
520 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 383-5088

314797

9

basis and billed for flight deck and cabin crew salaries and hazardous duty pay. (Vision Phase III invoices, attached as Ex. 22); (Dagget Dep., Ex. 2, at 111.)

42.     Vision typically submitted these invoices to Capital Aviation, but from time to time, would also directly submit them to CSC. (Feigin Dep., Ex. 1, at 35.)

43.     Upon receiving Vision's invoices, Capital Aviation would generate its own invoices based on Vision's invoices and would bill CSC for salaries and hazardous duty pay for Vision's flight deck and cabin crews. (Capital Aviation Phase III Invoices, attached as Ex. 23.)

44.     Once Capital Aviation prepared its invoice, it would submit it, along with Vision's invoice, to CSC. (Feigin Dep., Ex. 1, at 15, 25.) In reliance on those invoices, CSC would submit its invoice to the United States government for payment. (Feigin Dep., Ex. 1, at 15.) Once the United States government received CSC's invoice, it made payment to CSC. (*Id.*) After receiving payment, CSC would pay Capital Aviation, who in turn, would pay Vision. (*Id.* at 33.)

45.     Despite being paid the full cost line item amounts for flight deck and cabin crew salaries and "hazardous duty" pay (*id.* at 15), Vision failed to pay all of the salaries and none of the hazard pay that it billed for and collected on behalf of the Air Bridge Program employees to them (Preliminary Mukamal Report, Exhibit 12, at 4).

   E.     *Although Vision Recognized its Obligation to Pay Hazard Pay, the Class's Expert Determined that Vision Failed to Pay the Air Bridge Program Employees Hazard Pay for Phases II and III*

46.     On May 14, 2007, Vision's director of Flight Operations, Daniel Carson ("Carson"), had the following e-mail exchange with Vigil, on which Brian Dagget ("Dagget"), Vision's Air Bridge Program Manager, was copied:

GOODMAN LAW GROUP
A Professional Corporation
520 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 383-5088

314797

10

> Carson (Vision): Question:  we are not and have not paid any hz duty pay.  What is our exposure in audit or contract obligations
>
> Vigil (CSC):  Are you kidding me? We have been charged Hazardous duty pay throughout the program, Phase 3 alone would be in excess of $1.25 million.  This has to be addressed immediately as it could be a disaster, either retroactive or refunded.

(May 14, 2007 e-mail, attached as Ex. 24.)

47.     Dagget testified that after receiving Vigil's response, he spoke directly with Vigil about whether Vision had paid the Air Bridge Program employees the hazard pay Vision billed for and collected.  (Dagget Dep., Ex. 2, at 247.)  Specifically, Dagget testified that he informed Vigil "not to be alarmed" because Vision had "paid" the Air Bridge Program employees the hazard pay.  (*Id.*)  This statement, however, is demonstrably false.

48.     Pritchard, an Air Bridge Program pilot, e-mailed James Maguire ("Maguire"), the individual who replaced Carson as Vision's Director of Flight Operations shortly after Carson was terminated, while he was preparing his income taxes and inquired whether any of his pay at Vision included hazard pay.  (Pritchard Dep., Ex. 3, at 45-46.)

49.     Maguire did not respond to Pritchard's e-mail, and Pritchard decided to call Maguire to ask whether any of his compensation at Vision included hazard pay.  (*Id.* at 46.)

50.     During that telephone conversation, Maguire informed Pritchard that he would not respond to his e-mail regarding hazard pay in writing but that he would speak with Pritchard next time he reported for work in Washington, DC about the matter.  (*Id.* at 46-47.)

51.     When the two met in Washington, DC, Maguire was "really angry" with Pritchard for inquiring about hazard pay and questioned his trust in and loyalty to Maguire and Vision.  (*Id.* at 49-50.)

52.     CSC's 30(b)(6) representative testified that Vision was expected to pay its Air Bridge Program employees the full amounts budgeted and billed for on the cost line items for

GOODMAN LAW GROUP
A Professional Corporation
520 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 383-5088

314797

11

flight deck and cabin crew salaries and hazardous duty pay in Phases II and III of the Air Bridge Program. (Feigin Dep., Ex. 1, at 24-25, 28, 33, 37.)

53.     Consistent with that expectation, Vision's CEO, Acor, testified that if the Class added up the cost line items for flight deck and cabin crew salary and hazardous duty pay, for which Vision billed the upstream contractors, and compared those sums with Vision's payroll, it would reveal that Vision actually paid its employees an amount equal to or more than the amount it billed for and collected in flight deck and cabin crew salary and hazardous duty pay from the upstream contractors. (Acor Dep., Ex. 6, at 600-602.)

54.     The Class's expert analyzed Vision's payroll records and flight logs and determined that Vision failed to pay the flight deck and cabin crew any hazardous duty pay for Phases II and III of the Air Bridge Program. (Preliminary Mukamal Report, Ex. 12, at 4, 7-8.)

55.     In fact, Vision did not even pay the Air Bridge Program employees the full amount it billed for their salaries. (*Id.*)

56.     Specifically, for the short period of Phase II, Vision invoiced for and collected $564,591.67 more in flight deck and cabin crew salaries and hazardous duty pay than it paid out to the Air Bridge Program flight deck and cabin crews. (*Id.* at 7-8.) For Phase II, Vision billed for and collected $258,613.12 in hazard pay and $305,978.65 in salary for the Air Bridge Program employees, which it failed to pay to them. (*Id.*)

57.     In Phase III of the Air Bridge Program, Vision collected $2,710,239.70 more in flight deck and cabin crew salaries and hazardous duty pay than it actually paid to the Air Bridge Program employees. (*Id.* at 5.) Specifically, in Phase III, Vision invoiced for and collected $1,309,027.46 in hazardous duty pay and an additional $1,401,212.33 in salary for the Air Bridge Program employees, which it failed to pay to them. (*Id.*)

58.     Furthermore, Vision never even intended to pay the Air Bridge Program

GOODMAN LAW GROUP
A Professional Corporation
520 S. Fourth Street, 2ⁿᵈ Floor
Las Vegas, Nevada 89101
(702) 383-5088

employees any hazard pay. (*Id.* at 4.)  As the Class's expert stated, "Vision's Flight Deck and Cabin Crew Payroll Expense per flight hour of $377.40 (Scenario 1) or $507.47 (Scenario 2), based on actual pay to its flight deck and cabin crew, was below the rate of $591.56 per flight hour at which Vision billed Capital Aviation for Flight Deck and Cabin Crew payroll, *even without inclusion* of Hazardous Duty Bonus." (*Id.*)

F.    The McNeil Phase of the Air Bridge Program[3]

59.    The United States government changed contractors from CSC to McNeil in the summer of 2007. (Dagget Dep., Ex. 2, at 33.)

60.    Even though the government contractor changed, Vigil, the individual previously responsible for negotiating and operating the Air Bridge Program contract on behalf of CSC, was hired by McNeil to operate the Air Bridge Program on its behalf. (Maguire Dep., Ex. 5, at 18.)

61.    Similar to Phase III, Vision's Aircraft Quote, which it submitted to McNeil, contained certain cost elements, including cost elements for flight deck crew salary, flight deck crew hazardous duty bonus, cabin crew salary, and cabin crew hazardous duty bonus. (Vision's Aircraft Quote for Phase IV, Ex. 11); (McNeil Affidavit, Ex. 10.)  Specifically, Vision's Aircraft Quote identified a per hour fee of $624 for flight deck crew salary or an annualized amount of $3,700,000 and a $109 per hour fee for flight deck crew hazardous duty bonus or an annualized amount of $647,500. (Vision's Aircraft Quote, Ex. 11.)

62.    Vision's Aircraft Quote identified a per hour fee of $337 for cabin crew salary or an annualized amount of $2,000,000 and a per hour fee of $59 for cabin crew hazardous duty bonus or an annualized amount of $350,000. (*Id.*)

63.    The cost elements, of which cabin crew and flight deck crew salaries and

GOODMAN LAW GROUP
A Professional Corporation
520 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 383-5088

---

[3]In its first production of documents to the Class, Vision withheld all documents related to its contract with McNeil. In its supplemental production, Vision produced some documents but has unilaterally redacted most of the relevant information from them. (*See* Renewed Motion to Compel) [D.E. 93] (discussing Vision's discovery abuses).

GOODMAN LAW GROUP
A Professional Corporation
520 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 383-5088

hazardous duty bonus are included, add up to a "Total Program Cost" for Vision's operation of the Air Bridge Program flights. (McNeil Affidavit, Ex. 10, at ¶ 6.)

64.     Vision submits a weekly invoice to McNeil for operating the Air Bridge Program. (*Id.*)  On its weekly invoices to McNeil, Vision identifies its fixed price per flight for Total Services under CLIN 0001, CLIN 1001, and CLIN 0003. (*Id.*)

65.     For each 12 month period beginning July 31, 2007, and prorated for the current annual period, McNeil has paid Vision the amount it invoiced for Flight Services under CLIN 0001, CLIN 1001, and CLIN 0003, which together total the same amount identified in Vision's Aircraft Quote as the "Total Program Cost."  (*Id.*)   Therefore, McNeil has paid Vision the amounts identified on the Aircraft Quote for the flight deck and cabin crew salaries and hazard pay. (*Id.*)

66.     For managing the Air Bridge Program, Vision receives a yearly fee of $6,500,000. (Vision's Aircraft Quote to McNeil, Ex. 11.)  Furthermore, to date, for the Total Program Cost, Vision has invoiced for and collected hundreds of millions of dollars.  (Vision's invoice dated July 5, 2010, attached as Ex. 25.)

G.     *Vision Modifies the Pay Structure for Air Bridge Program Employees in October 2007, and Admits that its Pay Structure does Not Include Hazard Pay*

67.     In a memorandum from Maguire to Vision's Air Bridge Program pilots dated October 15, 2007, Vision informed its pilots about its new compensation scheme, which would have a retroactive effect. (Vision's October 15, 2007 Pay Memorandum to its Pilots, attached as Ex. 26.)

68.     On that same day, October 15, 2007, Maguire also sent a memorandum to the Air Bridge Program cabin crews informing them about certain changes to their compensation scheme. (Vision's Pay Memorandum to its Flight Attendants, attached as Ex. 27.)

68.     Maguire was responsible for developing the new compensation scheme for the

314797

14

GOODMAN LAW GROUP
A Professional Corporation
520 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 383-5088

1    pilots and the cabin crews, both of which were approved by Acor.  (Maguire Dep., Ex. 5, at 50-

2    51, 53, 78.)

3    69.    Maguire, however, testified that in developing Vision's new compensation

4    scheme for the Air Bridge Program pilots and cabin crews that he only considered the cost

5    elements for flight deck and cabin crew salary, which were identified in Vision's Aircraft Quote

6    to McNeil (*id.* at 50-51), and consciously decided not to include flight deck or cabin crew

7    hazardous duty bonus (*id.* at 96-97), which was also identified in Vision's Aircraft Quote to

8    McNeil.

9

10   70.    Maguire stated that he did not include any other amounts in Air Bridge Program

11   pilot and cabin crew compensation and specifically excluded the cost line items for hazard pay

12   because he "adamantly opposed" it and did not want the Air Bridge Program pilots or cabin

13   crews that operated the flights from various European cities to Baghdad and Kabul to be

14   compensated more than those flight deck and cabin crews that flew the transatlantic routes from

15   the United States to the various European cities.  (*Id.* at 97-98.)  Maguire was concerned that

16   paying Vision Air Bridge Program pilots and cabin crews hazard pay would create scheduling

17   conflicts because he believed that most of the flight deck and cabin crews would only want to fly

18   the flight segments that would be eligible to receive hazard pay.  (*Id.* at 98.)

19

20   71.    Accordingly, Maguire admitted that Vision did not pay its Air Bridge Program

21   employees any hazard pay for Phase IV because of its belief that it would cause scheduling

22   difficulties.  (*Id.*)

23

24   H.    *The Class's Expert Determined that Vision Failed to Pay the Air Bridge Program*
        *Employees Hazard Pay for Phase IV*

25

26   72.    The Class's expert analyzed Vision's payroll records and flight logs and

27   determined that Vision failed to pay the flight deck and cabin crew any hazardous duty pay for

28   Phase IV of the Air Bridge Program.  (Supplemental Mukamal Report, Ex. 13, at 4-6.)

314797

15

73.     In fact, Vision did not even pay the Air Bridge Program employees the full amount it billed for their salaries. (*Id.*)

74.     Specifically, in Phase IV, Vision invoiced for and collected $7,331,793 more in flight deck and cabin crew salaries and hazardous duty pay than it paid out to the Air Bridge Program flight deck and cabin crews. (*Id.* at 4.)  For Phase IV, Vision billed for and collected $2,934,952 in hazard pay and $4,396,841 in salary for the Air Bridge Program employees, which it failed to pay to them. (*Id.* at 5-6.)

75.     Furthermore, Vision never even intended to pay the Air Bridge Program employees any hazard pay in Phase IV.  As the Class's expert stated, "Vision's Flight Deck and Cabin Crew Payroll Expense per flight hour of $684.29, based on actual pay to its flight deck and cabin crew, was below the rate of $961.54 per flight hour at which Vision billed McNeil for Flight Deck and Cabin Crew payroll, *even without inclusion* of Hazardous Duty Bonus." (*Id.* at 6.)

## II.     ARGUMENT

"Summary judgment is proper 'if the pleadings', depositions, answers to interrogatories, and admission on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.'"  *Slumier v. Verity, Inc.,* 606 F.3d 584, 586 (9th Cir. 2010) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)).  Once the moving party files its motion for summary judgment, the non-moving party must "designate specific facts showing that there is a genuine issue for trial." *Celotex,* 477 U.S. at 324. Here, the Class has demonstrated that summary judgment is appropriate on its claims for unjust enrichment (Count I), constructive trust (Count II), money had and received (Count III), *quantum meruit* (Count IV), conversion (Count V), injunctive relief (Count VI), and declaratory relief (Count VII), because the elements for each claim are supported by the evidence

GOODMAN LAW GROUP
A Professional Corporation
520 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 383-5088

314797

and there are no material facts in dispute.

>    A.    *Vision will be Unjustly Enriched if it is Permitted to Retain the Hazard Pay that the Class Earned For Operating the Air Bridge Program Flights*

Unjust enrichment occurs "whenever a person has and retains a benefit which in equity and good conscience belongs to another." *Leasepartners Corp. v. Rovert L. Brooks Trust,* 942 P.2d 182, 187 (Nev. 1997) (internal quotations omitted).  The essential elements for a claim of unjust enrichment are: (1) a benefit conferred on the defendant by the plaintiff; (2) appreciation by the defendant of that benefit; and (3) the defendant's acceptance and retention of that benefit. *Topaz Mut. Co. v. Marsh*, 839 P.2d 606, 613 (Nev. 1992).

The Restatement elaborates upon when a retained benefit is one that "in equity and good conscience belongs to another," stating: "[i]f a payment to defendant is an asset to which the claimant (as against defendant) has the paramount entitlement, the law of restitution and unjust enrichment supplies a claim to recover the amount in dispute." Restatement (Third) of Restitution and Unjust Enrichment (Tentative Drafts) § 48 (T.D. No. 5, 2007).  Courts in Nevada and across the country have applied this rule to prevent defendants from becoming unjustly enriched when a third party pays over money to which a defendant does not have the "paramount entitlement," or which was collected on behalf of another. *See e.g. Custom Teleconnect, Inc. v. Int'l Tele-Services, Inc.*, 254 F. Supp. 2d 1173 (D. Nev. 2003) (finding that where a provider of telecommunications services delivered a customer to a competitor with the understanding that they would service the client together, it stated a claim for unjust enrichment after the competitor entered into an exclusive agreement with the customer, because the provider could show it was entitled to some of the proceeds from the deal); *Wayne County Produce Co. v. Duffy-Mott Co., Inc.*, 155 N.E. 669 (N.Y. 1927) (holding that defendant must refund the "war tax" it collected from plaintiffs on behalf of the government after the government refunded the tax to the

GOODMAN LAW GROUP
A Professional Corporation
520 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 383-5088

GOODMAN LAW GROUP
A Professional Corporation
520 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 383-5088

defendant); *Cohon v. Oscar L. Paris Co.*, 149 N.E. 2d 472, 475 (Ill. App. Ct. 1958) (requiring defendant to refund a tax collected on behalf of the State when it was refunded because, "[t]he tax having been passed on to the customers, the defendant had not depleted any of its own funds in the payment of the tax to the State; consequently when the money was returned to defendant it was money which did not belong to the defendant, but in equity and good conscience belonged to the customers who had paid it.").

Recently, in *Klein v. Arkoma Production Co.*, 73 F.3d 779 (8th Cir. 1995), the Eighth Circuit prevented a lessee from becoming unjustly enriched when it received settlement proceeds to which the landowner had a superior entitlement. In *Klein*, a royalty agreement entitled the landowner to a certain percentage of the proceeds from the natural gas produced by the lessee on the owner's land. *Id.* at 782. For a period of time, due to an unfavorable term in the lessee's contract with one of its natural gas purchasers, it received reduced proceeds for the natural gas produced from the land. *Id.* at 782-83. As a result, however, a claim accrued which allowed the lessee to potentially recoup some of its losses. *Id.* at 783. When the lessee eventually settled the claim and recovered some of its lost profits, the court held that the landowner was entitled to a portion of the settlement under the theory of unjust enrichment. *Id.* at 786. The court found that the land owner had a superior entitlement to part of the settlement monies, and that the lessee would have been unjustly enriched if it were permitted to pay the landowner only the reduced proceeds and yet retain the full amount of the settlement monies, which were the direct result of the reduced natural gas proceeds. *See id.* at 786-87.

Likewise, in *Town of New Hartford v. Connecticut Resources Recovery Authority*, 970 A.2d 592, 615 (Conn. 2009), the court followed *Klein* and required the defendant to pay back portions of a "tip fee" it had collected from the plaintiffs under the theory of unjust enrichment. The "tip fee" was based, in part, on the "cost of operations" of the defendant's facility. *Id.* at

314797

18

602.  During several years, the defendant's "cost of operations" went up due, in part, to a loan it made to Enron, which Enron defaulted on, causing the plaintiffs' "tip fee" to go up to cover some of those losses.  *Id.* at 605-06.  However, when some of the loan proceeds were later recovered from a third party, the court found that the defendant would be unjustly enriched if it were permitted to keep all of the settlement monies when it had already passed many of its losses along to the plaintiffs.  *Id.* at 611.  Although the plaintiffs in *Town of New Hartford* paid the "tip fee" based on the "cost of operations" during each year, the court found that the defendant would be unjustly enriched if it were permitted to retain both the increased "tip fees" from the preceding years, and the monies recovered, which would have reduced the "cost of operations," and thus the "tip fee" in prior years.  *Id.* at 612-13.   The court found that "under the circumstances," the settlement premiums "rightly belonged to the plaintiffs."  *Id.* at 612.  Thus, in both *Klein* and *Town of New Hartford*, the settlement monies were paid to the defendant on behalf of the plaintiffs, who had a superior entitlement to the monies.

Likewise here, the hazard pay that the upstream contractors paid to Vision, was paid on behalf of the Class for the individuals who took the risks for which the money was paid, thereby making their claim to the hazard pay superior to Vision's.  (Feigin Dep., Ex. 1, at 24-25, 28, 33, 37.)  CSC expected Vision to pay the Air Bridge Program flight deck and cabin crews the full amount of the salary and hazard pay that Vision invoiced for and collected on their behalf because they were the individuals that incurred the risk in operating the flights into and out of the war zones in Baghdad and Kabul.  (*Id.*)  Similarly, the hazard pay Vision received on behalf of the Class during Phase IV of the Air Bridge Program was specifically earmarked for Vision's Air Bridge Program flight deck and cabin crews in Vision's Aircraft Quote that it submitted to McNeil.  (Vision's Aircraft Quote to McNeil, Ex. 11.)  Thus, the Class's claim to the hazard pay is paramount to Vision's.  (*See* Feigin Dep., Ex. 1, at 24-25, 28, 33, 37); (Vision's Aircraft Quote

GOODMAN LAW GROUP
A Professional Corporation
520 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 383-5088

314797

19

to McNeil, Ex. 11.)

Moreover, a plaintiff's claim for recovery is particularly strong where, as here, the amount has been specifically earmarked and set aside for the plaintiff's benefit. For example, in *Wayne County Produce*, the court pointed out that the "war tax" that the plaintiffs paid to the defendant was specifically itemized, showing that the plaintiffs paid it for the purposes of being passed along to the government, and the government, in turn, refunded it so that it would be returned to the plaintiffs. 155 N.E. at 669. The court stated that "[t]his is not a case where the item of the tax is absorbed in a total or composite price to be paid at all events." *Id.* Similarly, in *Cohon*, the court noted the importance of the fact that the tax collected by the defendant had been earmarked for a particular purpose, and when the State refunded the plaintiffs' money to the defendant, it was for the plaintiffs' benefit and not the defendant's. 149 N.E. 2d at 476

Here, Vision determined and earmarked the amount of hazard pay to be allocated for Vision's Air Bridge Program flight deck and cabin crews (Meers e-mail to Dagget, Ex. 20, at CAI 27885-91); (Vision Aircraft Quote to McNeil, Ex. 11), for part of the period even specifically invoiced for it (Vision Phase III invoices, Ex. 22), and received the payments from the upstream contractors on behalf of the those employees (Feigin Dep., Ex. 1, 24-25, 28, 33, 37). For example, in Phases II and III Vision identified in its quote to Capital Aviation and CSC specific earmarked amounts for cabin crew and flight deck crew hazardous duty bonus (Meers e-mail to Dagget, Ex. 20, at CAI 27885-91), which were incorporated into CSC's Air Bridge Program bid proposal submitted to the United States government (CSC Phase II Bid Proposal, Ex. 7, at CSC 0033); (CSC Phase III Bid Proposal, Ex. 8, at CSC 0057). Similarly for Phase IV, Vision's Aircraft Quote to McNeil also identified specific funds earmarked for Vision's Air Bridge Program flight deck and cabin crews for hazardous duty bonus. (Vision Aircraft Quote to McNeil, Ex. 11, identifying flight deck crew hazardous duty bonus at $647,600 and cabin crew

GOODMAN LAW GROUP
A Professional Corporation
520 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 383-5088

314797

20

hazardous duty bonus at $350,000 on a 52 week annualized period.)  McNeil paid Vision the amount it invoiced for the "Total Program Cost," which included the amounts specifically earmarked for flight deck and cabin crew hazardous duty bonus. (McNeil Aff., Ex. 10, at ¶ 6.)

Vision, however, never paid its flight deck or cabin crews any of the hazardous duty bonus specifically earmarked for them and for which Vision billed for and collected from the upstream contractors in Phases II, III, or IV of the Air Bridge Program.[4]  (Preliminary Mukamal Report, Ex. 12, at 4-5, 7-8); (Supplemental Mukamal Report, Ex. 13, at 4-6.)  Accordingly, the Class has a superior claim to the monies earmarked for hazard pay and Vision has been unjustly enriched through its retention of these monies.  Vision must, therefore, disgorge the hazard pay it has retained to the Class, which consists of those individuals who actually operated the hazardous flights into and out of the war zones in Iraq and Afghanistan.

B.   The Class's Reasonable Compensation Includes its Hazard Pay under a Theory of Quantum Meruit

The doctrine of *quantum meruit* applies in the absence of an express agreement where the defendant promises to compensate the plaintiff for the fair value of the plaintiff's labor.  *Sack v. Tomlin*, 871 P.2d 298, 302 (Nev. 1994).  Accordingly, "[w]hen an express agreement cannot be found or provisions for payment are uncertain, and when a right to reasonable compensation is placed in issue by the pleadings or is litigated by express or implied consent of the parties, a recovery in *quantum meruit* may be allowed if necessary to prevent unjust enrichment."  *Id; see also Bangle v. Holland Realty Inv. Co.*, 393 P.2d 138, 140-41 (Nev. 1964).   Applying this principle in the context of real estate agents, Nevada courts have held that a real estate agent is entitled to a sales commission on the sale of real property where that agent can demonstrate an

---

[4] Vision may not have paid its flight deck or cabin crews any of the hazard pay specifically earmarked and collected from the upstream contractors for Phase I of the Air Bridge Program.  The Class, however, is not in possession of the evidence for Phase I because Vision failed to produce the documents that Vision previously agreed to produce and the Court has not yet ruled on the Class's Renewed Motion to Compel [D.E. 93] filed on January 20, 2010.

GOODMAN LAW GROUP
A Professional Corporation
520 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 383-5088

314797

"employment relationship" with the broker and that the agent was the procuring cause for the sale. *Morrow v. Barger,* 737 P.2d 1153, 1156 (Nev. 1987).

Here, the Class established its claim for *quantum meruit* as a matter of law. There is no express agreement between Vision and the Class that would bar the Class's claim in *quantum meruit,* as all of Vision's employees are at-will and are required to execute documents that acknowledge that there is no employment contract, either express or implied, between the employee and Vision. (Hester's Employee Handbook Acknowledgement Form, attached hereto as Ex. 28); (Meers Dep., Ex. 21, at 458); (Maguire Dep., Ex. 5, at 87-88.) Second, Vision is required to compensate the Class for the fair value of its labor, which includes the hazard pay that Vision collected on its behalf. (Feigin Dep., Ex. 1, 24-25, 28, 33, 37.) Similar to the real estate agent that may obtain a commission where that agent was the procuring cause of the sale, here the Air Bridge Program employees were the procuring cause for the payment of hazard pay from the upstream contractors to Vision. *Id.* The additional risk the Air Bridge Program employees took in operating the flights into and out of Baghdad and Kabul was the basis for Vision's ability to earmark specific funds for hazard pay (Meers e-mail to Capital Aviation, Ex. 20, at CAI 27885-91); (Feigin Dep., Ex. 1, 24-25, 28, 33, 37), invoice for hazard pay (Vision's Phase III invoices, Ex. 22), and ultimately receive payments for hazard pay on behalf of the Class (Feigin Dep., Ex. 1, 24-25, 28, 33, 37). Moreover, it was the expectation that Vision pay all of the hazard pay that it invoiced for and collected to the Air Bridge Program flight deck and cabin crews that operated the flights. *Id.* Thus, Vision would be unjustly enriched if it were permitted to retain the hazard pay that it received on behalf of the Class. (*See* Section II A.)

C. *Vision Has Possession Over the Class's Hazard Pay, Which in Good Conscience it is Required to Pay Over to it*

A claim for money had and received requires the plaintiff to demonstrate that the defendant received or obtained possession over the plaintiff's money, which defendant in equity

GOODMAN LAW GROUP
A Professional Corporation
520 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 383-5088

and good conscience is required to return to the plaintiff.  *Giorgetti v. Peccole*, 241 P.2d 199, 199 (Nev. 1952); *White Pine Co. Bank v. Sadler*, 6 P. 941, 943 (1885). There is no requirement of privity between the parties to sustain a claim for money had and received, or any promise to pay.  *Kondas v. Washoe County Bank*, 271 P. 465, 466 (1928).   Rather, the court implies the promise from one individual's having another's money, which that individual has no right to retain.  *Id.*  In such a case, the equitable principle upon which the action is founded implies the contract and the promise.  *Id.*

Claims for money had and received have long been recognized to recover money paid by a third party to a defendant on behalf of a plaintiff.  *See Leete v. Pacific Mill & Mining Co.*, 88 F. 957, 969 (D. Nev. 1898).  For example, in *Leete*, the court found that even if a contract between the parties did not require the defendant to return money recovered from the government to the plaintiff, because it was the understanding between the parties that the plaintiff was entitled to the recovered money, the plaintiff nonetheless stated a cause of action for money had and received.  *Id.*  Moreover, more recently in *Cannon v. Cannon*, 868 N.E. 2d 636, 643-44 (Mass. App. Ct. 2007), the court found that the decedent's children from a prior marriage were entitled to their share of the decedent's life insurance policy under a theory of money had and received even where the decedent failed to properly execute the change in beneficiary form to include their names in addition to that of his estranged wife.  The fact that the decedent attempted to change the beneficiary designation and that the estranged wife knew that the money was intended for his children was sufficient to support a claim for money had and received and that the wife may have "received money which in equity and good conscience belongs to the children." *Id.*

Likewise here, Vision received money which in equity and good conscience belongs to the Air Bridge Program employees.  Vision collected payments for hazard pay from the upstream

GOODMAN LAW GROUP
A Professional Corporation
520 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 383-5088

contractors on behalf of the Air Bridge Program employees, who took the risks attendant to the program flights into and out of the war zones in Iraq and Afghanistan, and the upstream contractors expected Vision to pay those employees the hazard pay for those risks. (Feigin Dep., Ex. 1, 24-25, 28, 33, 37.)  Although Vision was aware that the money was intended for the Class, and even wrongfully represented that the Class was being compensated, (Dagget Dep., Ex. 2, at 247), Vision, in fact, never paid the Class the hazard pay collected on its behalf (Mukamal Report, Ex. 12, at 4-5, 7-8); (Supplemental Mukamal Report, Ex. 13, at 4-6).

> D.    *Vision has Converted the Class's Hazard Pay by Wrongfully Exercising Control Over it in Defiance of its Rights*

Vision is wrongfully exercising control over the Class's hazard pay in defiance of the Class's rights.   Conversion is "a distinct act of dominion wrongfully exerted over personal property in denial of, or inconsistent with, title or rights therein or in derogation, exclusion or defiance of such rights." *Edwards v. Emperor's Garden Restaurant*, 130 P.3d 1280, 1287 (Nev. 2006) (citing *Wantz v. Redfield*, 326 P.2d 413 (Nev. 1958)).  In order to establish a claim for conversion, plaintiff "must demonstrate that [defendant] exerted an act of dominion over [plaintiff's] property, in derogation of his rights in the property." *Winchell v. Schiff*, 193 P.3d 946, 950 (Nev. 2008).  Additionally, "conversion is an act of general intent, which does not require wrongful intent and is not excused by care, good faith, or lack of knowledge." *M.C. Multi-Family Development, LLC v. Crestdale Assocs., Ltd.*, 193 P.3d 536, 542-43 (Nev. 2008) (citing *Evans v. Dean Witter Reynolds, Inc.*, 5 P.3d 1043, 1048 (Nev. 2000)).

While no Nevada court has directly addressed the concept of earmarked funds within the context of conversion, courts outside of Nevada have held that "[e]armarking overcomes the presumption that one in possession of money has title to it." *Hercules Automotive Prods., Inc. v. Tidwell*, 245 B.R. 903, 912 (M.D. GA 1999) (applying Georgia law) (citing *Adler v. Hertling*, 451 S.E. 2d 91, 96-97 (Ga. 1994) ("specific and identifiable" nature of funds necessary to

GOODMAN LAW GROUP
A Professional Corporation
520 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 383-5088

314797

24

establish plaintiff's title and right to possess). Applying this concept, the court in *Security State Bank v. Valley Wide Electric Supply, Co., Inc.*, 752 S.W. 2d 661, 665 (Tex. Ct. App. 1988), held that defendant bank converted plaintiff supplier's funds where those funds were earmarked for plaintiff supplier. There, a general contractor was awarded a contract to build a high school pursuant to which the general contractor awarded a subcontract to a subcontractor. *Id.* at 664. The subcontractor purchased supplies under that subcontract from plaintiff supplier, but the subcontractor failed to make all of the payments owed to plaintiff supplier for those supplies. *Id.* The general contractor was informed of the subcontractor's failure to pay plaintiff supplier's invoices and, to remedy the subcontractor's delinquency, the general contractor earmarked certain portions of its payments to the subcontractor for plaintiff supplier. *Id.* The defendant bank agreed to extend credit to the subcontractor, and as collateral accepted the assignment of the subcontractor's contract with the general contractor. *Id.* In accepting assignment of that subcontract, the defendant bank received payments from the general contractor, of which a portion of the monies were earmarked for plaintiff supplier. *Id.* Instead of paying plaintiff supplier the funds it received for its benefit, the defendant bank applied the payments it received from the general contractor against the subcontractor's debts owed to defendant bank. *Id.*

The court held that defendant bank converted plaintiff supplier's funds, because a certain portion of the payments from the general contractor were earmarked or paid for the benefit of plaintiff supplier. *Id.* at 665. "When a person has designated a particular use for proceeds from a check, those proceeds count as 'specific money' capable of conversion." *Id.* (internal quotations omitted.) This occurs because "[w]hen one person delivers money to another for a specific purpose, the person accepting the money becomes a trustee and the transaction becomes a trust." *Id.* Accordingly, the court found that the defendant bank converted the supplier's funds because those funds were intended for the benefit of plaintiff supplier. *Id.*

GOODMAN LAW GROUP
A Professional Corporation
520 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 383-5088

Similarly, Vision converted the hazard paid earmarked and paid by the upstream contractors to Vision for the Class's benefit to compensate Vision's Air Bridge Program employees for the additional risk incurred while operating the flights into and out of the war zones in Baghdad and Kabul. (*See* Feigin Dep., Ex. 1, 24-25, 28, 33, 37.) Meers determined and earmarked $1,250,000 of hazard pay to be allocated for Vision's Air Bridge Program employees and submitted that information in the form of a quote to Capital Aviation and CSC (Ex. 20, at CAI 27885-91), which was incorporated into CSC's bid proposal to the United States government (CSC Bid Proposal, Ex. 7, at CSC 0033); (CSC Phase III Bid Proposal, Ex. 8, at CSC 0057). Vision submitted invoices to CSC and Capital Aviation specifically identifying and billing for flight deck crew and cabin crew hazardous duty bonus (Vision Phase III invoices, Ex. 22), and CSC paid those invoices in reliance on Vision's invoices (Feigin Dep., Ex. 1, 15). Similarly for Phase IV, Vision's Aircraft Quote to McNeil also contained specific amounts of funds earmarked for Vision's Air Bridge Program flight deck and cabin crews for hazardous duty bonus on a 52 week annualized basis in the amounts of $647,500 and $350,000, respectively. (Vision's Aircraft Quote to McNeil, Ex. 11.)   Even though McNeil, like CSC, paid those specifically earmarked amounts (McNeil Affidavit, Ex. 10, at ¶ 6), Vision failed to pay the Air Bridge Program employees any of the hazard pay that it received in Phases II, III, and IV.[5] (Preliminary Mukamal Report, Ex. 12, at 4-5, 7-8); (Supplemental Mukamal Report, Ex. 13, at 4-6.)

Moreover, while bad faith is not required to establish a claim for conversion, Vision's bad faith is evident.  Specifically, Vision was aware that it was required to pay the Air Bridge Program employees hazard pay. Vigil responded to Carson's May 14, 2007 e-mail, informing him that Vision had not paid its employees hazard pay, on which Dagget was copied, that

---

[5] See footnote 4.

GOODMAN LAW GROUP
A Professional Corporation
520 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 383-5088

Vision's failure to pay its employees hazard pay "ha[d] to be addressed immediately as it could be a disaster." (Ex. 24.)  Even though Vision knew it was not paying its employees hazard pay, Dagget informed Vigil not to be "alarmed" and misrepresented to Vigil that Vision was paying its Air Bridge Program flight deck and cabin crews hazard pay. (Dagget Dep., Ex. 2, at 247.)  Of course, the Class's expert has demonstrated that this was entirely false.  (Preliminary Mukamal Report, Ex. 12, at 4-5, 7-8); (Supplemental Mukamal Report, Ex. 13, at 4-6.)   Vision also concealed the fact that it was collecting hazard pay from its employees and when directly asked, Maguire threatened Pritchard and told him not to inquire any further about hazard pay. (Pritchard Dep., Ex. 3, at 45-50.)  Finally, Maguire admitted that he consciously excluded hazard pay in calculating the Air Bridge Program flight deck and cabin crews' compensation because it would cause scheduling conflicts.  (Maguire Dep., Ex. 5, at 97-98.)  Although Vision knew that the hazard pay belonged to the Class, it wrongfully retained those payments in violation of the Class's rights.

E.   Vision Holds the Hazard Pay in Constructive Trust for the Class

A constructive trust arises where "the holder of legal title to property is held to be a trustee of that property for the benefit of another who[m] in good conscience is entitled to it." Locken v. Locken, 650 P.2d 803, 804-05 (Nev. 1982).  A constructive trust arises where: "(1) a confidential relationship exists between the parties; (2) retention of legal title by the holder thereof against another would be inequitable; and (3) the existence of such a trust is essential to the effectuation of justice." Id. at 805.[6]  Here, the Class has satisfied all three elements and the Court should impose a constructive trust over the hazard pay collected by Vision from the upstream contractors on the Class's behalf.

---

[6] Constructive trust is an independent cause of action in Nevada. See Bemis v. Estate of Bemis, 114 Nev. 1021 (Nev. 1998) (holding that plaintiff's claim for constructive trust was not barred by the statute of limitations and imposing constructive trust); McKissick v. McKissick, 560 P.2d 1366, 1369 (Nev. 1977) (imposing plaintiff's only cause of action for constructive trust over insurance proceeds).

314797

GOODMAN LAW GROUP
A Professional Corporation
520 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 383-5088

A confidential relationship exists where the parties have a duty of trust and confidence to each other. *Lindt v. Webber*, 134 P. 461, 466 (Nev. 1913); *Locken*, 650 P.2d at 805. For example, the court in *Lindt* held that the employment relationship between an employer and employee was based on "trust and confidence," which prevented the employee from engaging in conduct contrary to the employer's interest. *See* 134 P. at 461. There, the employee was sent to investigate a prospective mining interest on behalf of his employer and the employee purchased the land from the seller in order to re-sell it to his employer at a higher price. *Id.* The court held the employee's scheme was a "flagrant . . . breach of confidence" because the employee, through the benefit of the employment relationship, used that trust and confidence to take advantage of the employer. *Id.* at 466.

Similarly, a confidential relationship exists between Vision and the Air Bridge Program flight deck and cabin crews based on the trust and confidence of the employment relationship. *See id.* at 461. Here, that relationship of trust and confidence is substantial, because the flight deck and cabin crews risked their lives to operate Vision's flights into and out of the war zones in Baghdad and Kabul. (Pritchard Dep., Ex. 3, at 37-38.) Moreover, Vision used its superior position and unique knowledge to take advantage of the Air Bridge Program flight deck and cabin crews by using the risk those individuals personally undertook to justify and collect hazard pay on their behalf (*see* Feigin Dep., Ex. 1, at 24-25, 28, 33, 37-38); (Vision's Aircraft Quote to McNeil, Ex. 11), and then retained that hazard pay for itself (Preliminary Mukamal Report, Ex. 12, at 4-5, 7-8); (Supplemental Mukamal Report, Ex. 13, at 4-6); (Maguire Dep., Ex. 5, at 97-98). As was the case in *Lindt* under similar facts, Vision's scheme to deprive the Class of its hazard pay is a "flagrant . . . breach of confidence," because Vision used the trust and confidence of the employment relationship in order to exploit its employees. *See Lindt*, 134 P. at 466.

Vision's retention of the hazard pay constitutes an abuse of its confidential relationship

314797

28

with the Air Bridge Program flight deck and cabin crews and is inequitable.  For example, in *Bemis v. Estate of Bemis*, 967 P.2d 437, 439, 441-42 (Nev. 1998), plaintiffs were the proposed beneficiaries of a $25,000 trust that was to have been established by their father pursuant to a divorce decree.  At the time of the divorce, the plaintiffs, who were minors, did not know that a trust was to be created for their benefit and only learned about the trust upon their father's passing. *Id.* at 441. The father never established the trust for the plaintiffs, and when he died the plaintiffs filed creditors' claims against their father's estate, which the estate rejected. *Id.*  The court, however, imposed a constructive trust over the $25,000, because the estate's retention of those funds was inequitable since the funds should have gone to the plaintiffs. *Id.* at 442.  The court held that the constructive trust was necessary to effectuate justice because it prevented the father's estate "from benefitting from [the father's] inequitable act – the wrongful retention of [the plaintiffs'] money." *Id.*

Similarly, failure to impose a constructive trust over the Class's hazard pay would allow Vision to benefit from its inequitable act – Vision's wrongful retention of the Class's hazard pay. *See id.*  Here, Vision earmarked certain sums of money for hazard pay on behalf of the Air Bridge Program flight deck and cabin crews in its bid proposals to the upstream contractors (Meers e-mail to Dagget, Ex. 20, at CAI 27885-91); (Vision's Aircraft Quote to McNeil, Ex. 11), invoiced the upstream contractors for hazard pay, was paid that hazard pay for the benefit of the Class (Vision's Phase III invoices, Ex. 22); (McNeil Affidavit, Ex. 10, at ¶ 6), and the upstream contractors expected Vision to pay the Class the hazard pay that it received from them (Feigin Dep., Ex. 1, 24-25, 28, 33, 37-38).  Moreover, Vision knew that its retention of hazard pay was wrongful as evidenced by Vision's misrepresentation to CSC that it was paying hazard pay to its employees even though it was not (Dagget Dep., Ex. 2, at 247), Vision's questioning of Pritchard's loyalty for having the temerity to inquire about hazard pay (Pritchard Dep., Ex. 3, at

GOODMAN LAW GROUP
A Professional Corporation
520 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 383-5088

45-50), and Maguire's conscious decision to exclude payments of hazard pay in determining the Air Bridge Program employees' compensation over concerns of scheduling conflicts (Maguire Dep., Ex. 5, at 97-98).   Accordingly, the imposition of a constructive trust over the hazard pay is necessary to effectuate justice.

## III.   CONCLUSION[7]

Vision is the worst kind of war profiteer.   The amount of hazard pay due the Class pales in comparison to the hundreds of millions Vision billed the United States government for the Air Bridge Program.   (*See* Vision's July 5, 2010 Invoice, Ex. 25.)   While insignificant to Vision's bottom line, the hazard pay is of great significance to the Class as it recognizes and honors its sacrifice for the risks it took in operation of the Air Bridge Program flights. In its drive for even greater profits, Vision has deceived the businesses that it partnered with, the United States government, the tax payers, and exploited the very employees that allowed it to earn that profit in the first place.   Granting summary judgment in favor of the Class finally allows the Class members to obtain the compensation they deserve in recognition of the risks they undertook to operate the Air Bridge Program flights.   For the foregoing reasons, the Class respectfully requests that the Court grant its Motion for Summary Judgment.

GOODMAN LAW GROUP
A Professional Corporation
520 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 383-5088

---

[7] Should the Court determine that the Class has prevailed on any of its counts it can then grant the Class's request for injunctive and declaratory relief.

314797

30

1

2

Respectfully submitted,

KOZYAK TROPIN & THROCKMORTON, P.A.
Counsel for the Plaintiff
2525 Ponce de Leon, 9th Floor
Coral Gables, Florida 33134
Telephone: (305) 372-1800
Fax: (305) 372-3508

ROSS C. GOODMAN
GOODMAN LAW GROUP
520 South Fourth Street
Las Vegas, Nevada 89101
(702) 383-5088
(702) 385-5088 (Facsimile)

By: _/s/ David M. Buckner_____
      David M. Buckner
      Florida Bar No. 60550
      Brett E. von Borke
      Florida Bar. No. 0044802

### CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true copy of the foregoing has been served via the Court's CM/ECF system on July 29, 2010 on Harold P. Gewerter, Esq., 2705 Airport Drive, North Las Vegas, Nevada 89032.

By: _/s/ David M. Buckner_____
      David M. Buckner

GOODMAN LAW GROUP
A Professional Corporation
520 S. Fourth Street, 2ⁿᵈ Floor
Las Vegas, Nevada 89101
(702) 383-5088

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

314797

31