1   Ross C. Goodman, Esq., Nevada State Bar No. 7722
    GOODMAN LAW GROUP
2   520 South Fourth Street
    Las Vegas, Nevada 89101
3   (702) 383-5088

4   David M. Buckner, Esq., Florida State Bar No. 60550
    Brett E. von Borke, Esq., Florida State Bar No. 44802
5   KOZYAK TROPIN & THROCKMORTON, PA
    2525 Ponce de Leon, 9th Floor
6   Miami, Florida 33134
    (305) 372-1800
7   (305) 372-3508 (Facsimile)

8                   UNITED STATES DISTRICT COURT
                        DISTRICT OF NEVADA
9

10  GERALD HESTER, on behalf of himself
    and all others similarly situated,
11                                              Case No.: 2:09-CV-00117-RLH-RJJ
                            Plaintiff,
12  v.

13  VISION AIRLINES, INC.,

14                          Defendant.
15

16

17

18      PLAINTIFF GERALD HESTER'S INCORPORATED MEMORANDUM OF
19  LAW IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT ON VISION
        AIRLINES, INC.'S AMENDED COUNTERCLAIMS
20

21  KOZYAK TROPIN & THROCKMORTON, P.A.        GOODMAN LAW GROUP
    Counsel for the Plaintiff                520 South Fourth Street
22  2525 Ponce de Leon, 9th Floor            Las Vegas, Nevada 89101
    Coral Gables, Florida 33134              Telephone: (702) 383-5088
23  Telephone: (305) 372-1800                Facsimile: (702) 385-5088
    Fax: (305) 372-3508                      ROSS C. GOODMAN
24  David M. Buckner                         Nevada Bar No.: 7722
    Florida Bar No.: 60550
25  Brett E. von Borke
    Florida Bar No.: 0044802
26

27

28

GOODMAN LAW GROUP
A Professional Corporation
520 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 383-5088

GOODMAN LAW GROUP
A Professional Corporation
520 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 383-5088

Plaintiff, Gerald Hester ("Hester"), by and through undersigned counsel, respectfully submits his Incorporated Memorandum of Law in Support of his Motion for Summary Judgment on Counterclaimant Vision Airlines, Inc.'s ("Vision") Amended Counterclaims ("Motion"). Vision failed to produce, develop, or offer any evidence to support its claim that Hester revealed Vision's confidential information or that Hester disclosed the United States government's classified information. In fact, the very individuals designated to testify as Vision's 30(b)(6) corporate representatives acknowledged that Vision does not have any evidence to support the allegations in its Amended Counterclaims and admitted that Vision does not even possess classified information. These admissions alone demonstrate the frivolous and retaliatory nature of Vision's Amended Counterclaims. Moreover, the very information that Vision alleges that Hester disclosed is information that Vision put into the public record prior to the filing of this lawsuit or which has previously been disclosed by the United States government. Accordingly, the Court should grant Hester's Motion and end Vision's campaign of intimidation against the Class.

## I.    STATEMENT OF UNDISPUTED FACTS

1.    The United States government's "War on Terror" in Iraq and Afghanistan has been well documented in the media.    On April 1, 2004, Ambassador J. Cofer Black testified before the House International Relations Committee Subcommittee on International Terrorism about the "evolving nature of the al-Qaida organization and the continuing threat that it presents to the United States and [its] allies."   (Statement of J. Cofer Black, attached as Ex. 1, at 1.) Ambassador Black testified that, "[f]ollowing the September 11 attacks, we have forcefully applied the Bush doctrine: any person that supports, protects, or harbors terrorists is complicit in the murder of the innocent, and will be held to account. We have done so through our National Strategy to Combat Terrorism, which creates the policy framework for coordinated actions to

prevent terrorist attacks against the United States . . . [by] defeat[ing] terrorist organization[s] of global reach by attacking their sanctuaries, leadership, finances, and command, control and communications . . . ." (*Id.* at 4.)

2.  Likewise, the dangers associated with flying into and out of the war zones in Iraq and Afghanistan are well documented.  On November 26, 2004, Slobodan Lekic published an article on msnbc.com entitled *A Hair-Raising Flight into Baghdad: Commercial Flights from Jordan Offer a Harrowing Trip.*  (Slobodan Lekic article, attached as Ex. 2, at 1.)  In that article, Lekic wrote, "[l]ast year [at Baghdad International Airport], a civilian cargo jet was hit after takeoff with a shoulder-launched missile, and earlier this year a burst of automatic gunfire killed a passenger aboard an Australian C-130 Hercules transport plane." (*Id.*)  According to Lekic, "[t]o lessen the threat of being shot at, pilots have adopted a 'nonstandard approach' for landings [at Baghdad International Airport]: They arrive at 15,000 feet and then descend sharply in a stomach-churning series of tight, spiraling turns that pin passengers deep in their seats." (*Id.*)

3.  In the February 2005 edition of Army Magazine, Brigadier General Steven R. Hawkins and Colonel Gordon M. Wells published an article entitled *Nation Building in Mesopotamia: U.S. Military Engineers in Iraq.*  (Brigadier General Hawkins's article, attached as Ex. 3, at 17.)[1]  In that article, Brigadier General Hawkins and Colonel Wells detailed the procedures military flights use to fly into Baghdad International Airport.  (Ex. 3, at 22.) Specifically, they wrote, "[a]fter a three-hour flight, the pilots, wearing night vision goggles and flying in *total blackout conditions, guided their aircraft into a corkscrew descent* and safely delivered my team at 2:30 in the morning on April 13, at [Baghdad International Airport]." (*Id.*) (emphasis added.)

---

[1]  Army Magazine is published by the Association of the United States Army, a private, non-profit educational organization, and is publicly available on-line. (AUSA About Us Webpage, attached as Ex. 4.)

GOODMAN LAW GROUP
A Professional Corporation
520 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 383-5088

GOODMAN LAW GROUP
A Professional Corporation
520 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 383-5088

4.    In May 2005, Vision began operating as a subcontractor for the United States government and provided air transport services from various European cities and the United States to Baghdad and Kabul ("Air Bridge Program").  (Deposition of Laura Feigin, attached as Ex. 5, at 13); (Deposition of Brian Dagget, attached as Ex. 6, at 33.)

5.    As Vision's first Director of Flight Operations, Darrel Jensen ("Jensen"), testified, establishing the Air Bridge Program took considerable effort.  (Deposition of Darrel Jensen, attached as Ex. 7, at 13.)  In June 2005, Jensen was instructed by William Acor ("Acor"), Vision's Chief Executive Officer, to create the operational framework necessary to establish the Air Bridge Program.  (*Id.* at 11-13.)  In order to establish the Air Bridge Program, Jensen purchased flight maps from Jeppesen Aviation and contacted United Aircraft Services, a private aircraft handling company located in Dubai ("Dubai Company"), to assist with planning the flight routes from Frankfurt to Baghdad and Kabul and to obtain the required over-flight permits. (*Id.* at 14-15.)

6.    In order to enter and fly through the air space of countries on its way to Baghdad and Kabul, Vision was required to obtain over-flight permits from those countries.  (*Id.* at 16.) Rather than using an aircraft handler in the United States or requesting the United States government to procure these permits, Vision instead relied on the Dubai Company to obtain these over-flight permits for its Air Bridge Program flights (*id.*), which the Dubai Company obtained and filed with the appropriate authorities as a matter of public record in each respective country (*id.* at 20-21).  Once the over-flight permits were obtained and filed with the appropriate governmental authorities, the Dubai Company would then, through a non-secure telephone line, send by facsimile those permits to Frankfurt International Airport.  (*Id.* at 17.)  In addition, the Dubai Company would also send those documents to Jensen's personal hotmail e-mail address. (*Id.* at 16-17.)

308625.2

3

GOODMAN LAW GROUP
A Professional Corporation
520 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 383-5088

7.    Once Jensen received those documents from the Dubai Company, he would then file the flight plans as public records with the Frankfurt International Airport, which identified Vision's aircraft by its unique tail number -- N368CE -- and identified Baghdad or Kabul as the final destination for Vision's flights. (*Id.* at 19.)

8.    Vision's third Director of Flight Operations for the Air Bridge Program, James Maguire ("Maguire") (Deposition of James Maguire, attached as Ex. 8, at 10-11), a current Vision employee, testified before individuals without any security clearances that the Air Bridge Program flights to Kabul utilized certain "procedures," which required them to land with their "lights out" at night (*id.* at 31).   The Air Bridge Program flight deck crews on their flight to Kabul received their flight coordinates over an open radio frequency.   (Jensen Dep., Ex. 7, at 24.)

9.    Similarly, since the inception of the Air Bridge Program, the Air Bridge Program crews were required to fly into and out of Baghdad International Airport at night with the cockpit lights turned off.   (Maguire Dep., Ex. 8, at 30-31.) In addition to these "procedures," Vision aircraft also use the corkscrew approach to arrive and depart the airport in Baghdad. (*Id.* at 31-32.)   The Air Bridge Program crews utilized this procedure to stay within an area protected by the United States military.   (*Id.* at 32.)   The Air Bridge Program crews received their flight coordinates over an open radio frequency, including their vectoring instructions for the corkscrew descent into and ascent out of Baghdad International Airport.   (*Id.*)   As Maguire testified, it was common knowledge that all aircraft arriving and departing Baghdad International Airport used the corkscrew procedure.   (*Id.*)

10.    On September 24, 2006, Vision hired Hester as an Air Bridge Program pilot. (Vision Personnel Action Form, attached as Ex. 9.)   As a pilot for the Air Bridge Program, Hester was responsible for flying Vision's aircraft into and out of the war zones in Baghdad and Kabul. (Deposition of Gerald Hester, attached as Ex. 10, at 9.)

308625.2                                    4

11.    Shortly after Vision hired Hester, the European Parliament, in a report dated November 16, 2006 and entitled: *On the Companies Linked to the CIA, Aircraft Used by the CIA and the European Countries in which CIA Aircraft have made Stopovers,* identified Vision as working for the United States government and the Central Intelligence Agency.   (European Parliament Report dated November 16, 2006, attached as Ex. 11, at 12.)   Specifically, under a section of the European Union Parliament Report entitled *Aircraft Used by the CIA for "Extraordinary Renditions" (id.* at 10) it stated, "[t]he N368CE is a Boeing 737-300 registered to a shell company called Premier Aircraft Management and incorporated in North Las Vegas, Nevada.   Recently, the ownership of the Boeing has shifted from Premier Aircraft Management to a sister company called Vision Airlines." *(id.* at 12.)     The report further stated that Vision was operating "CIA flights" and that its aircraft, N368CE, had made "66 stopovers in Germany." *(Id.* at 23.)

12.    On January 19, 2007, in an interview with Fox News, then Senator Hillary Clinton discussed her recent flight to Baghdad International Airport.   (Interview with Senator Clinton dated January 19, 2007, attached as Ex. 12, at 1.)   In that interview Senator Clinton stated, "[w]hen you fly into a war zone like Baghdad, and I've done it numerous times now, there and elsewhere, you know, the C-130 does a kind of corkscrew landing . . . ." *(Id.)*   In response to Senator Clinton's remark, the Fox News interviewer stated, "[h]air-raising, that flight – I mean that corkscrew – I mean, I always hear descriptions of that corkscrew landing . . . ." *(Id.)*

13.    Nearly six months after Hester's employment at Vision began, Acor informed Hester on March 1, 2007, that he was required to sign a Non-Compete and Non-Disclosure Agreement ("Non-Disclosure Agreement") with Vision.   (Non-Disclosure Agreement, attached as Ex. 13); (Hester Dep., Ex. 10, at 106.)   Acor informed Hester that if he did not sign the Non-

GOODMAN LAW GROUP
A Professional Corporation
520 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 383-5088

GOODMAN LAW GROUP
A Professional Corporation
520 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 383-5088

Disclosure Agreement that his employment with Vision would be terminated immediately.  (Hester Dep., Ex. 10, at 106.)  Accordingly, Hester executed the Non-Disclosure Agreement on March 1, 2007.  (Non-Disclosure Agreement, Ex. 13, at 4.)

      14.    Pursuant to the Non-Disclosure Agreement, the non-disclosure provision states:

> During employment, and thereafter, Employee shall not, directly or indirectly, voluntarily or involuntarily, disclose to any person or entity any Confidential Information of Employer.  For the purposes of this Agreement, "Confidential Information" shall include, but is not limited to, any of Employer's confidential, proprietary or trade secret information disclosed to Employee or Employee otherwise learns in the course of employment such as, but not limited to, business plans, customer lists, customer names, customer contact information, price lists, financial statements, software diagrams, flow charts and product plans.

(*Id.* at 2.)

      15.    Hester also received and signed an Employee Acknowledgement Form on March 1, 2007, that stated that he had reviewed Vision's Employee Handbook.  (Hester's Employee Acknowledgement Form, attached as Ex. 14.)  Vision's Employee Handbook states under the section entitled "Employment At-Will" the following: "The employment relationship between Vision Airlines and its employees is at-will and may be terminated by either party at any time." (Employee Handbook attached as Ex. 15, at Section 2 at 2.)  The Employee Acknowledgement Form that Hester executed stated that, "I understand that the policies in this Employee Handbook in no way modify my status as an at-will employee and in no way imply, infer or guarantee my continued employment for any definite term . . . . *The language used in these policies is not intended to constitute a contract of employment, either expressed or implied.*"  (Hester's Acknowledgement Form, Ex. 14, at 1.) (emphasis added.)  Furthermore, the Employee Acknowledgement Form states, "[t]his Handbook should not be construed, nor does it constitute, any kind of 'employment contract,' . . . Nothing in this Employee Handbook creates or is intended to create a promise or representation of continued employment.  All employment with

308625.2

the Company is at-will . . . Employment at-will is the sole and entire agreement between the company and you concerning the duration of your employment and the circumstances under which your employment may be terminated." (*Id.*)

16. Nearly one year after his employment as a pilot on the Air Bridge Program began (and after numerous flights into and out of the war zones), Hester on July 25, 2007, executed a Classified Information Nondisclosure Agreement. (Classified Information Nondisclosure Agreement, attached as Ex. 16, at 2.) The Classified Information Nondisclosure Agreement states that it is, "An Agreement Between Gerald George Hester and the United States." (*Id.* at 1.) Hester executed the Classified Information Nondisclosure Agreement while Vision was a subcontractor for McNeil Technologies, Inc. ("McNeil"). (McNeil Affidavit, attached hereto as Ex. 17, at 1.)

17. In a memorandum from Maguire to Vision's Air Bridge Program pilots dated October 15, 2007, Vision informed its pilots about its new compensation scheme, which would have a retroactive effect ("Vision 767 Memorandum"). (Vision's October 15, 2007 Pay Memorandum to its Pilots, attached as Ex. 18.) Hester received a copy of the Vision 767 Memorandum which he signed and acknowledged receipt of on November 9, 2007. (*Id.* at p. 2.)

18. On May 5, 2008, Vision filed suit in the Circuit Court for Fairfax County, Virginia, against CSC and Capital Aviation, the companies that initially contracted with Vision to operate the Air Bridge Program, for failure to pay certain parts of Vision's invoices for weeks 54 and 55 of the Air Bridge Program. (Vision's Fairfax County Complaint, attached as Ex. 19.)

19. Vision publicly filed its Bill of Particulars on August 8, 2008, in which it stated, "[s]hortly after the September 11, 2001, terrorist attacks, CSC's predecessor-in-interest, DynCorp International, retained Vision to provide sensitive air transportation services for a certain United States government entity." (Vision's Bill of Particulars, attached as Ex. 20, at 1.)

GOODMAN LAW GROUP
A Professional Corporation
520 S. Fourth Street, 2ⁿᵈ Floor
Las Vegas, Nevada 89101
(702) 383-5088

Vision's Bill of Particulars further stated that, "[a]t CSC's request and for CSC's benefit, Vision signed an agreement with Capital [Aviation], effective as of October 1, 2005, and ending July 31, 2005 ("2005 Contract"). (*Id.* at 2.)  Vision attached, as an exhibit to its Bill of Particulars, a complete and non-redacted copy of its 2005 contract with Capital Aviation, which it filed as a matter of public record with the court in Fairfax County. (*Id.*)

20.     Vision's Bill of Particulars explained the type of services that Vision provided to the United States government pursuant to its contract with Capital Aviation. (*Id.*)  "The 2005 Contract required Vision to use a single aircraft to provide airline service between Frankfurt, Germany and Kabul Afghanistan, and between Frankfurt, Germany and Baghdad, Iraq, for certain fixed amounts – *i.e.,* $1,100,000 for eight rotations per month between Frankfurt and Kabul (plus $87,500 for a ninth rotation if required in any month); and $444,000 for four rotations per month between Frankfurt and Baghdad (plus $111,000 for a fifth rotation if required in any month)." (*Id.*)

21.     In Vision's Bill of Particulars, however, Vision claimed that "[s]oon after the 2005 Contract was finalized, the parties abandoned it and changed the terms of their agreement materially." (*Id.*)  "At the request of CSC, Vision began flying to Baghdad and Kabul from Washington, DC, instead of Frankfurt, Germany." (*Id.*)  Vision also explained the new compensation scheme under this agreement with Capital Aviation and CSC. (*Id.*)  "CSC requested, and Vision agreed, to adopt a new three-part payment formula, consisting of a fixed component, a variable component, and certain 'other direct costs.'" (*Id.* at 3.) Specifically, as alleged by Vision, the new compensation formula was structured so that Vision would receive the following:

GOODMAN LAW GROUP
A Professional Corporation
520 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 383-5088

GOODMAN LAW GROUP
A Professional Corporation
520 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 383-5088

(a) Under the new agreement, Vision was to receive a fixed amount of $499,000 per week regardless of the number of flights. The fixed component was intended to compensate Vision for the costs of making the aircraft available for the CSC Program. It covered, for example, aircraft lease/debt service, insurance, flight deck and cabin crew expenses, crew training, and general and administration costs.

(b) The variable cost was set at $3,963 per 'block hour.' This amount compensated for costs that would vary depending on the use of the aircraft. The 'block hour' price would cover fuel costs, maintenance reserves, interior and exterior conditions, flight planning, weather-related costs, etc.

(c) The 'other direct costs' were certain incidental charges that would be passed through to CSC/Capital at cost plus 10%. They included catering charges, landing fees, parking costs, ground handling charges, deicing costs, overflight permits, fuel surcharges, ground transportation, and crew hotel expenses.

(*Id.* at 3.)

22.     Vision also stated in its Bill of Particulars that when a new Request for Proposal for the Air Bridge Program contract was issued by the United States government, Vision "partnered with another entity, McNeil Technologies, to submit such a proposal." (*Id.* at 5.) According to Vision, "the United States government awarded the new contract, effective as of August 1, 2007, to Vision and McNeil, not to CSC or Capital." (*Id.*)

23.     Thus, in Vision's Bill of Particulars, Vision identified the following: (1) that it was a subcontractor for the United States government; (2) that it operated "sensitive air transportation services" on behalf of the United States government from Frankfurt, Germany, and Washington, DC, to Kabul and Baghdad; (3) that it contracted with Capital Aviation, CSC, and McNeil; and (4) disclosed all of the financial terms of its agreements with Capital Aviation and CSC. (*Id.* at 1-5.)

24.     On August 4, 2008, Vision terminated Hester's employment because he was over the age of 65. (Vision Personnel Action Form, Ex. 9.)

25.     On January 20, 2009, Hester filed a class action Complaint against Vision seeking

to recover hazard pay that Vision collected from the upstream contractors on behalf of the Air Bridge Program employees.  [D.E. 1.]  The Complaint in this action contained the following statements:

> After September 11, the United States government implemented a global strategy designed to eradicate terrorist organizations that threatened the security of the United States and its allies; [*Id.* at ¶ 7.]
>
> [A]ircraft arriving and departing Baghdad must utilize a dangerous corkscrew procedure, which requires the airplane to fly in a spiral directly above the airport in order to stay within the areas most heavily fortified by the United States military; and [*Id.* at ¶ 11.]
>
> [T]o reduce the likelihood of rocket and missile attacks, aircraft arriving and departing Baghdad International Airport must observe blackout procedures which require all exterior and interior aircraft lighting (except for cockpit instruments) to be turned off; [*Id.* at ¶ 11.]

26. Vision claims that this information constitutes Vision's confidential information or that this information is otherwise classified.  [D.E. 88 at ¶¶ 12, 13, 14.]

27. However, as Hester testified, the only information contained in the Complaint that he provided to his attorneys was the information contained in paragraph 2 of the Complaint, which was his own personal background information.  (Hester Dep., Ex. 10, at 181.)  Hester testified that the information contained in the Complaint, other than the background information contained in paragraph 2, was developed by Class counsel.  (*Id.* at 179-81.)

28. After the Complaint in this action was filed, certain articles were published in the Las Vegas Sun about this litigation.  (*Id.* at p. 209.)  One of those articles dated January 23, 2009 ("Las Vegas Sun Article"), contained the following statements from an anonymous source:

> [H]e said the purpose of the flights was to ferry personnel to and from antiterrorism and military operations.  The passengers typically included CIA and State Department personnel along with employees of private security contractor Blackwater; and
>
> The pilot, who said one flight outside of Kabul came under machine-gun fire that missed his plane, said all of the landings and takeoffs in the war zones were done at night using tight, difficult approaches and departures for security reasons. (ACC ¶ 16.)

GOODMAN LAW GROUP
A Professional Corporation
520 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 383-5088

(Las Vegas Sun Article dated January 23, 2009, attached hereto as Ex. 21, at 1.)

29.     Vision has repeated these statements and alleged without support, in unsealed pleadings, that this information is confidential or classified. [D.E. 88 ¶ 12.]

30.     Hester testified that he "has never spoken with any reporter from the Las Vegas Sun or any other newspaper" regarding "Vision Airlines." (Hester, Dep., Ex. 10, at 209-10.) Furthermore, Hester testified that he did not know who would have spoken to the press or who was the Las Vegas Sun's anonymous source. (*Id.* at 210.)

31.     During this litigation, Vision offered two 30(b)(6) corporate representatives to testify as to Vision's Amended Counterclaims against Hester. (Dagget Dep., Ex. 6, at 27-28.) Brian Dagget ("Daggett"), Vision's Air Bridge Program Manager, was one of the individuals that Vision put forward with knowledge of its Amended Counterclaims against Hester. (*Id.*)

32.     Paragraph 10 of Vision's Amended Counterclaims states:

> During his employment with Counterclaimant Vision and thereafter, Counterdefendant Hester has been directly and/or indirectly contacting Capital Aviation, Inc., Computer Sciences Corporation and McNeil Technologies, Inc., sometimes directly and sometimes indirectly, and discussing confidential and trade secret information of Counterclaimant Vision and attempting, in part, to convince such customers, contractors and business associates of Counterclaimant Vision to enter into new contracts with Counterdefendant Hester and/or others related to Counterdefendant Hester and terminating contracts with Counterclaimant Vision and/or interfering with contracts with Counterclaimant Vision all to the detriment of Counterclaimant Vision.

With respect to this paragraph, Daggett testified that Vision "did not have anything" to support this allegation. (*Id.* at 128.)

33.     Paragraph 11 of Vision's Amended Counterclaims states:

GOODMAN LAW GROUP
A Professional Corporation
520 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 383-5088

> Counterdefendant Hester has also released or discussed confidential and trade secret information to the press or public at large in an attempt to defame, harass and annoy Counterclaimant Vision enough that Capital Aviation, Inc., Computer Sciences Corporation and McNeil Technologies, Inc. and possibly other customers, contractors and business associates would breach or fail to renew their contracts or business associations with Coutnerdefendant Hester and/or associates or affiliates of Counterdefendant Hester, and further conducts such acts in an improper attempt to obtain monies from Counterclaimant Vision.

Dagget testified that the only information Vision had that supported this paragraph was the statements contained in the Las Vegas Sun Article. (*Id.* at 139.)

34.     Furthermore, Dagget testified that he did not have any information or evidence that Hester was the anonymous source quoted in the Las Vegas Sun Article. (*Id.* at 141.) The only information Dagget could offer to support Vision's allegation that Hester was the anonymous source for the Las Vegas Sun Article was that the article was published after Hester filed his lawsuit. (*Id.* at 155.) There is no evidence in the record in this case that Hester is the source quoted in the Las Vegas Sun Article.

35.     Dagget also testified that the only information that Vision claimed was confidential was that Vision operated flights to Baghdad and Kabul.  (*Id.* at 135.) Dagget, however, was unaware of any other confidential information that had been allegedly released by Hester, other than the destinations of the Air Bridge Program flights. (*Id.* at 136.)

36.     Furthermore, other than the fact that Hester filed a Complaint against Vision, Dagget testified that as to paragraphs 12, 13, 14, 15, 16, 17, and 18 of Vision's Amended Counterclaims that Vision did not have any information that supported its allegations. (*Id.* at 154-157.)

37.     Similarly, David Meers testified as Vision's 30(b)(6) witness on Vision's Amended Counterclaims.  (Deposition of David Meers, Ex. 22, at 283-84.)  Meers testified that other than the Las Vegas Sun Article, he was unaware if Vision had any evidence to support the

GOODMAN LAW GROUP
A Professional Corporation
520 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 383-5088

308625.2

12

1    allegations contained in Vision's Amended Counterclaims.   (*Id.* at 521.)

2         38.    Dagget also testified that since his employment at Vision began in February 2007

3    (Dagget Dep., Ex. 6, at p. 9), Vision has not been in possession of any classified information and

4    does not have any procedures to handle or store classified material.   (*Id.* at 119).

5         39.    For the period prior to Dagget's employment, the Closeout Certification of the Air

6    Bridge Program Contract stated that "Classified material _____ was   __X__ was not furnished by

7    Contractor or developed by Subcontractor under this Document."   (Capital Aviation Closeout

8    Certificate, attached as Ex. 23, at CAI 25530.)

9

10        40.    Furthermore, Vision acknowledged in its Response to Plaintiff's Second Set of

11   Interrogatories that none of its contracts have been cancelled as a result of the Class's lawsuit,

12   and it failed to identify any specific damages that it sustained as a result of that lawsuit.

13   (Vision's Response to Plaintiff's Second Set of Interrogatories, attached as Ex. 24, at 12.)

14

## II.    ARGUMENT

15        "Summary judgment is proper 'if the pleadings', depositions, answer to interrogatories,

16   and admission on file, together with the affidavits, if any, show that there is no genuine issue as

17   to any material fact and the moving party is entitled to judgment as a matter of law.'"   *Slumier v.*

18   *Verity, Inc.,* 606 F.3d 584, 586 (9th Cir. 2010) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317,

19   323 (1986)).   Once the moving party files its motion for summary judgment, the non-moving

20   party must "designate specific facts showing that there is a genuine issue for trial." *Celotex,* 477

21   U.S. at 324.  Here, the Class has demonstrated that summary judgment is appropriate on Vision's

22   Amended Counterclaims for breach of the "confidentiality and non disclosure agreements"

23   (Count I), injunctive relief (Count II), and declaratory relief (Count III), because Vision has

24   failed to offer any evidence to support the elements for each cause of action and there are no

25   material facts in dispute.

GOODMAN LAW GROUP
A Professional Corporation
520 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 383-5088

308625.2

13

GOODMAN LAW GROUP
A Professional Corporation
520 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 383-5088

**A.    VISION LACKS STANDING TO SUE HESTER FOR ANY ALLEGED BREACH OF THE CLASSIFIED INFORMATION NONDISCLOSURE AGREEMENT**

As a threshold matter, Vision lacks standing to sue Hester for any alleged breach of the Classified Information Nondisclosure Agreement because Vision is not a party to that contract. "A person who is not a party to a contract . . . cannot sue to enforce the contract." *Am. Monument Found., LLC, v. Fairbrother*, 2006 WL 3063473, at *8 (D. Nev. Oct. 24, 2006); *see also Wyatt v. Bowers*, 747 P.2d 881, 882 (Nev. 1987) (holding that individuals not parties to or recipients of a particular promise cannot sue to enforce breach of that covenant); *Olson v. Iacometti*, 533 P.2d 1360, 1364 (Nev. 1975) ("Before a stranger can avail himself of the exceptional privilege of suing for a breach of an agreement, to which he is not a party, he must, at least, show that it was intended for his direct benefit."). Here, the Classified Information Nondisclosure Agreement executed by Hester states that it is "AN AGREEMENT BETWEEN Gerald George Hester AND THE UNITED STATES." (Ex. 16 at 1) (emphasis in original). The plain language of the Classified Information Nondisclosure Agreement makes clear that Vision is not a party to it. Therefore, Vision lacks standing to sue Hester for any alleged breach of it. *See Wyatt*, 747 P.2d at 882; *Olson*, 533 P.2d at 1364.[2]

**B.    VISION FAILED TO OFFER ANY EVIDENCE THAT HESTER DISCLOSED CLASSIFIED INFORMATION**

Even assuming that Vision did have standing to sue for a breach of the Classified Information Nondisclosure Agreement, Vision failed to offer any evidence that Hester disclosed classified information. Vision argues that paragraphs 7 and 11 of the Class's Complaint contain

---

[2] Furthermore, counsel for Hester was unable to locate a single case where a party, other than the United States government, sued an individual or entity for breach of the Classified Information Nondisclosure Agreement. Of course, this follows logically because only the United States government has an ownership interest in its classified information, only designated employees of the United States government can actually classify a piece of information, and the United States government has its own procedures for protecting its classified information including the penalties for breach of the Classified Information Nondisclosure Agreement set forth in Title 18 of the United States Criminal Code.

308625.2                                                    14

GOODMAN LAW GROUP
A Professional Corporation
520 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 383-5088

classified information and that the anonymous source cited in the Las Vegas Sun Article divulged classified information.[3]  Vision, however, failed to offer any evidence to support its claim that this information is classified, or that Hester is the source of any of it.  Of course, Vision has offered no evidence because it is neither classified nor confidential.  Furthermore, the information contained in the Complaint and the Las Vegas Sun Article have been so widely disseminated in the public domain that such information could not possibly be classified.[4]

> i.   *Vision failed to provide any support for its claim that the information contained in either the Complaint or the Las Vegas Sun Article is classified.*

Vision claims that certain information contained in paragraphs 7 and 11 of the Complaint are classified.  In particular, Vision points to the following statements: (1) the United States government embarked on a global strategy to eradicate terrorism after the September 11, 2001 attacks; (2) aircraft arriving and departing Baghdad International Airport utilize a corkscrew procedure; and (3) aircraft arriving at Baghdad International Airport do so at night without any cockpit lighting to avoid attacks from insurgents.  In addition, Vision argues that the statements contained in the Las Vegas Sun Article that Vision transported CIA, Blackwater, and State Department personnel and that Vision aircraft had to use tight approaches into and out of the war zones was also classified.  Vision, however, failed to offer any evidence that this information is

---

[3] That Vision knowingly made these allegations in publicly filed documents, thereby confirming the allegedly classified nature of this information, may itself be a breach by the company.  *Cf. Gersteain v. CIA*, 2008 WL 4415080 (N.D. Cal. Sept. 26, 2008) (quoting declaration on behalf of CIA expressing concern about public confirmation of classified facts).  Of course, Vision knows that the information in the Complaint is public knowledge and in no way classified, and thus feels free to discuss this issue in the open.

[4] Vision's continual claim that Plaintiff disclosed classified information is baseless.  Vision has completely and utterly failed to substantiate its claim despite repeated opportunities to identify to this Court the classified information that it claims Hester divulged.  Shortly after filing this lawsuit, Vision's counsel contacted counsel for Plaintiff and insisted on filing a motion to seal the Complaint, allegedly because it contained classified material [D.E. 6].  Plaintiff agreed to this motion in good faith, even though Plaintiff was certain that the Complaint contained only publicly available information.  Plaintiff asked only that Vision produce support for its position about the classified nature of the information in the Complaint.  Vision never did so, and the Court *sua sponte* unsealed the Complaint.

308625.2                                    15

actually classified.

Rather, Vision's current Air Bridge Program Manager, Dagget, testified that since his employment at Vision began in February, 2007 (Dagget Dep., Ex. 6, at 9), Vision has not been in possession of any classified information and does not have any procedures to handle or store classified material (*id.* at 119). For the period prior to Dagget's employment, the Closeout Certification for the Air Bridge Program Contract stated that "Classified material _____ was ___X__ was not furnished by Contractor or developed by Subcontractor under this Document." (Capital Closeout Certificate, Ex. 23, at CAI 25530.) Thus, Vision has not been in possession of any classified information during any period of the Air Bridge Program and was unable to provide its employees, including Hester, with any classified information.[5]

> ii.    *The information contained in the Complaint and the Las Vegas Sun Article has been so widely disseminated that it cannot be classified.*

The information contained in the Complaint and the Las Vegas Sun Article fails to constitute a disclosure of classified information because this information is widely disseminated in the public domain. "Information related to the national defense typically cannot qualify as such if it is in the public domain; it must be closely held by the government." *See United States v. Rosen*, 445 F. Supp. 2d 602, 620 (E.D. Va. 2006). Furthermore, information is not classified where it "has been so widely circulated and is so generally believed to be true, that confirmation by one in a position to know would add nothing to its weight." *Alfred A. Knopf, Inc. v. Colby*, 509 F.2d 1362, 1370-71 (4th Cir. 1975). For example, in *United States v. Heine*, 151 F.2d 813, 817 (2d Cir. 1945), the Second Circuit Court of Appeals overturned a conviction under various

---

[5] The instruction to use the corkscrew procedure at Baghdad International Airport was transmitted over an open radio frequency to Vision's Air Bridge Program pilots and it was also common knowledge that this procedure was used by aircraft arriving and departing Baghdad. (Maguire Dep., Ex. 8, at 32.) Moreover, Maguire testified about this information before individuals that do not have a security clearance and never once indicated that it was classified (*id.* at 31-32), even though Maguire did refuse to discuss his employment history prior to his work at Vision based on his belief that it might be classified (*id.* at 24-25). Surely if this information was classified, Maguire would not have discussed it during his deposition.

308625.2                                              16

GOODMAN LAW GROUP
A Professional Corporation
520 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 383-5088

portions of the Espionage Act because supposedly classified information was made publicly available by the United States government.  The court held, "it is obviously lawful to transmit any information about weapons and munitions of war which the [Armed Services] had themselves made public; and if that be true; we can see no warrant for making a distinction between such information, and information which the services have never thought it necessary to withhold at all."  *Id.; see also United States v. Truong Dinh Hung*, 629 F.2d 908, 918 n.9 (4th Cir 1980) (noting that district court's instruction to jury was proper where it stated that "the defendants would not be guilty of transmitting national defense information if the information were available in the public domain").  Here, each allegedly classified piece of information can be traced to a public source.

The Complaint did not disclose any classified information by stating that aircraft use the corkscrew procedure to arrive and depart Baghdad International Airport, because such information is widely disseminated in the public domain.  First, the Complaint never stated that Vision aircraft use this procedure, but instead that "aircraft arriving and departing" the war zone do so.  [D.E. 1 at ¶ 11.]  Second, the fact that aircraft use the corkscrew procedure to arrive and depart Baghdad International Airport is information widely disseminated in the public domain by the United States government and various news outlets.  Then-Senator Hillary Clinton stated in an interview with Fox News that "[w]hen you fly into a war zone like Baghdad, and I've done it numerous times now, there and elsewhere, you know, the C-130 does a kind of *corkscrew landing* . . . ." (Clinton interview, Ex. 12, at 1) (emphasis added.)  (*See also* Brig. Gen. Steven Hawkins and Col. Gordon Wells September 2005 article in Army Magazine, Ex. 3, at 22) ("After a three-hour flight, the pilots, wearing night vision goggles and flying in *total blackout conditions, guided their aircraft into a corkscrew descent* and safely delivered my team at 2:30 in the morning on April 13, at [Baghdad International Airport].") (emphasis added); (Lekic

GOODMAN LAW GROUP
A Professional Corporation
520 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 383-5088

article, Ex. 2, at 1) ("To lessen the threat of being shot at, pilots have adopted a 'non-standard' approach for landing [at Baghdad International Airport]: They arrive at 15,000 feet and then descend sharply in a stomach-churning *series of tight, spiraling turns* that pin passengers deep in their seats.") (emphasis added). Accordingly, the information in paragraph 11 of the Complaint is not classified because it has been discussed in the public domain by a Senator of the United States, a United States Army Brigadier General and Colonel, and by countless newspaper reports. *See Heine*, 151 F.2d at 817. The United States government is making no effort to keep this information confidential, and Vision has no authority to classify it on its own.

Vision also contends that the allegation contained in paragraph 7 of the Complaint, which states after the September 11, 2001 attacks that the United States government embarked on a global strategy to eradicate terrorism, is also classified. Again, this information has been disclosed by the United States government and therefore cannot be classified. *See Heine*, 151 F.2d at 817. For example, on April 1, 2004, Ambassador J. Cofer Black testified before the House International Relations Committee Subcommittee that:

> Following the September 11 attacks, we have forcefully applied the Bush doctrine: any person that supports, protects, or harbors terrorists is complicit in the murder of the innocent, and will be held to account. We have done so through our National Strategy to Combat Terrorism, which creates the policy framework for coordinated actions to prevent terrorist attacks against the United States . . . [by] defeat[ing] terrorist organization[s] of global reach by attacking their sanctuaries, leadership, finances, and command, control and communications . . .

(Statement of Ambassador Black, Ex. 1, at 4.) Again, the United States government intentionally disseminated this information into the public domain, and as such it cannot be considered classified. *See Heine*, 151 F.2d at 817. Regardless, however, Hester never provided any of the information contained in the Complaint, other than the information that related to his

GOODMAN LAW GROUP
A Professional Corporation
520 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 383-5088

308625.2

18

1  background contained in paragraph 2. (Hester Dep., Ex. 10, at 181.)[6]

2  **C.     THE VISION 767 MEMORANDUM DOES NOT CONSTITUTE AN
3          EMPLOYMENT CONTRACT**

4        Vision has lumped into its Amended Counterclaims the Vision 767 Memorandum setting

5  out the pay scales of its flight and cabin crews during Phase IV of the Air Bridge Program.  The

6  Vision 767 Memorandum contains no provisions governing confidential or classified

7  information, and in no way informs the allegations of breach set forth in the Amended

8  Counterclaims.  Thus, the Court need not decide the legal status of the Vision 767 Memorandum

9  in order for Plaintiff to prevail as to the Amended Counterclaims, as it is irrelevant to the merits

10 of the Amended Counterclaims.   Nonetheless, because this issue has been raised by Vision

11 before in other contexts, Plaintiff will address it briefly here.

12

13      The Vision 767 Memorandum does not constitute an employment contract for four

14 reasons: (1) it is a communication and not a contract; (2) it fails to establish any obligations

15 between the parties; (3) Hester's at-will employment status precludes any contractual rights from

16 arising between Vision and Hester based on the Vision 767 Memorandum; and (4) Vision's

17 Employee Handbook prevents any contractual relationship from forming between Hester and

18 Vision based on the Vision 767 Memorandum.

19

20          *i.     The Vision 767 Memorandum is a communication and not a contract.*

21       "Basic contract principles require, for an enforceable contract, an offer and acceptance,

22 meeting of the minds, and consideration."  *May v. Anderson,* 119 P.3d 1254, 1257 (Nev. 2005).

23 The Vision 767 Memorandum does not constitute an employment contract because there was no

24

---

25 [6] The information contained in the Las Vegas Sun Article, which reports that Vision transported CIA, Blackwater,
26 and State Department personnel on its flights and that the Air Bridge Program flights use tight procedures at night to
   land, is also in the public domain. *See* European Parliament report dated November 16, 2006 and entitled: *On the
   Companies Linked to the CIA, Aircraft Used by the CIA and the European Countries in which CIA Aircraft have
27 made Stopovers.*  (EU Report, Ex. 11, at 10, 12, 23.)  Nonetheless, Hester testified that he was not the anonymous
   source cited in the Las Vegas Sun Article (Hester, Dep., Ex. 10, at 209-10), and Vision has offered and can offer no
28 evidence to the contrary (Dagget Dep., Ex. 6, at 154-157).

308625.2                                      19

GOODMAN LAW GROUP
A Professional Corporation
520 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 383-5088

GOODMAN LAW GROUP
A Professional Corporation
520 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 383-5088

1  offer and acceptance, meeting of the minds, or consideration between Hester and Vision. The

2  Vision 767 Memorandum is a communication between Hester and Vision, in which Vision

3  notified Hester about certain revisions it unilaterally made to its employment policies fifteen

4  days earlier. (*See* Vision 767 Memorandum, Ex. 18, at 1.)

5

6          As such, Hester could not accept or reject Vision's policy revisions.  *See Baldonado v.*

7  *Wynn Las Vegas, LLC*, 194 P.3d 96, 105-06 (Nev. 2008) (holding that memorandum revising

8  employment policies was not a contract).  Moreover, the communicative nature of the Vision 767

9  Memorandum is further reflected in the language above Hester's signature block, which states, "I

10 have read and acknowledge receipt of the memo regarding the Revised Pay Structure &

11 Guidelines for Boeing Pilots that went into effect on October 1, 2007."   (Vision 767

12 Memorandum, Ex. 18, at 2.)  As Maguire testified, he never negotiated the terms of the Vision

13 767 Memorandum with any of the employees (Maguire Dep., Ex. 8, at 81), there was no place on

14 the Vision 767 Memorandum for Vision to sign (*id.* at 84-85), and nowhere on the Vision 767

15 Memorandum does it state that it is a contract (*id.* at 85).   Accordingly, Hester merely

16 acknowledged receipt of the Vision 767 Memorandum and did not agree to be bound by those

17 terms any more than Vision was bound by the policy revisions it implemented. (*See* Vision 767

18 Memorandum, Ex. 18.)

19

20                    ii.      *A communication is not a contract where it does not imply obligations on*
21                             *behalf of the parties.*

22          A communication does not constitute a contract where it does not imply obligations on

23 behalf of the parties.  *See United Services Auto Ass'n. v. Shlang,* 894 P.2d 967, 971-72 (Nev.

24 1995).  For example, in *Barelli v. Barelli*, 944 P.2d 246, 250 (Nev. 1997), the Nevada Supreme

25 Court determined that a letter which stated that plaintiff is "currently and will continue on into

26 the future as a salaried employee of this company at the same rate of pay and position" failed to

27 constitute a contract because it did not impose any obligation on the plaintiff.  *Id.*  Similarly, the

28

308625.2                                        20

Vision 767 Memorandum fails to constitute a contract because it does not impose any obligations on either Vision or Hester. *See id.* While the Vision 767 Memorandum outlines new "policies" with respect to "salary structure," "training," "crew movement," "transportation," "hotel accommodations," and "per diem," it does not impose any obligations on Vision to honor these policies with regards to Hester or preclude Vision from altering these policies at any time, at its discretion, as to Hester in the future. (Vision 767 Memorandum, Ex. 18, at 2.) On the contrary, it merely explains the policies in effect as of October 1, 2007 and for an undetermined time thereafter. Furthermore, the Vision 767 Memorandum did not impose any obligations on Hester, as he was not required to continue working for Vision nor was Vision required to employ Hester for a definite period of time. Therefore, like the letter in *Barelli*, the Vision 767 Memorandum fails to impose any obligations on the parties, and is not a contract. *See also Shlang*, 894 P.2d at 971-72 (holding that a letter failed to constitute a contract because it did not impose any obligations on the parties even though the letter identified the items to be purchased, quantities, and price).

   iii.   *Hester's at-will employment status precludes any contractual rights from arising between Vision and Hester based on the Vision 767 Memorandum.*

Hester's at-will employment status precludes any contractual rights from arising between Vision and Hester based on the Vision 767 Memorandum. An employment relationship in Nevada is either at-will or governed by an employment contract. *See Ringle v. Bruton*, 86 P.3d 1032, 1037 (Nev. 2004). However, "at-will employees have no contractual rights arising from the employment relationship that limit the employer's ability to prospectively hire and fire employees, and to change the terms of employment." *Baldonado*, 194 P.3d at 106. Thus, the Nevada Supreme Court endorsed the district court's holding in *Baldonado* that a group of employees' "at-will . . . status precluded any challenge to the employment policy on breach of contract grounds." *Id.* at 98, 105 n.39.

GOODMAN LAW GROUP
A Professional Corporation
520 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 383-5088

21

There, table dealers at the Wynn Las Vegas sued the casino for breach of contract based on a memorandum the casino sent its employees which revised certain employment policies. *Id.* at 98. Specifically, the memorandum changed the tip policy for the table dealers and required them to share their tips with certain lower level management personnel. *Id.* The court held that the memorandum failed to constitute a contract, because the communication merely informed the casino's employees about the change in employment policies. *See id.* at 98, 105-06. Accordingly, a memorandum revising certain employment policies cannot form the basis of an employment contract that gives rise to a breach of contract claim. *See id.*

Similar to the employees in *Baldanado*, Vision's breach of contract claim fails because Hester's "at-will . . . status precludes any challenge to the employment policy on breach of contract grounds." *See id.* at 106. Vision thus could not bring a breach of contract claim based on the Vision 767 Memorandum, a communication that only informed Hester about certain changes to Vision's employment policies. Put another way, the Vision 767 Memorandum cannot form the basis of a contract that Hester could breach. *See id; see also Martin v. Sears, Roebuck & Co.,* 899 P.2d 551, 554 (Nev. 1995) (holding that "[s]ince a claim arising from breach of contract has no application to at-will employment, and [plaintiff] has not demonstrated that he was other than an at-will employee, a breach of contract cause of action will not lie").

> iv.   *Vision's Employee Handbook prevents any contractual relationship from forming between Vision and Hester.*

Vision's Employee Handbook prevents any contractual relationship from forming between Vision and Hester. "In Nevada, at-will employment is presumed in the absence of a written employment agreement." *See Ringle,* 86 P.3d at 1036. The at-will presumption may be rebutted if "a preponderance of the evidence [demonstrates] that there was an express or implied contract of employment . . . ." *Southwest Gas. Corp. v. Vargas*, 901 P.2d 693, 697 (Nev. 1995). However, a company may prevent any "implied contractual liability from arising . . . by

GOODMAN LAW GROUP
A Professional Corporation
520 S. Fourth Street, 2ⁿᵈ Floor
Las Vegas, Nevada 89101
(702) 383-5088

308625.2

22

including a disclaimer in their employee handbooks." *Id.  See also D'Angelo v. Gardner*, 819 P.2d 206, 209 n.4 (Nev. 1991) (holding that an employer can easily prevent an employment contract from arising by "including in its handbook an express disclaimer of implied contractual liability").

Vision specifically limits any contractual liability from arising between Vision and any of its employees based on the Vision 767 Memorandum because it incorporates by reference the Vision Employee Handbook into the Vision 767 Memorandum. (*See* Vision 767 Memorandum, Ex. 18, at 2.)  Vision's Employee Handbook states, "Employment At-Will: The employment relationship between Vision Airlines and its employees is at-will and may be terminated by either party at any time." (Vision's Employee Handbook, Ex. 15, Section 2 at 2.)  In case of any confusion, Vision includes in its Employee Handbook a statement that:

> I understand that the policies in this Employee Handbook in no way modify my status as an at-will employee and in no way imply, infer or guarantee my continued employment for any definite term . . . [Vision] reserves the right to modify, revoke, suspend, terminate, interpret, or change any or all portions of these policies with or without notice. The language used in these policies is not intended to constitute a contract of employment, either express or implied.

(*Id.* at Employee Signature Page.)  Vision's Employee Handbook also states:

> All employment with [Vision] is at-will.  You have the right to terminate your employment at any time, with or without cause or notice, and [Vision] has a similar right.  Employment at-will is the sole and entire agreement between [Vision] and you concerning the duration of your employment and the circumstances under which your employment may be terminated.

(*Id.* at Employee Signature Page.)

Hester received a copy of the October 2006 Employee Handbook (Hester Dep., Ex. 10, at 84) and executed an Employee Acknowledgement Form. (Employee Acknowledgement Form, Ex. 14.)  The Employee Acknowledgement Form that Hester executed stated:

GOODMAN LAW GROUP
A Professional Corporation
520 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 383-5088

308625.2

23

I understand that the policies in this Employee Handbook in no way modify my status as an at-will employee and in no way imply, infer or guarantee my continued employment for any definite term . . . *The language used in these policies is not intended to constitute a contract of employment, either expressed or implied.*"  Furthermore, the Employee Acknowledgement Form states, "[t]his Handbook should not be construed, nor does it constitute, any kind of 'employment contract,' . . . Nothing in this Employee Handbook creates or is intended to create a promise or representation of continued employment.  All employment with the Company is at-will. . . Employment at-will is the sole and entire agreement between the company and you concerning the duration of your employment and the circumstances under which your employment may be terminated."

(Employee Acknowledgement Form, Ex. 14.) (emphasis added.)  Therefore, Vision is precluded from arguing that the Vision 767 Memorandum constitutes an employment contract because it repeatedly disclaims such liability in its Employee Handbook and the Employee Acknowledgement Form.  *See Vargas*, 901 P.2d at 697; *D'Angelo*, 819 P.2d at 209 n.4.

> v.   *To the extent that Vision's claim is for breach of the Vision 767 Memorandum, it fails because the memorandum does not include a provision that governs confidential or classified information and Vision has offered no evidence that Hester breached any such provision.*

The Vision 767 Memorandum does not contain any provision that governs classified or confidential information.  (*See* Vision 767 Memorandum, Ex. 18.)  Thus, Hester could not have breached any such provision, as no provision exists.  Furthermore, as Dagget testified, since his employment at Vision began in February, 2007 (Dagget Dep., Ex. 6, at 9), Vision has not been in possession of any classified material (*id.* at 119) and the Closeout Certification for the Air Bridge Program contract for the period prior to that confirms that Capital Aviation furnished no classified material to Vision (Ex. 23, at CAI 25530).  Accordingly, Vision had no classified information to provide to Hester and therefore Hester had no classified information to disclose.  In addition, whether the information contained in the Complaint and the Las Vegas Sun Article was classified or confidential is of no moment, because Hester testified that the only information that he provided for the Complaint was the background information contained in

GOODMAN LAW GROUP
A Professional Corporation
520 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 383-5088

1   paragraph 2 (Hester Dep., Ex. 10, at 181).  Furthermore, Hester testified that he was not the

2   anonymous source cited in the Las Vegas Sun Article (*id.* at 209-10) and Vision has offered no

3   evidence to prove that he was the anonymous source.  (Dagget Dep., Ex. 6, at 128, 135-36, 139,

4   141, 154-57); (Meers Dep., Ex. 22, at 521.)

5

6   **D.     THE NON-DISCLOSURE PROVISION OF VISION'S NON-DISCLOSURE
         AGREEMENT   SHOULD   BE   STRUCK   DOWN   BECAUSE   IT   IS
7         OVERBROAD AND UNREASONABLE**

8         The non-disclosure provision of Vision's Non-Disclosure Agreement should be struck

9   down because it is overbroad and unreasonable.  While no Nevada court has articulated the

10  standard for determining whether a non-disclosure provision is valid, other jurisdictions have

11  held that non-disclosure covenants "are subject to reasonableness requirements." *Prudential Ins.*

12  *Co. of Am. v. Baum*, 629 F. Supp. 466, 469 (N.D. GA 1986) (applying Georgia law); *see also*

13  *Thomas & Betts Corp. v. Panduit Corp.,* 1999 WL 261861, at *2 (N.D. Ill Apr. 8, 1999) (same);

14  *N. Am. Paper Co. v. Unterberger*, 526 N.E.2d 621, (Ill. App. 1st Dist. 1988) (holding that non-

15  disclosure provision was "so overbroad, unreasonable and burdensome" that it far exceeded the

16  employer's protectable interest).  Non-disclosure requirements are subject to a reasonableness

17  standard because "they affect the dissemination of information necessary to free competition

18  among businesses." *Baum*, 629 F. Supp. at 469; *see also Nasco, Inc. v. Bimbert*, 239 Ga 675,

19  676 (Ga. 1977).  "Unlike general noncompetition provisions, however, specific nondisclosure

20  clauses bear no relation to territorial limitations and their reasonableness turns on factors of time

21  and the nature of the business interest sought to be protected." *Baum*, 629 F. Supp. at 469

22  (quoting *Durham v. Standy-By Labor of Georgia, Inc.,* 230 Ga. 558, 563 (Ga. 1973).  Here,

23  Vision's non-disclosure provision is unreasonable because it does not contain a time limitation

24  and it seeks to protect information beyond Vision's protectable interests.

25

26

27

28

GOODMAN LAW GROUP
A Professional Corporation
520 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 383-5088

308625.2                                    25

GOODMAN LAW GROUP
A Professional Corporation
520 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 383-5088

      i.  *Vision's non-disclosure provision is unreasonable and should be struck down because it does not contain a time limitation.*

Vision's non-disclosure provision is unreasonable and should be struck down because it does not contain a time limitation.   Courts have found that "nondisclosure covenants [are] unreasonable and therefore unenforceable if [they] lack[] any time limitation." *Baum,* 629 F. Supp. at 470; *Thomas v. Best Mfg., Corp.,* 234 Ga. 787, 788 (1975); *see also Aladdin, Inc. v. Krasnoff,* 214 Ga. 519, 520 (Ga. 1958) (invalidating non-disclosure covenant unlimited as to time or territory because "[c]onceivably, this would include all of the plaintiff's customers from the time of its incorporation to that time in the unforeseeable future when it shall cease to do business.")

Here, Vision's non-disclosure provision states:

> During employment, and thereafter, Employee shall not, directly or indirectly, voluntarily or involuntarily, disclose to any person or entity any Confidential Information of Employer.   For the purposes of this Agreement, "Confidential Information" shall include, but is not limited to, any of Employer's confidential, proprietary or trade secret information disclosed to Employee or Employee otherwise learns in the course of employment such as, but not limited to, business plans, customer lists, customer names, customer contact information, price lists, financial statements, software diagrams, flow charts and product plans.

(Vision Non-Disclosure Agreement, Ex. 13, at 2.)   Thus, Vision's non-disclosure provision contains no time provision and continues in perpetuity.   Accordingly, Vision's non-disclosure provision is unreasonable and should be struck down due to this infirmity. *See Baum,* 629 F. Supp. at 470; *Thomas,* 234 Ga. at 788; *see also Aladdin* 214 Ga. at 520.

      ii.  *Vision's non-disclosure provision is overbroad and should be struck down because it exceeds its protectable business interests.*

A non-disclosure provision is unreasonable if it exceeds the protectable interests of the employer.   *Trailer Leasing Co. v. Assoc. Commercial Corp.,* 1996 WL 392135, *1 (N.D. Ill 1996) (holding that provision barring employee from disclosing "any methods and manners" of the business without limitation was unreasonable).   Moreover, an agreement prohibiting the disclosure of any and all information about innumerable categories of information will not be

308625.2

26

enforced.  *See N. Am. Paper,* 526 N.E.2d at 623-24 (holding that agreement prohibiting employee from disclosing any information about "manufacturing, purchasing, research, development methods, practices, accounting, suppliers, marketing, merchandising, customers [], distribution, sale or use of any and all [products]," and "any and all items of whatever nature or kind which the employee has learned of, acquired or obtained knowledge of" during his employment was so "overbroad, unreasonable and burdensome" that they far exceeded any protectable interest of employer).

Here, Vision's non-disclosure provision is so vague that it defines confidential information in such a manner that it fails to inform Hester what information it includes or excludes.  Specifically, the vagueness of the provision is derived from the definition of "Confidential Information," which states, "Confidential Information shall include, but is not limited to . . . ." (Vision Non-Disclosure Agreement, Ex. 13, at 2.)  The fact that Vision fails to limit what constitutes confidential information in its definition means that all of Vision's information must be treated as confidential, because employees are unable to discern what Vision may consider confidential.  Accordingly, Vision's non-disclosure provision includes information beyond its protectable interests.  *See Trailer Leasing,* 1996 WL 392135, at *2-4.  Moreover, the categories that Vision enumerated, "business plans, customer lists, customer names, customer contact information, price lists, financial statements, software diagrams, flow charts and product plans" are overbroad, unreasonable, and burdensome because they exceed Vision's protectable business interest and include information that Vision itself has never treated as confidential.  (*See* Vision's Bill of Particulars, Ex. 20, at 1-5 (identifying the type of "sensitive" air transportation services it provided for the United States government, the arrival and destinations of the Air Bridge Program flights, the companies that it contracted with, and the terms of its financial relationship with CSC and Capital Aviation); *N. Am. Paper,* 526 N.E.2d at

GOODMAN LAW GROUP
A Professional Corporation
520 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 383-5088

308625.2

27

623-24; *see also Neal v. Griepentrog*, 837 P.2d 432, 435 (1992) (recognizing that not every customer pricing list is a trade secret).)

**E.    VISION FAILED TO DEMONSTRATE THAT ANY OF ITS INFORMATION IS TRULY CONFIDENTIAL**

Courts have long held that an employer's information is not confidential for purposes of a non-disclosure agreement where that information has been publicly disclosed by the employer or is widely available in the public domain. *See Nmotion, Inc., v. Environmental Tectonics Corp.,* 148 Fed. Appx. 591, 592, 2005 WL 1899286, at * 1 (9th Cir. Aug. 4, 2005) (holding that plaintiff could not sustain claim for breach of non-disclosure agreement where plaintiff previously publicly disclosed the allegedly confidential information subject to the claim); *Rugen v. Interactive Bus. Sys., Inc.,* 864 S.W.2d 548, 552 (Tex. App. 1993) (holding that information is only confidential where it "is not generally known or readily ascertainable by independent investigation"); *Van Prods Co. v. Gen. Welding & Fabricating, Co.,* 213 A.2d 769, 778-779 (Pa. 1965) ("there is considerable authority to the effect that public sale of the article in question or description thereof in literature available to the public will destroy an[y] trade secret which the inventor might have had") *Electro-Craft Corp. v. Controlled Motion, Inc.,* 332 N.W.2d 890, 901 (Min. 1983) ("To put it another way, the employer must come into court with clean hands; the employer cannot complain of the employee's use of information if the employer has never treated the information as a secret.").

Here, the information contained in paragraphs 7 and 11 of the Complaint does not disclose Vision's confidential information, as it states "aircraft arriving and departing" and does not specifically identify that these are Vision's procedures.  [D.E. 1, at ¶ 11.]  In addition, this information has been published in numerous newspaper articles prior to this litigation and by the United States government.  (*See* Exs., 1, at 4; 2, at 1; 3, at 22; 12, at 1.)  The information provided in the Las Vegas Sun Article by the anonymous source was contained in the European

GOODMAN LAW GROUP
A Professional Corporation
520 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 383-5088

308625.2

28

GOODMAN LAW GROUP
A Professional Corporation
520 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 383-5088

Union Parliament Report, which was published years before this litigation. (EU Report, Ex. 11, at 10-13, 23.)   Finally, Vision disclosed all of its allegedly confidential information in its public filings in Fairfax County, including: (1) that it was a subcontractor for the United States government; (2) that it operated "sensitive air transportation services" on behalf of the United States government from Frankfurt, Germany, and Washington, DC, to Kabul and Baghdad; (3) that it contracted with Capital Aviation, CSC, and McNeil; (4) and disclosed all of the financial terms of its agreements with Capital Aviation and CSC. (Vision's Bill of Particulars, Ex. 20, at 1-5.) Thus, none of the information Vision claims is confidential is actually confidential as it has either been previously disclosed in the public record by Vision, the United States government, the European Union Parliament, or various news agencies.[7]

Regardless, it is of no consequence whether Vision's information is confidential because Vision has failed to offer any proof that Hester disclosed Vision's purportedly confidential information.[8]  In fact, the evidence conclusively demonstrates that Hester did not disclose any of Vision's purportedly confidential information.  Vision claims that its purportedly confidential information was disclosed in paragraphs 7 and 11 of the Complaint and by an anonymous source cited in the Las Vegas Sun Article.[9]   However, Hester testified that the only information

[7] Vision has failed to offer any evidence in support of its damages and therefore its breach of the confidentiality and non-disclosure agreement claim must be denied.  Specifically, in response to Plaintiff's Second Set of Interrogatories, Vision acknowledged that it has not lost any contract related to this litigation or suffered any damages. (Ex. 24, at 12.)

[8] Dagget testified that as to paragraphs 12, 13, 14, 15, 16, 17, and 18 of Vision's Amended Counterclaims that Vision did not have any information that supported its allegations, other than the fact that there was a Complaint filed in this action and that shortly thereafter the Las Vegas Sun Article was published about this litigation. (Dagget Dep., Ex. 6, at 154-157.)  Thus, Vision has acknowledged that there is no basis for its claim that Hester was the source quoted in the Las Vegas Sun Article, and in fact, he was not.

[9] Dagget, who testified as one of Vision's Rule 30(b)(6) representatives, stated that the only information that Vision claimed was confidential was that Vision operated flights to Baghdad and Kabul (Dagget Dep., Ex. 6, at 135), and was not aware of any other confidential information purportedly released by Hester.  However, this information could not possibly be confidential as Vision has not treated it as such. First, Vision files its flight plans in advance as a matter of public record, these identify the destinations of their flights (Jensen Dep., Ex. 7, at 20-21), and Vision

308625.2

29

contained in the Complaint that he provided was the information contained in paragraph 2, which was his own personal background information, and Vision has no proof to the contrary. (Hester Dep., Ex. 10, at 181.)  Similarly, Hester also testified that he "has never spoken with any reporter from the Las Vegas Sun or any other newspaper" regarding "Vision Airlines," (*id.*, at 209-10), and again Vision has no proof to support its baseless allegations.[10]

## III. CONCLUSION[11]

Vision has embarked on a campaign of intimidation against Plaintiff and the Class.  It has filed not only its Amended Counterclaims in this action, but has sued other Class members in at least one other action.  This campaign is part of Vision's effort to deter the Class from the prosecution of its lawsuit to recover the hazard pay that the Class has earned.  Vision filed its Amended Counterclaims alleging that Plaintiff disclosed classified information, even though Vision knew full well that it did not have any classified information to provide to Hester for him to disclose or even any evidence to support its claim that Hester disclosed the allegedly classified information.  Vision made these allegations without any good faith basis – really without any basis whatsoever – as evidenced by the testimony of its Rule 30(b)(6) witnesses.  Vision now attempts to mislead this Court that the very information it has disseminated into the public domain is somehow confidential. For the foregoing reasons, Hester respectfully requests that the Court grant his Motion for Summary Judgment on Vision's Amended Counterclaims.

GOODMAN LAW GROUP
A Professional Corporation
520 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 383-5088

---

disclosed this information in its Bill of particulars, which was also filed as a matter of public record in its litigation in Fairfax County, Virginia (Bill of Particulars, Ex. 20, at 2).

[10] Dagget testified that Vision did not have any evidence to substantiate its claim that Hester was the anonymous source cited in the Las Vegas Sun Article. (Dagget Dep., Ex. 6, at 140.)

[11] Vision's claim for declaratory and injunctive relief is defective for the same reasons Vision's claim for breach of the confidentiality and non-disclosure agreements fail, and Plaintiff respectfully requests that such relief be denied.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

KOZYAK TROPIN & THROCKMORTON, P.A.
Counsel for the Plaintiff
2525 Ponce de Leon, 9th Floor
Coral Gables, Florida 33134
Telephone: (305) 372-1800
Fax: (305) 372-3508

ROSS C. GOODMAN
GOODMAN LAW GROUP
520 South Fourth Street
Las Vegas, Nevada 89101
(702) 383-5088
(702) 385-5088 (Facsimile)

By: /s/ David M. Buckner
       David M. Buckner
       Florida Bar No. 60550
       Brett E. von Borke
       Florida Bar. No. 0044802

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true copy of the foregoing has been served via the Court's CM/ECF system on July 29, 2010 on Harold P. Gewerter, Esq., 2705 Airport Drive, North Las Vegas, Nevada 89032.

By: /s/ David M. Buckner
       David M. Buckner

GOODMAN LAW GROUP
A Professional Corporation
520 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 383-5088

308625.2

31