HAROLD P. GEWERTER, ESQ.
Nevada Bar No. 499
HAROLD P. GEWERTER, ESQ. LTD.
2705 Airport Drive
North Las Vegas, Nevada 89032
Telephone: (702) 382-1714
Fax: (702) 382-1759
Email: harold@gewerterlaw.com
Attorney for Defendant
VISION AIRLINES, INC.

E filed: August 23, 2010

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

*****

| | |
|---|---|
| GERALD HESTER, on behalf of himself and all others similarly situated, | CASE NO: 2:09-CV-00117-RLH-RJJ |
| Plaintiff, | |
| vs. | **DEFENDANT VISION AIRLINES, INC.'S OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** |
| VISION AIRLINES, INC., | |
| Defendant. | |

VISION AIRLINES, INC. ("VISION"), by and through its attorney of record, HAROLD P. GEWERTER, ESQ., of the law firm of HAROLD P. GEWERTER, ESQ., LTD., respectfully submits Defendant VISION'S Opposition to Plaintiff's Motion for Summary Judgment.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

1

This Opposition shall consist of this Preamble, the following Points and Authorities and the complete files and records of this action.

DATED this 23rd day of August, 2010.

>HAROLD P. GEWERTER, ESQ., LTD.
>
>    /s/   *Harold P. Gewerter, Esq.*
> HAROLD P. GEWERTER, ESQ.
> Nevada Bar No. 499
> 2705 Airport Drive
> North Las Vegas, NV 89032
> Attorney for Defendant
> VISION AIRLINES, INC.

## POINTS AND AUTHORITIES

### I.

### FACTS

Defendant VISION has, since 2005, provided airline services to a contractor or subcontractor of a federal government entity. Plaintiff HESTER is a former VISION pilot who claims that Defendant VISION failed to give him specific sums of "hazard pay" allegedly required for flights into and out of Baghdad, Iraq and Kabul, Afghanistan.

Plaintiff HESTER does <u>not</u> allege that Defendant VISION breached any contract with him, or seek to recover as a third-party beneficiary of a contract between others. Nor does he suggest that Defendant VISION violated any state or federal wage-and-hour laws. Instead, Plaintiff HESTER contends that Defendant VISION was required to provide specifically-defined and separately-identified hazard pay simply because the United States Government allegedly <u>intended</u> its prime contractors to require downstream subcontractors to make such payments. But no subcontract to which Defendant VISION is or was a party ever required Defendant VISION to make any specific amount of hazard-duty-related payments. Nor did Defendant VISION's at-will compensation agreement with Plaintiff HESTER.

Because no law or contract creates such an obligation, Plaintiff HESTER fashions a handful of unjust enrichment-type claims, which he then wraps in the imagery of war and patriotic duty. Many of Plaintiff's allegations are fundamentally wrong. Plaintiff HESTER'S

2

rights and Defendant VISION's obligations were defined by contract. And where, as here, there are valid and enforceable contracts, Plaintiff's equitable claims are unavailable as a matter of law.

### BACKGROUND

Defendant VISION hired Plaintiff HESTER in September 2006 to pilot flights into and out of Baghdad and Kabul. (Plaintiff's Complaint, ¶ 1.) In consideration for his duties, Defendant VISION offered Plaintiff HESTER a defined compensation package that Plaintiff HESTER accepted.[1] Plaintiff HESTER does not contend that Defendant VISION failed to pay him any agreed upon sum. Defendant VISION had similar agreements with other crew members. Defendant VISION terminated Plaintiff's employment on or about August 4, 2008.

Plaintiff HESTER contends that he (and other VISION crew members) should have received "hazard pay" for all flights originating or terminating in Baghdad or Kabul, id. at ¶¶ 6, 57, presumably in addition to the defined compensation package to which he had agreed. Plaintiff HESTER grounds his "right" to receive "hazard pay" in the purported language of certain contracts – contracts to which he was not a party and, in some cases, to which Defendant VISION was not a party.

Plaintiff HESTER alleges that Capital Aviation, Inc. ("Capital") in 2004 contracted with the U.S. Government to provide airline service into and out of Baghdad and Kabul. (Id. at ¶ 25.) Thereafter, Capital subcontracted that service with Defendant VISION ("Capital Subcontract," attached hereto as Exhibit 1). (Id. at ¶ 28.) The Complaint alleges that the Capital Subcontract required specific sums of "hazard pay" to be given to Defendant VISION employees. (Id. at ¶ 30.)

The Complaint further alleges that in mid-2006 the U.S. Government changed primary contractors and executed a contract with McNeil Technologies ("McNeil") with the same terms as the Government's contract with Capital. (Id. at ¶ 51.) Like Capital, McNeil subcontracted the service with VISION ("McNeil Subcontract," attached hereto as Exhibit 2). (Id.) Plaintiff

---

[1] Hester's rate of compensation was materially above market to account for the risks associated with flying into Iraq and Afghanistan.

HESTER maintains that the terms of the McNeil Subcontract were substantively the same as the Capital Subcontract and that it too required Defendant VISION to make specific hazard duty payments to its employees. (Id.)

The Capital and McNeil Subcontracts, however, show that Plaintiff's key allegations are false.[2] The dispositive facts are as follows: (1) VISION never agreed with Capital or McNeil to give Plaintiff HESTER specific hazardous duty payments over and above his regular compensation; and (2) Plaintiff HESTER received all wages and benefits that he and Defendant VISION agreed he would receive. For the reasons stated below, these facts support entry of a full summary judgment in favor of Defendant VISION as a matter of law and a denial of summary judgment in favor of Plaintiff.

---

[2]   For example:

- Plaintiff contends that the Government contracted directly with Capital. (Complaint, ¶¶ 25-27.) But it actually contracted with Computer Sciences Corporation, which then subcontracted with Capital. Vision was not a party to either of these contracts.

- Plaintiff contends that the Capital and McNeil Subcontracts require specific amounts of hazard pay. (Complaint, ¶¶ 30, 34-36, 51.) Neither, however, mentions any specific sum of such payments to Vision employees. Under the Capital Subcontract, Capital's payments to Vision were based on the number of rotations flown per week. (See Exhibit 1.) Under the McNeil Subcontract, McNeil paid Vision a fixed amount per flight and a variable sum to reimburse for fuel costs. (See Exhibit 2.) The McNeil Subcontract nowhere even mentions "hazard pay." (Id.)

- Plaintiff claims that in 2006 Vision contracted with McNeil to provide air transport services under the same terms and conditions as the Capital Subcontract. (Complaint, ¶ 51.) Vision, however, did not contract with McNeil until 2007, and at that time it executed a new and different contract from the one it had with Capital. (See 2 2.)

3 Cont.

- Plaintiff claims to know the contents of the agreements between the U.S. Government and its prime contractors (here, CSC and McNeil). (Complaint, ¶¶ 18-27, 51.) At least parts of these documents are "classified," however, so it is very unlikely that Plaintiff ever saw them.

# ARGUMENT

## STANDARD FOR SUMMARY JUDGMENT

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper "where the record before the Court on the motion reveals the absence of any material facts and [where] the moving party is entitled to prevail as a matter of law." *Zoslaw v. MCA Distributing Corp.,* 693 F.2d 870, 883 (9th Cir. 1982), cert. denied, 460 U.S. 1085 (1983) (quoting *Portland Retail Druggists Association v. Kaiser Foundation Health Plan,* 662 F.2d 641, 645 (9th Cir. 1981), cert. denied, 460 U.S. 1085 (1983). "A material issue of fact is one that affects the outcome of the litigation and requires a trial to resolve the parties differing versions of the truth." *Securities and Exchange Commission v. Seaboard Corporation,* 677 F.2d 1289, 1293 (9th Cir. 1982); *United States v. First National Bank of Circle,* 652 F.2d 882, 887 (9th Cir. 1981).

The party moving for summary judgment has the burden of showing the absence of a genuine issue of material fact, and the court must view all facts and inferences in the light most favorable to the responding party. *Adickes v. S.H. Dress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed. 142 (1970), *Zoslaw, supra,* 693 F.2d at 883; *Lessard v. Applied Risk Management,* 307 F.3d 1020 (9th Cir. Oct. 3, 2002); *Warren v. City of Carlsbad,* 58 F.3d 439 (9th Cir. 1995). Once this burden has been met, "[t]he opposing party must then present specific facts demonstrating that there is a factual dispute about a material issue." *Zoslaw, supra* 693 F.2d at 883. The movant is entitled to summary judgment if the non-moving party, who bears the burden of persuasion, fails to designate "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). Thus, in order to preclude a grant of summary judgment, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indust. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct 1348, 89 L.Ed. 2d 538 (1986)(quoting Fed. R. Civ. P. 56(e)).

Given these statements regarding summary judgment and based on the facts and law discussed herein, it is clear Plaintiff HESTER cannot prevail on the claims included in his Complaint against this Defendant.

## PLAINTIFF'S EXPERT HAS NEITHER BEEN ADMITTED IN THIS CASE AND HIS CONCLUSIONS ARE INACCURATE

Plaintiff HESTER bases his entire Motion for Summary Judgment on the report of its purported expert whose testimony in this case was deemed inadmissible by this Honorable Court due to untimely disclosure, and which status Plaintiff HESTER has made and remains itself the subject of a pending Motion. Thus Plaintiff's entire Motion for Summary Judgment fails as it has as its linch pin the "experts report". Further, even if such expert's report were to be admitted, Defendant VISION disagrees with its conclusions. Defendant VISION'S calculations show that the pilots and flight crew on these programs have been paid what they contracted for. It is also unclear how this purported expert is qualified to make the legal conclusions put forth by the Plaintiff HESTER as emanating from the purported expert. According to Plaintiff HESTER this purported expert has decided that legally Plaintiff HESTER was due "hazard pay", that legally they were not bound by their contracts, and apparently this purported accounting expert is to be deemed an expert in the doctrine of unjust enrichment not due to any expertise or background but because it is convenient for Plaintiff HESTER. Further, since Defendant VISION has had no opportunity to cross examine or challenge the findings of this un-admitted expert, such finding cannot be the basis for a Motion for Summary Judgment.

## DISCOVERY HAS PRODUCED ONLY EVIDENCE IN CONTRADICTION OF PLAINTIFF HESTER'S CLAIMS

As part of the hearing on Plaintiff's Motion to Compel on October 23, 2009, this Honorable Court stated: "Sounds like one of the fastest ways to get their case is to just interview the person that's going to represent the class, Mr. Hester, the named class rep. That will nail a lot of this down." (Transcript page 114, Exhibit "3" attached hereto). The discussion regarding HESTER'S deposition continued:

> MR. GEWERTER: Your honor, if my client is in a better position, then there is no case. My client says he got paid everything. Is that then an admission that he got paid everything if my clients records are correct? Obviously they are saying my client's records are not correct.
> THE COURT: This is a question that would be much more easily handled in a deposition.
> MR. GEWERTER: I'm sorry, your Honor.

| | | |
|---|---|---|
| 1 | THE COURT: | I mean, you can see how you would have him sitting there in front of you. And you say you know, when you started was there a contract? How did you know what you were going to make? |
| 2 | | |
| 3 | MR. GEWERTER: | If I ask for a contract I'll get an objection that it's a legal conclusion. But I will go down that path though your honor. |
| 4 | THE COURT: | Well, there was some basis for him to be paid and what was the basis? I mean, he must have had some expectation. He didn't just one day walk on the flight line and start flying to Afghanistan for these people. |

(*Id.* at 121.)

Therefore, pursuant to the Court's instructions, and in an effort to gain information regarding the basis for Plaintiffs' claims, on March 19, 2010, Defendant's counsel took the deposition of the lead plaintiff in this case Gerald Hester. The deposition of Plaintiff HESTER revealed, however, in no uncertain terms, that Plaintiff HESTER was paid exactly what he believed he was entitled to.

> Q. (GEWERTER) And what was your compensation arrangement when you first became a pilot at Vision Airlines? (Page 11)
> A. (HESTER) I believe we were paid $100 an hour, flight hour.
> Q. And that was what you were promised when you first came to work for Vision Airlines. Correct?
> A. That's what I was told the pay was.
> Q. Was that the pay you received?
> A. Yes.
> Q. Were you told anything other than a hundred dollars per hour when you first came to work for Vision Airlines?
> A. There was per diem.
>
> …
>
> Q. So you got a hundred dollars per hour for flight time. Correct? (Page 12)
> A. Yes.
> Q. Were you guaranteed a number of hours per month—
> A. No.
> Q. -- or just as needed?
> A. I'm sorry.
>    We were not guaranteed a certain number of hours per month.
>
> …
>
> A. I didn't make an agreement. That's what it was.
>    I was an at-will employee. (Page 12)
> Q. You acknowledge you were an at-will employee. Correct? (Page 13)

|   |   |   |
|---|---|---|
| A. | Yes. |
| Q. | And you say you didn't make an agreement, but that's what was offered to you, a hundred dollars per hour, plus per diem.  Correct? |
| A. | Yes. |
| Q. | And you accepted that pay structure.  Correct? |

MR. BUCKNER:     Object to the form.

| Q. | (GEWERTER)  You can go ahead and answer. |
|---|---|
| A. | Yes. |

…

| A. | Because I'm over the age limit for 121 operations. (Page 23) |
|---|---|

…

| Q. | So you're aware as an experienced pilot that you are not able to work as a pilot, a line pilot, for a company that's 121 certified? |
|---|---|
| A. | That's correct. |

To be sure, Plaintiff HESTER unequivocally testified that he was an at-will employee with Defendant VISION, that he had a defined compensation package with Defendant VISION that he accepted, and that he received all moneys due and owing to him under those compensation packages.  (Hester Depo., pp. 11-12, 45-47, 90-91, 113-114, 189, attached hereto as Exhibit "4.")("The pay that was offered is, I believe the pay that I received."). Plaintiff's pay was set forth by contract.(See Exhibit "5")  Plaintiff HESTER also unequivocally testified that he never told anyone at Defendant VISION that he thought he was being improperly compensated and he did not even think that he was improperly compensated until he was told that by his attorneys.  (*Id.* at pp. 37-38, 48.)  Instead, this case presented Plaintiffs' counsel with the opportunity to parade the ideas of patriotism and warfare in the public sphere in an attempt to gain notoriety for themselves.[3]

| Q. | When you were first hired, what was your promise for pay? (Page 45) |
|---|---|

MR. BUCKNER: Object to the form.

---

[3]     Plaintiff HESTER testified that he never authorized his attorney to speak to the press about this case and reveal what the Company alleges is confidential information.  (*Id.* at pp. 200-203.)

8

Q. Go ahead and answer, please.
A. $100 an hour.
Q. So if I take a hundred dollars per hour, and multiply the number of hours here, I should then determine how much time and money you earned while at Vision Airlines? (Page 46)
A. Yes.
Q. Thank you.
   Have you actually done that?
A. No.
…

Q. As we sit there today, though, you have no evidence or facts that your direct deposits somehow were different than what you agreed to work for at Vision Airlines. Correct? (Page 47)
MR. BUCKNER:   Object to the form.
THE WITNESS:   The pay that was offered is, I believe the pay that I received. Occasionally there were errors, and I submitted the corrections as requested.
….

Q. What are these documents? (Page 48)
A. These are earnings statements.
Q. And you've seen these before. Is that correct?
A. Yes.
Q. Are these accurate?
A. Yes.
Q. Did you ever complaint to anyone at Vision Airlines that you were not receiving what you promised to be received?
A. No.
…

Q. So you were now guaranteed, whether you flew or not, as long as you were employed an annual salary of 40,000 a year based on this schedule. Correct?
MR. BUCKNER:  Object to the form.
THE WITNESS:  Yes.
BY MR. GEWERTER:
Q. And prior to November 1, 2007, in spite of the fact you were caught sleeping and acknowledged it, you had no guarantee of any minimum, did you?
MR. BUCKNER:  Object to the form.
MR. GEWERTER:   You can have a standing objection for every question I ask if you like.
MR. BUCKNER:   If you're asking objectionable questions I'll object and make a record.
MR. GEWERTER:   I think the objection is objectionable, but go ahead and answer.
THE WITNESS:   Yes. (Page 86)
…
Q. Is that what this grid says to you? (Page 86)

| | | |
|---|---|---|
| A. | It – it established that there was a base pay. | |
| Q. | Plus you received an hourly pay, depending on which aircraft you flew.  Correct? | |

…

| | | |
|---|---|---|
| Q. | Effective November 1, 2007, did you receive all compensation as set forth in this two-page document signed by you? (Page 90) | |
| A. | Yes. | |

…

Q. Did you receive all money as set forth in this grid, on page 2? (Page 90)
MR. BUCKNER: Object to form. (Page 91)
THE WITNESS: I believe I was paid in accordance with that grid.
Q. Did you receive a base salary in accordance with this grid on page 2?
A. Yes.
Q. Did you receive an hourly salary in accordance with this grid on page 2 of this document marked Exhibit 44?
A. Yes.
Q. Do you have any knowledge whatsoever that you did not receive every penny of the base salary as set forth in this grid?
A. No.
Q. Do you have any knowledge whatsoever that you did not receive any money whatsoever for the hourly component of this grid on page 2 of Exhibit 44?
A. No.

As noted above, based on Plaintiff HESTER'S deposition testimony, he admits that he had an agreement to receive a certain specified wage and that he, in fact, received all wages due under that agreement. Apparently, based on the allegations in the Complaint, Plaintiff HESTER now believes that he is owed some sort of additional "hazard pay" over and above the amount he agreed to receive. However, based on his deposition testimony, it is clear that Plaintiff HESTER is <u>not</u> aware of a <u>single</u> alleged <u>fact</u> that forms the basis for his right to receive this additional compensation. As outlined below, when asked very specific questions regarding the factual allegations in this case, ***Plaintiff HESTER repeatedly stated that he did <u>not</u> provide that information to his attorneys, that he could <u>not</u> verify its accuracy, and that he has <u>no</u> idea where the information came from***.   For example:

- HESTER could not remember any specific individual that he spoke to at VISION regarding alleged "hazard pay." (*Id.* at pp. 35-37.)
- HESTER only believed he was entitled to "hazard pay" after he spoke with the attorneys in this case. (*Id.* at p.37-38.)

    Q.   [4]  When did you first come to the conclusion that Vision had not paid you all the money you felt you were entitled to while working for Vision Airlines?
MR. BUCKNER: Object to the form.
    Q.   You can answer it.
    A.   When my attorneys discovered that was in fact the case.
    Q.   Well, how would you have a lawyer if you didn't know you had a case?
    A.   I didn't know if it were true or not.

- HESTER could not remember whether he was contacted by Plaintiffs' counsel or whether he contacted them. (*Id.* at pp. 38-39.)

- HESTER did not request to be lead plaintiff in this case, instead, Plaintiffs' counsel requested that he take that role. (*Id.* at pp. 41-42, 126.)

- HESTER does not know the amount at issue in the case for himself or for the class. (*Id.* at pp. 132-33.)

    Q.   Do you believe that amount in the class is significantly in excess of $5 million?
    A.   I don't know the amount at issue.
    Q.   In fact, it's a fair statement, when you filed this complaint, you have no basis, factual basis, to determine who much you are owed individually. Did you?
    A.   I did not.

- Despite, the colorful language in the Complaint regarding war ridden airports in Iraq and Afghanistan, Plaintiff HESTER has no information regarding military activity in those areas at the time of his employment with Defendant VISION. (*Id.* at pp. 139-152, 156-157)(noting, for example, that he did not supply the information regarding, and did not know the accuracy of, the fact that there was an alleged C-130 cargo plane crash in February 2005).

- In fact, Plaintiff HESTER admits that most of the information in the Complaint came from someone other than himself – someone that he could not identify and that his counsel would not let him identify on the basis of privilege. (*Id.* at pp. 133-134, 169.)

    Q.   But you provided facts to your counsel, though, didn't you?
    A.   About myself.

---

[4] Unless otherwise noted the Questions are asked by Harold Gewerter, Esq., attorney for Defendant VISION, and the Answers were provided by Plaintiff HESTER.

1
2
3
4
5
6
7
8
9
10
11
12

    Q.    Who else provided facts to the same law firm?
    MR. BUCKNER:  Object to form.  Stop a second. You can answer the question if you know it without having gotten it from us.  If you got it from a conversation from us, it's attorney-client privileged communication and I'm instructing you not to answer.
    THE WITNESS: *You have to ask them.  I don't know where they got their information.*

…

    Q.    Well, somehow information got on this complaint that you allege did not come from you.  Is that correct?
    A.    That is correct.
    Q.    Do you know where the information came from, which individuals?
    A.    I do not.

…

    Q.    And paragraph 23, on page 8.  Are you the source of that information?
    A.    No, I was not.
    Q.    Do you know who was?
    A.    No, I do not.

- HESTER confirmed on a number of occasions that *he does not know the accuracy of the factual information in the complaint* and instead simply "trusted his attorneys" that the information was true. (*Id.* at pp. 152, 158-159, 161-162, 166-67, 177-85.)

    Q.    You never actually researched this yourself, did you?
    A.    No, I did not.  I'm guided by my attorneys, who I trust.

…

    Q.    Look at paragraph 14.   Did any of that information come from you?
    A.    No.
    Q.    Do you know whether or not that's true or false?
    A.    *I believe it to be true.*
    Q.    *And why do you believe it to be true?*
    A.    *Because I trust my attorneys.*
    Q.    *Is that where the information came from?*
    A.    *To the best of my knowledge, yes.*

…

    Q.    Look at paragraph 16 on page 6 of the Complaint.  It starts off by saying, "The United States government recognizes that employees of government contractors in Iraq and Afghanistan confront some of the same dangerous conditions encountered by government employees and members of the armed services." How do you know that the United States government recognizes that?
    MR. BUCKNER: Object to the form.
    THE WITNESS:  *I'm not the source of this information.   I believe it to be true, and I rely on my attorneys for that.*

…

12

Q. And the next sentence, "Due to the United States government's reliance on contractors, the shortage of individuals willing to work in those countries threatens the government's ability to successfully implement its global defense strategy."
How do you know that to be true?
A. *I was not the source of that information. I believe it to be true.*
Q. Well, what do you know about—
A. *I rely on my attorneys.*
Q. What do you know about the global defense strategy of the United States government?
A. Are you speaking of the Bush Doctrine?
Q. I'm not speaking of anything other than what's in your complaint. I didn't draft this, so I'm not the one responsible for the wordage.
A. *I didn't draft it either, sir.*
Q. But you approved it, though.
A. Yes.
Q. Paragraph 18, on page 7. *Did that information come from you?*
A. *No, it did not. …*
…
Q. Do you see where it says, "Hazard pay compensation is incorporated into a pass-through provision contained in the contract between the government and the contractor"? Is that a true statement?
A. *I wasn't the source of that information.*
Q. Have you ever seen the contract between Vision Airlines and any other contractor or the United States government?
A. No, I have not.
Q. So you don't know whether or not there's a pass-through provision contained in any such contract, do you?
A. *No, but I believe it to be true, based on the research accomplished by my attorneys.*
…
Q. So you don't know whether that $2,500 figure and $5,000 figure exists between the United States government and Capital Aviation, do you?
A. *No, I do not.*
Q. Paragraph 27 on page 9. "In contracting with Capital Aviation from air transport services, the United States government incorporated the hazard pay into a pass-through provision of the contract." How do you know that to be true?
A. *I'm not the source for this information. I believe it to be true based upon information, belief and research accomplished by my attorneys.*
Q. And then the next sentence says, "Because the employee hazard pay was incorporated into a pass-through provision, it required Capital Aviation to pay the hazard pay it received from the United States government to any subcontractor, who was required to pass those funds through to the air crews completing the work." Do you know if that's a true or false statement?
A. Same answer, Mr. Gewerter.

13

| | | |
|---|---|---|
| 1 | Q. | And what is that answer? |
| 2 | A. | *I wasn't the source of this information. I believe it to be true based upon the investigation done by my attorneys.* |
| 3 | Q. | Any other investigation, or just by your attorney? |
| | A. | My attorneys. |
| 4 | Q. | Anyone -- anyone other than your attorneys? |
| 5 | A. | No. |
| | … | |
| 6 | Q. | Later in that same paragraph, it says, "Moreover, Vision fired all the crew members that knew about or had previously received hazard pay for flying to Kabul and replaced them with employees who did not know that they were entitled to receive hazard pay." Who are those employees that were fired? |
| 7 | | |
| 8 | A. | I don't know. |
| 9 | Q. | How do you know this to be a true or false statement then? |
| | A. | *I was not the source of this information.* |
| 10 | … | |
| 11 | Q. | "In the summer of 2007, Dr. Dan Carson, Vision's director of flight operations contacted Capital Aviation and inquired if the United States government provided hazard pay for Vision's employees who were flying into Baghdad and Kabul." How do you know that to be a true statement? |
| 12 | | |
| 13 | A. | *I wasn't the source of this information.* |
| 14 | … | |
| 15 | Q. | And then it says, "Dr. Carson contacted the president of Vision, William Acor, to discuss the hazard pay. During that conversation, Mr. Acor instructed Dr. Carson to cease his inquiries into the hazard pay issue." Now, who told you that? |
| 16 | | |
| 17 | A. | *I wasn't the source of this information.* |
| | Q. | Okay. So you never heard that then? |
| 18 | A. | No. |
| 19 | … | |
| 20 | Q. | You state in your lawsuit that, "This lawsuit seeks to end Vision's wrongful and exploitive conduct." Describe for me what you mean by that, please. |
| 21 | A. | *Again, I wasn't the source of the information here in this part of the complaint.* |
| 22 | … | |
| 23 | Q. | *You have no documents in your hand that verifies or backs up what you just said under oath, do you?* |
| 24 | A. | *I don't. I rely on information discovered by my attorney.* |

- In perhaps his most telling admission of a lack of knowledge, **Plaintiff HESTER admits that he in fact has <u>no</u> personal knowledge whatsoever that anyone at Defendant VISION including himself was entitled to any sort of "hazard pay."** (*Id.* at pp. 159, 162, 168-70, 178-85.)

14

Q. Then it says, "Accordingly, the United States government has extended the practice of paying hazard and imminent danger pay to employees of government contractors that work in Iraq and Afghanistan." How do you know that to be true?

A. Same answer.

Q. What is that answer?

A. *I'm not the source of this information. I rely on my attorneys. I believe it to be true.*

Q. And you believe it to be true, but you have no independent knowledge, do you have?

A. *I have no independent knowledge, but I trust my attorneys.*

…

Q. How do you know in the second sentence of that paragraph, where it says, "Specifically the United States government provides the contractor with funds for the following: (1) the contracted services; and (2) hazard pay for the contractors' employees that work for Iraq and Afghanistan"?

A. *I was not the source of that information. I believe it to be true, and I trust my attorneys.*

…

Q. The second sentence, "Accordingly, if the contractor subcontracts with another company to perform the contracted services, the pass-through provision requires that the contractor 'pass through' the hazard pay that it collects from the United States government to the subcontractor; i.e., the contractor pays the subcontractor the hazard pay." And it goes on. Where did you learn that information from?

A. *I am not the source of that information.*

Q. So for clarity, have you ever seen any contracts between Vision and any other government contractor?

A. No, I have not.

…

Q. And looking at paragraph 24 on page 8. Look at the third line, where it says, "Accordingly, the United States government has standardized the amount of hazard pay that crew members on the flights to Baghdad and Kabul receive for every takeoff and landing. Specifically, every captain, first officer, international relief officer receives $2,500 each for every takeoff and landing at these airports in Baghdad and Kabul, making a total of $5,000 in hazard pay per round trip." Is that a true statement?

A. *I was not the source of that information.*

Q. Do you know who was?

A. I do not.

…

Q. Look at paragraph 30 at the bottom of the page. "In addition, Capital Aviation provided Vision the hazard pay that the United States government gave Capital Aviation for the benefit of Vision's employees, which Vision was required to distribute to those crew members on the flights to Baghdad and

15

Kabul." Do you know if that's a true or false statement?
A. *I was not the source of that information. I believe it to be true based on the research done by my attorneys.*

…

Q. Look at paragraph 36 on page 11. "Accordingly, Capital Aviation provided Vision with a minimum of $54,000 per week in hazard pay meant for Vision's employees." How do you know that money was meant for Vision employees?
A. *I'm not the source of this information. I believe it to be true, based on the investigation of my attorneys.*

…

Q. Look at paragraph 38 on page 11. "In August 2005, Vision decided that it would capture a financial windfall if it simply retained all the hazard pay it collected from Capital Aviation for its own benefits." What information do you have that Vision obtained a financial windfall?
A. *I was not the source of that information.*
Q. What information do you have that Vision received any hazard pay they collected—I'm sorry, what information do you have that Vision received any hazard pay?
A. *I'm not the source of this information.*

…

Q. What information do you have personal knowledge of in this complaint?
A. The information concerning myself.
Q. And that's it, then?
A. That's it.
Q. Nothing about the contract between Capital and Vision. Correct?
A. Correct.
Q. *And nothing about hazard pay. Correct?*
A. *Correct.*

Based on the foregoing, it is without question that the lead plaintiff in this case possesses no information or knowledge regarding the material facts that form the basis for the Complaint in this case, *including **no** information whatsoever on hazard pay*, and that the true individuals with information or knowledge about the claim are, if anyone, apparently his lawyers. (*See, e.g.*, *id.* at p. 227) ("*I did not file the complaint, and I wasn't the source for the information.*")

Further, throughout the entire course of a thorough discovery process, Plaintiff HESTER has failed to produce or discover any document or contract requiring the payment of specifically-defined and separately-identified hazard pay.

# SUMMARY JUDGMENT FOR PLAINTIFF HESTER SHOULD BE DENIED AS TO COUNTS I, III, IV AND V OF THE COMPLAINT BECAUSE THE PARTIES' RIGHTS AND OBLIGATIONS ARE DEFINED BY CONTRACT.

Under Nevada law, equitable causes of action for unjust enrichment, money had and received,[5] and quantum meruit are unavailable when a valid agreement exists between the parties. *See Thorne v. Wagner*, 2007 US Dist. LEXIS 10750; 2007 WL 496373 (D. Nev. Feb 13, 2007) (dismissing the plaintiff's unjust enrichment claim because "no agreement can be implied when there is an express agreement"); *Trustees of the Operating Engineers Pension Trust v. Tab Contractors, Inc.,* 224 F.Supp.2d 1272, 1278 (D. Nev. 2002) (same); *Sack v. Tomlin*, 110 Nev. 204, 208, 871 P.2d 298, 302 (1994) (noting that the doctrine of quantum meruit applies only "to an action for restitution involving work and labor performed…in the absence of an agreed upon amount.").

Moreover, "an employee who has been paid his agreed wages [can]not claim additional compensation in quantum meruit to prevent his employer's supposed 'unjust enrichment.'" See *Ewing v. Sargent*, 87 Nev. 74, 80, 482 P.2d 819, 823 (1971) (*citing Keith v. Kottas*, 119 Mont. 98, 100, 172 P.2d 306, 307 (1946)) ("holding that services rendered by an employee are presumed compensated for by the stipulated wage, that to overcome this presumption he must prove an <u>express contract</u> for <u>additional</u> compensation and that no implied contract can be posited in such a situation.")(emphasis added).

Similarly, a claim for conversion requires Plaintiff HESTER to prove that Defendant VISION exercised control over property that was rightfully his. *See Wantz v. L.V. Redfield*, 74 Nev. 196, 198, 326 F.2d 413, 414 (1958). But Plaintiff HESTER cannot establish any right to "hazard pay" without interpretation of the contracts and a determination that the contracts were breached.

---

[5] A claim for "money had and received" is duplicative of a claim for unjust enrichment and, therefore, should be dismissed on the same grounds. *See* 66 Am. Jur. 2d <u>Restitution and Implied Contracts</u> § 172 (2008) (attached hereto as Exhibit 6).

Here, the parties agreed that Plaintiff HESTER would work as a pilot for Defendant VISION in return for certain fixed compensation. This agreement constituted a valid compensation contract. *See Vancheri v. GNLV Corp.,* 105 Nev. 417, 421, 777 P.2d 366, 369 (1989) ("Employment 'at-will' is a contractual relationship and thus governed by contract law.") Moreover, neither the Capital Subcontract nor the McNeil Subcontract required the payment of any "hazardous duty" sum. For these reasons, Plaintiff HESTER'S claims for unjust enrichment, money had and received, quantum meruit, and conversion should have the entry of an order denying summary judgment.

## SUMMARY JUDGMENT FOR PLAINTIFF HESTER SHOULD BE DENIED AS TO COUNTS II, VI AND VII BECAUSE THEY ARE REMEDIES WHICH FAIL BECAUSE THE SUBSTANTIVE CAUSES OF ACTION FAIL.

The Complaint asserts as separate causes of action three (3) types of equitable relief – constructive trust, injunctive relief, and declaratory judgment. These are remedies, not separate claims. *See State Farm Mut. Auto. Ins. Co. v. Jafbros Inc.,* 109 Nev. 926, 928, 860 P.2d 176, 178 (1993) ("It is axiomatic that a court cannot provide a remedy unless it has found a wrong. '[T]he existence of a right violated is a prerequisite to the granting of an injunction.'"); *Knittle v. Progressive Cas. Ins. Co.,* 112 Nev. 8, 10, 908 P.2d 724, 725 (1996) (to obtain a declaratory judgment, Plaintiff must prove that he has a legally protectable interest in controversy); *Crockett & Myers, Ltd. v. Napier, Fitzgerald, & Kirby, LLP,* 440 F.Supp.2d 1184, 1197 (D. Nev. 2006) ("a constructive trust is 'a remedial device by which the holder of legal title to property is held to be a trustee of that property for the benefit of another who in good conscience is entitled to it.'").[6]

---

[6] To succeed in his claim for a constructive trust, Plaintiff also must prove that he and Vision had a confidential relationship. Plaintiff suggests that such a relationship flowed from his employment alone. But he is wrong as a matter of law. "No presumption of a confidential relationship arises from the bare fact that parties to a contract are employer and employee; rather, additional ties must be brought out in order to create the presumption of a confidential relationship between the two." *Miller v. Yokohama Tire Corp.,* 358 F.3d 616, 621 (9th Cir. 2004) (*citing Odorrizzi v. Bloomfield Sch. Dist.,* 246 Cal. App. 2d 123, 54 Cal. Rptr. 533 (1996)).

As shown above, Plaintiff HESTER cannot prove a violation of any right, or injury to any legally-protectable interest. For the same reasons that summary judgment for Defendant should be entered in the four (4) substantive Counts, the three (3) remedial Counts should have summary judgment denied as to Plaintiff.

### III.

### CONCLUSION

For the foregoing reasons, Defendant VISION respectfully requests this Court to Deny in its entirety Plaintiff HESTER'S Motion for Summary Judgment.

DATED this 23rd day of August, 2010.

HAROLD P. GEWERTER, ESQ., LTD.

 /s/  Harold P. Gewerter, Esq.
HAROLD P. GEWERTER, ESQ.
Nevada Bar No. 499
2705 Airport Drive
North Las Vegas, Nevada 89032