1  **Ross C. Goodman, Esq., Nevada State Bar No. 7722**
   **GOODMAN LAW GROUP**
2  520 South Fourth Street
   Las Vegas, Nevada 89101
3  (702) 383-5088
   (702) 385-5088 (Facsimile)
4
   **Kenneth R. Hartmann, Esq., Florida State Bar No. 664286**
5  **Brett E. von Borke, Esq., Florida State Bar No. 44802**
   **KOZYAK TROPIN & THROCKMORTON, PA**
6  2525 Ponce de Leon, 9th Floor
   Miami, Florida 33134
7  (305) 372-1800
   (305) 372-3508 (Facsimile)
8
   **David M. Buckner, Esq. Florida State Bar No. 60550**
9  **GROSSMAN ROTH, P.A.**
   2525 Ponce de Leon, 11th Floor
10 Coral Gables, Florida  33134
   Telephone: (305) 442-8666
11 Fax: (305) 285-1668

12 **ATTORNEYS FOR PLAINTIFF & THE CLASS**

13              **UNITED STATES DISTRICT COURT**
                   **DISTRICT OF NEVADA**
14
   GERALD HESTER, on behalf of himself
15 and all others similarly situated,
                                          Case No.:  2:09-CV-00117-RLH-RJJ
16                     Plaintiff,
   v.
17
   VISION AIRLINES, INC.,
18
                       Defendant.
19

20 **THE CLASS'S RESPONSE TO VISION AIRLINES, INC.'S MOTION FOR SUMMARY**
21                                  **JUDGMENT**

22         The Class, by and through undersigned counsel, hereby respectfully submits its Response

23 to Vision Airlines, Inc.'s ("Vision") Motion for Summary Judgment ("Response").  In its Motion

24 for Summary Judgment ("Motion"), Vision attempts to escape liability by focusing solely on

25 what Plaintiff, Gerald Hester ("Hester"), knew about Vision's wrongful and illegal retention of

26

27

28

GOODMAN LAW GROUP
A Professional Corporation
520 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 383-5088

GOODMAN LAW GROUP
A Professional Corporation
520 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 383-5088

1    the Class's hazard pay.[1]  However, there is not one count in the Class's Complaint that contains

2    as an element the state of mind of any Class member, Hester's included, and this whole line of

3    argument is nothing but a distraction.    Tellingly, Vision's argument ignores the relevant

4    evidence, which includes the testimony of Vision's 30(b)(6) witnesses, the testimony of the

5    upstream contractors and other third-parties, and the documents produced in this case.  In fact,

6    Vision cites only two material facts and misstates a number of non-material facts in its Motion.

7    That Vision ignores the evidence developed through discovery, which has been inappropriately

8    limited by Vision's bad-faith conduct,[2] is not surprising, since that evidence definitively

9

10   establishes the merits of the Class's claims.

11          The only substantive legal argument that Vision raises in its Motion is that the Class's

12   claims are barred because there is an employment contract between Vision and Hester. This

13   argument is not only wrong as a matter of fact but also as a matter of law.  The Class is entitled

14   to summary judgment on this argument because no reasonable jury could find that there is an

15   employment contract between Vision and Hester.  Vision repeatedly and expressly disclaims any

16   contractual relationship between Vision and its employees that operated the flights into and out

17   of Baghdad, Iraq and Kabul, Afghanistan ("Air Bridge Program").  The document that Vision

18   claims is the employment contract, the Vision 767 Memorandum, is nothing more than Vision's

19   attempt to convert a communication with members of the Class into an employment contract

20

21   which the law does not permit.  Moreover, even if the Court found that a reasonable jury could

22

23   _____

24   [1] While styled as a Motion for Summary Judgment, Vision is really re-litigating its Motion to Disqualify [D.E. 120].
     Accordingly, the Class respectfully incorporates by reference herein its Response to Vision's Motion to Disqualify
     and all of the exhibits attached thereto [D.E. 126].

25   [2] In its Reply in Support of Vision's Motion to Compel [D.E. 134], Vision claims that the only outstanding
26   discovery left between the parties is two weeks of flight logs from 2006 and the payroll information from June 2010
     [*Id.* at 6]. Vision, however, knows that it refused to produce nearly all of the documents that it previously agreed to
27   produce to the Class.  The Class's Renewed Motion to Compel [D.E. 93] and the Class's Supplement in Support of
     its Renewed Motion to Compel [D.E. 106] sets forth Vision's bad-faith discovery behavior and remains pending and
28   awaits a ruling from this Court.

1  determine that there is an employment contract between Vision and Hester, summary judgment

2  is still inappropriate because whether a contract exists is a question of fact which precludes

3  summary judgment. Finally, Vision argues that the Class's constructive trust claim is defective

4  because it is a remedy and not an independent cause of action and because there is no

5  confidential relationship between Hester and Vision.  Vision is wrong on both counts, as Nevada

6  courts have recognized that constructive trust is an independent cause of action and that the

7  employment relationship is confidential in nature.   Accordingly, Vision's Motion must be

8  denied.

9

10  **I.     FACTS**

11          Vision's Motion addresses only Hester's knowledge about the information contained in

12  the Complaint and does not address or reference any of the other deposition testimony  or

13  documents produced during the course of discovery.  Thus, the Class will not waste the Court's

14  time setting forth all of the facts that support its claims, but instead incorporates them by

15  reference through the Class's Incorporated Memorandum of Law in Support of its Motion for

16  Summary Judgment ("Class's Motion for Summary Judgment") [D.E. 135] including its

17  Statement of Undisputed Facts, and all of the exhibits referenced therein and attached thereto,

18  into this Response.   Accordingly, the Class in its Response will address only those facts

19  identified by Vision in its Motion and will distinguish them on the basis of whether those facts

20  are material or non-material.[3]

21  **A.     MATERIAL FACTS[4]**

22  1.      "Plaintiff Hester unequivocally testified that he was an at-will employee with

---

[3] Vision cites many non-material facts in its Motion, but the facts do nothing to support its argument that it is entitled to summary judgment.  As set forth in the Class's Response to Vision's Motion to Disqualify [D.E. 126], Hester's knowledge of certain facts contained within the Complaint [D.E. 1] have no bearing on his status as an adequate Class representative.  Moreover, these non-material facts have no bearing on whether the Court may grant the parties summary judgment.  *See Anderson,* 477 U.S. at 248 ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted.")

[4] Vision did not number its paragraphs in its Motion setting forth the undisputed facts and thus the corresponding paragraphs in the Class's Response cannot specifically refer back to Vision's Motion.

315603.1

GOODMAN LAW GROUP
A Professional Corporation
520 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 383-5088

GOODMAN LAW GROUP
A Professional Corporation
520 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 383-5088

Defendant Vision . . . ." [D.E. 137, at 6.] The Class agrees that this is true as to Hester and all of the employees who operated the Air Bridge Program.   (Hester Dep., Ex. 1, at 12-13.) Furthermore, as it did with the other Class members, Vision provided Hester with a copy of its Employee Handbook (*id.* at 84) and Hester executed an Employee Handbook Acknowledgement Form stating that he received a copy of Vision's Employee Handbook and reviewed it.  (Hester's Employee Acknowledgement Form, attached as Ex. 2.)   Vision's Employee Handbook states under the section entitled "Employment At-Will" the following: "The employment relationship between Vision Airlines and its employees is at-will and may be terminated by either party at any time."  (Employee Handbook, attached as Ex. 3, at Section 2 at 2.)   Vision's Employee Handbook also states:

> I understand that the policies in this Employee Handbook in no way modify my status as an at-will employee and in no way imply, infer or guarantee my continued employment for any definite term . . . [Vision] reserves the right to modify, revoke, suspend, terminate, interpret, or change any or all portions of these policies with or without notice. . . *All employment with [Vision] is at-will.*  You have the right to terminate your employment at any time, with or without cause or notice, and [Vision] has a similar right.  *Employment at-will is the sole and entire agreement between [Vision] and you concerning the duration of your employment and the circumstances under which your employment may be terminated.*

(*Id.* at Employee Signature Page) (emphasis added.)

The Employee Handbook Acknowledgement Form that Hester executed stated, "I understand that the policies in this Employee Handbook in no way modify my status as an at-will employee and in no way imply, infer or guarantee my continued employment for any definite term . . . ."  (Employee Acknowledgement Form, Ex. 2, at 1.)

2. Vision claims that the Vision 767 Memorandum is an employment contract and that it governed Hester's employment. [D.E. 137 at 6.]  Hester testified that he was at-will and that he never entered into an employment contract with Vision. (Hester Dep., Ex. 1, at 12.)  The

315603.1

4

GOODMAN LAW GROUP
A Professional Corporation
520 S. Fourth Street, 2ⁿᵈ Floor
Las Vegas, Nevada 89101
(702) 383-5088

Vision 767 Memorandum is dated October 15, 2007 and is styled as a memorandum.[5] (Vision 767 Memorandum, attached as Ex. 8.) The communicative nature of the memorandum is further reflected by its plain language which states above Hester's signature block, "I have read and acknowledge receipt of the *memo* regarding the Revised Pay Structure & Guidelines for Boeing Pilots that went into effect on October 1, 2007." (*Id.* at 2.) The Vision 767 Memorandum does not refer to contractual terms, and never uses the term contract. (*See id.*) Even though the Vision 767 Memorandum is dated October 15, 2007, it actually took effect as of October 1, 2007, which further reflects its communicative nature as Vision made these changes unilaterally and without the prior consent of Hester or any other member of the Class. (*See id.*) In fact, Hester did not even acknowledge receipt of the Vision 767 Memorandum until November 9, 2007 – more than one month after Vision unilaterally implemented those changes to its guidelines.

James Maguire ("Maguire"), Vision's third Director of Flight Operations and the author of the Vision 767 Memorandum testified that no lawyer reviewed the Vision 767 Memorandum prior to its distribution to the Air Bridge Program employees (Deposition of James Maguire, attached as Ex. 9, at 78), that he did not negotiate the terms of the Vision 767 Memorandum with any of the Air Bridge Program employees (*id.* at 80-81), and that there was no place on the Vision 767 Memorandum for Vision to sign and accept (*id.* at 84-85). Maguire also testified that the Air Bridge Program employees were and remained employed at-will, even after the Vision 767 Memorandum was provided to them. (*Id.* at 86-88.) Davis Pritchard ("Pritchard"), an Air Bridge Program pilot, testified that he never signed an employment contract with Vision

---

[5] The Vision 767 Memorandum does not cover the entire period of Hester's employment at Vision. The Vision 767 Memorandum is dated October 15, 2007, and took effect October 1, 2007. Thus, the memorandum does not cover May 1, 2005 through September 30, 2007, which includes Phases I-III of the Air Bridge Program. Accordingly, even if the Court were to determine against the evidence and the law that the Vision 767 Memorandum was an employment contract, this would not bar the Class's claims for unjust enrichment and *quantum meruit* for the hazard pay that Vision billed for and collected in Phases I-III, because the memorandum did not cover that time period.

315603.1
5

1  (Deposition of Davis Pritchard, Ex. 10, at 28), that he did not believe that the Vision 767

2  Memorandum was a contract when Vision provided it to him (*id.* at 30), and that no one at

3  Vision ever informed him that the Vision 767 Memorandum was an employment contract (*id.*).

4      Vision also disclaims the formation of any employment contract in its Employee

5  Handbook and the Employee Handbook Acknowledgement Form.  Those documents both state

6  that all employment with Vision is at-will.  (Employee Handbook, Ex. 3, at Section 2 at 2);

7  (Acknowledgement Form, Ex. 2.) Vision's Employee Handbook prevents the formation of any

8  employment contract, because it states, "[e]mployment at-will is the sole and entire agreement

9  between [Vision] and you . . . ."  (Employee Handbook, Ex. 3, at Signature Page.) Furthermore,

10  Vision's Employee Handbook Acknowledgement Form states, "[t]he language used in [the

11  Employee Handbook] is not intended to constitute a contract of employment, either expressed or

12  implied."  (Employee Acknowledgement Form, Ex. 2.)  Thus, when these facts are considered

13  here, there is no legal basis for a jury to conclude that there is an employment contract between

14  Vision and Hester, and thus the Class is entitled to summary judgment on this claim.

## B.    NON-MATERIAL FACTS

15  1.    Vision claims that "it is apparent from the deposition of Plaintiff Hester that the

16  true basis for this lawsuit is not that Plaintiff Hester, or any other class member, believes that

17  they were improperly compensated by Defendant Vision . . . [but that] this case presented

18  Plaintiffs' counsel with the opportunity to parade the ideas of patriotism and warfare in the

19  public sphere in an attempt to gain notoriety for themselves."  [D.E. 137, at 6.]  This *ad hominem*

20  attack against counsel is both without factual support and completely irrelevant.

21      Hester testified on numerous occasions that he was the proponent for the lawsuit against

22  Vision.  Hester testified that he reviewed the Complaint carefully prior to its filing (Hester Dep.,

23  Ex. 1, at 141-142), and that he approved the filing of the Complaint against Vision.  (*Id.*)  In

24  addition, Hester also testified that "it simply isn't fair for Vision to keep money that was earned

25  through the actions of other employees . . . if Vision collected hazard pay, the money should go

GOODMAN LAW GROUP
A Professional Corporation
520 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 383-5088

1    to the people who performed the hazardous duty.  That's simply commonsense and equity in my

2    view." (*Id.* at 193.)

3         2.     Vision argues that Hester testified that "he had a defined compensation package

4    with Defendant Vision that he accepted, and that he received all moneys due and owing to him

5    under those compensation packages." [D.E. 137 at 6.][6]  Hester actually testified that he "didn't

6    make an agreement" with Vision, because he was an at-will employee.  (Hester Dep., Ex. 1, at

7    12.)  Furthermore, Vision's own Employee Handbook prevents the formation of any contract

8    between Vision and Hester.  Specifically, the Employee Handbook states, "[e]mployment at-will

9    is the sole and entire agreement between [Vision] and you . . . ."  (Employee Handbook, Ex. 3,

10   Signature Page.) The Employee Handbook Acknowledgement Form that Hester executed states:

> I understand that the policies in this Employee Handbook in no way
> modify my status as an at-will employee and in no way imply, infer or
> guarantee my continued employment for any definite term . . . *The
> language used in these policies is not intended to constitute a contract of
> employment, either expressed or implied.*  This Handbook should not be
> construed, nor does it constitute, any kind of 'employment contract,' . . .
> Nothing in this Employee Handbook creates or is intended to create a
> promise or representation of continued employment.  *All employment
> with [Vision] is at-will. . . Employment at-will is the sole and entire
> agreement between [Vision] and you concerning the duration of your
> employment and the circumstances under which your employment may
> be terminated.*

(Acknowledgement Form, Ex. 2.)  Hester did not testify that he had a defined compensation

package with Vision and therefore the Class disputes this fact.

         Furthermore, Hester also testified that he was never paid any hazard pay, to which he

---

[6] Vision cites to pages 11-12, 45-47, 90-91, 113-114, and 189 of Hester's deposition for support that Hester testified that he had a "defined compensation package" with Vision. [D.E. 137 at 6.]  These citations, however, fail to offer any support for Vision's argument.  Rather, the testimony cited to merely confirms that Vision paid Hester certain amounts of money at different periods of time throughout his employment at Vision.  For example, on pages 11-12 and 45-47, Hester acknowledged that Vision paid him $100 per flight hour.  On pages 90-91 and 113-114, Hester testified that he was paid $70 per hour and a certain base salary starting on October 1, 2007.  As Hester testified, this was the "rate structure that was unilaterally imposed by Vision Airlines."  (Hester Dep., Ex. 1. at 114.)  On page 189, Hester testified that this litigation seeks to recover hazard pay on behalf of the Class and that he was an at-will employee.  Thus, there is no support in the record for Vision's statement that Hester had a defined compensation package that he accepted or that he was paid all of the monies he was owed by Vision.

GOODMAN LAW GROUP
A Professional Corporation
520 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 383-5088

GOODMAN LAW GROUP
A Professional Corporation
520 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 383-5088

believed he was entitled. (Hester Dep., Ex. 1, at 49); (*see also id.*, at 193.)   Specifically, Hester

stated, "I and the other pilots and the flight attendants and the mechanics who did the hazardous

duty that would justify the receipt of hazard pay should be the ones who receive it."  (Hester

Dep., Ex. 1, at 49); (*see also id.*, at 193.)   Moreover, the evidence establishes that Vision

determined and earmarked certain amounts of hazard pay to be allocated for Vision's Air Bridge

Program flight deck and cabin crews (Meers e-mail to Dagget, Ex. 4, at CAI 27885-90); (Vision

Aircraft Quote to McNeil, Ex. 5), for part of the period specifically invoiced for it (Vision Phase

III invoices, Ex. 6), and received the payments from the upstream contractors on behalf of those

employees (Feigin Dep., Ex. 7, 11, 24-25, 28, 33, 37).

For example, in Phases II and III Vision identified in its quote to Capital Aviation and

CSC specific earmarked amounts for cabin crew and flight deck crew hazardous duty bonus

(Meers e-mail to Dagget, Ex. 4, at CAI 27885-90), which were incorporated into CSC's Air

Bridge Program bid proposal submitted to the United States government (CSC Phase II Bid

Proposal, Ex. 11, at CSC 0033, 0035-36); (CSC Phase III Bid Proposal, Ex. 12, at CSC 0042,

0057), and the upstream contractor's paid Vision this hazard pay with the expectation that Vision

would pay the hazard pay that it collected to the Air Bridge Program employees (Feigin Dep.,

Ex. 7, 11, 24-25, 28, 33, 37).

Similarly for Phase IV, Vision's Aircraft Quote to McNeil also identified specific funds

earmarked for Vision's Air Bridge Program flight deck and cabin crews for hazard pay.  (Vision

Aircraft Quote, Ex. 5, identifying flight deck crew hazard pay at $647,500 and cabin crew hazard

pay at $350,000 on a 52 week annualized period.)  McNeil paid Vision the amount it invoiced

for the "Total Program Cost," which included the amounts specifically earmarked for flight deck

and cabin crew hazard pay. (Affidavit of McNeil Technologies, Inc., Ex. 13, at ¶ 6.)  Vision,

however, never paid its flight deck or cabin crews, including Hester, any of the hazard pay

GOODMAN LAW GROUP
A Professional Corporation
520 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 383-5088

specifically earmarked for them and for which Vision billed for and collected from the upstream contractors in Phases II, III, or IV of the Air Bridge Program. (Preliminary Mukamal Report, Ex. 14, at 4-5, 7-8); (Supplemental Mukamal Report, Ex. 15, at 4-6); (Maguire Dep., Ex. 9, at 97-98.) [7]

Vision was also aware that it was required to pay the Air Bridge Program employees hazard pay and even misrepresented to the upstream contractors that it was doing so. Daniel Carson ("Carson"), Vision's then Director of Flight Operations, e-mailed William Vigil ("Vigil"), at the time CSC's Air Bridge Program Manager, on May 14, 2007, informing Vigil that Vision had failed to pay its employees any hazard pay. (May 14, 2007 e-mail from Carson to Vigil, attached as Ex. 16.) In response to that e-mail, which Vigil copied Brian Dagget ("Dagget"), Vision's Air Bridge Program Manager, Vigil replied that Vision's failure to pay its employees hazard pay "ha[d] to be addressed immediately as it could be a disaster . . . ." (*Id.*) Even though Vision knew that it was not paying its employees any hazard pay, Dagget nonetheless informed Vigil not to be "alarmed" and misrepresented to Vigil that Vision was paying its Air Bridge Program flight deck and cabin crews hazard pay. (Deposition of Brian Dagget, attached as Ex. 17, at 247.) Of course, the Class's expert demonstrated that this was entirely false. (Preliminary Mukamal Report, Ex. 14, at 4-5, 7-8); (Supplemental Mukamal Report, Ex. 15, at 4-6.) Vision also concealed the fact that it was collecting hazard pay from its employees. When directly asked about hazard pay, Maguire threatened Pritchard and questioned his loyalty to Maguire and to Vision. (Pritchard Dep., Ex. 10, at 45-50.) Finally, Maguire admitted that he consciously excluded hazard pay in calculating the Air Bridge Program flight deck and cabin crews' compensation. (Maguire Dep., Ex. 9, at 97-98.) Therefore, the Class

---

[7] Vision failed to produce all of the documents it agreed to produce to the Class. Until Vision completes its document production, the Class cannot determine its damages for Phase I.

1   disputes that Hester received all the monies due and owed him, because he did not receive any

2   hazard pay from Vision.

3        3.    Vision states that "Hester could not remember any specific individual that he

4   spoke to at Vision regarding alleged 'hazard pay.'" [D.E. 137, at 7.]   Again, this is entirely

5   irrelevant.   In any event, Hester actually testified that, "I just asked [Carson] that I had heard

6   rumors about hazard pay." (Hester Dep., Ex. 1, at 35.)   Hester also testified that while employed

7   at Vision he spoke with Pritchard about Pritchard's discussions with Maguire about hazard pay.

8   (*Id.* at 171.)

9        In addition to Hester's testimony, Pritchard testified that he e-mailed Maguire while

10  preparing his income tax return and inquired whether any of his compensation at Vision included

11  hazard pay. (Pritchard Dep., Ex. 10, at 45-46.) Maguire did not respond to Pritchard's e-mail,

12  and Pritchard decided to call Maguire to inquire about hazard pay.   (*Id.* at 46.)   During that

13  telephone conversation, Maguire informed Pritchard that he would not respond to his e-mail

14  regarding hazard pay in writing but that he would speak with Pritchard the next time he reported

15  for work in Washington, D.C., about the matter.   (*Id.* at 46-47.)   When the two met in

16  Washington, D.C., Maguire was "really angry" with Pritchard for inquiring about hazard pay and

17  questioned his trust in and loyalty to Maguire and Vision. (*Id.* at 49-50.)   Thus, the Class

18  disputes this non-material fact.

19       4.    Vision argues that "Hester only believed that he was entitled to 'hazard pay' after

20  he spoke with the attorneys in this case." [D.E. 137, at 7.]   Hester actually testified that he knew

21  that he might be entitled to hazard pay based on his conversations with Carson, Pritchard, and

22  others. (Hester Dep., Ex. 1, at 35-36, 171.)   Hester contacted his attorneys to determine if he had

23  a viable legal claim against Vision for hazard pay, and as Hester testified, it was his belief that,

24  "if Vision collected hazard pay, the money should go to the people who performed the hazardous

GOODMAN LAW GROUP
A Professional Corporation
520 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 383-5088

1    duty." (*Id.* at 193.) The Class, therefore, disputes this irrelevant and non-material fact.

2        5.      Vision claims that "Hester could not remember whether he was contacted by

3    Plaintiffs' counsel or whether he contacted them." [D.E. 137, at 7.]  Hester previously stated in

4    an affidavit that he initiated this lawsuit by contacting counsel over his concerns that Vision

5    wrongfully deprived him and the Class of the hazard pay that they earned while operating the Air

6    Bridge Program flights. (Affidavit of Gerald Hester, attached as Ex. 18, at ¶ 3.)  Again, the Class

7    disputes this non-material fact.

8

9        6.      Vision claims that "Hester did not request to be lead Plaintiff in this case, instead

10   Plaintiffs' counsel requested that he take that role." [D.E. 137, at 7.]  Hester actually testified

11   that he agreed to serve as the Class representative in this action. (Hester Dep., Ex. 1, at 42.) The

12   Class disputes this non-material fact.

13       7.      Vision claims that, "Hester does not know the amount at issue in the case for

14   himself or for the Class. [D.E. 137, at 7.]   Hester actually testified that, "I'm uncertain as to

15   how much I am individually owed," (Hester Dep., Ex. 1, at 132), because, "[t]he amount of the

16   hazard pay that Vision collected was not disclosed to us employees." (*Id.* at 133.)  However, the

17   Class's expert has detailed in the Preliminary Expert Report the amount the Class is owed for

18   Phases II and III of the Air Bridge Program.  (Preliminary Mukamal Report, Ex. 14.)  Once

19   Vision made additional discovery available to the Class (only after the discovery deadline had

20   passed), the Class provided Vision with the Supplemental Expert Report of Barry Mukamal,

21   which detailed the amount of hazard pay that Vision collected and failed to pay over to the Class

22   for Phase IV. (Supplemental Mukamal Report, Ex. 15, at 4-6.)  As the Class's expert noted,

23   however, Vision failed to provide all of the documents necessary to perform a damages

24   calculation for Phase I of the Air Bridge Program. [D.E. 110, at Ex. 1.] Therefore, the Class

25   disputes this non-material fact.

26

27

28

GOODMAN LAW GROUP
A Professional Corporation
520 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 383-5088

315603.1                                11

GOODMAN LAW GROUP
A Professional Corporation
520 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 383-5088

8.     Vision also claims that "[d]espite, [sic] the colorful language in the Complaint regarding war ridden airports in Iraq and Afghanistan, Plaintiff Hester has no information regarding military activities in those areas at the time of his employment with Vision." [D.E. 137, at 8.]  It is not clear why this is important.   Nonetheless, it is also false, as Hester actually testified that he knew that he was flying into a "military-protected" area when he flew into Baghdad (Hester Dep., Ex. 1, at 155), that he saw gunfire near the airport (*id.* at 205-206), and that he believed he saw military helicopters and hardware at the airport based on their paint schemes (*id.* at 147).  The Class disputes this non-material fact.

9.     Vision claims that "Hester admits that most of the information in the Complaint came from someone other than himself . . . ." [D.E. 137, at 8.]  The Class does not dispute this fact, as Hester testified that the only specific information that he provided counsel for the Complaint was his background information contained in paragraph 2.  (Hester Dep., Ex. 1, at 181.)  Moreover, the Complaint explicitly states, "Plaintiff Gerald Hester . . ., on behalf of himself and all other similarly situated, sues Vision, and alleges as follows on personal knowledge as to all matters relating to himself, *and on information and belief based upon the investigation of his counsel as to all other matters.*"   [D.E. 1 at 2.] (emphasis added.)  Furthermore, for the reasons set forth in the Class's Response to Vision's Motion to Disqualify [D.E. 126] this fact, while undisputed, is not material.

10.     Vision states that, "[i]n perhaps his most telling admission of a lack of knowledge, Plaintiff Hester admits that he in fact has no personal knowledge whatsoever that anyone at Defendant Vision including himself was entitled to any sort of hazard pay."  [D.E. 137, at 11.]  Hester actually testified that "if Vision collected hazard pay, the money should go to the people who performed the hazardous duty."[8]  (Hester Dep., Ex. 1, at 193.)

---

[8] The Class incorporates by reference its response in Section IB2 of the Response into response number 10.

315603.1

12

GOODMAN LAW GROUP
A Professional Corporation
520 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 383-5088

## II.   ARGUMENT

### A.   SUMMARY JUDGMENT STANDARD

"Summary judgment is proper 'if the pleadings', depositions, answers to interrogatories, and admission on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.'" *Slumier v. Verity, Inc.,* 606 F.3d 584, 586 (9th Cir. 2010) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)).   Once the moving party files its motion for summary judgment, the non-moving party must "designate specific facts showing that there is a genuine issue for trial." *Celotex,* 477 U.S. at 324.   "A material issue of fact is one that affects the outcome of the litigation and requires a trial to resolve the parties differing versions of the truth."   *S.E.C. Comm'n v. Seaboard Corp.,* 677 F.2d 1289, 1293 (9th Cir. 1982).   Here, the Class designated specific facts demonstrating that summary judgment is not appropriate for Vision because there was no contract as a matter of law (in which case summary judgment for the Class on this argument is appropriate), or at the very least because there are material facts in dispute as to whether a contract existed.

> i.   *Vision's Motion must be denied because no reasonable jury could accept Vision's version of the facts in support of its argument that there is an employment contract between Hester and Vision.*

Vision's Motion must be denied on the claim that a contract exists between Vision and Hester because no reasonable jury could accept Vision's version of the facts in support of its argument that there is an employment contract. *See Scott v. Harris*, 550 U.S. 372, 380 (2007). "Summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).   Moreover, "[c]redibility determinations, the weighing of evidence, and the drawing of legitimate inferences from facts are

315603.1

1    jury functions, not those of a judge . . . The evidence of the nonmovant is to be believed and all

2    justifiable inferences are to be drawn in his favor." *Id.*   However, summary judgment is

3    appropriate where no reasonable jury could believe the moving party's argument. *See id.; Ricci*

4    *v. DeStefano*, 129 S.Ct. 2658, 2683 (2009) (concurring).

5
6         Vision's claim that it had a contractual relationship with Hester must be denied because

7    the Vision 767 Memorandum is not an employment contract between the parties as a matter of

8    law. *See Anderson,* 477 U.S. at 248; *Ricci*, 129 S.Ct. at 2683.   Hester testified that he had no

9    employment contract with Vision. (Hester Dep., Ex. 1, at 12.)   An analysis of the Vision 767

10   Memorandum belies the fact that it is a communication and not an employment contract.   The

11   Vision 767 Memorandum is styled as a memorandum, refers to itself as a "memo," and the

12   language below the signature block indicates that it is a communication and not a contract,

13   because it limits the effect of Hester's signature to having received and read the memorandum.

14   In addition, the Vision 767 Memorandum could not be a contract because even though it was

15   dated October 15, 2007, it actually took effect as of October 1, 2007, which required Vision to

16   unilaterally make these changes without the consent of Hester or any of its Air Bridge Program

17   employees.   (*See* Vision 767 Memorandum, Ex. 8, at 1.)   In fact, Hester did not even

18   acknowledge receipt of the Vision 767 Memorandum until November 9, 2007 – more than one

19   month after Vision unilaterally implemented those changes to its guidelines.   Thus, when these

20   facts are weighed in their entirety, there is no rational basis for a jury to believe that there is an

21   employment contract between Hester and Vision and Vision's Motion on this argument must be

22   denied as a matter of law.

23
24
25             ii.      *Vision's Motion must be denied because there are material facts in*
                        *dispute.*
26
27       Alternatively, even if the Court holds that a reasonable jury could find that the Vision 767

28   Memorandum is an employment contract, Vision's Motion must still be denied.   Whether a

315603.1                                      14

GOODMAN LAW GROUP
A Professional Corporation
520 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 383-5088

contract exists is a question of fact, which is inappropriate for summary judgment. *Ringle v. Bruton*, 120 Nev. 82, 88-90 (Nev. 2004) (holding that district court did not err in denying summary judgment because material issue of fact existed as to whether there was a valid and enforceable employment contract between employee and employer); *Bibicoff & Assocs., Inc. v. Fulton*, 108 Nev. 895, 895 (Nev. 1992) (overturning district court's grant of summary judgment because existence of contract was question of material fact); *Carr-Bricken v. First Interstate Bank of Nev.,* 105 Nev. 570, 574 (Nev. 1989) (holding that summary judgment was inappropriate because material facts existed where parties contested whether an implied-in-fact contract existed); *Stone v. Mission Bay Mortgage Co.,* 99 Nev. 802, 804-805 (Nev. 1983) (finding that summary judgment was not appropriate because a material issue of fact existed as to whether an application for employment constituted an employment contract between employee and employer). Here, at the very least, it is disputed whether the Vision 767 Memorandum is an employment contract.  While Vision has taken the position that it is a contract (Maguire Dep., Ex. 9, at 75), Hester and Pritchard both testified that it was not a contract (Hester Dep., Ex. 1, at 12); (Pritchard Dep., Ex. 10, at 28), and Pritchard testified that nobody from Vision ever informed him that it was an employment contract (Pritchard Dep., Ex. 10, at 30).  Accordingly, whether the Vision 767 Memorandum constitutes an employment contract, or whether there was any employment contract between Vision and Hester, is a question of material fact that is in dispute and not appropriate for summary judgment.

**B.     VISION'S MOTION FOR SUMMARY JUDGMENT MUST BE DENIED BECAUSE HESTER'S RIGHTS AND OBLIGATIONS ARE NOT DEFINED BY CONTRACT**

Vision argues that it is entitled to summary judgment on the Class's claims for unjust enrichment (Count I), money had and received (Count III), *quantum meruit* (Count IV), and conversion (Count V) because the "parties' rights and obligations are defined by contract."

GOODMAN LAW GROUP
A Professional Corporation
520 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 383-5088

315603.1

15

GOODMAN LAW GROUP
A Professional Corporation
520 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 383-5088

[D.E. 137, at 15.]   Vision's argument is premised on its belief that "the parties agreed that Plaintiff Hester would work as a pilot for Defendant Vision in return for certain fixed compensation.  This agreement constituted a valid compensation contract."  [D.E. 137, at 16.] Vision, however, fails to cite to any portion of the record in support of this argument and it is unclear from Vision's Motion whether it is arguing that there is an express or implied employment contract between the parties.  Thus, the Class will respond to both arguments.  In addition, Vision's argument that the Class's claims for money had and received and conversion are precluded based on the existence of an employment contract is incorrect as a matter of law.

> i.  *Hester's at-will employment status does not constitute an express or implied contractual relationship that would preclude the Class's claims for unjust enrichment or quantum meruit.*

Hester's at-will employment status does not constitute an express or implied contractual relationship that would preclude the Class's claims for unjust enrichment or *quantum meruit*. The Nevada Supreme Court held that an at-will employment relationship fails to create an express or implied contractual relationship between the parties. *Bally's Grand Employees Fed. Credit Union v. Wallen*, 779 P.2d 956, 957 (Nev. 1989).  In *Bally's Grand Employees Federal Credit Union v. Wallen*  779 P.2d 956, 957 (Nev. 1989), the court held that the plaintiff could only recover on her contract based employment claims if she was "other than an at-will employee; *i.e.,* it was required to find that [defendant] employed [plaintiff] under either an express or an implied contract . . . ."  *See also Ozawa v. Vision Airlines, Inc.,* 216 P.3d 788, 791 (Nev. 2009) ("Since employees in Nevada are presumed to be at-will, an employer can dismiss an employee with or without cause . . . ."); *Am. Bank Stationary v. Farmer*, 799 P.2d 1100, 1101-02 (Nev. 1990) ("We note that all employees in Nevada are presumed to be at-will employees. An employee may rebut this presumption by proving by a preponderance of the evidence that there was an express or implied contract between his employer and himself . . . ."); *S.W. Gas*

GOODMAN LAW GROUP
A Professional Corporation
520 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 383-5088

*Corp. v. Vargas*, 901 P.2d 693, 697 (Nev. 1995) (same).  As such, "at-will employees have no contractual rights arising from the employment relationship that limit the employer's ability to prospectively hire and fire employees, and to change the terms of employment." *Baldonado v. Wynn Las Vegas, LLC*, 194 P.3d 96, 106 (Nev. 2008).  Accordingly, Nevada courts recognize that employment at-will is separate and distinct from employment pursuant to an employment contract and that there is no express or implied contractual relationship that exists between an employer and employee based on the at-will employment relationship. *See id.*

Any other determination would contravene the entire purpose of at-will employment, which is to allow employers to hire employees without entering into an "express written" employment contract. *State v. Eighth Judicial Dist. Court ex. rel. County of Clark*, 42 P.3d 233, 240 (Nev. 2002) ("It is well settled in Nevada that generally an at-will employee can be terminated 'whenever and for whatever cause' without giving rise to liability on the part of the employer.") (internal quotations omitted).  The mere fact that the at-will employment relationship may be governed by contract principles does not convert at-will employment into employment based on an "express written agreement." *See Reeves v. Alyeska Pipeline Service Co.*, 926 P.2d 1130 (AK 1996) (holding that "quasi-contracts are judicially created obligations to do justice . . . the obligation to make restitution that arises in quasi-contract is not based upon any agreement between the parties, objective or subjective." )[9]

Here, Vision's representatives testified that Hester and all of the other members of the

---

[9] The only case that Vision cites to in support of its claim that employment at-will is equivalent to an employment contract is *Vancheri v. GNLV Corp.*, 105 Nev. 417, 420 (Nev. 1989).  This case, however, only illustrates the Class's point that employment at-will does not create an express or implied contractual relationship between the parties.  There, a former employee brought suit against his former employer alleging wrongful termination. *Vancheri*, 105 Nev. at 419.  The court held that the former employee failed to rebut the at-will employment relationship and establish the existence of either an express or implied contract between the former employer and the former employee. *Id.* at 421-22.  Therefore, the employee's contract based employment claims were denied. *Id.* Thus, the sole case Vision cites in support of its argument actually supports the Class's position and demonstrates that employment at-will does not constitute an express or implied contractual relationship. *See id.*

GOODMAN LAW GROUP
A Professional Corporation
520 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 383-5088

1  Class were at-will employees (Maguire Dep., Ex. 9, at 73), Vision's Employee Handbook states

2  that all employees' employment at Vision was at-will (Employee Handbook, Ex. 3, at Section 2

3  at 2), and Hester testified that his employment at Vision was at-will and that he never entered

4  into any employment contract with Vision (Hester Dep., Ex. 1, at 12-13). As such, the at-will

5  employment relationship between Vision and Hester fails to constitute an employment contract,

6  and does not create an express or implied contract that would bar the Class's claims for unjust

7  enrichment or *quantum meruit*. *See Wallen*, 779 P.2d at 957.

8

9          ii.      *There is no express contract between Hester and Vision that would*
                    *preclude the Class's claims for unjust enrichment or quantum*
10                  *meruit.*

11         There is no express contract that precludes the Class's claims for unjust enrichment or

12  *quantum meruit.*   Vision's argument that the Vision 767 Memorandum is an employment

13  contract fails on numerous grounds. First, "[b]asic contract principles require, for an enforceable

14  contract, an offer and acceptance, meeting of the minds, and consideration." *May v. Anderson*,

15  119 P.3d 1254, 1257 (Nev. 2005).     The Vision 767 Memorandum does not constitute an

16  employment contract because there was no offer and acceptance or meeting of the minds. Vision

17  failed to make any contractual offer to Hester or any other member of the Class, and as such,

18  Hester and the Class could never accept any offer made by Vision. The Vision 767

19  Memorandum is dated October 15, 2007, but stated that the policy revisions Vision implemented

20  took effect October 1, 2007. (*See* Vision 767 Memorandum, Ex. 8, at 1.) Thus, Vision

21  unilaterally, and without the consent of the Class, made certain changes to its internal policies

22  and notified the Class only after those changes took effect. (*See id.*) As Hester testified, the

23  Vision 767 Memorandum merely informed him that this was the "rate structure that was

24  unilaterally imposed by Vision Airlines." (Hester Dep., Ex. 1, at 114.) As such, Hester could

25

26

27

28

315603.1                                        18

GOODMAN LAW GROUP
A Professional Corporation
520 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 383-5088

not accept or reject Vision's policy revisions, and there could be no meeting of the minds.[10]  *See*

*Baldonado*, 194 P.3d at 105-06 (holding that memorandum revising employment policies was

not an employment contract).

No rational jury could conclude that there was an express employment contract between

members of the Class and Vision.  Maguire, the author of the Vision 767 Memorandum testified

that no lawyer reviewed the Vision 767 Memorandum prior to its distribution to the Air Bridge

Program employees (Maguire Dep., Ex. 9, at 79), that he did not negotiate the terms of the

Vision 767 Memorandum with any of the Air Bridge Program employees (*id.* at 80-81), and

there was no place on the Vision 767 Memorandum for Vision to sign and accept (*id.* at 84-85).

Maguire also testified that the Air Bridge Program employees were at-will, even after the Vision

767 Memorandum was sent to them.  (*Id.* at 86-88.)  Pritchard testified that he never signed an

employment contract with Vision (Pritchard Dep., Ex. 10, at 28), he did not believe that the

Vision 767 Memorandum was a contract when it was provided to him (*id.* at 30), and that no one

at Vision ever informed him that the Vision 767 Memorandum was an employment contract

(*id.*).

Vision also disclaims the formation of any employment contract in its Employee

Handbook and the Employee Handbook Acknowledgement Form.  Those documents both state

---

[10] Vision cites *Ewing v. Sargent*, 482 P.2d 819 (Nev. 1971), for the proposition that "an employee who has been paid his agreed wages [can] not claim additional compensation in *quantum meruit* to prevent his employer's supposed unjust enrichment."  [D.E. 137 at 15]  *Ewing*, however, does not stand for this proposition.  In *Ewing*, the plaintiff, a furniture manufacturer, sued the defendant, a furniture seller, for additional compensation beyond what the parties agreed to in an express writing.  *Id.* at 820, 823.  The court rejected the plaintiff's claim because there was an "express written agreement between the parties, [which was] evidenced by the purchase orders between the [defendant] and the [plaintiff]."  *Id.* at 823.  *Ewing* is distinguishable on many grounds.  First, there was no employment relationship between the furniture manufacturer and seller, but rather this involved the sale of goods.  Second, *Ewing* does not preclude the Class's claim for recovery under *quantum meruit* because there was no "express written agreement" between the Class and Vision.  In adopting this legal principle, the Nevada Supreme Court in *Ewing* cited to several cases in other jurisdictions where courts held that an express written agreement precluded recovery under a theory of *quantum meruit*.  482 P.2d at 823.  One of the cases *Ewing* cited was *Keith v. Kottas*, 172 P.2d 306 (Mont. 1946).  *Ewing*, 482 P.2d at 823.  The *Ewing* court did not adopt the holding in that case, and specifically said that its ruling was not grounded on the principles in that or the other cases cited.  *Id.*  Indeed, the court "[a]ssum[ed]" that quatum meruit is a theoretically possible remedy," though it denied that relief on the facts of the case.  *Id.*  *Keith v. Kottas* is therefore not the law of Nevada or even dicta.  *See id.*

that all employment with Vision is at-will. (Employee Acknowledgement Form, Ex. 2); (Employee Handbook, Ex. 3, at Section 2 at 2, Signature Page.) Vision's Employee Handbook prevents the formation of any employment contract, because it states, "[e]mployment at-will is the sole and entire agreement between [Vision] and you . . . ." (Employee Handbook, Ex. 3, at Signature Page.) Furthermore, Vision's Employee Acknowledgement Form states, "All employment with [Vision] is at-will. . . Employment at-will is the sole and entire agreement between [Vision] and you concerning the duration of your employment and the circumstances under which your employment may be terminated." (Employee Acknowledgement Form, Ex. 2 at 1.) Therefore Vision's Motion must be denied because no rational jury could believe Vision's version of the facts that there was an express employment contract between Hester and Vision.

> iii.   *The Vision 767 Memorandum is a communication and not a contract because it does not imply any obligations on behalf of the parties.*

The Vision 767 Memorandum is a communication and not a contract, because it does not imply any obligations on behalf of the parties. A communication does not constitute a contract where it does not imply obligations on behalf of the parties. *See United Services Auto Ass'n. v. Shlang,* 894 P.2d 967, 971-72 (Nev. 1995). For example, in *Barelli v. Barelli*, 944 P.2d 246, 250 (Nev. 1997), the Nevada Supreme Court determined that a letter which stated that plaintiff is "currently and will continue on into the future as a salaried employee of this company at the same rate of pay and position" failed to constitute a contract because it did not impose any obligations on the plaintiff. Similarly, the Vision 767 Memorandum fails to constitute a contract because it does not impose any obligations on either Vision or the Class. *See id.* While the Vision 767 Memorandum outlines changes to certain policies, it does not impose any obligation on Vision to honor those policies nor does it preclude Vision from altering those policies at any time, at its discretion in the future. (Vision 767 Memorandum, Ex. 8, at 2.) On the contrary, it merely explains the policies in effect as of October 1, 2007 and for an undetermined time

GOODMAN LAW GROUP
A Professional Corporation
520 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 383-5088

315603.1

thereafter.  The Vision 767 Memorandum did not impose any obligations on members of the Class, as they were not required to continue working for Vision nor was Vision required to employ them for a definite period of time.  Therefore, like the letter in *Barelli*, the Vision 767 Memorandum fails to impose any obligations on the parties, and is not a contract that would bar the Class's claims based on *quantum meruit* or unjust enrichment.  944 P.2d at 250; *see also Shlang*, 894 P.2d at 971-72 (holding that a letter failed to constitute a contract because it did not impose any obligations on the parties even though the letter identified the items to be purchased, quantities, and price). If the Court adopted Vision's argument, it would effectively convert every employer's communication with an employee into an employment contract – a result that is contrary to Nevada's employment at-will policy.

> iv.    *Hester's at-will employment status precludes any contractual rights from arising between Vision and Hester based on the Vision 767 Memorandum.*

Hester's at-will employment status precludes any contractual rights from arising between Vision and Hester based on the Vision 767 Memorandum.  An employment relationship in Nevada is either at-will or governed by an employment contract. *See Ringle*, 86 P.3d at 1037. However, "at-will employees have no contractual rights arising from the employment relationship that limit the employer's ability to prospectively hire and fire employees, and to change the terms of employment." *Baldonado*, 194 P.3d at 106.  Thus, the Nevada Supreme Court endorsed the district court's holding in *Baldonado* that a group of employees' "at-will . . . status precluded any challenge to the employment policy on breach of contract grounds." *Id.* at 98, 105 n.39.

There, table dealers at the Wynn Las Vegas sued the casino for breach of contract based on a memorandum the casino sent its employees which revised certain employment policies. *Id.* at 98.  Specifically, the memorandum changed the tip policy for the table dealers and required them to share their tips with certain lower level management personnel. *Id.*  The court held that

315603.1

21

GOODMAN LAW GROUP
A Professional Corporation
520 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 383-5088

the memorandum failed to constitute a contract, because the communication merely informed the casino's employees about the change in employment policies.   *See id.* at 98, 105-06. Accordingly, a memorandum revising certain employment policies cannot rebut the employment at-will presumption.   *See id.*   Similar to the employees in *Baldonado*, the Vision 767 Memorandum, a communication that informed the Class about certain policy revisions, fails to rebut their at-will employment status and does not convert the Vision 767 Memorandum into an express employment contract.   *See id.*   Put another way, the Vision 767 Memorandum cannot form the basis of a contract that would preclude the Class's claims for unjust enrichment or *quantum meruit.   See id; see also Martin v. Sears, Roebuck & Co.,* 899 P.2d 551, 554 (Nev. 1995) (holding that "[s]ince a claim arising from breach of contract has no application to at-will employment, and [plaintiff] has not demonstrated that he was other than an at-will employee, a breach of contract cause of action will not lie").

> *v.* *Vision's Employee Handbook prevents any contractual relationship from forming between Vision and Hester, and thus, prevents the formation of any contract that would preclude the Class's claims for unjust enrichment or quantum meruit.*

Vision's Employee Handbook prevents any contractual relationship from forming between Vision and Hester, and thus, prevents the formation of any contract that would preclude the Class's claims for unjust enrichment or *quantum meruit.* "In Nevada, at-will employment is presumed in the absence of a written employment agreement." *See Ringle,* 86 P.3d at 1036. The at-will presumption may be rebutted if "a preponderance of the evidence [demonstrates] that there was an express or implied contract of employment . . . ." *Vargas,* 901 P.2d at 697. However, a company may prevent any "implied contractual liability from arising . . . by including a disclaimer in their employee handbooks." *Id. See also D'Angelo v. Gardner,* 819 P.2d 206, 209 n.4 (Nev. 1991) (holding that an employer can easily prevent an employment contract from arising by "including in its handbook an express disclaimer of implied contractual

315603.1

22

1   liability").

2       Vision specifically limits any contractual liability from arising between Vision and any of

3   its employees based on the Vision 767 Memorandum because it incorporates by reference the

4   Vision Employee Handbook into the Vision 767 Memorandum.  (*See* Vision 767 Memorandum,

5   Ex. 8, at 2.)  Vision's Employee Handbook states, "Employment At-Will: The employment

6   relationship between Vision Airlines and its employees is at-will and may be terminated by

7   either party at any time."  (Vision's Employee Handbook, Ex. 3, Section 2 at 2.)  Vision's

8   

9   Employee Handbook also states:

10          I understand that the policies in this Employee Handbook in no way
            modify my status as an at-will employee and in no way imply, infer or
11          guarantee my continued employment for any definite term . . . [Vision]
            reserves the right to modify, revoke, suspend, terminate, interpret, or
12          change any or all portions of these policies with or without notice.  *The
            language used in these policies is not intended to constitute a contract of
13          employment, either express or implied.* All employment with [Vision] is
            at-will.  You have the right to terminate your employment at any time,
14          with or without cause or notice, and [Vision] has a similar right.
            *Employment at-will is the sole and entire agreement between [Vision]
15          and you concerning the duration of your employment* and the
            circumstances under which your employment may be terminated.
16   

17   (*Id.* at Employee Signature Page) (emphasis added.)

18       Hester received a copy of the October 2006 Employee Handbook (Hester Dep., Ex. 1, at

19   84) and executed an Employee Acknowledgement Form (Employee Acknowledgement Form,

20   Ex. 2).  The Employee Acknowledgement Form that Hester executed stated:

21          I understand that the policies in this Employee Handbook in no way
            modify my status as an at-will employee and in no way imply, infer or
22          guarantee my continued employment for any definite term . . . *The
            language used in these policies is not intended to constitute a contract of
23          employment, either expressed or implied . . . .* This Handbook should not
            be construed, nor does it constitute, any kind of 'employment contract,' .
24          . . Nothing in this Employee Handbook creates or is intended to create a
            promise or representation of continued employment.  *All employment
25          with the Company is at-will . . . Employment at-will is the sole and entire
            agreement between the company and you concerning the duration of
26          your employment and the circumstances under which your employment
            may be terminated.*
27   

28   

GOODMAN LAW GROUP
A Professional Corporation
520 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 383-5088

GOODMAN LAW GROUP
A Professional Corporation
520 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 383-5088

(*Id.*) (emphasis added.)   Thus, Vision is precluded from arguing that the Vision 767 Memorandum constitutes an employment contract because it repeatedly disclaims such liability in its Employee Handbook and the Employee Handbook Acknowledgement Form. *See Vargas*, 901 P.2d at 697; *D'Angelo*, 819 P.2d at 209 n.4.   There is no employment contract that would bar the Class's claims for unjust enrichment or *quantum meruit*, because Vision expressly disclaims the existence of any employment relationship based on contract.

> vi.   *The contracts between Vision and the upstream contractors do not preclude the Class's claims for unjust enrichment or quantum meruit.*

The contracts between Vision and the upstream contractors do not preclude the Class's claims for unjust enrichment or *quantum meruit*.   Vision argues that the existence of contracts between itself and Capital Aviation and McNeil somehow preclude the Class's claims for unjust enrichment and *quantum meruit*.   However, these "express written agreements" do not preclude the Class's claims because they are between Vision and Capital Aviation and Vision and McNeil, not between Vision and the Class members.   Thus, they fail to constitute an express contract that would bar the Class's unjust enrichment or *quantum meruit* claims.[11]

---

[11] In its Motion, Vision claims that neither the "Capital Subcontract nor the McNeil Subcontract required the payment of any 'hazardous duty' sum." [D.E. 137, at 16.] However, the original subcontract between Vision and Capital Aviation specifically identifies "crew hazard pay" as a component of Vision's price to Capital Aviation. (Capital Aviation subcontract, attached as Ex. 19, at CAI 27862.) Moreover, while not critical to the Class's claims, Vision makes this assertion even though it has failed to produce the full and complete version of either contract with all the associated modifications, which is one of the many subjects of the Class's Renewed Motion to Compel [D.E. 93] filed on January 20, 2010, and supplemented by the Class's Supplement in Support of the Class's Renewed Motion to Compel [D.E. 106] on April 9, 2010, which awaits a ruling from this Court.  Vision has refused to produce any of the modifications to this contract, which one of Vision's 30(b)(6) representatives testified that there were at least two (Meers Dep., Ex. 20, at 382).  The Class, however, has obtained through third-party discovery unexecuted drafts of at least twelve different modifications to the contract between Capital Aviation and Vision. (*See* Modification 11, attached as Ex. 21, at CAI 30986); (Modification 12, attached as Ex. 22.)  Specifically, Modification 11 to that contract identifies "hazardous duty compensation" for Vision's Air Bridge Program employees. (Modification 11, Ex. 21, at CAI 30996-30997.) Similarly, Vision has refused to produce a non-redacted version of the McNeil contract and has instead only provided the Class with a heavily redacted version. One of Vision's 30(b)(6) representatives testified that there were at least "22 or 24" modifications to the McNeil Contract, none of which were produced to the Class despite Vision's promise to do so. (Meers Dep., Ex. 20, at 417.) The contract between Vision and McNeil was also renewed for an additional year (McNeil Affidavit, attached as Ex. 13, at ¶ 7), and Vision has refused to produce this contract to the Class.  Vision's refusal to turn over these documents is not surprising, as CSC's representative testified that Vision was expected to pay its employees the

315603.1

GOODMAN LAW GROUP
A Professional Corporation
520 S. Fourth Street, 2ⁿᵈ Floor
Las Vegas, Nevada 89101
(702) 383-5088

vii.   *The existence of an employment contract between Vision and Hester does not bar the Class's claims for conversion or money had and received.*

Even assuming that the Vision 767 Memorandum was an employment contract, which it is not, it still would not bar the Class's claims for conversion or money had and received.  For example, in *Countrywide Home Loans, Inc. v. Thitchener*, 192 P.3d 243, 248 (Nev. 2008), plaintiff pled claims for breach of contract and conversion seeking to recover under the same set of operative facts.  There, the jury awarded the plaintiff damages on its breach of contract and conversion claims.  *Id.*  The Nevada Supreme Court held, however, that the award for breach of contract and conversion were duplicative awards because they were "alternative or different theories of relief based on the same facts." *Id.*  Thus, Nevada courts have recognized that the existence of a contract between a plaintiff and a defendant does not preclude a conversion claim seeking to recover under the same set of facts. *Id.*; *see also Maki v. Chong*, 119 Nev. 390, 391 (Nev. 2003) (recognizing that plaintiff in prior action against defendant obtained default judgment for breach of contract and conversion where defendant converted plaintiff's settlement check and used the funds to purchase the real property subject to the instant lawsuit).

Similarly, the Class's claim for money had and received is not precluded by the existence of a contract between Vision and Hester.  For example, the court in *Leete v. Pacific Mill & Mining Co.*, 88 F. 957, 969 (D. Nev. 1898), held that plaintiff stated a cause of action for money had and received even though there was a contract between the parties that did not require the defendant to return the money recovered from the government to the plaintiff. *See also Kondas v. Washoe County Bank*, 271 P. 465, 466 (Nev. 1928) (holding that plaintiff prevailed on claim for money had and received even where a verbal contract existed between plaintiff and defendant); *Cannon v. Cannon*, 868 N.E. 2d 636, 643-44 (Mass. App. Ct. 2007) (holding that

---

hazard pay it billed for and collected (Feigin Dep., Ex. 7, 11, 24-25, 28, 33, 37), Vision identified hazard pay as part of its quotes to Capital Aviation, CSC and McNeil, CSC identified hazardous duty pay as part of its quote to the United States government, and Vision received hazard pay on behalf of its employees in all four phases of the Air Bridge Program (*id.*).

plaintiff prevailed on claim for money had and received even though the beneficiary form failed to identify plaintiff as a beneficiary). Thus, in Nevada, the existence of a contract between the plaintiff and the defendant is not a bar to a party's claim for money had and received or conversion.[12]

## C.    CONSTRUCTIVE TRUST IS AN INDEPENDENT CAUSE OF ACTION IN NEVADA

Vision moves for summary judgment on the Class's claim for constructive trust on the basis that since the Class is not entitled to judgment on any of its other counts, constructive trust is a remedy and does not apply. [D.E. 137, at 16.] Vision argues that the Class's claim for constructive trust is also deficient because the Class cannot establish a confidential relationship between members of the Class and Vision. [*Id.*] Vision's arguments, however, are legally flawed because Nevada courts have long recognized that constructive trust is an independent cause of action and that there is a confidential relationship between Hester and Vision.

> i.    *Nevada courts recognize a claim for constructive trust as an independent cause of action.*

Vision argues that the Class's claim for constructive trust fails because it is a remedy and does not apply since the Class cannot succeed on any of its other claims. *Id.* Vision's argument, however, is incorrect because Nevada courts have long recognized a claim for constructive trust as a separate and independent cause of action. *See Bemis v. Estate of Bemis*, 114 Nev. 1021

---

[12] Vision argues that the Class's claim for money had and received "is duplicative of a claim for unjust enrichment, and, therefore, should be dismissed on the same grounds." [D.E. 137, at 15 n.6] To the extent that Vision is arguing that dismissal is required because these counts are duplicative, it is mistaken. The basis for Vision's argument is an article in American Jurisprudence, which cites only the case of *Hall v. Humana Hosp. Daytona Beach*, 686 So. 2d 653 (Fla. 5th DCA 1996). Nevada courts, by contrast, have long recognized an independent claim for money had and received. *See Brown v. Federal Savings and Loans*, 777 P.2d 361, 364 (Nev. 1983) (discussing that jury did not find defendant liable under theory of money had and received); *Carter v. Barbash*, 417 P.2d 154, 156 (Nev. 1966) (granting plaintiff's claim for "money had and received"); *Giorgetti*, 241 P.2d at 201 (recognizing "the common-law count of money had and received"); *Craig v. Harrah*, 201 P.2d 1081, 1086-87 (Nev. 1949) (affirming district court's ruling in favor of plaintiff on action for money had and received). *See also CIG Exploration, Inc. v. Mitchell*, 24 P.3d 966, 971 (UT 2001) (recognizing a cause of action for money had and received); *C.A.M. Concepts, Inc. v. Gwyn*, 136 P.3d 60, 63 (OR. 2006) (same); *Leslie v. Fidelity Na'l Title Ins. Co.*, 2009 WL 483956, *5 (W.D. Wash. 2009) (recognizing that money had and received and unjust enrichment are two separate and distinct causes of action). Indeed, even Florida courts are divided on the subject, with some holding that, unlike unjust enrichment, money had and received is a remedy at law. *See Willis v. Fowler*, 136 So. 358, 368 (Fla. 1931); *Sharp v. Bowling*, 511 So. 2d 363, 364 (Fla. 5th DCA 1987). Accordingly, the Class's claim for money had and received is not duplicative of its unjust enrichment claim.

315603.1

26

GOODMAN LAW GROUP
A Professional Corporation
520 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 383-5088

(Nev. 1998); *McKissick v. McKissick*, 560 P.2d 1366, 1369 (Nev. 1977).[13]   For example, in

*McKissick v. McKissick*, 560 P.2d 1366, 1369 (Nev. 1977), the court treated plaintiff's claim for

constructive trust as an independent cause of action and imposed a constructive trust over the

proceeds from an insurance policy.   *See also In re Jane Tiffany Living Trust 2001, U/A/D/ Nov.

*5, 2001*, 177 P.3d 1060, 1064 (Nev. 2008) (holding that the district court did not err in

dismissing plaintiff's civil action for constructive trust because it was time barred).   Accordingly,

the Class's claim for constructive trust is an independent cause of action and the Court can

impose a constructive trust over the hazard pay that Vision collected for the benefit of the Class.

>                 ii.        *A confidential relationship exists between the Class and Vision.*

Vision also argues that the Class cannot succeed on its claim for constructive trust

because there was no confidential relationship between it and Vision.   [D.E. 137, at 16.]

Vision's argument, however, is incorrect as a matter of law.   A constructive trust arises where

"the holder of legal title to property is held to be a trustee of that property for the benefit of

another who[m] in good conscience is entitled to it."   *Locken v. Locken*, 650 P.2d 803, 804-05

(Nev. 1982).   A constructive trust arises where: "(1) a confidential relationship exists between

the parties; (2) retention of legal title by the holder thereof against another would be inequitable;

and (3) the existence of such a trust is essential to the effectuation of justice."   *Id.* at 805.

A confidential relationship exists where the parties have a duty of trust and confidence to

each other.   *Lindt v. Webber*, 134 P. 461, 466 (Nev. 1913); *Locken*, 650 P.2d at 805.   For

example, the court in *Lindt v. Webber*, 134 P. 461, 461 (Nev. 1913), held that the employment

relationship between an employer and employee was based on "trust and confidence," which

prevented the employee from engaging in conduct contrary to the employer's interest. There, the

employee was sent to investigate a prospective mining interest on behalf of his employer and the

employee purchased the land from the seller in order to re-sell it to his employer at a higher

---

[13] While Nevada courts have held that a constructive trust is a "remedial device," that does not mean that it is solely

GOODMAN LAW GROUP
A Professional Corporation
520 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 383-5088

GOODMAN LAW GROUP
A Professional Corporation
520 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 383-5088

price. *Id.* The court held the employee's scheme was a "flagrant . . . breach of confidence" because the employee, through the benefit of the employment relationship, used that trust and confidence to take advantage of the employer. *Id.* at 466.

Similarly, a confidential relationship exists between Vision and the Class based on the trust and confidence of the employment relationship. *See id.* at 461. Here, that relationship of trust and confidence is substantial, because the flight deck and cabin crews risked their lives to operate Vision's flights into and out of the war zones in Baghdad and Kabul. (Pritchard Dep., Ex. 10, at 37-38.) Moreover, Vision used its superior position and unique knowledge to take advantage of the Air Bridge Program flight deck and cabin crews by using the risk those individuals personally undertook to justify and collect hazard pay on their behalf (*see* Feigin Dep., Ex. 7, at 24-25, 28, 33, 37-38); (Vision's Aircraft Quote to McNeil, Ex. 5), and then retained that hazard pay for itself (Preliminary Mukamal Report, Ex. 14, at 4-5, 7-8); (Supplemental Mukamal Report, Ex. 15, at 4-6); (Maguire Dep., Ex. 9, at 97-98). As was the case in *Lindt* under similar facts, Vision's scheme to deprive the Class of its hazard pay is a "flagrant . . . breach of confidence," because Vision used the trust and confidence of the employment relationship in order to exploit its employees. *See Lindt*, 134 P. at 466.

Furthermore, Vision's argument that Nevada does not recognize the confidential nature of the employment relationship is incorrect. [D.E. 137, at 16 n.6]   In support of its argument, Vision cites *Miller v. Yokohama Tire Corp.*, 358 F.3d 616, 621 (9th Cir. 2004), for the proposition that "no presumption arises from the bare fact that parties to a contract are employer and employee; rather additional ties must be brought out in order to create the presumption of [a] confidential relationship between the two." [D.E. 137, at 16 n.6] The *Miller* court, however, applied California law, which does not apply here.

a remedy.

GOODMAN LAW GROUP
A Professional Corporation
520 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 383-5088

1    Moreover, even applying the more stringent standard under California law, which is not

2    required under Nevada law, the Class has sufficiently demonstrated the "additional ties"

3    necessary to establish a confidential relationship between itself and Vision.  The employment

4    relationship between the Class and Vision, which involved dangerous flights into war zones,

5    required the utmost trust and confidence between the parties and certain additional ties between

6    Vision and the Air Bridge Program employees.  Those additional ties included Vision's

7    requirement that Class members execute a Non-Competition & Non-Disclosure Agreement

8    which precluded them from competing against Vision and from disclosing Vision's truly

9    confidential information.  (Vision Non-Compete Non-Disclosure Agreement, attached as Ex.

10   23.)    Furthermore, Class members were required to execute a Classified Information

11   Nondisclosure Agreement.  (Classified Information Non-Disclosure Agreement, attached as Ex.

12   24.)  Thus, these facts are sufficient for a jury to find a confidential relationship between Vision

13   and the Class.  *See Hagan v. Fairfield*, 238 Cal. App. 2d. 197, 198 (Cal. Dist. Ct. App. 1965)

14   (holding that a confidential relationship existed between client and private investigator based on

15   the "secrecy" of the matters the private investigator investigated).[14]

16   **III.    CONCLUSION**

17       Vision's Motion must be denied because as a matter of fact and law there was no

18   employment contract between Vision and the Class members.  However, even if the Court did

19   conclude that a rational jury could determine that there was a contract here, summary judgment

20   is still not appropriate because there are material facts in dispute.  Vision tries to escape liability

21   to the Class by attempting to convert the Vision 767 Memorandum, a communication between

22   Vision and Hester that covers only Phase IV of a four phase program, into an employment

---

[14] Vision argues that the Class is not entitled to declaratory or injunctive relief because it has failed to demonstrate that it has prevailed on any of its claims or suffered an injury of a legally-protectable interest.  Accordingly, the Class is entitled to summary judgment on its claims for declaratory and injunctive relief if the Court finds that the Class has suffered an injury and grants it summary judgment on any of its counts.

315603.1                                    29

contract.  Vision's argument is not only legally deficient, but is also squarely contradicted by its own Employee Handbook which expressly disclaims any employment relationship other than employment at-will.  Moreover, even if the Vision 767 Memorandum was an employment contract, it still would not preclude the Class's claims for unjust enrichment for Phases I-III or the Class's claims for money had and received and conversion for Phases I-IV.  Accordingly, for the foregoing reasons, Vision's Motion must be denied.

Respectfully submitted,

/s/ Brett E. von Borke
Kenneth R. Hartmann, (FBN 664286)
Brett E. von Borke (FBN 0044802)
KOZYAK TROPIN & THROCKMORTON, P.A.
2525 Ponce de Leon, 9th Floor
Coral Gables, Florida 33134
Telephone: (305) 372-1800
Fax: (305) 372-3508

/s/ Ross Goodman
GOODMAN LAW GROUP
ROSS GOODMAN, (NBN 7722)
520 South Fourth Street
Las Vegas, Nevada 89101
(702) 383-5088
(702) 385-5088 (Facsimile)

/s/ David M. Buckner
David M. Buckner
David M. Buckner (FBN 60550)
GROSSMAN ROTH, P.A.
2525 Ponce de Leon, 11th Floor
Coral Gables, Florida  33134
Telephone: (305) 442-8666
Fax: (305) 285-1668

**COUNSEL FOR PLAINTIFF AND THE CLASS**

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that a true copy of the foregoing has been served via the Court's CM/ECF system on August 23, 2010 on Harold P. Gewerter, Esq., 2705 Airport Drive, North Las Vegas, Nevada 89032.

By: /s/ David M. Buckner
David M. Buckner

GOODMAN LAW GROUP
A Professional Corporation
520 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 383-5088