# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| GERALD HESTER, on behalf of himself and all others similarly situated,<br><br>    Plaintiff(s),<br><br>vs.<br><br>VISION AIRLINES, INC.,<br><br>    Defendant(s). | Case No.: 2:09-cv-00117-RLH-RJJ<br><br>**O R D E R**<br><br>(Motion for Summary Judgment–#135; Cross Motion for Summary Judgment–#137; Motion for Summary Judgment on Vision Airline's Inc.'s Amended Counterclaim–#138) |

   Before the Court is Plaintiff Gerald Hester's **Motion for Summary Judgment** (#135), filed July 29, 2010. The Court also considered Defendant Vision Airlines, Inc.'s Response (#141), filed August 23, 2010, and Hester's Reply (#156), filed September 9, 2010.

   Also before the Court is Vision's **Motion for Summary Judgement** (#137), filed July 29, 2010. The Court also Considered Hester's Response (#143), filed August 23, 2010 and Vision's Reply (#153), filed September 9, 2010.

   Lastly, before the Court is Hester's **Motion for Summary Judgment on Vision Airlines, Inc.'s Amended Counterclaims** (#138), filed July 29, 2010. The Court also considered Vision's Response (#142), filed August 23, 2010, and Hester's Reply (#155), filed September 9, 2010.

1

**BACKGROUND**

Since 2005, Defendant Vision Airlines has provided air transportation services for the United States government as a subcontractor. Twice weekly, Vision transports individuals and cargo to and from Bagdad, Iraq and Kabul, Afghanistan. Although this service ultimately benefits the federal government, Vision does not contract directly with the United States. Initially, the federal government contracted with Computer Sciences Corporation ("CSC") to provide transportation to Bagdad and Kabul. CSC, in turn, subcontracted with Capital Aviation, Inc., which then subcontracted with Vision to provide the air transportation services. Vision provided these services pursuant to its subcontract with Capital Aviation until the summer of 2007, at which point it contracted with McNeil Technologies, Inc., who apparently stepped into the shoes of CSC or Capital Aviation. Vision currently provides air transportation services to Iraq and Afghanistan under its subcontract with McNeil Technologies.

According to Hester, the government pays CSC for the flights, who then pays Capital Aviation, who then pays Vision. Hester further alleges that as part of CSC's subcontract, it provides Capital Aviation with hazard pay for the employees who operate the flights to and from the Middle East. Capital Aviation allegedly then provides that hazard pay to Vision, who is required to remit the hazard pay to its crew members.

Hester alleges that starting in May 2005, he operated flights twice weekly to and from Kabul International Airport. Hester further alleges that from May 2005 to September 2005, Vision collected hazard pay for its employees, but made only "sporadic payments" during that time. (Dkt. #63, Mot. 3.) According to Hester, at the end of September 2005, Vision "decided to retain [the] hazard pay for itself and fire[] all of the employees who were aware that Vision was required to pay its employees hazard pay." (*Id.*) Thus, Hester alleges that from October 2005 until the summer of 2007, Vision received hazard pay from Capital Aviation for its flights to Iraq and Afghanistan, but did not remit any of these payments to its employees. Finally, Hester alleges

\

Vision has received hazard pay from McNeil Technologies since the summer of 2007 to the present, but has not remitted this money to its employees.

On January 20, 2009, Hester filed suit in this Court alleging (1) unjust enrichment; (2) constructive trust; (3) money had and received; (4) quantum meruit; (5) conversion; (6) injunctive relief; and (7) declaratory relief. (Dkt. #1, Compl.) On Dec. 12, 2009, after its initial counterclaims were dismissed, Vision brought the following amended counterclaims against Hester: (1) breach of confidentiality and non-disclosure agreements; (2) injunctive relief; and (3) declaratory relief. (Dkt. #88, Am. Countercl.) On July 29, 2010, Hester filed his Motion for Summary Judgement on Class' Claims. (Dkt. #135.) The same day, Vision filed a Cross Motion for Summary Judgment. (Dkt. #137.) Both parties have responded to the respective motions. Finally, also on the 29th, Hester filed a Motion for Summary Judgment on Vision's Amended Counterclaims (Dkt. #138) to which Vision responded (Dkt. #142 Resp. Aug. 23, 2010). For the reasons discussed below, the Class' Motion for Summary Judgment is denied, Vision's Motion for Summary Judgment is granted in part and denied in part, and Hester's Motion for Summary Judgment on Vision's Amended Counterclaims is granted.

**DISCUSSION**

In this order, the Court will address the two motions for summary judgment based on the Class' complaint simultaneously. The Court will then separately address the Motion for Summary Judgment on Vision's Amended Counterclaims. Since each is a summary judgment motion, the same legal standard applies throughout.

**I.      Legal Standard**

A court will grant summary judgment if "the pleadings, the discovery and disclosure materials on file, and any affidavits show there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is "genuine" if there is a sufficient evidentiary basis on which a reasonable fact-finder could find for the nonmoving party, and a dispute is "material" if it could affect the outcome of the suit

under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). In evaluating a motion, a court views all facts and draws all inferences in the light most favorable to the nonmoving party. *Zoslaw v. MCA Distrib. Corp.*, 693 F.2d 870, 883 (9th Cir. 1982).

The movant bears the burden of showing that there are no genuine issues of material fact. *Id.* "In order to carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). Once the movant satisfies the requirements of Rule 56, the burden shifts to the party resisting the motion to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256; *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The nonmoving party "may not rely on denials in the pleadings but must produce specific evidence, through affidavits or admissible discovery material, to show that the dispute exists," *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991), and "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986).

**II.     Summary Judgment on Class Claims**

   **A.     Unjust Enrichment, Conversion, and Money Had and Received**

The Class has presented sufficient factual issues to preclude summary judgment on its claims for unjust enrichment, money had and received, and conversion. As to all three claims (and the *quantum meruit* claim addressed below), Vision argues that these claims must be dismissed because there is an express contract between the parties. Vision fails in this argument. Although a court will not imply an agreement where an express agreement exists, Vision has failed to show an express employment contract. *Leasepartners Corp. v. Robert L. Brooks Trust Dated November 12, 1975*, 942 P.2d 182, 187 (Nev. 1997). What Vision has shown are some of its policies, including payment polices, which Vision expressly stated in its employment manual are

4

not contracts. (Dkt. #156, Ex. 12, Employee Handbook § 2, 2.) Therefore there is no express contract covering the relevant subject matter even though employment at-will is a contractual relationship. *Baldonado v. Wynn Las Vegas, LLC*, 194 P.3d 96, 105–06 (Nev. 2008). Since no express contract between Vision and the Class members is relevant to these issues, Vision's argument fails. Therefore, the Court may properly address the Class' claims.

### i. Unjust Enrichment

The Class has presented sufficient evidence for a claim of unjust enrichment. Unjust enrichment is the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience." *Topaz Mut. Co., Inc. v. Marsh*, 839. P.2d 606, 613 (Nev. 1992) (quoting *Nevada Industrial Dev. v. Benedetti*, 741 P.2d 802, 804 n.2 (Nev. 1987)). The elements of an unjust enrichment claim are: (1) a benefit conferred on the defendant by the plaintiff; (2) appreciation by defendant of that benefit; and (3) the defendant's acceptance and retention of that benefit. *Id*.

Hester has presented evidence to meet the requirements of an unjust enrichment claim. Specifcally, Hester has shown that Vision has billed other parties with invoice lines stating a standard rate of pay for Vision's employees and additionally a hazard bonus. (*See* Dkt. #135, Ex. 11 Invoice.) These invoices also show separate line items for Vision's profits. (*Id.*)

It is more than conceivable that a jury could find that these line items marked "Hazard Duty Bonus" rightfully belong to the employees. This is especially true considering that Laura Feingin of CSC testified in her deposition that CSC was billed for hazard pay and expected that it would be paid to Vision's employees, (*Id.*, Ex. 1, Feingin Dep. 24–25, 28, 33, 37–38), and yet Maguire, apparently a high level Vision employee who helped set the pay scale, testified in his deposition that Vision decided not to give any type of bonus for flying into Afghanistan or Iraq because they feared scheduling problems (*Id.*, Ex. 5, Maguire Dep. 96–98). This does not conclusively prove that the money does or does not belong to the employees which would lead to summary judgment. It does, however, create a triable issue of fact. If this money does not belong

1  to the employees, however, it seems that it might belong to the entity who initially paid it believing
2  that it would go to the employees, namely the United States. Further, factual issues also remain as
3  to exactly how much money was billed and how much money was paid. Therefore, summary
4  judgment would be inappropriate on the unjust enrichment claim.

### ii.  Conversion

The Class has presented sufficient evidence for a claim of conversion. Conversion is a "distinct act of dominion wrongfully exerted over personal property in denial of, or inconsistent with, title or rights therein or in derogation, exclusion or defiance of such rights." *Edwards v. Emperor's Garden Restaurant*, 130 P.3d 1280, 1287 (Nev. 2006) (citing *Wantz v. Redfield*, 326 P.2d 413 (Nev. 1958)). Here, it seems incongruous to state that the Class does not have at least some rights, if not actual title, in the hazard duty pay that CSC and the other upstream contractors delivered to Vision since the upstream contractors intended that the hazard pay go to the Class. (*See* Dkt. #135 Ex. 1, Feingin Dep. 24–25, 28, 33, 37–38 (stating that CSC expected all invoice line items to be paid as billed including hazard pay).) William Acor of Vision claims that the money was paid, just not called hazard pay, which the Class, its expert, and at least one witness for Vision dispute. However, the amount owed and whether the payments were made is still an issue of fact for a jury to determine. Thus, summary judgment is inappropriate as to this claim.

### iii.  Money Had and Received

The class has shown sufficient facts for a claim of money had and received. Money had and received is a tort rarely used in the modern day, at least in Nevada. It is similar to both unjust enrichment and a constructive trust. Presumably it is plead here in the alternative as are other of the Class' claims.

An action for money had and received exists whenever one man has received or obtained the possession of another's money, "which he ought in equity and good conscience [] pay over." *Kondas v. Washoe County Bank*, 271 P. 465, 466 (Nev. 1928). "There need be no privity between the parties, or any promise to pay, other than that which results or is implied from one

1  man's having another's money, which he has no right conscientiously to retain." *Id*. The *Kondas*
2  court continued, "[w]hen the fact is proved that he has the money, if he cannot show a legal or
3  equitable ground for retaining it the law creates the privity and the promise." *Id*. Further, contrary
4  to Vision's assertion, a claim for "money had and received cannot be denied merely because the
5  plaintiff may have other remedies to recover its loss." 66 Am. Jur. 2d *Restitution and Implied*
6  *Contracts* § 172 (2008).

7        In the present case, a reasonable juror could find that Vision obtained money that
8  equity and good conscience require it to pay over to the class. This is because Vision received
9  extra payments labeled "hazard duty bonus" from the upstream contractors who believed the
10 hazard bonus line item would be paid to the Class. Therefore the claim stands. The Court notes,
11 however, that Vision is correct that the claim is essentially duplicative of the unjust enrichment
12 claim, and so the Class cannot recover on both.

13     **B.**    **Quantum Meruit**

14       The Class has not shown sufficient triable facts to sustain their claim in *quantum*
15 *meruit*. To establish a claim in *quantum meruit*, a plaintiff must show the following elements: (1)
16 that valuable services were rendered; (2) to the defendant; (3) those services were given with the
17 knowledge and consent of the defendant; and (4) it was reasonably understood that the plaintiff
18 expected to be paid. 66 Am. Jur. 2d Restitution and Implied Contracts § 38 (2008). Also, there
19 must not be a "contract governing the issue of payment for the ... services." *Id.*

20       The Court grants summary judgment on the Class' *quantum meruit* claim because
21 there was a compensation agreement between the parties. (*See* Dkt. #141, Ex. 4, Hester Dep.
22 11–12, 47, 90–91.) Hester (and presumably the other members of the class) agreed to work for
23 particular salaries, or at least no facts show otherwise. (*Id*.) When Vision changed the salary in
24 the 737 Memorandum (*Id.* Ex. 5) the employees continued to work and thereby agreed to those
25 changed policies, including salary. *See Baldonado*, 194 P.3d at 105–06 (stating that at-will
26 employer's may unilaterally change the terms of employment and that an employee's continued

7

1   work constitutes sufficient consideration for the modification).  Employment at-will is not an
2   employment contract in the sense of a written document determining how a person can be fired or
3   limiting a company's ability to fire an employee, but it still creates a limited contractual
4   relationship where one party agrees to pay the other for work done, generally at a specific rate of
5   pay.  *Id*.  Here, the class agreed to work and Vision agreed to pay for that work.  Vision met its
6   basic employment obligation under what limited agreement existed.  The other claims survive
7   because separate entities gave money to Vision expecting it to be passed on to the Class, which
8   was not governed by any contract or other agreement, not because Vision didn't pay the Class
9   what it agreed to pay them for their services.

10             One proper analogy is a waiter (or waitress) working at a restaurant.  He is likely an
11  at-will employee.  He has an agreement to receive a certain salary or, more likely, an hourly wage.
12  Assuming the restaurant complies with minimum wage laws that hourly wage is all that the
13  restaurant owes the waiter for his work.  Nonetheless, if a customer leaves a tip with the manager
14  for the waiter, neither the manager nor the restaurant has rights in that money.  Justice and equity
15  would require that money to be given to the waiter or, at the very least, returned to the customer,
16  not pocketed by the manager or the restaurant.  This situation is similar.  Vision paid its employees
17  their salaries.  Vision, however, has not shown that it paid the hazard bonus, intended for those
18  employees, that Vision received from the United States by way of the upstream contractors.
19  Neither has Vision shown that its keeping the money is just, equitable, or legal.  Vision has only
20  shown that no express contract that it has disclosed covers this scenario.  This allows the unjust
21  enrichment, money had and received, and conversion claims to survive.  The available evidence
22  does not, however, help the *quantum meruit* claim.
23             Since Vision paid the agreed upon salary, or at least no evidence contradicts that,
24  the claim in *quantum meruit* must fail as a matter of law.
25  /
26  /

### C. Remedies – Constructive Trust, Injunctive and Declaratory Relief

#### i. Constructive Trust

The Class has not presented sufficient evidence on their claim for a constructive trust. A constructive trust is an equitable remedy, *Bemis v. Estate of Bemis*, 967 P.2d 437, 441 (Nev. 1998), though the Court does not dispute the Class' claim that a constructive trust may be an independent cause of action given the proper circumstances. This, however, is not one such circumstance. Here, the Class has other claims that may give rise to a constructive trust or money damages, which makes an independent claim for a constructive trust improper. Even though the independent claim for a constructive trust fails, a constructive trust may still be an appropriate remedy if the Class succeeds on its remaining claims.

#### ii. Injunctive and Declaratory Relief

Likewise, injunctive and declaratory relief are remedies, not individual claims. A court cannot grant a remedy until it finds a wrong. *State Farm Mut. Auto Ins. Co. v. Jafbros, Inc.*, 860 P.2d 176, 178 (Nev. 1993). Since there are factual issues remaining such relief must be denied until the factual issues have been resolved.

### III. Summary Judgment on Vision's Amended Counterclaims

Vision has presented no material factual evidence to support its amended counterclaims. In fact, Vision merely relies on its own allegations, suppositions, and coincidence for its argument that there are sufficient issues of material fact for trial. Such reliance is insufficient as a matter of law. *See Nilsson, Robbins, Dalgarn, Berliner, Carson & Wurst v. Louisiana Hydrolec*, 854 F.2d 1538, 1545 (9th Cir. 1988) (holding that a nonmoving party may not rely on its pleadings and allegations to defeat a properly supported motion for summary judgment where those pleadings and allegations are not supported by any record evidence). Therefore, the Court grants summary judgment against all amended counterclaims.

/

/

### A. Breach of Classified Information Non-Disclosure Agreement

The Class met its burden of production by showing that Vision does not have sufficient, or any, evidence to carry its burden of persuasion at trial. Vision alleges and has provided evidence that Hester signed both a classified information non-disclosure agreement with the United States and a confidentiality and non-disclosure agreement with Vision itself. Vision alleges that it is a third party beneficiary of Hester's agreement with the United States. It is unclear why this would be so since Vision's witness testified that Vision was not in possession of classified information and Vision publicly provided the information that it was a subcontractor to the US government in other court filings. (Dkt. #138, Ex. 6, Dagget Dep. 118–19, 141–145) Vision even quotes multiple paragraphs from the agreement without showing that it is a "**stated third party beneficiary**" as it claims. (Dkt. #142 at 4 (emphasis in original).) Vision did not provide any other evidence that they were an intended third party beneficiary beyond mere statements that it was. Since there is no evidence that Vision was an intended third party beneficiary, beyond Vision's word, Vision does not have standing to enforce the agreement. If the United States government believes or has evidence that Hester has classified information and that he has unlawfully divulged any of that information it has sufficient resources to pursue its remedies directly.

Even if Vision could enforce this agreement, Vision has not produced any evidence that any of the information revealed in court documents is classified and has not produced any evidence that Hester has revealed any classified information elsewhere. Vision's own deposition witnesses testified that they had no personal knowledge or reason to believe that Hester divulged classified information or talked to the Las Vegas Sun other than not liking the coincidence. (Dkt. #138, Ex. 6, Dagget Dep. 139–141.) Coincidence is not evidence and does not create a material factual dispute.

/

/

### B. Breach of Vision Confidentiality and Non-Disclosure Agreement

Vision further claims that Hester violated his confidentiality and non-disclosure agreement which he signed with Vision. For Vision to succeed on its claim it must show that Hester disclosed confidential information. *United States v. Rosen*, 445 F. Supp. 2d 602, 620 (E.D. Va. 2006). Some examples of the "confidential" information Vision claims Hester revealed, without providing evidence that he did so, are: (1) aircraft arriving in Baghdad observe blackout procedures requiring all non-essential lights on the aircraft to be turned off; (2) aircraft landing in Baghdad utilize a corkscrew type procedure to stay within the area most protected by the US military; (3) aircraft arrive and depart from Baghdad and Kabul under the cover of darkness and need prior authorization from the US or British military, and (4) "[a]fter September 11, the United States government implemented a global strategy designed to eradicate terrorist organizations that threatened the security of the United States and its allies." (Dkt. #142 at 8–9.) The Court notes, however, that all of this information is publicly available from other sources, including national and international newscasts and magazines. If information has been previously publicly disseminated it cannot be considered confidential. *Rosen*, 445 F. Supp. 2d at 620. These allegations can, therefore, only lead the Court to conclude that Vision does not understand the term "confidential information." Further, Vision continues to allege that Hester was the source in a Las Vegas Sun article but has yet to provide any evidence of this allegation. It is, therefore, mere speculation. Finally, Vision provided no evidence that Hester contacted any of Vision's clients for any purpose, much less evidence that he is trying to steal them away.

Vision has not set forth any specific facts or evidence for trial on its amended counterclaims, it has only repeated its allegations and provided copies of contracts, a memo which may also be evidence of contract terms irrelevant to this particular motion, and a news article that it found unpleasant. Since Vision has not met its burden of showing that there are triable issues of material fact, summary judgment is appropriate.

/

AO 72
(Rev. 8/82)

**C.     Injunctive and Declaratory Relief**

Since the Court grants summary judgment against Vision's amended counterclaims for breach of confidentiality and non-disclosure agreements, the Court must also grant summary judgment on the second and third amended counterclaims for injunctive and declaratory relief.

## CONCLUSION

Accordingly, and for good cause appearing,

IT IS HEREBY ORDERED that the Class' Motion for Summary Judgment (#135) is GRANTED/DENIED.

IT IS ALSO HEREBY ORDERED that Vision's Motion for Summary Judgment (#137) is GRANTED/DENIED.

IT IS ALSO HEREBY ORDERED that Hester's Motion for Summary Judgment on Vision Airline, Inc.'s Amended Counterclaims (#138) is GRANTED.

Dated: September 15, 2010

_____
**ROGER L. HUNT**
**Chief United States District Judge**