UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| GERALD HESTER, on behalf of himself and all other similarly situated,<br><br>              Plaintiff,<br><br>  vs.<br><br>VISION AIRLINES, INC.,<br><br>              Defendant. | Case No.: 2:09-cv-00117-RLH-NJK<br><br>**O R D E R** |

VISION AIRLINES, INC., having responded in writing and appeared at two hearings on the matter, being ORDERED to SHOW CAUSE as to why the Court should not issue an order forthwith finding it was responsible for Rule 11 violations by making material misrepresentations to the Court, is hereby SANCTIONED $10,000.00 for the reasons following.

//
//
//
//
//

**BACKGROUND**

The facts giving rise to this case are set out more particularly in this Court's prior Orders. Briefly, this case arises from Vision Airlines' failure to pay hazard-pay to its subcontracted pilots who provided air transportation services for the United States government under the Air Bridge Program contract.[1] Plaintiffs' Class filed suit in 2009. Due to extensive and pervasive dilatory and obstructionist tactics during discovery, this Court struck Vision's answer and entered default against Vision. (#196, Nov. 3, 2010). At trial, a jury returned a verdict in excess of $5 million dollars for the Class. (#221, Nov. 9, 2010).

Post-trial, the Class moved for permanent injunctive and declaratory relief directing Vision to pay future hazard-pay to the pilots. (#241, Dec. 17, 2010). Vision objected. (#242, Dec. 20, 2010). This Court scheduled an evidentiary hearing regarding the motion for permanent injunctive and declaratory relief for February 22, 2011. (#255, Feb. 2, 2011). However, before the evidentiary hearing was held, the Class agreed to withdraw the injunctive and declaratory relief claims because Vision made a representation to the Class that "based on the [government] contract as of [that] date, there [were] only nine weeks left on the" contract. (#258 at 2, Feb. 16, 2011). The Class reasoned that due to the short time remaining on the contract, seeking an injunction was not "an efficient use of party and judicial resources to litigate and resolve the injunctive and declaratory relief claims." (*Id.*) Based on Vision's representation to the Class and the Court, the Court vacated the evidentiary hearing. (#259, Feb. 17, 2011).

Despite its representation to the Class and the Court via a modification order, Vision knew the contract contained several additional option periods that could feasibly extend the contract through July 2012. (#335, Suppl. To 2d Mot. For Sanctions, Ex. 4 at 2; Ex. 5 at 1). Vision did in fact continue flying the flights under the Air Bridge program until July 2012. (#330, Tr. of

---

[1] The "Air Bridge" contract is phase 4 of a larger contract referred to as the PC Trooper II contract. This contract was between Vision Airlines and McNeil Technologies, a government contractor.

Show Cause Hr'g 35: 2-18, April 23, 2013). Despite having a judgment making hazard-pay directly payable to the pilots, Vision did not "alter or change anything" relating to its hazard-pay practices and continued to withhold hazard-pay from the pilots who continued flying flights for Vision under the Air Bridge contract through July 2012 without interruption.

In the meantime, Vision appealed this Court's rulings as to striking the answer, entering default, and certifying the class. The Ninth Circuit affirmed this Court's decisions. (#293, July 19, 2012). The Class also appealed this Court's dismissal of the punitive damages claims. The Ninth Circuit reversed that decision and remanded to this Court for a jury trial on the punitive damages claims. (*Id.*)  Based on the Circuit's decision, this Court set new discovery deadlines. (#302, Oct. 22, 2012). It was during the new discovery period that Class Counsel became aware that the contract did not end and Vision continued to fly without paying hazard-pay. Specifically, the Class obtained a series of documents and emails from Conway Mackenzie, an accounting firm that had allegedly done limited accounting work for Vision. (#314 at 4). One of the emails from Mr. Albanese, Vision's general counsel, to Mr. Acor, Vision's CEO and President, sent in September of 2012, states "We stand the chance of having [Class Counsel] adding on to the damages if he finds out that we ran the program longer than advertised." (#314, Ex. 2).The Class filed a Motion for Sanctions. This Court ordered Vision to show cause why it should not be sanctioned.

Having given Vision notice and opportunity to respond, this Court held a show cause hearing on April 11, 2013. The Court continued the show cause hearing following Vision's claim it was relying on the advice of counsel, and allowed both parties to take the depositions of the attorneys involved so the attorneys could describe what actions they did or did not take. On June 14, 2013, this Court reconvened the show cause hearing. Vision produced the original unredacted Air Bridge contract for the first time in this litigation only days before the continued hearing.

//

**DISCUSSION**

**I. LEGAL STANDARD**

Rule 11 of the Federal Rules of Civil Procedure states, "[b]y presenting to the court a pleading, written motion, or other paper—whether by signing, filing, submitting, or later advocating it—an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances ... [that] it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation" and that "the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on belief or a lack of information." Fed. R. Civ. P. 11(b). Rule 11 "was designed to create an affirmative duty of investigation both as to law and as to fact before motions are filed," and "[i]t creates an objective standard of 'reasonableness under the circumstances.'" *Golden Eagle Distrib. Corp. v. Burroughs Corp.*, 801 F.2d 1531, 1536 (9th Cir. 1986)(quoting Advisory Committee Note, 97 F.R.D. 165, 198 (1983)).

A court may, *sua sponte*, "order an attorney, law firm, or party to show cause why conduct specifically described in the order has not violated Rule 11 ..." Fed. R. Civ. P. 11(c)(3). If "the court determines that [Rule 11] has been violated" after the party facing sanctions has had a reasonable opportunity to respond, "the court may impose an appropriate sanction on any attorney, law firm, or *party that violated the rule or is responsible for the violation*." Fed. R. Civ. P. 11(c)(1)(emphasis added). Rule 11 sanctions may be imposed jointly and severally as between a party and his counsel. *See id.*; *see also Kendrick v. Zanides*, 609 F.Supp. 1162, 1173 (N.D. Cal. 1985) (imposing joint and several liability on attorney and party) and *Pack v. Hoge Fenton Jones & Appel, Inc.*, Nos. 12-CV-4512-SC, 12-CV-4513-SC, 2013 WL 140027 *8 (N.D. Cal. January 10, 2013)(imposing several liability on represented party).

Rule 11 permits the imposition of monetary and non-monetary sanctions on parties who violate its terms. See Fed. R. Civ. P. 11(c)(4). "The selection of an appropriate sanction 'is

AO 72
(Rev. 8/82)

ordinarily left in the first instance to the discretion of the district court, and it will not be disturbed on appeal absent a showing of an abuse of discretion.'" *Huettig & Schromm, Inc. v. Landscape Contractors Council of N. Cal.*, 790 F.2d 1421, 1427 (quoting *Westmoreland v. CBS, Inc.*, 770 F.2d 1168, 1178 (D.C. Cir. 1985)). The sanction imposed "must be limited to what suffices to deter repetition of the conduct," and may include "an order to pay a penalty into court." Fed. R. Civ. P. 11(c)(4).

**II. ANALYSIS**

Having considered all the testimony, papers, and arguments submitted, the Court finds Vision intentionally misled the Class and Court when it represented that Air Bridge contract would end in April 2011. Vision asserted three arguments in response to this Court's show cause order. First, Vision argued that there was no violation because, when made, the statement was technically true – the contract was slated to end in April 2011. Second, Vision argues that it should not be held responsible because Vision attorneys are responsible for any misrepresentation and contradictorily, Vision has the right to rely on advice of counsel because counsel did not tell Vision to correct the misrepresentation. Third, Vision argued that, even if the newly produced contract showed the representation was false, Vision had already been punished for failing to produce the contract and any additional sanctions would be overly punitive. However, each of Vision's arguments is unavailing.

**A. Rule 11 violation**

Vision's first argument in defense of the misleading nature of the representation is that, when made, the statement was technically true. The argument is specious because even if "technically" true, the statement was deliberately misleading considering the additional option periods. Initially, the actual representation made to the Court was that the contract itself, not an only an option period, was ending. (#258, Notice of Withdrawal of its Claims for Inj. & Dec. Relief, at 2, February 16, 2011 ("[T]he parties conferred and realized that, based on the McNeil contract that as of the present date, there are only nine weeks left on the current McNeil Vision

5

contract for the Air Bridge Program.")). Thus, the failure to disclose the actual contract is especially relevant because it would have put the Court and the Class on notice of the additional option periods, refuting Vision's claim that the contract was definitively ending in April 2011.

Vision's awareness of the misleading nature of the representations is shown through several emails exchanged between Mr. Brian Daggett, a Vision Vice-President, and Mr. Albanese. First, Mr. Albanese stated that he intended to "give [Class counsel] the notice that the current contract ends in April *in order to try to stave off the injunction*." (*Id.*, emphasis added). The intent was to give the Class and the Court the impression that the contract was completely over and that is what Vision achieved by concealing the contract and only disclosing the modification order. Then, Mr. Daggett, concerned about pilots defecting to other companies, sought to "soften a bit" and "alleviate the tone the contract is finished" in communicating with the pilots. ((#335, Suppl. to 2d Mot. For Sanctions, Ex. 8, at 1). Objectively, this was a deliberate attempt to conceal the additional option periods after the trial to deter the Class from seeking an injunction while keeping the pilots flying the flights without hazard-pay. Moreover, as discussed below, the continued lies to perpetuate the fraud clearly evidences objective bad faith on the part of Vision via its executives.

Based on these emails, it is apparent that Vision simply did not want to and had no intention of paying the pilots future hazard-pay. Vision went to great lengths to insulate itself and avoid paying the pilots including, bidding on a new contract, renegotiating the prior Air Bridge contract, considering new employment agreements with the pilots, and seeking affirmation from McNeil that Vision did not need to pay the hazard pay. Even knowing none of these alternatives and excuses were viable, Vision admittedly still did not pay the pilots. Vision's deliberate concealment not only caused unnecessary delay, but was perpetrated to deny the pilots the hazard-pay due to them.

Had this Court known that there were additional option periods on the contract, even in light of the modification order proffered by Vision, this Court would not have signed the

AO 72
(Rev. 8/82)

parties' stipulation and would not have vacated the evidentiary hearing. Vision deliberately misled the Class and this Court in violation of Rule 11 to avoid paying future hazard-pay to the pilots flying under the Air Bridge contract.

**B. Vision is the party responsible for the Rule 11 violation**

Having determined that Rule 11 was violated, the Court must determine who is responsible for that violation. Vision makes two arguments that its attorneys are responsible for the violation. First, Vision argues that "the people who [were] directing this litigation from the company's point of view [were] not aware that the attorneys had represented that the contract was going to terminate and there didn't need to be a permanent injunction." (#330, Tr. of Show Cause Hr'g 9: 6-10, April 23, 2013)(Counsel's response in the affirmative to Court question.) Second, in contradiction to its first argument, Vision also argues that it had the right to rely on the advice of counsel and no attorney told Vision it had to correct the representation when it technically became false. Aside from the fact that these two arguments are themselves inconsistent, they both fail based on the evidence presented.

**1. Knowledge of the Representation**

To support its first argument that it should not be sanctioned because the attorneys were responsible for the violation, Vision argues "the people who [were] directing this litigation from the company's point of view [were] not aware that the attorneys had represented that the contract was going to terminate." (#330, Tr. of Show Cause Hr'g 9: 6-10, April 23, 2013). In short, Vision attempts to shift all blame onto its attorneys for the misrepresentation.

At the first hearing, Mr. Acor attempted to shift blame away from himself and Vision by suggesting that he did not have the necessary security clearance to see the contract, let alone direct outside counsel to make the representation to the Court and Class. Mr. Acor continued to assert the alleged "classified" nature of the contract and that he did not have clearance to the information. (#330, Tr. of Show Cause Hr'g 50:16-23; 51:19-23, April 23, 2013). Mr. Acor testified that Mr. Albanese managed the majority of the litigation. (*Id.* at 49:19-23). Further, Mr.

7

1  Acor testified that he did not know that anyone had represented the April 2011 contract end date to
2  the Court and Class, and that he only knew there was a motion for an injunction that the attorneys
3  managed. (*Id.* at 52:20-25, 53:1-14).

4  However, Mr. Albanese confirmed that the contract was not, in fact, classified and
5  never had been. (#335, Suppl. to 2d Mot. For Sanctions, Ex. 4 at 2). Also, Mr. Wasmuth testified
6  that either Mr. Acor or Mr. Meers, another upper-level manager at Vision, at a joint meeting
7  confirmed that the contract would end shortly, thus forming the basis for the representation to be
8  made to the Class and Court. (Wasmuth Dep., #335, Suppl. to 2d Mot. For Sanctions, Ex. 3, 44:8-
9  17). Moreover, Mr. Wasmuth testified that Mr. Albanese gave him the modification order that
10 purports to evidence the contract ending. (*Id.* at 45:15-20). Mr. Albanese's email stating he
11 intended to "give [Class counsel] the notice that the current contract ends in April in order to try to
12 stave off the injunction" belies Vision's argument that it was unaware the representation was being
13 made.

14  The Court believes the statements of people whose stories are both logically tenable
15 and internally consistent over that of a person who stands to benefit from misleading the Court.
16 Evidence has shown that Mr. Acor has lied at least four times in open court during the first
17 hearing. Upon this Court's questioning, Mr. Acor's attempt to deflect blame onto the
18 "management" of a company of which he is CEO is perplexing. Mr. Acor was conveniently not
19 present at the continued hearing to explain his prevarication.

20  Both Mr. Acor and Mr. Albanese were aware its attorneys were making the
21 representation that the contract was ending, Mr. Albanese gave Mr. Wasmuth the modification
22 order to support Vision's representation that the contract was ending, and the intent was to prevent
23 the entry of a permanent injunction. These facts fly directly in the face of Vision's second
24 argument and show Vision's management did in fact know the representation was being made.
25 Accordingly, Vision's argument fails.
26 //

### 2. Advice of Counsel

To support its second argument that it should not be sanctioned because the attorneys were responsible for the violation, Vision attempts to shield itself from sanctions by claiming it had a right to rely upon advice of counsel. However, Vision has not shown what "advice" was relied upon. Instead, Vision's argument is that it has a right to rely upon the fact that its counsel did not give it any advice. However, Vision did not even inform its counsel of its intended actions regarding the continued flights to prompt counsel to give advice or even seek to obtain advice of counsel on this matter. In fact, it is clear to this Court that Vision management kept its own attorneys in the dark to avoid being given advice to disclose adverse facts. Thus, Vision cannot rely on the non-advice of counsel when Vision's own actions prevented counsel from giving proper advice.

Although Rule 11 creates an affirmative duty of investigation, any reasonable inquiry done by an attorney would have been thwarted by Vision's failure to produce the contract or inform counsel of the option periods on the contract. This is evident because Mr. Wasmuth did ask for confirmation that the contract was ending, and rather than giving Mr. Wasmuth the contract showing additional option periods, Mr. Albanese, as general counsel for Vision, only produced a modification order. It is notable that Mr. Wasmuth was not given the Air Bridge contract and Vision only produced the Air Bridge contract to the Class days before the continued show cause hearing. This is relevant to determine who was responsible for the misrepresentation, Vision's outside counsel or Vision's management team. While Vision's management team was aware of the contract and the additional option periods it contained, Mr. Wasmuth only had the modification order given to him by Mr. Albanese. Mr. Wasmuth testified that he would have disclosed the end date of the contract and any information about continuing negotiations had he known the true facts. (*Id.* at 111:2-21).

Even Mr. Albanese's testimony suggests that he did not know all the salient facts to be able to give proper legal advice. Specifically, it seems he was kept in the dark about the

1   continued flights under the Air Bridge program. For example, as of April 8, 2013, Mr. Albanese
2   still did not know that Vision had affirmatively exercised an option under the Air Bridge contract
3   in August 2011. (#335, Suppl. to 2d Mot. For Sanctions, Ex. 4 at 2).  Mr. Albanese was not
4   involved in any of the "rebid" or "recompete" bids. (*Id.*) Mr. Albanese's only advice was that
5   "Vision should enter into individual employment agreements . . . so that there was no issue left to
6   litigate on the hazard pay issue." (*Id.*) Mr. Albanese later cautioned against the "continued flying,"
7   even though he was under the impression Vision was flying under a new proposed contract, when
8   it was in fact an extension of the Air Bridge contract. (*Id.* at 3).

Vision cannot rely on non-advice of counsel when it deliberately concealed facts from its own counsel to prevent the attorneys from giving Vision advice it did not want to hear. Had Vision disclosed its true intentions to continue flying flights or the Air Bridge contract to either its own attorney, Mr. Wasmuth, to the Class, or to the Court, the Court would not have vacated the evidentiary hearing and the matter would have been settled over two years ago. However, Vision deliberately chose to withhold information from everyone, including its own counsel, to avoid paying the hazard-pay to which this Court determined the pilots were entitled.

During the first hearing, the Court was wary to suggest that Vision lied to the Court and the Class. For that reason, this Court allowed Vision to take the depositions of Mr. Albanese and Mr. Wasmuth. However, it is now abundantly clear to the Court that Vision, via its management team – including Mr. Acor – misled the Class and the Court to believe the contract was definitively ending, and Mr. Acor continued the scheme to cover that misrepresentation by lying under oath in the presence of this Court. Therefore, the Court finds that Vision was responsible for the misrepresentation and sanctions should be applied to Vision only.

**C. Nature and Amount of Sanction**

Vision argues that, even if the representation was false, Vision has already been disproportionately reprimanded because the Court struck its answer and Vision was not allowed to raise viable defenses. Vision is correct in that it has been reprimanded for its prior discovery

1   abuses. To be sure, this Court did strike Vision's answer for misrepresentations to the Class and to
2   this Court, for its refusal and failure to provide discovery it was ordered to produce and, for its
3   general attempts to stonewall the discovery efforts of the Plaintiff. That sanction ultimately cost
4   Vision over $5 million dollars.
5            Although Vision has been sanctioned before, it has not been sanctioned for this
6   misrepresentation. This new sanction relates to a representation made well after the striking of the
7   answer and the jury trial to determine the resultant damages. Specifically, Vision deliberately
8   misled the Court into vacating its evidentiary hearing to settle the injunctive and declaratory relief
9   claims. But moreover, even after being caught deliberately misleading the Court, Vision's CEO
10  lied under oath to cover up the original misleading representation and attempted to blame
11  attorneys who are no longer part of this case. And again, after being caught lying under oath,
12  Vision switched tactics and legal arguments to avoid being sanctioned. None of these actions
13  relate to the previously sanctioned discovery misbehavior.
14           This case is still not resolved. The Court needs to be able to rely on the
15  representations made by the parties moving forward. This Court must impose a sanction that
16  suffices to deter repetition of the conduct. The Court has considered the nature of the
17  misrepresentation relied upon by this Court in agreeing to dismiss the injunctive relief claims,
18  Vision's continued insistence of its innocence in light of testimony by its own prior counsel to the
19  contrary, and Vision CEO's blatant distortion of the relevant facts to deflect blame and continue to
20  prevaricate, enhance, and justify the original misleading representation. At every step, Vision
21  continues to show its disdain for this Court and the legal processes in place to ensure justice is
22  served.  The Court has considered other sanctions including instigating criminal contempt
23  proceedings against Mr. Acor for lying under oath directly to this Court, but declines to institute
24  those at this time.
25           In light of the foregoing, for Vision's misleading representation made in February
26  2011, the Court finds that a fine of $10,000.00 is the absolute minimum amount that will suffice to

deter repetition of the conduct. As this Court ordered Vision to show cause *sua sponte*, the sanctions are to be paid into the court.

## CONCLUSION

Accordingly, and for good cause appearing,

IT IS HEREBY ORDERED that Vision shall remit a monetary sanction in the amount of $10,000.00 to the Clerk of the Court no later than September 1, 2013.

Dated: July 12, 2013.

_____
**ROGER L. HUNT**
**United States District Judge**

AO 72
(Rev. 8/82)