# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

**\* \* \***

| | |
|---|---|
| GERALD HESTER, on behalf of himself and all other similarly situated, | Case No.: 2:09-cv-00117-RLH-NJK |
| Plaintiff, | **O R D E R** GRANTING FINAL APPROVAL OF THE SETTLEMENT AGREEMENT |
| vs. | |
| VISION AIRLINES, INC., | |
| Defendant. | |

  This Court has considered the Unopposed Motion for Final Approval of the Settlement Agreement (#390, filed May 16, 2014), which seeks an Order (1) granting final approval of the Settlement; (2) granting Mr. Hester a service award of $5,000.00; (3) awarding counsel attorneys' fees of $510,000.00 (representing a 30% fee award) and costs totaling $198,732.45 (of which $18,750.00 are anticipated recoverable costs); and (4) granting any additional relief the Court deems just and appropriate. Having conducted the final fairness hearing on June 30, 2014 and having heard the comments of counsel, the Court GRANTS the relief sought in the Class' Unopposed Motion for Final Approval of the Settlement Agreement.

**BACKGROUND**

This case arises from Vision Airlines' failure to pay hazard-pay to its subcontracted pilots who provided air transportation services for the United States government under the Air Bridge Program contract.[1]  During the United States military occupation of Iraq and Afghanistan, the United States government sought contractors to provide logistical support to enhance its overtaxed supply lines to Iraq and Afghanistan.  These "air bridge" pilots flew large, slow commercial aircrafts into the war zones in Baghdad, Iraq and Kabul, Afghanistan to deliver supplies for United States diplomatic posts and other related activities.  Recognizing that the work of the air bridge pilots was dangerous, the United States government specifically allocated hazard pay for the pilots and crew members who were, very literally, risking their lives transporting supplies through war zones.  Although the United States contracted with private airlines, the contracts included "pass-through" provisions to ensure that the hazard pay made it to the pilots and crew members.

Vision Airlines was a downstream contractor who received hazard pay for its pilots from May 1, 2005 through July 31, 2012.  Although Vision initially paid some of the allocated hazard pay to its pilots, by August 2005, Vision stopped paying the hazard pay and instead kept the money for its own benefit.  Then, Vision went further and fired all pilots and crew members who knew about or had previously received hazard pay, and it replaced them with employees who were unaware that they were entitled to it.

**Complaint and Trial**

Plaintiff Gerald Hester filed the instant class action lawsuit on behalf of Vision's Air Bridge pilots and flight attendants to recover the hazard pay due and owed the Class.  (Compl. (Doc. #1).  Due to extensive and pervasive dilatory and obstructionist tactics during discovery, this Court struck Vision's answer and entered default against Vision.  (Doc. #196).  Before the jury

---

[1] The "Air Bridge" contract is phase 4 of a larger contract referred to as the PC Trooper II contract.  This contract was between Vision Airlines and McNeil Technologies, a government contractor.

1   was selected, the Court dismissed the punitive damages claims, finding the complaint did not

2   establish sufficient evidence, nor clear and convincing evidence as required by Nevada Revised

3   Statutes, of conduct justifying punitive damages.  (Doc. #220, at 2.)  At trial, a jury returned a

4   verdict in excess of $5 million dollars for the Class, which covered flights flown until July 5,

5   2010.  (Doc. #221.)

6   **Post-Trial and Injunctive Relief**

7           Post-trial, the Class moved for permanent injunctive and declaratory relief directing Vision

8   to pay future hazard-pay to the pilots, as some pilots continued to fly flights into the war zones for

9   Vision.  (Doc. #241.)  Vision objected. (Doc. #242.)  This Court scheduled an evidentiary hearing

10  regarding the motion for permanent injunctive and declaratory relief for February 22, 2011.  (Doc.

11  #255.)  However, before the evidentiary hearing was held, the Class agreed to withdraw the

12  injunctive and declaratory relief claims because Vision made a representation to the Class that

13  "based on the [government] contract as of [that] date, there [were] only nine weeks left on the"

14  contract.  (Doc. #258, at 2.)  The Class reasoned that due to the short time remaining on the

15  contract, seeking an injunction was not "an efficient use of party and judicial resources to litigate

16  and resolve the injunctive and declaratory relief claims."  (*Id.*)  Based on Vision's representation to

17  the Class and the Court, the Court vacated the evidentiary hearing.  (Doc. #259.)

18          Despite its representation to the Class and the Court via a modification order, Vision knew

19  the contract contained several additional option periods that could feasibly extend the contract

20  through July 2012.  (Suppl. To 2d Mot. For Sanctions (Doc. #335), Ex. 4 at 2; Ex. 5 at 1.)  Vision

21  did in fact continue flying the flights under the Air Bridge program until July 2012.  ( Tr. of Show

22  Cause Hr'g (Doc. #330), 35: 2-18.)  Despite having a judgment making hazard-pay directly

23  payable to the pilots, Vision did not "alter or change anything" relating to its hazard-pay practices

24  and continued to withhold hazard-pay from the pilots who continued flying flights for Vision

25  under the Air Bridge contract through July 2012 without interruption.  (*Id.* at 17:5-8.)

26  ///

AO 72
(Rev. 8/82)

**Appeal and Remand**

In the meantime, Vision appealed this Court's rulings as to striking the answer, entering default, and certifying the class.  (Doc. #274.)  The Ninth Circuit affirmed this Court's decisions.  (Op. 9th Cir. Ct. Appeals (Doc. #293).)  The Class also appealed this Court's dismissal of the punitive damages claims.  (Doc. #279.)  The Ninth Circuit reversed that decision and remanded to this Court for a jury trial on the punitive damages claims.  (Op. 9th Cir. Ct. Appeals (Doc. #293.)

Based on the Circuit's decision, this Court set new discovery deadlines.  (Doc. #302.)  It was during the new discovery period that Class Counsel became aware that the contract did not end and Vision continued to fly without paying hazard-pay.  (Pl.'s 2d Mot. Sanctions (Doc. #314), at 4.)  Specifically, the Class obtained a series of documents and emails from Conway Mackenzie, an accounting firm that had allegedly done limited accounting work for Vision.  (*Id.*)  In one of those emails, Mr. Albanese, Vision's general counsel, stated to Mr. Acor, Vision's CEO and President, sent in September of 2012, states "We stand the chance of having [Class Counsel] adding on to the damages if he finds out that we ran the program longer than advertised."  (*Id.* at Ex. 2.)  The Class filed a Motion for Sanctions seeking a sanction in the amount equal to the hazard pay from August 1, 2010 through the date Class pilots stopped flying Air Bridge program flights for Vision.  (Pl.'s 2d Mot. Sanctions (Doc. #314).)

**Renewed Injunctive Relief Claims, Execution of Judgment, and Contempt**

The Court held multiple hearings on the Motion for Sanctions and related Order to Show Cause.  (Mins. Show Cause Hr'g (Doc. # 329); Mins. Continued Show Cause Hr'g (Doc. #337).)  Ultimately, the Court sanctioned Vision $10,000.00 to be paid to the Court based on the nature of Vision's misrepresentation relied upon by this Court in agreeing to dismiss the injunctive relief claims, Vision's continued insistence of its innocence in light of testimony by its own prior counsel to the contrary, and Vision CEO's blatant distortion of the relevant facts to deflect blame and continue to prevaricate, enhance, and justify the original misleading representation.  (Doc. #339.)

AO 72
(Rev. 8/82)

1    Additionally, the Court allowed the Class to revive the permanent injunction claims and

2    found based on the prior Ninth Circuit affirmed sanctions that "the Class is entitled to damages

3    equal to the proven amount of the hazard pay that Vision collected during the period of the Air

4    Bridge program from the end of the damages period proven at trial through the time that the Class'

5    injunction would have covered." (Doc. #324, at 8.)  The Court originally intended the revived

6    claims to be heard at the trial on punitive damages (*id.*); however, Vision's continued

7    prevarications caused the Court to allow the Class to renew its motion for judgment.  (Mins.

8    Continued Show Cause Hr'g (Doc. #337).)  The Court allowed Vision time to depose the Class'

9    damages calculation expert, and obtain and submit that its own rebuttal expert's report, (*id.*),

10   which Vision failed to do.  Consequently, on September 6, 2013, this Court considered the

11   proffered evidence, found that the damages were a sum certain, and entered judgment in the

12   amount of $1,811,251.00 against Vision for the hazard pay Vision collected from July 6, 2010

13   through July 31, 2012.  (Doc. #344.)  Later, based on the September 6 judgment, the Court

14   awarded Class Counsel $543,375.30 in attorneys' fees and $107,238.80 in costs from the gross

15   common fund.  (Doc. #350.)

16   When Class Counsel attempted to execute on the September 6 judgment, Vision again

17   began a campaign of delay and obfuscation.  To be sure, Vision engaged in dilatory and bad faith

18   tactics to prevent the Class from obtaining Vision's financial information that would allow the

19   Class to identify and garnish Vision's bank accounts and assets to satisfy the judgment.  Class

20   Counsel was forced to file motions to compel the information.  (Mot. to Compel (Doc. #354).)

21   Magistrate Judge Koppe entered an order compelling Vision to respond to the propounded

22   discovery without objection.  (Doc. # 356.)  Vision failed to do so.  Thereafter, Magistrate Judge

23   Koppe certified the facts underlying discovery violations to this Court for consideration of

24   contempt sanctions, and set the matter for hearing.  (Doc #376.)

25   ///

26   ///

AO 72
(Rev. 8/82)

1    Consistent with Vision's pattern of bad faith behavior throughout this litigation, Vision

2  produced some of the documents it claimed it did not have the night before the hearing.[2]  (Doc.

3  #383.)  At the  hearing, this Court found Vision in blatant contempt of Court and ordered Vision to

4  post a bond in the amount of the $1,811,251.00 judgment as a sanction for the contempt (Doc.

5  #382) over Vision's strong objections and arguments that it was "impossible for Vision to post

6  [the] bond," because "[t]here are no assets in Vision," "[t]here is nobody who's going to

7  underwrite [the] bond," "[t]here is no ability to get [the] bond," and "Vision does not have equity

8  in anything."  (Tr. of Show Cause Hr'g (Doc. #384), at 52: 21-25; 53:1-14.)

9  **Punitive Damages Trial Negotiations and Settlement**

10    The jury trial for the punitive damages claims was set to commence on Monday March 10,

11  2014.  (Doc. #377.)  However, on Friday, March 7, 2014, the parties informed the Court that they

12  were close to reaching a settlement agreement.  (Doc. #386.)  Thus, the Court vacated the jury trial

13  and set the matter for status conference.  (Doc. #385.)

14    At the status hearing, the parties informed the Court that they had a signed settlement

15  agreement and a letter of credit from Vision's bank to ensure payment of the settlement.  (*Id.*)  The

16  Court heard argument from Class Counsel who expressed serious reservations about Vision's

17  ability to pay any substantial judgment and conveyed concerns that Vision would file for

18  bankruptcy, discharging any potential judgment entered in favor of the Class.  (*Id.*)  Based on those

19  concerns, and the Court's familiarity with Vision's bad behavior in the long history of this

20  litigation, the Court agreed with Class Counsel that a settlement that would ensure substantial

---

22    [2] It was clear to the Court then, as it is now, that Vision, and not Vision's counsel, was
23  solely responsible for the failure to turn over the documentation.  Simply, Vision's counsel
   could not produce what it did not have, and the reason Vision's counsel did not have the
24  information was because Vision refused to give the information to its own counsel.  As has
   been Vision's practice from the beginning of this litigation, Vision - via its management team -
   deliberately withheld pertinent information from its own attorneys to avoid being given advice
25  it did not want to hear.  Similarly, as the Court has noted numerous times on the record, the
   Court is convinced that Vision's attorneys have complied with the discovery rules to the best
26  of their ability considering their client's misbehavior and lack of cooperation throughout the
   discovery processes.

1   payment of the unpaid September 6 judgment would be favorable to the risk of non-payment or

2   discharge of the obligation.  (*Id.*)  The parties entered the terms of the Settlement on the record and

3   filed a subsequent Motion for Preliminary Approval of the Settlement Agreement.  (Mot. Prelim.

4   Approval Settlement Agreement (Doc. #387).)  The Court granted preliminary approval.  (Doc.

5   #388.)

6   **TERMS OF THE SETTLEMENT AGREEMENT**

7   As described in the Court's order, (Doc. #388), the terms of the Settlement Agreement are:

8   The proposed Settlement Class is an opt-out class under Rule 23(b)(3) of the Federal Rules

9   of Civil Procedure.  The certified Settlement Class is defined as:

10  All Vision pilots and flight attendants who were crew members on flights
    to or from Iraq or Afghanistan between May 1, 2005 and July 31, 2012.

11  Excluded from the Settlement Class are (a) Vision, its directors of flight
    operations, corporate officers and directors, and their immediate family

12  members, and (b) any governmental entity.

13  *Aggregate Amount of the Settlement*

14  The Settlement consists of a $1,700,000.00 Settlement Payment (the "Settlement Fund") to

15  be distributed to the Class that operated the Air Bridge flights from July 6, 2010 through July 31,

16  2012.  Vision will pay those funds on the thirty-fifth (35th) day after final approval of the

17  Settlement by the Court.  Should Vision fail to do so, the payment will be made by International

18  Bank of Commerce ("IBC") based on a letter of credit issued by IBC for the benefit of the Class.

19  The Air Bridge Program was divided into four phases that correspond to the following

20  time periods: (1) Phase I - June 2005 through April 30, 2006; (2) Phase II - May 1, 2006 through

21  July 14, 2006; (3) Phase III - July 15, 2006 through July 31, 2007; and (4) Phase IV - August 1,

22  2007 through July 31, 2012.  The Class previously collected and distributed the hazard pay

23  obtained at trial that covered Air Bridge flights from May 1, 2006 through July 5, 2010.

24  Accordingly, the Settlement Fund will be distributed to those Class members that operated Vision

25  flights to and from Baghdad and Kabul from July 6, 2010 through July 31, 2012.

26  ///

1        *Formula for Computing Individual Recovery*

2              The Class' expert, Barry Mukamal, determined that from July 6, 2010 through July 31,

3        2012, Vision billed for and received $1,811,251.00 in hazard pay, which Vision did not pay to the

4        Class members.  The upstream contractors paid Vision different hourly hazard pay amounts for its

5        pilots and flight attendants that operated the flights from the various European cities into and out

6        of the war zones in Baghdad and Kabul during the period of July 6, 2010 through July 31, 2012.

7        Using Vision's payroll and flight records for the time period of July 6, 2010 through July 31,

8        2012, Mr. Mukamal will identify specifically which pilots and flight attendants flew from the

9        various European cities into and out of the war zones in Baghdad and Kabul.  Mr. Mukamal will

10       determine each Class members' damages from July 6, 2010 through July 31, 2012 by multiplying

11       each Class members' total number of hours flown from the European city into and out of the war

12       zones of Baghdad and Kabul and back to the European city by the hourly hazard pay rate that

13       Vision received for their benefit but did not pay to them.  Once those amounts have been

14       determined, Mr. Mukamal will adjust it by the appropriate pro-rata share based on the difference

15       between the $1,811,251.00 judgment for hazard pay and the $1,700,000.00 Settlement Fund.

16             Moreover, once the individual Settlement Class members' damages are determined by Mr.

17       Mukamal, those individual amounts will be further reduced by the appropriate pro-rata share to

18       cover the attorneys' fees representing thirty percent (30%) of the Settlement Fund, all litigation

19       costs including the costs of administration and notification of the Settlement Class, and a service

20       award of $5,000.00 for Mr. Hester.

21             *Attorneys' Fees and Costs*

22             Class counsel seeks thirty percent, equal to $510,000.00, of the Settlement Fund, plus

23       reimbursement of all litigation costs and expenses, which amount to $198,732.45.  The latter

24       amount includes $18,750.00 in costs, including costs travel to the Final Fairness Hearing and

25       notice to the Class of the Final Fairness Hearing, and for anticipated costs for claims

26       administration, and for the accounting expert to determine the individual amounts due each Class

1  member.

2  *Class Representative Service Award*

3  The Class seeks a service award of $5,000 for Mr. Hester, the lead Plaintiff in the lawsuit,

4  to be paid from the Settlement Fund, and in addition to whatever payment (if any) Mr. Hester

5  would be entitled to under the terms of the Settlement.

6  *Releases*

7  As part of the Settlement, the Settlement Class members and Vision will, upon payment of

8  the Settlement Fund, mutually release each other with regard to all claims connected in any way

9  with the Lawsuit.  The forms of the releases approved by the Court are part of the Settlement

10  Agreement.  (Doc. #391-1, at 3-5.)

11  *Settlement Termination*

12  The Settlement was conditioned on court approval.  Pursuant to the terms of the

13  Settlement, because the Court has granted final approval by entry of this Order, the Settlement will

14  terminate only if an appellate court rejects the Settlement.  In the event that the Settlement is

15  rejected by an appellate court, the Parties will return to the *status quo ante* before the Settlement

16  Agreement was entered into by them.

17  *Notice to the Class, Form of Notice, and Opt-Out/Objection Period*

18  Class Counsel provided notice in the form approved by the Court to class members via first

19  class mail.  (Mot. Final Approval (Doc. #390) Ex. B, at ¶ 2.)  The notice was reasonably calculated

20  under the circumstances to apprise the Class of settlement class certification, the Settlement terms,

21  Class Counsel's fee application and request for a service award for Plaintiff, as well as the

22  Settlement Class members' rights to opt-out of the Class or object to the Settlement.

23  Class members had 30 days after the postmarked date of the Notice to opt-out of the Class

24  or file objections to the terms of the Settlement Fund.  (*Id.* at ¶ 3.)  No Class members objected or

25  opted-out of the Class.  (*Id.*)

26  ///

AO 72
(Rev. 8/82)

*Settlement Administration*

Class counsel will work with a national claims administrator, Rust Omni, to administer the Settlement Fund.  Once the amounts due and owed each Settlement Class member has been determined by the Class' expert, Mr. Mukamal, Class counsel will provide that information to Rust Omni.  Class counsel will also provide addresses for each individual Settlement Class member to Rust Omni.  Once Rust Omni receives that information from Class counsel, Rust Omni will issue checks in the amount due and owed each individual Class member based on the computations outlined above and will send those checks to each Class member via certified U.S. mail.  To the extent a Class members' address is unknown, Rust Omni will assist Class counsel in identifying the Class members' address.  Rust Omni will keep records related to the receipt of each certified letter containing the checks sent to the Class members.  All costs associated with the settlement administration will be paid from the Settlement Fund.

*Final Fairness Hearing*

The Class moved for Final Approval of the Settlement Agreement.  (Mot. Final Approval (Doc. #390).)  Based on the Court's calendar conflict, the Honorable Philip M. Pro agreed to conduct the Final Fairness Hearing.  (Doc. #391.)  Judge Pro set the Final Fairness Hearing and ordered Class Counsel to "update the notice posted to its website no later than May 25, 2014 to: (1) reflect that the attorneys fees request of thirty percent amounts to $510,000.00 of the Settlement Fund, and all litigation costs and expenses amount to $198,732.45 (of which $18,750.00 are anticipated costs); and (2) give notice to any interested Class member that he or she may attend the Final Fairness Hearing set for June 30, 2014 at 9:00 am." (*Id.*)  Class Counsel timely updated the website as ordered.  (Doc. #392.)

The Final Fairness Hearing commenced on June 30, 2014.  (Mins. Final Fairness Hr'g (Doc. #393.)  The Court heard the representations of Class Counsel and Vision's Counsel about the terms of the settlement, Counsel's request for attorneys' fees and costs, and Mr. Hester's service award.  *Id.*  No class members attended the hearing and none objected to any of the terms

AO 72
(Rev. 8/82)

1   of the settlement, attorneys' fees and costs, or the service award.  *Id.*  The Court stated on the

2   record that the terms of the settlement were fair, adequate, and reasonable.  *Id.*  This written order

3   follows.

4   **DISCUSSION AND FINDINGS**

5       WHEREAS, the Court has received and reviewed the Settlement Agreement entered into

6   between Gerald Hester, named class representative, on the one hand, and Vision Airlines, on the

7   other hand, which was filed with the Court on March 20, 2014, and has considered the terms of the

8   proposed Settlement Agreement set forth therein;

9       WHEREAS, all terms contained herein shall have the same meanings as set forth in the

10  Settlement Agreement, unless otherwise defined herein;

11      WHEREAS, on April 7, 2014, the Court entered its Order preliminarily approving the

12  Settlement of this class action, approving the form and method of notice ("Preliminary Approval

13  Order");

14      WHEREAS, the Court has received the Affidavit of David M. Buckner, Class Counsel,

15  attesting to the mailing of the Notice of Settlement in the form and manner approved by the Court

16  in the Preliminary Approval Order;

17      WHEREAS, on May 22, 2014, the Court set a date and time for a final approval hearing to

18  consider whether the Settlement Agreement should be finally approved by the Court as fair,

19  adequate, and reasonable;

20      WHEREAS, on May 22, 2014, the Court directed Class Counsel to update the notice

21  posted to its website no later than May 25, 2014 to: (1) reflect that the attorneys fees request of

22  thirty percent amounts to $510,000.00 of the Settlement Fund, and all litigation costs and expenses

23  amount to $198,732.45 (of which $18,750.00 are anticipated costs); and (2) give notice to any

24  interested Class member that he or she may attend the Final Fairness Hearing ("Updated Notice

25  Requirement");

26  *///*

1       WHEREAS, on May 23, 2014, David M. Buckner, Class Counsel, filed a Notice of

2 compliance with the Court's order and Updated Notice Requirement;

3       WHEREAS, no objections were filed to the Settlement Agreement, Class Counsel's

4 request for attorneys' fees and costs, and Mr. Hester's service award;

5       WHEREAS, on June 30, 2014, the Court having conducted the Final Approval Hearing,

6 and having considered the arguments presented in the papers and during the proceeding, including

7 a description of the history of this litigation and adequacy of the Settlement Agreement, presented

8 by Class Counsel and Vision's Counsel during the hearing;

9       **IT IS HEREBY ORDERED, ADJUDGED, and DECREED AS FOLLOWS:**

10     1.     The Court has jurisdiction over the subject matter of this action, Gerald Hester, the

11           named Class Representative, Vision Airlines, the Defendant, and all members of

12           the Class.

13     2.     In accordance with Rule 23 of the Federal Rules of Civil Procedure and the

14           requirements of due process, all members of the Class have been given proper and

15           adequate notice of the Settlement Agreement.  Based upon the evidence submitted

16           by the Parties, the Settlement Agreement, the arguments of counsel, and all the

17           files, records, and proceedings in this case, the Court finds that the Notice and

18           notice methodology effectuated pursuant to the Settlement Agreement and Court's

19           Preliminary Approval Order: (a) constituted the best practicable notice under the

20           circumstances; (b) constituted notice that was reasonably calculated, under the

21           circumstances, to apprise members of the Class of the pendency of the litigation,

22           their right to object to the Settlement Agreement, and their right to appear at the

23           Final Fairness Hearing; (c) were reasonable and constituted due, adequate, and

24           sufficient notice to all persons entitled to notice; and (d) met all applicable

25           requirements of the Federal Rules of Civil Procedure and any other applicable law.

26           *See Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950); *Torrisi*

AO 72
(Rev. 8/82)

1    *v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1374 (9th Cir. 1993) (citing *In re Cement*

2    *& Concrete Antitrust Litig.*, 817 F.2d 1435, 1440 (9th Cir. 1987)), *Marshall v.*

3    *Holiday Magic, Inc.*, 550 F.2d 1173, 1178 (9th Cir. 1977).

4    3.    Based upon the evidence submitted by the Parties, the Settlement Agreement, the

5          arguments of counsel, and all the files, records, and proceedings in this case, the

6          Court finds that the Settlement Agreement warrants final approval pursuant to Rule

7          23 of the Federal Rules of Civil Procedure because it is fair, adequate, and

8          reasonable to those it affects, and resulted from vigorously contested litigation,

9          including extensive discovery, motion practice, and good-faith arm's length

10         negotiations between the parties, and is in the public interest.  *Hanlon v. Chrysler*

11         *Corp.*, 150 F.3d 1011, 1026-27 (9th Cir. 2008).   In making this determination, the

12         Court has considered the following factors:

13         a.    *The strength of the Class' case relative to the costs of continued litigation.*

14               Here, judgment in the amount of $1,811,251.00 had already been entered

15               against Vision.  Also, the Class stood a reasonable chance of prevailing at

16               trial on the punitive damages claim.  However, this factor still weighs in

17               favor of approving the Settlement considering Vision's assertions that it

18               would file for bankruptcy protection, which would have stayed the Class'

19               punitive damages trial.  *See Lane v. Facebook*, 696 F.3d 811, 823 (9th Cir.

20               2012).

21         b.    *The risk, expense, complexity, and likely duration of further litigation.*

22               There is always risk inherent in a jury trial and that risk cannot be

23               discounted.  Additionally, there is the risk of having any favorable verdict

24               on the punitive damages claims overturned on appeal.  This lawsuit is in its

25               sixth year.  Vision's conduct has been the subject of repeated orders and

26               sanctions by this Court.  This litigation has been extremely time consuming

AO 72
(Rev. 8/82)

1    for the Court to address given Vision's conduct, and has included a trial on

2    damages, an appeal for which the Ninth Circuit heard oral argument and

3    entered a published order, and a second judgment entered on the basis of

4    Vision's misconduct.  In fact, Vision has appealed nearly every significant

5    issue and assuredly would appeal any punitive damages award entered

6    against it if that trial were in fact to proceed.  Moreover, this lawsuit has

7    been expensive for the Class to litigate, costing the Class several hundred

8    thousand dollars in costs alone since the first judgment.  The greatest risk,

9    however, was the likelihood that Vision would file for bankruptcy, which

10   would have left little if anything for class members.  *See Torrisi*, 8 F.3d at

11   1376 ("Here one factor predominates . . . [t]hat factor is Tucson's financial

12   condition.").

13       c.    *The risk of maintaining class action status.*  Here, there is little risk of

14   decertification given the litigation and appeal previously resolved.

15   However, the inherent risk of decertification built into class actions weighs

16   in favor of approval of the Settlement.  *See Rodriguez v. West Publ'g Corp.*,

17   563 F.3d 948, 966 (9th Cir. 2009).

18       d.    *The amount offered in settlement.*  Here, the $1.7 million dollar settlement

19   represents an extremely favorable  94% recovery of actual damages, which

20   the Court had already determined to be $1,811,251.00.  This is an excellent

21   result because the Class has nearly recovered all of its damages between this

22   Settlement and the judgment previously entered by this Court against Vision

23   after trial.  *See Rodriguez*, 563 F.3d at 965; *Hanlon*, 150 F.3d at 1027;

24   *Officers for Justice v. Civil Serv. Comm'n of San Francisco*, 688 F.2d 615,

25   625 (9th Cir. 1982).

26       e.    *The fairness of the settlement amount relative to both the defendant's*

14

*liability and the approximate total recovery of the plaintiffs.*  Here, the $1.7 million dollar settlement, backed by Vision's Bank's letter of credit, is even more apparently fair considering Vision's financial situation (as discussed next) and Vision's attempts to thwart collection of the $1,811,251.00 judgment.  The Settlement will allow the Class to suspend its costly collection efforts in multiple jurisdictions, which have further increased the Class' costs, yet recovered no assets on behalf of the Class because of Vision's financial condition.  Additionally, the settlement terms were reached through arms-length negotiations that took place over months between Class counsel and Vision.  Therefore, the Court finds that the Settlement amount representing nearly full recovery for the Class supports final approval of the Settlement.

f.   *The defendant's financial condition.*  Here, there was the very real threat and possibility of Vision filing for bankruptcy and discharging the prior $1,811,251.00 judgment and any potential future judgment.  As counsel for Vision made clear at the hearing on March 10, 2014, the greatest risk by far to any recovery made by the Class was that Vision intended to declare bankruptcy immediately prior to the punitive damages trial.  Indeed, counsel for Vision affirmed that he was in the process of preparing a bankruptcy petition when the Settlement was reached.  This risk of bankruptcy weighs heavily in favor of approving the Settlement notwithstanding the strength of the Class' case.  *See Torrisi*, 8 F.3d at 1376.

g.   *The extent of discovery completed, and the stage of the proceedings.*  Here, the Class agreed to settle the remainder of this lawsuit after Class Counsel expended an extraordinary amount of time, skill, and patience litigating this six-year long case, conducted extensive discovery, proceeded to a trial on

AO 72
(Rev. 8/82)

damages, withstood an appeal, conducted additional discovery, and attempted to locate assets belonging to Vision that could be used to satisfy the additional $1,811,251 judgment.  Moreover, the settlement was reached on the eve of the punitive damages trial.  Accordingly, Plaintiff and Class counsel had sufficient information to enable them to make a reasoned judgment about the merits of the Settlement and were able to obtain nearly 94% of the Class' damages as a result of Class counsel's efforts.  *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000).  As such, this factor weighs in support of final approval of the Settlement.

h.    *The experience and views of counsel.*  Class Counsel consists of experienced trial lawyers who have litigated numerous class actions.  Based on his experience, Lead Class Counsel aptly noted that obtaining 94% recovery of actual loss is extraordinary comparative to other class action settlements, and accordingly is particularly favorable to the Class.  Based on this degree of recovery, both Class Counsel and Vision expressed their views of the fairness of the Settlement Agreement at the Final Fairness Hearing.  The Court agrees that this represents the best possible settlement that could be obtained under the circumstances, and this factor supports approval of the Settlement.

i.    *The presence of a government participant.*  This factor was not implicated.

j.    *The reaction of the class members to the proposed settlement.*  Here, no class members objected to the Settlement Agreement or opted out of the class.  In this case, the class consists of an easily and readily identifiable group of pilots, who in the class action context, constitute a relatively small class of plaintiffs.  Moreover, in this case, the lack of objections is notable for a few reasons.  First, Class Counsel has kept the Class aware of the

1   progress of the litigation through a portion of Class Counsel's website,

2   which includes notable rulings and all notices.  Second, Class Counsel

3   fielded questions from members of Class about the rulings or progress of

4   the lawsuit.  Third, based on the first distribution from the jury verdict in

5   excess of $5 million dollars, Class members are aware of the methodology

6   for distribution, which was the same then as it is now.  In light of these

7   considerations, the fact that there are no objectors or opt-outs to the

8   Settlement Agreement demonstrates the fairness, reasonableness, and

9   adequacy of the Settlement.

10   k.   *The absence of any evidence of collusion between the parties and/or their*

11   *counsel.*  This is especially evident considering that it is unlikely that Mr.

12   Hester will receive any portion of the Settlement, save his service award,

13   which is within this Court's discretion.  Additionally, Class Counsel will

14   ultimately receive less in fees than the Court has already ordered to be paid

15   from the common fund based on the $1,811,251.00 judgment.  Finally,

16   based on the long-term ongoing negotiations between the parties and Class

17   Counsel's refusal to consider any settlement without a letter of credit from

18   Vision's bank to ensure payment, it is apparent that there was no collusion.

19   *Hanlon*, 150 F.3d at 1026-27.

20   4.   After carefully considering each of these factors, the Court finds that this settlement

21   provides substantial benefits to the class members providing almost complete

22   economic relief.  *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946

23   (9th Cir. 2011) (citing *Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566, 575 (9th

24   Cir. 2004)); *In re Heritage Bond Lit.*, 546 F.3d 667, 674 (9th Cir. 2008); *Torrisi*,

25   8.F3d at 1375; *Officers for Justice v. Civil Serv. Comm'n of San Francisco*, 688

26   F.2d 615, 625 (9th Cir. 1982).  This settlement may be presumed to be fair, because

1   settlements that follow sufficient discovery and genuine arm's length negotiation

2   are presumed fair.  *Hanlon*, 150 F.3d at 1026.  Moreover, as addressed above and in

3   Plaintiffs' briefing, continued litigation would have been incredibly risky

4   particularly in light of Vision's threats to file bankruptcy, which would effectively

5   make the Class' chance obtain any redress slim.  The Court likewise finds that

6   discovery was extensive in this litigation, and that Class Counsel conducted the

7   necessary and appropriate investigations to properly evaluate the settlement value.

8   Finally, the Court finds that the fact that no class members objected to the

9   settlement, nor opted out of the class, is overwhelming evidence of the fairness of

10  the Settlement Agreement.

11  5.     The Class' Motion for Final Approval is hereby GRANTED, and the Settlement

12         Agreement is hereby APPROVED as fair, reasonable, adequate, and in the public

13         interest.  The Parties are directed to consummate the Agreement in accordance with

14         its terms.

15  6.     The Court APPROVES payment of the $1.7 million settlement in accordance with

16         the terms of the Settlement Agreement and this Order.

17  7.     The Court APPROVES payment of a Class Representative Award to Gerald Hester

18         in the amount of $5,000.00.  Initially, the Court notes that Mr. Hester likely had

19         nothing to gain in terms of actual damages from the $1,811,251.00 judgment

20         because he did not fly the flights that gave rise to that judgment.  Thus, Mr. Hester

21         likely will receive only his Class Representative Award under the terms of the

22         Settlement Agreement.  Despite knowing this, Mr. Hester expended time and effort,

23         undertaking at times, personal difficulties and reputational risk, to guide the

24         prosecution of this case since the Ninth Circuit remand by attending mediation,

25         preparing to testify at trial on the Class' punitive damages claim, and reviewing the

26         Class' pleadings.  For that service, the Court finds that the Class Representative

Award is fair, adequate, reasonable, and warranted.  *See Van Vranken v. Atl. Richfield Co.*, 901 F. Supp 294, 299 (N.D. Cal 1995).

8.   The Court finds that Class Counsel's request for an award of 30% in attorneys' fees, amounting to $510,000.00 of the Settlement Fund, is reasonable and justified. The Court finds that Class Counsel has achieved an exceptionally favorable result for the members of the Settlement Classes by diligently pursuing this complex, and often times trying, litigation for years despite the substantial risk of no recovery. The Court further finds that the settlement reached here, amounting to 94% of total recovery, is exceptional in view of Vision's threatened bankruptcy, which would likely result in little recovery, if any.  The result achieved is a significant factor to be considered in making a fee award.  *Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983).

9.   The Court finds that the attorneys' fees award should be a percentage of the common fund.  "[A] litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole."  *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980).  "In a common fund case, the district court has discretion to apply either the lodestar method or the percentage-of-the-fund method in calculating a fee award."  *Fischel v. Equitable Life Assurance Soc'y of the U.S.*, 307 F.3d 997, 1006 (9th Cir. 2002).  The percentage method however, is favored. Manual for Complex Litigation, 4th § 14.121 at 187-188 (2004); *Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268, 271 (9th Cir. 1989); *Six Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir. 1990).

10.   The Ninth Circuit has "established 25% of the common fund as the benchmark award for attorney fees," which is a "starting point" that can and should be adjusted when the Court considers the excellent results achieved for the Class, the

complexity of the issues, the risk of no recovery, and the effort expended by counsel. *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1048 (9th Cir. 2002); *Six Mexican Workers*, 904 F.2d at 1311 (exceptional results require an upward adjustment); *In re Pacific Enterprises Sec. Litig.*, 47 F.3d 373, 379 (9th Cir. 1995) (complexity and risks warrant upward adjustment).  "The benchmark percentage should be adjusted, or replaced by a lodestar calculation, when special circumstances indicate that the percentage recovery would be either too small or too large in light of the hours devoted to the case or other relevant factors." *See, e.g., In re Mego*, 213 F.3d at 457, 463; *see also Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268, 272 (9th Cir. 1989).  An award of 25% for attorneys' fees in common fund cases may be adjusted upward or downward to account for several non-exclusive factors and non-exhaustive.  *Hanlon*, 150 F.3d at 1029. Some factors are: (1) the time and labor required; (2) the novelty and difficulty of the questions involved; (3) the skill required to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and the length of the professional relationship with the client; and (12) awards in similar cases.  *Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 70 (9th Cir. 1974) (overturned on other grounds) (citing *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974)).

11.    The Court finds that an award of 30% of the common fund is the appropriate percentage fee award in this case.  In making its determination, the Court has considered all these factors and finds:

a.    This case demanded substantial time and labor from the attorneys involved,

AO 72
(Rev. 8/82)

1    including thousands of hours of attorney and paralegal time, considerable

2    briefing on motions to dismiss, class certification, motions to compel,

3    motions for summary judgment, motions for sanctions, defending against

4    Vision's counterclaims, trial preparation, litigating discovery disputes with

5    third-parties across the United States, a jury trial, defending against Vision's

6    appeal to the Ninth Circuit Court of Appeals, the Class' cross-appeal to the

7    Ninth Circuit Court of Appeals, and uncovering Vision's fraud on the Court

8    after the case had been remanded for a trial on punitive damages.

9    b.    Although the Complaint presented relatively straightforward contract and

10        equitable claims that should have proceeded to trial in the normal course,

11        Class Counsel's burdens in litigating this case were unnecessarily

12        exacerbated by Vision's continued misbehavior.  To compensate for

13        Vision's discovery abuses and excessive misbehavior, Class Counsel was

14        required to draw on considerable experience and a high degree of skill and

15        creativity, along with an exhausting expenditure of effort and patience.

16    c.    Class Counsel was forced to address numerous frivolous arguments and

17        positions taken by Vision.  For example, throughout this litigation, despite

18        being ordered by the Court to do so, Vision refused to produce relevant

19        discovery while asserting wholly unsubstantiated and specious arguments

20        that the documents sought were "classified," subject to the "state secrets

21        privilege," or contained "highly-sensitive information that may compromise

22        national security or the safety of any persons."  (Vision's Opp'n Mot. to

23        Compel, Doc. #58.)  Then, when Vision finally produced the documents, the

24        documents were incomplete and heavily redacted, again under the guise of

25        "protecting national security."  (Order Granting Mot. for Sanctions (Doc.

26        #196.))  As a result of this misbehavior, Class Counsel was faced with the

AO 72
(Rev. 8/82)

1    formidable task of, not only disproving Vision's baseless arguments, but

2    engaging in the task while having their own patriotism and national loyalties

3    questioned.

4    d.    Litigation of this case required Class Counsel to be highly trained in class

5          action matters and able to litigate in multiple jurisdictions.  The record

6          establishes that this case involved significant challenges to Class counsel,

7          including Vision's burdensome counterclaims, Vision's discovery abuses

8          which included the withholding of critical evidence, Vision's scheme to

9          deceive the Court and the Class about the end date of the Air Bridge, the

10         difficulty in obtaining documents from third-parties, the appeal and cross

11         appeal to the Ninth Circuit Court of Appeals, and the considerable effort

12         required to collect from Vision's assets.

13   e.    This appears to be the first nationwide class action brought against a

14         government subcontractor on behalf of a group of employees to recover a

15         hazardous duty bonus.  The issues in this case were complex, including the

16         certification of a nationwide class under theories of equitable relief, and the

17         legal hurdles were many and substantial.  Vision mounted a vigorous

18         defense, invoking the state secrets doctrine and national security, and

19         withheld critical documents, accompanied by a complete denial of

20         responsibility or legal liability, which it pursued through the Ninth Circuit

21         Court of Appeals.  The time and expense this case demanded was daunting,

22         obviating Class counsel's ability to work on other matters.  Success despite

23         Vision's repeated discovery violations is a considerable milestone and

24         justifies an appropriate fee award.

25   f.    This action was prosecuted by Class counsel entirely on a contingent fee

26         basis.  In undertaking to prosecute this complex action on that basis, counsel

AO 72
(Rev. 8/82)

1    assumed a significant risk of nonpayment or underpayment.  Over the entire

2    course of this case, the Class was required to expend over $2,315,466.00 in

3    attorney and paralegal time and more than $597,000.00 in costs to litigate

4    the case against Vision.  (Doc. #390-2.)  Uncompensated expenditures of

5    this magnitude can severely damage or destroy firms of the relatively small

6    size of Class counsels' firm.  As a calculation under the lodestar would

7    result in an even larger award than the one sought here, that substantial risk

8    warrants an appropriate fee.

9    g.    Class counsel achieved excellent results on behalf of the Class.  Despite

10    Vision's refusal to produce key documents, Class counsel was still able to

11    obtain a jury verdict in favor of the Class for the full amounts of hazardous

12    duty bonus collected by Vision before July 2010, and a settlement of nearly

13    94% of the Class' hazard pay for the three option periods ending July 2012.

14    Moreover, the settlement is secured by a letter of credit from IBC in the face

15    of Vision's admission to the Class and the Court that it intended to file for

16    bankruptcy protection immediately prior to the punitive damages trial

17    should the punitive damages trial occur.  The Class will have recovered

18    nearly 100% of its damages, which is an excellent result under any

19    circumstances, but especially under these circumstances.

20    h.    Class counsel's fee request comports with customary fees and awards in

21    similar cases and its reasonableness is confirmed by the fact that Class

22    counsel's lodestar is greater than the fees it is requesting.  (Doc. # 390-2.);

23    see also (Aff. Peter M. Angulo (Doc. #325-2.))

24    12.    The Court finds that payment of Class Counsels' documented expenses is

25    appropriate.  The Court therefore APPROVES payment of reasonable Costs to

26    Class Counsel for all litigation costs and expenses amounting to $198,732.45 (of

which $18,750.00 are anticipated costs for distribution of proceeds to the Class.)

13.   The Settlement Fund, Class Representative Compensation Award, and Attorneys' Fees and Costs shall be distributed in accordance with the terms of the Settlement Agreement, and any further required orders of this Court.

14.   Pursuant to the terms of the Settlement Agreement, upon payment of the Settlement Fund either by Vision or International Bank of Commerce ("IBC") based on the letter of credit issued by IBC for the benefit of the Class, this suit will be DISMISSED WITH PREJUDICE and without costs to any Party.

15.   In consideration of the Settlement Fund, and for other good and valuable consideration, all members of the Class shall, by operation of this Judgment, have fully, finally, and forever released, relinquished, and discharged all claims connected in any way to this lawsuit, against Vision Airlines, in accordance with the Settlement Agreement.

16.   In consideration of dismissal of the Class' claims, and for other good and valuable consideration, Vision Airlines, by operation of this Judgement, will have fully, finally, and forever released, relinquished, and discharged all claims connected in any way to this Lawsuit, against all members of the Class, in accordance with the Settlement Agreement.

17.   Without affecting the finality of this Judgment in any way, and subject to the terms of the Settlement Agreement, this Court retains jurisdiction over: (a) implementation of the Settlement Agreement and its terms; (b) distribution of the Settlement Fund, the Class Representative Compensation Award, and the Attorneys' Fees and Costs Amount; and (c) all other proceedings related to the implementation, interpretation, administration, consummation, and enforcement of the terms of the Settlement Agreement.   The time to appeal from this Judgment shall commence upon its entry.

AO 72
(Rev. 8/82)

18.     The Settlement will terminate only if an appellate court rejects the Settlement. Should an appellate court reject the Settlement, the Parties will return to the *status quo ante* before the Settlement Agreement was entered into by them.

19.     This Court finds there is no just reason for delay and expressly directs Judgment and immediate entry by the Clerk of the Court.

DATED: July 17, 2014

_____
PHILIP M. PRO
United States District Judge

AO 72
(Rev. 8/82)